UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

| | |
|---|---|
| ALYSSON MILLS, IN HER CAPACITY AS RECEIVER FOR ARTHUR LAMAR ADAMS AND MADISON TIMBER PROPERTIES, LLC, | Case No. 3:18-cv-00866CWR-FKB |
| | Arising out of Case No. 3:18-cv-252, *Securities and Exchange Commission v. Arthur Lamar Adams and Madison Timber Properties, LLC* |
| Plaintiff, | |
| v. | Hon. Carlton W. Reeves, District Judge |
| BUTLER SNOW LLP; BUTLER SNOW ADVISORY SERVICES, LLC; MATT THORNTON; BAKER, DONELSON, BEARMAN, CALDWELL & BERKOWITZ, PC; ALEXANDER SEAWRIGHT, LLC; BRENT ALEXANDER; and JON SEAWRIGHT, | |
| Defendants. | |

## COMPLAINT

Alysson Mills, in her capacity as the court-appointed receiver for Arthur Lamar Adams and Madison Timber Properties, LLC (the "Receiver"), through undersigned counsel, files this Complaint against Butler Snow LLP; Butler Snow Advisory Services, LLC; Matt Thornton; Baker, Donelson, Bearman, Caldwell & Berkowitz, PC; Alexander Seawright, LLC; Brent Alexander; and Jon Seawright (collectively "Defendants"), stating as follows:

**INTRODUCTION**

For more than ten years, Arthur Lamar Adams ("Adams"), through his companies Madison Timber Company, LLC and Madison Timber Properties, LLC ("Madison Timber"), operated a Ponzi scheme that defrauded hundreds of investors. Investors believed that Madison Timber used investors' money to purchase timber from Mississippi landowners; that Madison Timber sold the timber to Mississippi lumber mills at a higher price; and that Madison Timber repaid investors their principal plus interest with the proceeds of those sales. Investors received timber deeds that purported to secure their investments—but the deeds were fake. There was no timber and no proceeds from sales of timber.  The money used to repay existing investors came solely from new investors.

Madison Timber had to continuously grow to repay existing and new investors, and continuously grow it did.  In 2011, Madison Timber took in approximately $10 million from investors.  By 2018 that number had grown by a factor of 16.  In the one-year period prior to April 19, 2018, the date Adams surrendered to federal authorities and confessed to the Ponzi scheme, Madison Timber took in approximately $164.5 million.  As of April 19, 2018, Madison Timber had 501 outstanding promissory notes, reflecting debts to investors of more than $85 million.[1]

Madison Timber would not have grown without Defendants' encouragement and assistance.  Defendants lent their influence, their professional expertise, and even their clients to Adams.  They made a fraudulent enterprise a fraternity.  Defendants contributed to the success of the Madison Timber Ponzi scheme, and therefore to the debts of the Receivership Estate to investors.  By this complaint the Receiver seeks to hold Defendants accountable.

---

[1] The evidence at Adams's sentencing established that of the $164.5 million that Madison Timber received in its last year of operation, it paid back approximately $79.5 million, leaving an $85 million difference.  The outstanding principal and interest owed to investors is necessarily higher.

## JURISDICTION AND VENUE

1.      The Court has jurisdiction over this action and its parties, and venue is proper in this Court, pursuant to the Securities Act of 1933, 15 U.S.C. § 77v(a); the Securities & Exchange Act of 1934, 15 U.S.C. § 78aa; 28 U.S.C. § 1692; and 28 U.S.C. § 754.

2.      This action arises in connection with and is ancillary to the civil action already pending in this Court styled *Securities & Exchange Commission v. Arthur Lamar Adams and Madison Timber Properties, LLC*, No. 3:18-cv-252-CWR-FKB.  In that civil action, the Securities & Exchange Commission ("S.E.C.") alleges that "[b]eginning in approximately 2004," Adams, through Madison Timber, "committed securities fraud by operating a Ponzi scheme" in violation of the Securities Act of 1933 and the Securities & Exchange Act of 1934.[2]

3.      The S.E.C. requested that the Court appoint a receiver for the estates of Adams and Madison Timber.[3]  As the Court that appointed the Receiver, this Court has jurisdiction over any claim brought by the Receiver in the execution of her duties. "[I]t is well-settled that when an initial suit results in the appointment of the receiver, any suit that the receiver thereafter brings in the appointment court in order to execute h[er] duties is ancillary to the main suit." *U.S. Small Bus. Admin. v. Integrated Envtl. Sols., Inc.*, No. 05-cv-3041, 2006 WL 2336446, at *2 (S.D. Tex. Aug. 10, 2006) (citing *Haile v. Henderson Nat'l Bank*, 657 F.2d 816, 822 (6th Cir. 1981)).  *See also* 28 U.S.C. § 1692 ("In proceedings in a district court where a receiver is appointed for property, real, personal, or mixed, situated in different districts, process may issue and be executed in any such district as if the property lay wholly within one district . . . ").

4.      Consistent with that precedent, Chief U.S. District Judge Daniel P. Jordan III has ordered that all "cases filed by the duly appointed Receiver . . . which . . . arise out of or relate to

---

[2] Doc. 3, Securities & Exchange Commission vs. Adams, et al., No. 3:18-cv-00252 (S.D. Miss).
[3] Docs. 11, 21, Securities & Exchange Commission vs. Adams, et al., No. 3:18-cv-00252 (S.D. Miss).

[*Securities & Exchange Commission v. Arthur Lamar Adams and Madison Timber Properties, LLC*, No. 3:18-cv-252-CWR-FKB] shall be directly assigned by the Clerk of Court to U.S. District Judge Carlton W. Reeves and U.S. Magistrate Judge F. Keith Ball."[4]  In compliance with Chief Judge Jordan's order, the Receiver shall separately file, contemporaneously with this complaint, a notice of relatedness.

## PARTIES

5.    Plaintiff Alysson Mills is the Court-appointed Receiver for the estates of Adams and Madison Timber.  The Court's order of appointment vests in her the power to, among other things:

> investigate and . . . bring such legal actions based on law or equity in any state, federal, or foreign court as the Receiver deems necessary or appropriate in discharging her duties as Receiver.[5]

The Receiver brings this civil action in her capacity as Receiver and pursuant to the powers vested in her by the Court's orders and applicable law.  The Receiver has standing to pursue, *inter alia*, claims against third parties whose actions contributed to the success of the Madison Timber Ponzi scheme, and therefore to the debts of the Receivership Estate.

6.    Defendant Butler Snow LLP (with Butler Snow Advisory Services, LLC, "Butler Snow") is a Delaware limited liability partnership doing business in Mississippi.

7.    Defendant Butler Snow Advisory Services, LLC (with Butler Snow LLP, "Butler Snow") is a Mississippi limited liability company doing business Mississippi.

8.    Defendant Matt Thornton is an adult resident of Jackson, Mississippi.  He is founder, President, and CEO of Butler Snow Advisory Services, LLC.

---

[4] Doc. 45, Securities & Exchange Commission vs. Adams, et al., No. 3:18-cv-00252 (S.D. Miss).

[5] Doc. 33, Securities & Exchange Commission vs. Adams, et al., No. 3:18-cv-00252 (S.D. Miss). By order dated August 22, 2018, the Court eliminated the requirement that the Receiver obtain "prior approval of this Court upon ex parte request" before bringing any legal action.  Doc. 38, Securities & Exchange Commission vs. Adams, et al., No. 3:18-cv-00252 (S.D. Miss).

9.    Defendant Baker, Donelson, Bearman, Caldwell & Berkowitz, PC ("Baker Donelson") is a Tennessee professional corporation doing business in Mississippi.

10.   Defendant Alexander Seawright, LLC is a Mississippi limited liability company doing business in Mississippi.

11.   Defendant Brent Alexander is an adult resident of Jackson, Mississippi. He is a "Senior Public Policy Advisor" for Baker Donelson. With Jon Seawright, he owns Alexander Seawright, LLC.

12.   Defendant Jon Seawright is an adult resident of Jackson, Mississippi. He is a shareholder of Baker Donelson and a member of its national governing Board of Directors. With Brent Alexander, he owns Alexander Seawright, LLC.

## ADAMS AND MADISON TIMBER

13.   For more than ten years, Adams, through Madison Timber, operated a Ponzi scheme that purported to purchase timber from Mississippi landowners and resell it to Mississippi lumber mills at higher prices.

14.   Investors in Madison Timber delivered to Madison Timber large sums of money, typically in excess of $100,000 dollars, in reliance on the promise that Madison Timber would repay them their principal plus interest of not less than 12% per annum, and sometimes as much as 20% per annum. The promised interest invariably far exceeded the interest any investor might receive on any other collateralized investment.

15.   Investors believed that Madison Timber would use their money to acquire timber deeds and cutting agreements from Mississippi landowners; that Madison Timber would then sell the timber to Mississippi lumber mills at a higher price; and that with the proceeds of those sales Madison Timber would repay investors their principal and promised interest.

5

16.     In exchange for their investments, investors in the Madison Timber Ponzi scheme received a promissory note in the amount of their investment, payable in twelve monthly installments together with the promised interest; twelve pre-dated checks, each in the amount of the installment due under the promissory note; a timber deed and cutting agreement by which a named landowner purported to grant to Madison Timber the rights to harvest timber on the land described in the deed; and a timber deed and cutting agreement by which Madison Timber purported to grant its own rights to the investor.

17.     In fact, the timber deeds and cutting agreements were fake.  Madison Timber had no rights to harvest timber and no timber to cut and sell.  Because Madison Timber had no revenues whatsoever, investors were being repaid with new investors' money.

18.     Each month, Madison Timber required more and more new investors to repay existing investors.  Like any Ponzi scheme, Madison Timber had to continuously grow.  To grow Madison Timber, Adams relied on recruiters, including Defendants, to attract new investors.

19.     In 2011, Madison Timber took in approximately $10 million from investors.  By 2018 that number had grown by a factor of 16.

20.     In April 19, 2018, on the heels of investigations of him by the F.B.I. and the U.S. Attorney's Office for the Southern District of Mississippi, Adams turned himself in. In the one-year period prior to April 19, 2018, Madison Timber took in approximately $164.5 million. As of April 19, 2018, Madison Timber had 501 outstanding promissory notes, reflecting debts to investors of more than $85 million.[6]

---

[6] The evidence at Adams's sentencing established that of the $164.5 million that Madison Timber received in its last year of operation, it paid back approximately $79.5 million, leaving an $85 million difference.  The outstanding principal and interest owed to investors is necessarily higher.

21.     Adams pleaded guilty to the federal crime of wire fraud and "admit[ted] to all of the conduct of the entire scheme and artifice to defraud."[7]  On October 30, 2018, he was sentenced to a term of imprisonment of 235 months.[8]

22.     The S.E.C. separately charged Adams with violations of the Securities Act of 1933 and Securities & Exchange Act of 1934, alleging in its complaint that "[b]eginning in approximately 2004," Adams, through Madison Timber, "committed securities fraud by operating a Ponzi scheme."[9]

23.     The promissory notes sold by Madison Timber to investors were "securities," as that term is defined under 15 U.S.C.A. §78(c)(A)(10) and Miss. Code Ann. § 75-71-102(28).

24.     As alleged in the complaint in the underlying action *SEC v. Arthur Lamar Adams et al.*, No. 3:18-cv-252 (S.D. Miss.), and in the bill of information filed against Adams in *U.S. v. Arthur Lamar Adams*, No. 3:18-c-188 (S.D. Miss.), Adams, Madison Timber, and their affiliates, including Defendants, facilitated sales of promissory notes to investors through material misstatements and omissions; employed a device, scheme, or artifice to defraud; and engaged in acts, practices, or courses of business that operated or would operate as a fraud or deceit, all in violation of Section 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q(A); Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, thereunder; as well as the Mississippi Securities Act, Miss. Code Ann. § 75-71-501.

25.     The sales furthermore violated the Securities Act of 1933 and the Mississippi Securities Act because there were no registration statements for the promissory notes, *see* Section 5 of the Securities Act of 1933, 15 U.S.C § 77e, and Miss. Code Ann. § 75-71-301; and the

---

[7] Doc. 11, United States v. Adams, No. 3:18-cr-00088 (S.D. Miss.).
[8] Doc. 21, United States v. Adams, No. 3:18-cr-00088 (S.D. Miss.).
[9] Doc. 3, Securities & Exchange Commission vs. Adams, et al., No. 3:18-cv-00252 (S.D. Miss).

promissory notes were not exempt from registration, *see* Section 5 of the Securities Act of 1933, 15 U.S.C § 77e, and Miss. Code Ann. §§ 75-71-201 through 75-71-203.

## BUTLER SNOW

26.     Adams and Madison Timber's relationship with Butler Snow began in 2009 and continued until Adams turned himself in on April 19, 2018.

### The first engagement

27.     Adams had made a name for himself as someone who understood the timber industry and made money brokering timber sales.  For many years Adams brokered legitimate timber sales—but by 2009 he had figured out that he could fake things, and he saw an opportunity to go big.

28.     Adams previously had done business with Pinnacle Trust, a financial services company in Madison, Mississippi.  He and Pinnacle Trust discussed ways to maximize Adams's business.  They decided to form an investment fund and engaged Butler Snow law firm to draft the private placement memorandum, or PPM.

29.     The investment fund was named Madison Timber Fund, LLC.  Its aim would be to raise $10,000,000 by selling 100 units at $100,000 each.  Lawyers at Butler Snow spent months working with Adams on the PPM and its accompanying documents.

30.     The resulting PPM, drafted by Butler Snow, described the fund as follows:

MADISON TIMBER FUND, LLC, a Mississippi limited liability company (the "*Fund*"), has been formed for the objective of achieving income and capital preservation through investment in timber-producing real estate and other interests in timber.

8

31.     The PPM identified Adams and Madison Timber Company, Inc. as the fund's "Manager" and advised that the fund's "Business Strategy" depended on the Manager's "network of contacts":

[T]he Fund purchases the standing timber directly from the landowner and then sells or arranges for the sale of the tree harvest. The purchase is made by the execution of a "Timber Deed," which is consequently filed in the real estate records of the county where the land is located. The Timber Deed commonly allows for a 24 to 36 month period to actually harvest the timber. . . .

* * *

Using its network of contacts cultivated over 20 years, the Manager regularly receives opportunities to purchase land tracts with timber. Typically, the Manager has the opportunity to purchase before these tracts go on the "market." This gives the Manager a first-look pricing advantage. . . .

* * *

The Manager also has a number of established relationships with various lumber mills, which includes knowledge of the mills' preferred specialty type of lumber needs from hardwoods to pine. These mills also offer the Manager referrals for timber purchases. The Manager's Timber Deeds are designed to protect the Fund from liability for cleanup, property damage, road repair and other harvesting challenges.

* * *

[T]he Manager has developed a timber purchase format that allows the Manager to control the cyclical aspects of the business. By securing various term-length contracts, the Manager is able to even out its supplies of timber for its mill purchasers. The Manager intentionally purchases short-term contracts (3 to 6 month harvest), mixed with mid-term (6 to 12 months) and longer-term tracts (24 to 36 months) to enable the Manager to have a steady three-year supply of harvestable inventory.

In addition, the Manager tracks the needs of its regular mill customers to better supply the type of product they need.

* * *

The Manager believes that its competitive advantage is its flexibility in choosing both wood sources and wood processing mills. By not having an in-house mill, the Manager is able to obtain raw timber from various locations and match it to buyers and mills that are geographically compatible with the mill location. . . .

The Manager's pricing philosophy is to offer its mills a highly competitive product. The Manager can offer lower pricing in exchange for a contributing stream of referrals from its mill customers. The Manager is able to maintain a highly competitive pricing strategy because it operates with low overhead costs,

outsources its harvesting operations with a network of loggers and owns very little equipment.

32.     The PPM identified several "Timber Investment Risks," including "Timber Price Volatility."  The PPM explained:

> The Fund's revenues will be affected by the cyclical nature of the forest products industry.  Prices for timber can experience significant variation and have been historically volatile.  The Fund will have little control over the timing and extent of price changes for timber products.  The demand for timber and wood products is affected primarily by the level of new/residential construction activity, the supply of manufactured timber products, including imported timber products, and other uses of timber products.  These activities are subject to variation because of changes in economic conditions, interest and currency rates, population growth and changing demographics and seasonal weather cycles and storm activity.

33.     The PPM also identified several "General Investment Risks," one of which was "Reliance on the Manager."   The PPM explained that the fund's success is "substantially dependent on the Manager"—therefore the fund might fail if Adams quits or dies.  The PPM disclosed the fund "does not currently own key-person insurance on the life of Lamar Adams" but will "purchase such a policy within twelve months."

34.     Ultimately the fund itself did not attract any investors, and the PPM was shelved for the time being.

35.     Adams, however, continued to broker purported timber sales and make money entering "joint ventures" with individual investors to purchase purported stand-alone timber tracts that he called "standing tracts." In 2011, Madison Timber took in approximately $10 million from investors.

36.     By this time the Madison Timber Ponzi scheme had been perfected. The consistent, uniform returns of 12% to 14% attracted dozens of investors with between $100,000 and $200,000 to invest—but like any Ponzi scheme, each month Madison Timber required more and more new

investors to repay the old ones. Adams would have to continuously grow Madison Timber to keep up.

### The second and third engagements

37.     To continuously grow Madison Timber, Adams turned again to Butler Snow.

38.     Butler Snow markets itself to clients as "the only resource you need." To provide business services to its law firm's clients, in 2011 Butler Snow launched Butler Snow Advisory Services, "a wholly owned subsidiary that provides non-legal business advice."  Butler Snow's website boasts that Butler Snow Advisory provides "executive-level strategic guidance" to closely held businesses:

> Closely held businesses face many of the same challenges as large, public companies without the advantage of strategic advisors. This can make it more difficult to those business owners to make informed decisions regarding their business strategy.

> Butler Snow Advisory specializes in providing executive-level strategic guidance to private, family owned and closely held companies. We've built a diverse, experienced team of professionals that are uniquely positioned to leverage industry knowledge and real-world experience to work for our clients from day one. Members of the BSA team are dedicated to understanding the goals of your company and crafting actionable strategies for success, all while identifying opportunities and mitigating risks.

39.     Butler Snow's website boasts that Butler Snow Advisory "utilize[s] resources from across the Butler Snow network to match your business needs":

> In addition to our team's expertise, as a part of the larger Butler Snow family, BSA has the advantage of access to resources and networks that put our company ahead of the competition. Our team approach allows us to utilize resources from across the Butler Snow network to match your business needs with the expertise required. As a result, our clients benefit from strategic counsel, innovative solutions and efficient execution – all from an extensive, reputable network of professionals.

> A few of the Butler Snow advantages include access to a legal network that boasts:
> - 325+ attorneys
> - 24 offices across the United States and in Asia and the United Kingdom

- client representation in all 50 states and the District of Columbia, as well as internationally in more than 25 countries around the globe
- extensive business knowledge in a wealth of industries, including telecommunications, technology, banking and finance, healthcare, oil and gas and manufacturing

40.     Under the leadership of Matt Thornton, its President and CEO, Butler Snow Advisory sought to "fast-track" its own business by acquiring "top-level talent."  In April 2012, Thornton announced that Mike Billings would join the team as a "strategic advisor":

> Michael Billings is a strategic advisor for Butler Snow Advisory Services, specializing in strategic business development – helping clients identify optimal business opportunities, then designing and implementing business development strategies to gain a competitive advantage within the sector. He has years of experience serving in a business development, consulting and advisory capacity to a number of large companies in the Dallas, Texas area.

41.     Butler Snow Advisory was young, and Billings was brand new, when in May 2012 the opportunity to "strategically advise" Madison Timber arose.  Adams wanted assistance with a "$30-50 million capital raise."  Thornton alerted Don Cannada and Barry Cannada, a senior partner and the Vice Chair of Butler Snow, respectively, to the prospects of this new business.

42.     A series of meetings followed at Butler Snow's Ridgeland office.  After, Thornton told Adams "I have thoroughly enjoyed getting to know you and believe we could be a piece of the puzzle in terms of strategic business growth and the associated financing/capital strategies to accompany growth."  Thornton proposed that Adams engage Butler Snow Advisory to provide "strategic business development, strategic financing/capital strategies and overall management advisory services" and, separately, engage Butler Snow law firm to update the preexisting PPM.

43.     Internally Thornton and Billings discussed how Butler Snow Advisory would be compensated.  They proposed a monthly fee of $3,500 "to assist in strategic business development" plus a "success fee" for "individual projects."  If Thornton and Billings succeeded

in establishing a fund, they proposed to receive half of Madison Timber's management fee plus 33% (later reduced to 25%) of Madison Timber's carried interest.  At the time, Billings wrote Thornton of Adams's "insatiable appetite for cash":

> As Lamar [Adams] has a seemingly insatiable appetite for cash, all the way up to a couple hundred $ Million, in theory we would be engage[d] and be paid the $3,500 retainer until he says "uncle" and does not have the capacity to do any more volume.

Thornton agreed that they should "lock that down for at least a year."

44.    In August 2012, at Thornton's urging, Adams formally engaged Butler Snow Advisory to "focus on strategic business development" and, separately, formally engaged Butler Snow law firm to update the preexisting PPM.[10]

**The pitch**

45.    While lawyers at Butler Snow updated the preexisting PPM, Thornton and Billings began pitching Madison Timber to high net-worth clients.  During this time they often copied Barry Cannada on their emails to keep him apprised of their progress.

46.    They had early success with a high net-worth client in New Orleans.  The investor was not interested in investing in a fund, but he was willing to entertain a "joint venture" in a "standing tract."  Billings and Adams made a presentation to the investor that falsely represented that Madison Timber had "timber sales" of $9,576,252 in 2009; $8,087,072 in 2010; and $10,034,024 in 2011.  The impressed investor wired Madison Timber $450,000, and Madison Timber delivered to Butler Snow an $8,000 "commission check."  One month later, after the same

---

[10] The "BSA – Standard Terms and Conditions" that accompanied the August 8, 2012 engagement letter for the "Engagement of Butler Snow Advisory" includes an arbitration clause, but the letter itself, signed by Lamar Adams for Madison Timber and Martin Willoughby for Butler Snow Advisory, expressly states that "The state and federal courts in Mississippi shall have exclusive jurisdiction in relation to any claim, dispute or difference concerning this Engagement Contract and any matter arising from it.  The parties hereto irrevocably waive any right they may have to object to any action being brought in that Court, to claim that the action has been brought to an inconvenient forum or to claim that that Court does not have jurisdiction."

investor wired Madison Timber another $1,050,000, Madison Timber delivered to Butler Snow a $15,750 "commission check."

47.     Buoyed by this early success, Billings introduced Adams to two "billion-dollar" "family offices" in Texas.  Thornton gushed at this "tremendous 'start.'"  On the same day, eager to please Adams, and worried his counterparts at Butler Snow law firm were not meeting Adams's needs, Thornton complained to Barry Cannada that an associate in Butler Snow's Memphis office had failed to return Adams's call and caused Adams to submit a bid for a tract of land "without legal review."   Thornton lamented that "we continue to have the same scenario occur over-and-over again with respect to Advisory asking the law firm to assist in a timely, efficient & within scope manner."

48.     While lawyers at Butler Snow continued to work on the updated PPM, Thornton and Billings looked for other investors who, like the high net-worth client in New Orleans, might prefer to invest in a "standing tract" only.  They were aware that Madison Timber offered a consistent, uniform return of 12% to 14%.  They made a list of thirty-plus mostly local individuals and families to target as "Small Investor Madison Timber Prospects." Many of the individuals on their list became investors in Madison Timber.

49.     In February 2013 lawyers at Butler Snow finalized the updated PPM.  The fund would now aim to raise up to $100,000,000 by selling 1,000 units at $100,000 each.  Notably, the fund's "Business Strategy" and "Timber Investment Risks"—reproduced above, both of which were false or misleading—were unchanged. Nevertheless, Thornton represented that he personally "reread from a non-legal language standpoint and all business, market and organizational aspects remain in-tact."

50.     With the PPM in hand, Thornton made pitches to bigger, institutional clients.  He told them that "Madison Timber (Lamar Adams, President) is a very good client of ours" that "has been vetted by several $1.5 billion family office(s) in Texas, encompassing a 75+ day due diligence period [and] as you would imagine, Lamar passed with flying colors!"  In fact, the two "family offices" in Texas had chosen not to invest in Madison Timber.

51.     One institutional client to whom Thornton pitched Madison Timber candidly remarked that "First blush says there has been some inventory build over the last four years."  But instead of addressing the question raised by the remark, Thornton continued his pitch: "'Inventory Build-Up' . . . great question and one major topic we would like to discuss 'face-to-face' . . . we believe Madison Timber's business model, strategic partnerships and forward-thinking supply/demand philosophy is a real differentiator."

52.     Thornton often emphasized non-disclosure agreements both to reinforce the exclusivity of Madison Timber's purported "strategic partnerships" and to justify Madison Timber's inability to provide requested information.  He told one potential investor "we have had entities sign NDA(s) prior to providing financial information . . . we certainly did this with the two multi-billion $ family office entities in Dallas."  He told another potential investor, "As we discussed extremely confidential information relative to Madison Timber's relationships with mills, financing structure and the like, we certainly appreciate very much your team's treating today's discussion and information provided in the STRICTLY CONFIDENTIAL category under the NDA umbrella."  These comments had the effect of impressing upon the potential investor that Madison Timber represented a uniquely lucrative investment opportunity.

53.     Thornton told yet another potential investor who asked about mill contracts: "Lamar [Adams] has an extremely stringent NDA with his mill partners [and] due to this

extremely stringent NDA, we have not shared any mill names/profiles with any potential investors to date."  Of course, this representation was false because Adams did not have any "mill partners" therefore there was no "extremely stringent NDA" and no "mill names/profiles" to share. But Thornton went on:

> Additionally, as the investor has a contract with Madison Timber (and NOT with the mill directly) via promissory note issued from Madison Timber that has assigned timber deed worth twice as much as their invested dollars.  So, investors would be looking to Madison Timber for payment (not the mill), and in the event of a default by Lamar, the investors simply file the deed / resell the timber.

Thornton thus assured the potential investor that he should not worry about the mills, because his contract would be with Madison Timber—a company backed by Butler Snow's reputation.

54.     Ultimately, no investor chose to invest in the fund for which the PPM had been updated and through which Butler Snow and Adams had hoped to raise $100,000,000.  But many individuals and institutional clients to whom Thornton and Billings made a pitch did invest in purported "standing tracts" only, and for each of these investments, Madison Timber delivered to Butler Snow a "commission check."

55.     For all of these transactions, Thornton, Billings, and Butler Snow acted as unlicensed brokers, in violation of federal and state law.  A broker is "any person engaged in the business of effecting transactions in securities for the account of others." *See* Section 3(4) of the Securities Exchange Act of 1934, 15 U.S.C. § 78c.  The S.E.C.'s public website states that the receipt of transaction-related commissions is a key indicator that a broker must be registered.[11]  A recent search using the Financial Industry Regulatory Authority's public online BrokerCheck confirms that neither Thornton, Billings, nor Butler Snow have ever registered with the S.E.C.

---

[11] *Guide to Broker-Dealer* Registration, U.S. SECURITIES & EXCHANGE COMMISSION, https://www.sec.gov/reports pubs/investor-publications/divisionsmarketregbdguidehtm.html.

56.     Butler Snow knew or should have known what it was doing was unlawful. Among the notes in Butler Snow's Madison Timber files is this comment from Don Cannada in 2009: "Very broad definition of what a broker is . . . Includes one who for a commission procures a purchaser or prospect etc.  See 73-35-31 for penalties.  Says you can't pay an unlicensed broker, but doesn't provide any penalty if you do so."

57.     Investors might fairly question what Butler Snow did for them to earn their commissions.   The answer is not much.   While they extolled Madison Timber's "strategic partnerships and forward-thinking supply/demand philosophy," neither Thornton nor Billings, nor anyone at Butler Snow, conducted an even cursory inspection of Madison Timber's operations. If they had, they would have been forced to face the reality that Madison Timber was nothing more than a Ponzi scheme.

58.     Instead, Butler Snow aided and abetted Madison Timber's growth, lending Adams and Madison Timber their influence, professional expertise, and clients.   Butler Snow's imprimatur was powerful, and they knew it.  They even agreed to serve as a "referral" for other firms' clients.  In July 2013 "Baker Donelson" sought "a few referrals" to validate Madison Timber.  Thornton responded within minutes: "No problem by me – thanks!"  Billings exclaimed: "You are more than welcome to include me as a reference for anything at any time . . . highest marks possible!!"

**Red flags**

59.     Not only did Thornton, Billings, and Butler Snow broker Madison Timber investments without a license and fail to independently confirm that the timber and rights in question were real, they also recklessly ignored numerous red flags.

60.     Indeed, the timber deeds and cutting agreements between landowners and Madison Timber were fake. The landowners' signatures, forged by Adams, often looked the same. A call to any one of the purported landowners, or a simple check of the title for any one of the purported tracts of land, would have confirmed the truth. Neither Thornton nor Billings, nor anyone at Butler Snow, ever called a landowner or checked a tract's title.

61.     Madison Timber also had no real contracts with any mills. A call to any one of the mills for which Madison Timber purported to have contracts would have confirmed the truth. Neither Thornton nor Billings, nor anyone at Butler Snow, ever called a mill. Worse, having conducted no due diligence themselves, they falsely represented to potential investors that they could not disclose Madison Timber's "mill partners" due to an "extremely stringent NDA."

62.     Adams required that an investor agree that he or she would not record the deed by which Madison Timber purported to grant its own rights to the investor unless and until Madison Timber failed to make a payment due under the promissory note. Incredibly, notwithstanding the suspicious "agreement not to record," neither Thornton nor Billings, nor anyone at Butler Snow, questioned this requirement.

63.     The "profit" that Adams promised was 300% to 400% better than that payable by any other fully collateralized investment and was uniform and consistent. This fact should have been a glaring warning sign standing alone, particularly for individuals such as Thornton and Billings who touted decades of business experience. It is all the more incredible that neither Thornton nor Billings, nor anyone at Butler Snow, ever questioned it, given that the PPM drafted by Butler Snow, which Thornton professed to have read, expressly disclosed the risk of "Timber Price Volatility."

**Another engagement**

64.     By December 2013 Adams had grown tired of paying Butler Snow Advisory the monthly fee of $3,500 plus travel expenses. Separately Billings saw potential to make more money recruiting new investors to Madison Timber fulltime.  Adams and Billings informed Thornton that they would "proceed on a direct basis," meaning Billings would leave Butler Snow Advisory to work for Adams fulltime, effective January 1, 2014.  Thornton told Adams he had "thoroughly enjoyed" Madison Timber" and to "please let me know if I or BSAS can ever be of service again."

65.     Butler Snow, however, did not cease servicing Adams.  In 2015 Adams engaged Butler Snow to assist Oxford Springs, LLC, of which he effectively was the managing member, with "regulatory permitting and compliance matters."  Butler Snow thus continued to lend its influence to Adams, this time with government bodies.  Indeed, Butler Snow was still sending invoices to Adams after Adams turned himself in.

66.     Notwithstanding its attorney-client relationships with Adams and Madison Timber, not to mention its own role in perpetuating the Ponzi scheme, after Adams turned himself in Butler Snow purported to represent investors in their demands of Madison Timber.  These investors were led to believe that Butler Snow could and would represent their best interests. At the same time, however, Butler Snow also purported to represent Billings—whose interests clearly were adverse to investors.

67.     On May 11, 2018, Butler Snow sent Adams a letter titled "Disengagement" advising that "recent events" made it "appropriate for us to withdraw from the representation."

## BAKER DONELSON

68.     Adams and Madison Timber's relationship with Baker Donelson began in 2011 and continued until Adams turned himself in on April 19, 2018.

### A joint venture

69.     In 2011, Brent Alexander and Jon Seawright, a lawyer and lobbyist at the Baker Donelson law firm in Jackson, were looking to start a new investment fund.

70.     Alexander and Seawright made acquaintances with Adams and a partnership quickly formed.  Alexander and Seawright would create an LLC that would pool other people's money to invest in Madison Timber, and Adams would share the returns with Alexander and Seawright. From Seawright's perspective, it was "a virtually risk free deal":

> I feel pretty good about this . . . Please explain to me why this is not a virtually risk free deal.  There is no pricing risk – everything is tied down on the front end.  The only risk I see is (i) mill defaults, but you still own the land, (ii) Lamar is a fraud, but no evidence of that, or (iii) such a fundamental collapse of the timber industry that mill defaults and uncut timber is less than purchase price, but investor is oversecured almost 2:1, so there would have to be catastrophic collapse.  Jds

71.     Alexander and Seawright saw a big opportunity in Madison Timber, but to raise "significant capital" for Adams, they needed to do some "smaller investments to prove out the income earning potential."  They pitched the first investment to a client of Baker Donelson. Seawright told the client that Alexander and Seawright would be responsible for everything:

> We would be responsible for papering everything, liaison with Lamar, monitoring process of sale of timber, acquisition of timber rights, proper recording of documents, etc., distribution of loan repayments and otherwise managing the investment.

Seawright told the client that "[r]unning funds through us or BD [Baker Donelson] escrow is not a problem," and all "legal and other admin expenses" would "come out of our share."

72.     Alexander and Seawright's "share" would include a portion of each investment's return, what Adams called a "birddog fee."  Adams told Alexander and Seawright that he could ensure a 14% "profit" with a 2% "birddog fee" built-in, but Alexander and Seawright could decide "how you guys want the split done."

73.     Seawright proposed instead that each investment's promissory note bear 13% interest, of which investors would receive 10% and Alexander and Seawright would keep 3%. Separately Alexander and Seawright negotiated an additional 3% commission for themselves.  As a result, Alexander and Seawright's "share" of each investment's return included the 3% they disclosed to investors, plus an extra undisclosed 3% that Adams paid them directly.

74.     Seawright drafted subscription agreements and accompanying documents for the sales of units in what was then called Alewright Investments, LLC, later renamed Alexander Seawright Timber Fund I, LLC.  From 2011 until April 2018, Alexander and Seawright used their fund to invest other people's money in Madison Timber and split the "profits" with Adams.

**The pitch**

75.     Throughout this time period Alexander and Seawright pitched their fund to potential investors, including Baker Donelson clients, as an exclusive "friends and family" fund. Alexander often used the phrase "simple, elegant and profitable" to describe the fund.  He told investors that "we are in it"— a lie; neither Alexander nor Seawright invested their own money in the fund—"our neighbors, lots of physicians, many of the attorneys at Baker Donelson and other firms, a United States Senator etc."

76.     Alexander was a persistent salesman. His pitch varied slightly depending on his audience—for some investors the minimum was $25,000; for others, $50,000—but he always promised a "rock stable" and "oversecured" 10% return, in a fund "safe enough for friends and

21

family."  If an investor said he could invest "either 25k or 30," Alexander responded "$50k would be better for you . . . The more you get in circulation, the more you can compound each quarter."

77.    If a potential investor was noncommittal Alexander applied pressure.  He told investors the fund "sells out quick" and "is moving fast." To one such person he texted: "[You] need to invest in the timber fund.  We have figured the math and can get you 14 percent fully secured if you reinvest your principle [sic] and interest every quarter.  It compounds like you would not believe," followed by, "Are you going to invest in this timber round?  You need to put your money to work.  No pressure at all, just smart advice in this climate."

78.    Alexander and Seawright specifically targeted individuals who had recently sold assets because they knew those individuals had money to invest. Such individuals included clients for whom Baker Donelson had recently closed transactions.

**Backed by Baker Donelson**

79.    Investors reasonably believed that their investment in Madison Timber, through Alexander Seawright Timber Fund I, LLC, was backed and promoted by, and had been vetted by, Baker Donelson.

80.    Alexander and Seawright relied heavily on their affiliation with Baker Donelson in securing investments. Alexander and Seawright described the fund to potential investors who were clients of Baker Donelson as a fund for preferred Baker Donelson clients and partners.

81.    Alexander and Seawright referred potential investors to Baker Donelson's website, which shows that Jon Seawright is not merely a shareholder in Baker Donelson's Jackson office but an elected member of the firm's national governing Board of Directors. Baker Donelson is a law firm, not an investment advisory firm, but its website touts Jon Seawright's advanced degree in taxation and "extensive experience" in business development and capital formation. Its website

presents Brent Alexander as a "Senior Public Policy Advisor" who is qualified by regulators to serve as a principal in, or advisor to, hedge funds and who has a "rapidly growing" practice in "advising venture capital and related investors."

82.   Baker Donelson knew Alexander and Seawright relied on their affiliation with Baker Donelson in securing investments and allowed it.

83.   Alexander and Seawright used Baker Donelson's Jackson office's address for official business.  They and Adams held "closings" at Baker Donelson's Jackson office. They used Baker Donelson's runners to pick up investors' checks.

84.   Alexander and Seawright enlisted their colleagues at Baker Donelson, including in offices in other states, to introduce them to potential investors.  They asked their colleagues to "[h]elp us get a meeting if you're able," adding "[i]f you can get us in the door, it would mean a great deal." Their colleagues obliged.

**Easy money**

85.   Investors were led to believe that they could rely on Alexander and Seawright to evaluate each investment using their professional expertise and judgment, which was backed by Baker Donelson's reputation.   In fact Alexander and Seawright undertook no meaningful evaluation of the investments they pushed on unwitting persons, including Baker Donelson's clients.   At the beginning of their partnership with Adams, Seawright asked questions such as "Who bears the loss with respect to the destruction of timber?  For example, if there is fire, beetles, hurricane, whatever, who is on the hook? Is it an insured risk?"  But he accepted Adams's answers to his questions without follow-up.  Adams told Seawright that Madison Timber had "umbrella [insurance] on all tracts" (he added, "Expensive, don't need it but have it").  Seawright never asked to inspect the insurance, which did not exist.

86.     Investors were led to believe that Alexander and Seawright personally inspected the timber underlying each investment.  Of course they did not. Alexander and Seawright gave investors "Equity Term Sheets" that described each upcoming investment opportunity.  An "Equity Term Sheet" dated March 5, 2017, for instance, explained that for the "minimum investment" of $25,000, an investor would share in the "cutting rights on tracts of land in various counties (the 'Timber Rights')."  Like all of Alexander and Seawright's "Equity Term Sheets," the "Equity Term Sheet" dated March 5, 2017, expressly represented that Alexander and Seawright would personally inspect the property in question:

> Company [Alexander and Seawright] will inspect the property related to the Timber Rights, must receive the original, executed Note and timber deed and will inspect the executed agreement(s) with the timber mill(s).

Alexander and Seawright could not and did not inspect the property in question—nor "the executed agreement(s) with the timber mill(s)"—because such did not exist. These representations were patently false.

87.     Alexander and Seawright even devised a "Timber Rights Investment Closing Checklist" that included among its list of things to do "Review Mill Contract" and "Review Land re Timber."  Alexander and Seawright could not and did not review any "Mill Contract" or "Land re Timber" because there was no "Mill Contract" or "Land re Timber" to review.

88.     On information and belief, Alexander and Seawright "inspected" a purported timber tract only once or twice, at the very inception of their partnership with Adams.  The "inspection" was hardly professional.  Email traffic indicates "inspection" meant "[grab] a cooler of beer and make a loop."

89.     Between 2011 and April 2018, Alexander and Seawright withdrew over $980,000 from the Alexander Seawright Timber Fund I, representing their "shares" of investors' returns.  In addition Adams separately paid them over $600,000 representing undisclosed "birddog fees."

90.     On information and belief, Adams also sometimes paid Alexander and Seawright bonuses, including Christmas bonuses in cash that he had delivered to Alexander and Seawright at their Baker Donelson office.

91.     For all this time, Alexander and Seawright acted as unlicensed brokers, in violation of federal and state law.  A broker is "any person engaged in the business of effecting transactions in securities for the account of others." *See* Section 3(4) of the Securities Exchange Act of 1934, 15 U.S.C. § 78c.   The S.E.C.'s public website states that the receipt of transaction-related commissions is a key indicator that a broker must be registered.[12]  A recent search using the Financial Industry Regulatory Authority's public online BrokerCheck confirms that neither Alexander nor Seawright have ever registered with the S.E.C.

92.     Investors might fairly question what Alexander and Seawright did to investigate the investment.  The reality is not much.  In October 2017, Alexander bragged to a potential investor that "to our surprise, we have now financed the purchase of about $60 million in timber . . . It has worked so well that we simply send out an email on the 15th of each month and some hours later have collected the investment we need for the next round."

93.     Neither Alexander nor Seawright, nor anyone at Baker Donelson, conducted an even cursory inspection of Madison Timber's operations. If they had, they would have realized what should have been obvious—that the money was too good to be true because Madison Timber

---

[12] *Guide to Broker-Dealer* Registration, U.S. SECURITIES & EXCHANGE COMMISSION https://www.sec.gov/reports pubs/investor-publications/divisionsmarketregbdguidehtm.html

was nothing more than a Ponzi scheme.  Instead, they aided and abetted Madison Timber's growth, providing Adams and Madison Timber their influence and their clients.

**Red flags**

94.    Not only did Alexander and Seawright and Baker Donelson fail to independently confirm that the timber and rights in question were real, they recklessly ignored numerous red flags.

95.    The timber deeds and cutting agreements between landowners and Madison Timber were fake. The landowners' signatures, forged by Adams, often looked the same. A call to any one of the hundreds of purported landowners, or a simple check of the title for any one of the hundreds of purported tracts of land, would have confirmed the truth.  Neither Alexander nor Seawright, nor anyone at Baker Donelson, ever called a landowner or checked a tract's title.

96.    Madison Timber also had no real contracts with any mills.  A call to any one of the mills for which Madison Timber purported to have contracts would have confirmed the truth. Neither Alexander nor Seawright, nor anyone at Baker Donelson, ever called a mill.

97.    Adams required that an investor agree that he or she would not record the deed by which Madison Timber purported to grant its own rights to the investor unless and until Madison Timber failed to make a payment due under the promissory note. Seawright quipped that "I have been clear that I am no timber expert"—but he is unquestionably a lawyer to whom his clients and investors looked to evaluate the investment's risks.  Incredibly, notwithstanding the suspicious "agreement not to record," neither Alexander nor Seawright, nor anyone at Baker Donelson, questioned this requirement.

98.    The "profit" that Adams promised was 300% to 400% better than that payable by any other fully collateralized investment and was uniform and consistent.  This fact should have

been a glaring warning sign but Alexander, who Baker Donelson presents as a qualified and experienced advisor, turned this warning sign into a selling point.  Alexander bragged about his "six year perfect track record" of consistent uniform returns under his "beautiful, albeit simple, financial model."

99.     Adams purported to have identified mills with an insatiable demand for timber at uniform prices. The market price for timber is readily available from multiple sources, and any one of those sources would have confirmed that the market price for timber actually rises and falls, sometimes dramatically, over short periods of time.  Neither Alexander nor Seawright, nor anyone at Baker Donelson, ever evaluated the investment in light of such information.  To the contrary, Seawright gloated that "[Adams] has stated that volume is not problem and indicates there are enough opportunities for him to soak up as much capital as we can raise."

100.    In 2014 Adams decided that he did not want to have to manage Madison Timber during the month of December. He told his "bird dogs," including Alexander and Seawright, that Madison Timber would not issue checks in December going forward; what had been a 12-month payoff would become a 13-month payoff, skipping the last month of the year.  Seawright blindly passed on to investors the dubious explanation that mills shut down in December for OSHA inspections:

> In December 2014, we were notified that the mills intended to shut down operations in December to allow a break for the holidays and complete OSHA required inspections.  With their operations down, they requested that no payment be made in December.  The broker we worked with agreed to this, but on the condition that the interest rate is increased by 1%, which they agreed to.  This increase is passed on to investors, so now all rounds pay out in 12 payments over 13 months, with a total interest of 13%.  The result is the annual effective interest rate increased to 10.15%, so while the payments are stretched out by a month, the interest rate is better.

Neither Alexander nor Seawright, nor anyone at Baker Donelson, did anything to verify this false information.

### Alexander Seawright Timber Fund II

101.    In 2015 Alexander and Seawright had an idea.  They had been making monthly investments with Adams of between $100,000 and $500,000 using other people's money. Alexander proposed that "[we] systemize this a little and take it to the next level." Over the next two years Alexander and Seawright would brainstorm a new model that could make Alexander and Seawright rich.  Alexander estimated that if a fund put $1 million in Madison Timber and then reinvested the principal and interest each month for ten years it would make $17 to $18 million. What if the fund put $10 million in?

102.    The idea consumed Alexander.  He texted Seawright, "Woke at [sic] at 2 thinking about the structure of the timber pool.  We pull this off, we get rich."  Using Baker Donelson's conference rooms and resources, he hosted meetings with and made presentations to accountants, investors, and advisors to push his idea and debate the merits of a five-year versus ten-year model. He reported the models gave people "much more level headed" than he "an orgasm as to its potential."  Fearing that "now that they have seen up our skirts" people will "try to cut us out," he had prospective partners execute a non-disclosure agreement that Seawright drafted.

103.    Alexander and Seawright gave their new model a new company and named it Alexander Seawright Timber Fund II, LLC.  They made a pitchbook for prospective investors.  As always, in it they emphasized their affiliation with Baker Donelson:

> Brent Alexander is a senior public policy advisor at Baker, Donelson, Bearman, Caldwell and Berkowitz ("Baker Donelson") one of the nation's largest law firms. He provides strategic business consulting for the firm's clients and serves as a national recognized lobbyist both regionally and federally. . . .

Jon Seawright is a senior shareholder at Baker Donelson and a member of the firm's Board of Directors.  Seawright has been deemed by peer-reviewed *Super Lawyers* as a Rising Star, as well as one of the nation's top attorneys, and represents a range of national and regional clients, specializing in complex business transactions, mergers and acquisitions and taxation. . . .

104.    The 15-page pitchbook extolled the "elegant, simple and highly profitable" model by which Alexander and Seawright had already "invest[ed] more than $20 million to facilitate the purchase of over $50 million in timber."  The pitchbook falsely represented that an investment would be "over-secured" and the timber would be "insured."  The pitchbook called the opportunity to compound both principal and interest in the new fund "a nice trick indeed":

> Similar in almost all respects in operation to Alexander Seawright Timber Fund I, Alexander Seawright Timber Fund II will use a pool of dedicated funds to allow Alexander Seawright, not individual investors, the authority to systematically control the reinvestment of all of the returned principal and interest in each subsequent round of the fund.  This will dramatically increase returns without increasing risk.
>
> On a fully secured investment.
>
> This is a nice trick indeed.

105.    The feedback was not all good.  One prospective investor observed that Alexander and Seawright could count "the respect we have for Baker" "to the good"—but the investment presented at least ten concrete concerns, the first of which he called the "John Grisham novel problem":

> To the concerning . . .
> 1. The structure seems very difficult – bordering on uninvestable in its current form – for institutional managers, which is to say those managing money for others.  Were this to go bad in any way, there's a beginning to a John Grisham novel problem here: two lawyers drove up from Jackson, MS, to Memphis, TN, to pitch yield hungry investors on a double digit, nearly riskless opportunity.  The opportunity was unaudited, and the lawyers did the tax work. . . .

But Alexander brushed off the criticism. ("I'm not sure he is a particularly artful or cogent writer," he told Seawright.)

106.     The same prospective investor questioned why Alexander and Seawright themselves were not invested in their own fund.  "Your interest in the incentive is noteworthy, but, it is derived from sweat, not money you stand to lose," he wrote.  Alexander replied, "We do have skin in the game, at least in the way we characterize it":

> We do have skin in the game, at least in the way we characterize it, in that we have fronted the expenses for the design, implementation, operation and management of Alexander Timber Fund I, with little direct compensation because we knew that if we were successful in building a track record, the opportunity to create a larger fund would follow. . . . [O]ur incentives under this model are perfectly aligned with our investors.  If they don't make money, we really don't make money.  That's about the best we can do.

What Alexander's reply did not acknowledge was the obvious:  Investors stood to lose their own money, but Alexander and Seawright did not.

107.     The same prospective investor pressed Alexander and Seawright on the question of "margin"—that is, how did their broker (Adams) guarantee such uniform and consistent profits?  He asked "what are we missing to understand here that a broker exists which [sic] such large spreads/ margins?":

> Gents – in doing some research on this strategy, I spoke to a friend who is more familiar with timber.  I described the model this opportunity works under, which was foreign to him.  What he is used to seeing is the forester working as an agent of the landowner, where the forester is incented by receiving (if they are really good) 5-10% of the sales price.  In this model, the forester markets the timber directly to the mills and, in some cases, literally opens the bids up in front of everyone.  Both the concept of a broker and the 30ish % margins discussed seemed unfamiliar (and this is a very experienced guy).

Notwithstanding this meaningful input, neither Alexander nor Seawright, nor anyone at Baker Donelson, did anything to slow things down, nor even made a cursory analysis of their and Adams's business.

108.     Instead Alexander and Seawright speeded things up with more forceful presentations.  They now argued Alexander Seawright Timber Fund II, LLC was for investors

"with brains and balls."  Meanwhile they continued to invest other people's money in Alexander Seawright Timber Fund I, LLC.

109.    In late 2017, Alexander and Seawright finally secured a "key investor" to "seed" Alexander Seawright Timber Fund II, LLC with $6 million.  Alexander wanted $12 million to start but figured he would raise the remaining $6 million by "bootstrapping."  Eventually he hoped "to raise an additional $36 [million] over the life of the fund and let it roll for ten years."

110.    The "key investor" was a Baker Donelson client who would fund his investment with the proceeds from the sale of a major asset. Seawright represented him in the sale. Alexander told him, "I think you know us well enough to trust us, and if anything were ever go wrong, the fund would simply unwind, at a profit."   He continued:

> As you know, we are extremely confident in the model which is why we are investing and reinvesting our earnings along with you under the same conditions. Every deal has risk, but the only way that the numbers would be affected would be if we for some reason could not close the rounds on a monthly basis (and I am very confident we will). . . .
>
> The purchase from the timber owner and the sale to the mill are executed simultaneously Remember on the sale, we are over-secured by 50 percent.  We put up half the money, but have rights to the entire tract of timber.  So, that gives us a lot of margin to sell to someone else should there be a default.  We have never experienced a default, but we have a lot of wiggle room should one occur.

111.    Anticipating their launch, Alexander and Seawright opened a new bank account for Alexander Seawright Timber Fund II, LLC.  Alexander wrote Adams to advise that starting May 1, 2018, they would "start deploying at $1 million a month beginning May 1":

> [W]e have a signed commitment for $6 million that we plan to start deploying at $1 million a month beginning May 1. . . . [I]t is safe to assume that we will invest $1 million an month increasing to $1.5 million a month. . . . Also, this investment, which will be made under Alexander Seawright Timber Fund II, will be in addition to the on-going investment in Alexander Seawright Timber Fund I, so plan on an average of about $350,000 -$500,000 per month in Alexander Seawright Timber Fund I. We are excited about the opportunity to provide a regular, consistent and

predictable volume of capital to your company and look forward to growing in cooperation with you over the next 5 years.

112.    Just days before Alexander and Seawright would have deployed their "key investor" and client's money, Adams turned himself in.  As news spread, the investor sought information from Alexander.  Alexander told the investor that Alexander and Seawright were victims:

> Investor: How did you get hooked with him?
> Alexander: My clients are hanging with me.  They know I am a victim.
> Investor: To think I was almost out of my entire life earnings makes me shiver
> Alexander: Everyone knew him.  Country club fixture.
> Alexander: Would not let you lose your savings.
> Investor: Man it was close . . . a day or two . . .
> * * *
> Alexander: To be clear, Jon and I were the victims of fraud.

## CAUSES OF ACTION
## COUNT I
## FOR CIVIL CONSPIRACY
## AGAINST ALL DEFENDANTS

113.    The Receiver re-alleges each of the foregoing paragraphs as though stated fully herein.

114.    Mississippi law defines a civil conspiracy as a "combination of persons for the purpose of accomplishing an unlawful purpose or a lawful purpose unlawfully." *Shaw v. Burchfield*, 481 So. 2d 247, 255 (Miss. 1985).

115.    Defendants conspired with Adams to commit the tortious acts alleged in this complaint.

116.    Defendants agreed to assist Adams by recruiting new investors to Madison Timber.

117.   Madison Timber was a Ponzi scheme; therefore Defendants and Adams's purpose was unlawful.

118.   In addition, Defendants acted unlawfully.  Defendants were unlicensed brokers of securities, in violation of federal and state law.  The securities that Defendants sold were not exempt from registration but were unregistered, in violation of federal and state law.

119.   In furtherance of their unlawful purpose, among other overt acts, Defendants pitched Madison Timber to potential investors, including their clients; consummated sales of Madison Timber to investors; and received commissions from Adams for their assistance in growing Madison Timber's business.

120.   Defendants need not have known that Madison Timber was a Ponzi scheme to unlawfully conspire with Adams.  Nevertheless, in view of the numerous red flags described in this complaint, Defendants knew or should have known that Madison Timber was a Ponzi scheme.

121.   Numerous red flags notwithstanding, Defendants lent their influence, their professional expertise, and even their clients to Adams. They made a fraudulent enterprise a fraternity.  Madison Timber grew from an approximately $10 million-a-year Ponzi scheme in 2011 to an approximately $164.5 million-a-year Ponzi scheme as of April 19, 2018.

122.   Defendants were essential to the growth of the Madison Timber Ponzi scheme.  But for Defendants' encouragement and assistance, Madison Timber would not have continuously grown—it would have failed before ensnaring hundreds of new unwitting investors.

123.   Defendants contributed to Madison Timber's success over time, and therefore to the Receivership Estate's liabilities today. Defendants and Adams's civil conspiracy is a proximate cause of the debts of the Receivership Estate.

124.     Defendants are jointly and severally liable for the debts of the Receivership Estate, which their and Adams's civil conspiracy proximately caused.

125.     Because Defendants acted with reckless disregard of the wellbeing of others, and in specific instances described in this complaint committed actual fraud, punitive damages are appropriate.

## COUNT II
## FOR AIDING AND ABETTING
## AGAINST ALL DEFENDANTS

126.     The Receiver re-alleges each of the foregoing paragraphs as though stated fully herein.

127.     The Restatement (Second) of Torts § 876(b) (1979) provides that a defendant is liable if he "knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself."  Stated differently, a defendant is liable for aiding and abetting the wrongful conduct of another.

128.     Defendants aided and abetted Adams in committing breaches of duties owed by Adams to Madison Timber and in other tortious conduct alleged in this complaint.

129.     In view of the numerous red flags described in this complaint, Defendants knew or should have known that Madison Timber was a Ponzi scheme.

130.     Numerous red flags notwithstanding, Defendants gave substantial assistance and encouragement to Adams.  Defendants lent their influence, their professional expertise, and even their clients to Adams. They made a fraudulent enterprise a fraternity.  Madison Timber grew from an approximately $10 million-a-year Ponzi scheme in 2011 to an approximately $164.5 million-a-year Ponzi scheme as of April 19, 2018.

131.    Defendants were essential to the growth of the Madison Timber Ponzi scheme.  But for Defendants' substantial assistance and encouragement, Madison Timber would not have continuously grown—it would have failed before ensnaring hundreds of new unwitting investors.

132.    Defendants contributed to Madison Timber's success over time, and therefore to the Receivership Estate's liabilities today. Defendants' substantial assistance and encouragement is a proximate cause of the debts of the Receivership Estate.

133.    Defendants are jointly and severally liable for the debts of the Receivership Estate, which their substantial assistance and encouragement proximately caused.

134.    Because Defendants acted with reckless disregard of the wellbeing of others, and in specific instances described in this complaint committed actual fraud, punitive damages are appropriate.

## COUNT III
## FOR RECKLESSNESS, GROSS NEGLIGENCE, AND AT A MINIMUM NEGLIGENCE AGAINST ALL DEFENDANTS

135.    The Receiver re-alleges each of the foregoing paragraphs as though stated fully herein.

136.    "Negligence is a failure to do what the reasonable person would do under the same or similar circumstances." *Estate of St. Martin v. Hixson*, 145 So. 3d 1124, 1128 (Miss. 2014).

137.    While negligence is the failure to exercise due care, recklessness "is a failure or refusal to exercise any care."  *Maldonado v. Kelly*, 768 So. 2d 906, 910 (Miss. 2000).

138.    Defendants were in advantageous positions to discover Adams's fraud.  In view of the numerous red flags described in this complaint, a reasonable person in the same or similar circumstances would have discovered Adams's fraud.

139.     Defendants not only failed to exercise due care, they failed or refused to exercise any care at all in their dealings with Adams.

140.     Defendants' recklessness, or at a minimum negligence, allowed Madison Timber to continuously grow.  Madison Timber grew from an approximately $10 million-a-year Ponzi scheme in 2011 to an approximately $164.5 million-a-year Ponzi scheme as of April 19, 2018.

141.     But for Defendants' recklessness, or at a minimum negligence, Madison Timber would not have continuously grown—it would have failed before ensnaring hundreds of new unwitting investors.

142.     Defendants by their recklessness, or at a minimum negligence, contributed to Madison Timber's success over time, and therefore to the Receivership Estate's liabilities today. Defendants' recklessness, or at a minimum negligence, is a proximate cause of the debts of the Receivership Estate.

143.     Defendants are liable for the debts of the Receivership Estate, which their recklessness, or at a minimum negligence, proximately caused.

144.     Because Defendants acted with gross negligence evincing a reckless disregard of the wellbeing of others, punitive damages are appropriate.


### COUNT IV
### FOR VIOLATIONS OF MISSISSIPPI'S FRAUDULENT TRANSFER ACT
### AGAINST BUTLER SNOW ADVISORY, THORNTON,
### ALEXANDER SEAWRIGHT, ALEXANDER, AND SEAWRIGHT

145.     The Receiver re-alleges each of the foregoing paragraphs as though stated fully herein.

146.     The Receiver may avoid any transfer made in violation of the Mississippi Uniform Fraudulent Transfer Act (the "Act"), MISS. CODE ANN. §15-3-101, *et seq.*

147.    Pursuant to § 107 of the Act, the Receiver may recover from any party any funds that Madison Timber transferred with the actual intent to hinder, delay, or defraud any of its creditors. Because Madison Timber was a Ponzi scheme, by definition all transfers by Madison Timber were made with the actual intent to hinder, delay, or defraud its creditors.

148.    The Receiver is entitled to avoid all "commissions," fees, and other such payments paid by Adams or Madison Timber to Defendants Butler Snow Advisory, Thornton, Alexander Seawright, Alexander, and Seawright, and to the entry of a judgment against Defendants Butler Snow Advisory, Thornton, Alexander Seawright, Alexander, and Seawright for the amount of all such monies received by them.

149.    Alternatively, the Receiver is entitled to recover all monies paid to Defendants Butler Snow Advisory, Thornton, Alexander Seawright, Alexander, and Seawright because (i) Madison Timber was insolvent when it paid those commissions because its net liabilities far exceeded the value of its (nonexistent) assets and (ii) Madison Timber received no value for the commissions paid to Defendants Butler Snow Advisory, Thornton, Alexander Seawright, Alexander, and Seawright.

### COUNT V
### FOR VIOLATIONS OF MISSISSIPPI'S RACKETEER INFLUENCED AND CORRUPT ORGANIZATION ACT
### AGAINST BUTLER SNOW ADVISORY, THORNTON, ALEXANDER SEAWRIGHT, ALEXANDER, AND SEAWRIGHT

150.    The Receiver re-alleges each of the foregoing paragraphs as though stated fully herein.

151.    Mississippi's RICO statute provides: "It shall be unlawful for any person to conduct, organize, supervise or manage, directly or indirectly, an organized theft or fraud enterprise."  MISS. CODE ANN. § 97-43-3.1.

152.    Madison Timber was a "fraud enterprise" within the meaning of Mississippi's RICO statute because "fraud enterprise" includes one conducted by "mail or other means of communication," MISS. CODE ANN. § 97-43-3.1, and Adams was convicted of wire fraud.

153.    Mississippi's RICO statute further provides: "It is unlawful for any person employed by, *or associated with*, any enterprise to conduct or participate, directly or indirectly, in such enterprise through a pattern of racketeering activity. . . ."  MISS. CODE ANN. § 97-43-5 (emphasis added).  "'Racketeering activity' means to commit, to attempt to commit, to conspire to commit . . . any crime which is chargeable under [Mississippi's RICO statute]," MISS. CODE ANN. § 97-43-3, including wire fraud.

154.    Defendants Butler Snow Advisory, Thornton, Alexander Seawright, Alexander, and Seawright participated, directly or indirectly, in the Madison Timber "fraud enterprise."

155.    Their participation allowed the Madison Timber "fraud enterprise" to continuously grow.  Madison Timber grew from an approximately $10 million-a-year Ponzi scheme in 2011 to an approximately $164.5 million-a-year Ponzi scheme as of April 19, 2018.

156.    But for their participation, the Madison Timber "fraud enterprise" would not have continuously grown—it would have failed before ensnaring hundreds of new unwitting investors.

157.    By their participation, they contributed to Madison Timber's success over time, and therefore to the Receivership Estate's liabilities today. Their participation is a proximate cause of the debts of the Receivership Estate.

158.    Defendants Butler Snow Advisory, Thornton, Alexander Seawright, Alexander, and Seawright therefore are liable for "threefold the actual damages sustained" by the Receivership Estate, punitive damages, and attorneys' fees.

## COUNT VI
## FOR JOINT VENTURE LIABILITY
## AGAINST ALEXANDER SEAWRIGHT, ALEXANDER, AND SEAWRIGHT

159.    The Receiver re-alleges each of the foregoing paragraphs as though stated fully herein.

160.    "[A] joint venture can be defined as a single purpose partnership." *Duggins v. Guardianship of Washington ex rel. Huntley*, 632 So. 2d 420, 427 (Miss. 1993).  "Profit sharing is the most important factor in determining whether a joint venture exists." *Walker v. Williamson*, 131 F. Supp. 3d 580, 591 (S.D. Miss. 2015).  "Where a joint venture exists, its members are bound by the acts of the other members acting in the course and scope of the joint venture." *Braddock Law Firm, PLLC v. Becnel*, 949 So. 2d 38, 50 (Miss. Ct. App. 2006).

161.    Defendants Alexander Seawright, Alexander, and Seawright formed a joint venture with Adams and Madison Timber, as evidenced by their stated intent to form a fund to invest other people's money in Madison Timber and to split the "profits" with Adams.

162.    Defendants Alexander Seawright, Alexander, and Seawright did invest other people's money in Madison Timber and did split the "profits" with Adams.

163.    As Adams and Madison Timber's joint venturers, Defendants Alexander Seawright, Alexander, and Seawright are liable for debts incurred within the scope of their joint venture, which was still ongoing on April 19, 2018, the date Adams turned himself in.

164.     Defendants Alexander Seawright, Alexander, and Seawright therefore are jointly and severally liable for the debts of the Receivership Estate.

## COUNT VII
## FOR ATTORNEY MALPRACTICE
## AGAINST BUTLER SNOW

165.     The Receiver re-alleges each of the foregoing paragraphs as though stated fully herein.

166.     "Lawyers owe their clients a duty to protect them from liability in every possible way." *Official Stanford Inv'rs Comm. v. Greenberg Traurig, LLP*, No. 3:12-cv-4641, 2014 WL 12572881, *3 (N.D. Tex. Dec. 17, 2014).

167.     Adams and Madison Timber had a lawyer-client relationship with Defendant Butler Snow. Adams twice engaged Defendant Butler Snow to draft a private placement memorandum, or PPM, for Madison Timber.

168.     The PPMs drafted by Defendant Butler Snow contained numerous false and misleading statements, including but not limited to those described in this complaint, regarding Madison Timber's "Business Strategy" and "Timber Investment Risks."

169.     In view of the numerous red flags described in this complaint, a reasonable lawyer in the same or similar circumstances would have discovered Adams's fraud.

170.     Defendant Butler Snow not only failed to exercise due care, it failed or refused to exercise any care at all in its dealings with Adams.  Defendant Butler Snow was not merely negligent, but reckless, in its handling of legal affairs to which it was entrusted.

171.     Although no investor chose to invest in the funds for which the PPMs were drafted, many relied on the PPMs in choosing to invest in purported "standing tracts" only.

172.    Defendant Butler Snow's recklessness, or at a minimum negligence, allowed Madison Timber to continuously grow.   Madison Timber grew from an approximately $10 million-a-year Ponzi scheme in 2011 to an approximately $164.5 million-a-year Ponzi scheme as of April 19, 2018.

173.    But for Defendant Butler Snow's recklessness, or at a minimum negligence, Madison Timber would not have continuously grown—it would have failed before ensnaring hundreds of new unwitting investors.

174.    Defendant Butler Snow by its recklessness, or at a minimum negligence, contributed to Madison Timber's success over time, and therefore to the Receivership Estate's liabilities today. Defendant Butler Snow's recklessness, or at a minimum negligence, is a proximate cause of the debts of the Receivership Estate.

175.    Defendant Butler Snow is liable for the debts of the Receivership Estate, which its recklessness, or at a minimum negligence, proximately caused.

176.    Because Defendant Butler Snow acted with gross negligence evincing a reckless disregard of the wellbeing of others, punitive damages are appropriate.

## COUNT VIII
## FOR NEGLIGENT RETENTION AND SUPERVISION
## AGAINST BUTLER SNOW AND BAKER DONELSON

177.    The Receiver re-alleges each of the foregoing paragraphs as though stated fully herein.

178.    "[A]n employer will be liable for negligent hiring or retention of his employee when an employee injures a third party if the employer knew or should have known of the

employee's incompetence or unfitness." *Backstrom v. Briar Hill Baptist Church, Inc.*, 184 So. 3d 323, 327 (Miss. Ct. App. 2016).

179.    Agents of Defendants Butler Snow and Baker Donelson agreed to assist Adams by recruiting new investors to Madison Timber, thereby acting as unlicensed brokers of securities, in violation of federal and state law.

180.    In view of the numerous red flags described in this complaint, Defendants Butler Snow and Baker Donelson knew or should have known of their agents' incompetence or unfitness.

181.    Defendants Butler Snow and Baker Donelson were reckless, or at a minimum negligent, in retaining their agents and failing to supervise their agents' dealings.

182.    Defendants Butler Snow and Baker Donelson's recklessness, or at a minimum negligence, allowed Madison Timber to continuously grow.  Madison Timber grew from an approximately $10 million Ponzi scheme in 2011 to an approximately $164.5 million Ponzi scheme on April 19, 2018.

183.    But for Defendants Butler Snow and Baker Donelson's recklessness, or at a minimum negligence, Madison Timber would not have continuously grown—it would have failed before ensnaring hundreds of new unwitting investors.

184.    Defendants Butler Snow and Baker Donelson, by their recklessness, or at a minimum negligence, contributed to Madison Timber's success over time, and therefore to the Receivership Estate's liabilities today. Defendants Butler Snow and Baker Donelson's recklessness, or at a minimum negligence, is a proximate cause of the debts of the Receivership Estate.

185.    Defendants Butler Snow and Baker Donelson are liable for the debts of the Receivership Estate, which their recklessness, or at a minimum negligence, proximately caused.

186.    Because Defendants Butler Snow and Baker Donelson acted with gross negligence evincing a reckless disregard of the wellbeing of others, punitive damages are appropriate.

## LIABILITY OF BUTLER SNOW
## FOR BUTLER SNOW ADVISORY

187.    Defendant Butler Snow is liable for the acts of Butler Snow Advisory, and therefore the acts of Thornton and Billings, because Defendant Butler Snow authorized or directed those acts; had knowledge of, or gave consent to, those acts; or acquiesced in those acts when it knew or should have known that it should have taken steps to prevent them.

188.    Defendant Butler Snow is liable for the acts of Butler Snow Advisory because the two effectively operate as a single business enterprise, and Butler Snow and Butler Snow Advisory are alter egos.

189.    The Receiver is entitled to a declaratory judgment holding, *inter alia*, that Defendant Butler Snow is liable for payment of all damages or other relief awarded in favor of the Receiver and against Defendant Butler Snow Advisory.

## LIABILITY OF ALEXANDER AND SEAWRIGHT
## FOR ALEXANDER SEAWRIGHT

190.    Defendants Alexander and Seawright are liable for the acts of Alexander Seawright because they authorized or directed all acts of Alexander Seawright.

191.    Defendants Alexander and Seawright are liable for the acts of Alexander Seawright because the three are alter egos.

192.    The Receiver is entitled to a declaratory judgment holding, *inter alia*, that Defendants Alexander and Seawright are personally liable for payment of all damages or other relief awarded in favor of the Receiver and against Defendant Alexander Seawright.

## BUTLER SNOW'S AND BAKER DONELSON'S VICARIOUS LIABILITY

193.   The apparent backing of Defendants Butler Snow and Baker Donelson enabled Thornton and Billings, and separately Alexander and Seawright, respectively, to recruit new investors to Madison Timber. Defendants Butler Snow and Baker Donelson are liable for the negligent and reckless acts of their agents, including but not limited to Thornton and Billings, and Alexander and Seawright, respectively.

194.   The Receiver is entitled to a declaratory judgment holding, *inter alia*, that Defendant Butler Snow is liable for payment of all damages or other relief awarded in favor of the Receiver and against Defendants Butler Snow Advisory and Thornton, and that Defendant Baker Donelson is liable for payment of all damages or other relief awarded in favor of the Receiver and against Defendants Alexander and Seawright.

———————————

WHEREFORE, the Receiver respectfully requests that, after due proceedings, the Court enter judgments:

1.   awarding damages in her favor and against Butler Snow LLP; Butler Snow Advisory Services, LLC; Matt Thornton; Baker, Donelson, Bearman, Caldwell & Berkowitz, PC; Alexander Seawright, LLC; Brent Alexander; and Jon Seawright, jointly and severally;

2.   awarding any and all attorney's fees, costs, and interest allowed by contract or law; and

3.   awarding any and all other relief as may be just and equitable.

December 19, 2018

Respectfully submitted,

/s/  Lilli Evans Bass

BROWN BASS & JETER, PLLC
Lilli Evans Bass, Miss. Bar No. 102896
LaToya T. Jeter, Miss. Bar No. 102213
1755 Lelia Drive, Suite 400
Jackson, Mississippi 39216
Tel: 601-487-8448
Fax: 601-510-9934
bass@bbjlawyers.com
*Receiver's counsel*

/s/ Brent B. Barriere

FISHMAN HAYGOOD, LLP
*Admission pro hac vice pending*
Brent B. Barriere, *Primary Counsel*
Jason W. Burge
Kristen D. Amond
Rebekka C. Veith
201 St. Charles Avenue, Suite 4600
New Orleans, Louisiana 70170
Tel: 504-586-5253
Fax: 504-586-5250
bbarriere@fishmanhaygood.com
jburge@fishmanhaygood.com
kamond@fishmanhaygood.com
rveith@fishmanhaygood.com
*Receiver's counsel*