UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

| | |
|---|---|
| ALYSSON MILLS, IN HER CAPACITY AS RECEIVER FOR ARTHUR LAMAR ADAMS AND MADISON TIMBER PROPERTIES, LLC<br><br>        Plaintiff<br><br>v.<br><br>BUTLER SNOW LLP; BUTLER SNOW ADVISORY SERVICES, LLC; MATT THORNTON; BAKER, DONELSON, BEARMAN, CALDWELL & BERKOWITZ, PC; ALEXANDER SEAWRIGHT, LLC; BRENT ALEXANDER; and JON SEAWRIGHT<br><br>        Defendants | Case No. 3:18-cv-866-CWR-FKB<br><br>Arising out of Case No. 3:18-cv-252 Securities and Exchange Commission v. Arthur Lamar Adams and Madison Timber Properties, LLC<br><br>Hon. Carlton W. Reeves, District Judge |

**MEMORANDUM IN SUPPORT OF
JOINT MOTION OF BUTLER SNOW PARTIES
TO DISMISS OR STAY PROCEEDINGS PENDING ARBITRATION**

Defendants Butler Snow LLP ("Butler Snow"), Butler Snow Advisory Services, LLC ("BSAS"), and Matt Thornton ("Thornton") (collectively, the "Butler Snow Parties") jointly move the Court to dismiss or stay litigation of the claims asserted against them pending arbitration as required by the Federal Arbitration Act ("FAA").[1]

The Complaint asserts that the Butler Snow Parties caused a multi-million dollar financial fraud that continued until 2018. Each of the Butler Snow Parties denies liability with respect to those matters. Many of the allegations in the Complaint relating to the Butler Snow Parties are

---

[1] The Fifth Circuit has declined to decide whether arbitration motions fall under Rule 12(b)(1) or 12(b)(3). *Noble Drilling Servs., Inc. v. Certex USA, Inc.*, 620 F.3d 469, 472 (5th Cir. 2010). In either event, this motion is one made within the scope of Rule 12.

1

incorrect, exaggerated, or misleading. But because this arbitration motion is predicated on a written arbitration agreement, this is not the time to debate those allegations.

However, it is helpful to explain how the arbitration agreement was executed and the roles of the Butler Snow Parties. Thus, the limited involvement and duration of any connections of any Butler Snow Party with Adams are briefly summarized below.

**Butler Snow LLP**

The law firm of Butler Snow was engaged with respect to three matters that related to Adams.

*First*, in 2009 Butler Snow was initially engaged in connection with Madison Timber Fund, LLC on a referral from a longtime contact of Butler Snow. Butler Snow drafted a limited liability company agreement and a private placement memorandum for this proposed timber fund and made securities filings with the Securities and Exchange Commission ("SEC") and the Securities Division of the Mississippi Secretary of State. That fund was far different from what became Adams' Ponzi scheme referenced in this litigation. However, Adams elected *not* to implement the proposed timber fund.

*Second*, in 2012 Butler Snow was engaged to prepare a revised version of the private placement memorandum. Once again, Adams decided *not* to use the fund for his activities. By the end of February 2013, the law firm had ceased any activity on the memorandum, and the law firm formally concluded that engagement in July 2013. The fund, like other legitimate timber funds common in this country, would have offered an investment interest in a fund intended to invest in timber assets, not loans secured by timber deeds as in the plan described in the Receiver's Complaint. Moreover, as the Complaint concedes, the two private placement

memoranda (in 2009 and in 2012) did not result in any investing activity. Complaint at ¶¶ 34, 54. Butler Snow received a total of $28,428.92 in fees for both engagements.

*Third*, and finally, Butler Snow represented Oxford Springs, LLC, a real estate development entity in which Adams owned a minority interest. Butler Snow provided counsel related to environmental permitting and other regulatory matters for Oxford Springs beginning in September 2015. According to the Receiver's December Report, Oxford Springs still owns approximately 2300 acres of land purchased in 2015 and 2016 for more than $6,000,000. *See* Doc. 70 in *SEC v. Adams* [Cause No. 3:18-cv-252]. Other than enhancing the value of a project in which the Receiver now claims an interest, the work Butler Snow performed with respect to Oxford Springs is totally unconnected with any alleged wrongdoing in this case.

**Butler Snow Advisory Services, LLC**

BSAS is a separate legal entity organized as an LLC with its own governance structure. It is a subsidiary of the Butler Snow law firm. Neither BSAS nor its employees or contractors engage in the practice of law but instead advise small and mid-sized entities with respect to various business matters. Defendant Matt Thornton, a non-lawyer, has acted as its President since 2011.

On a referral from a third party, not the law firm, on August 8, 2012, Madison Timber Company and Adams engaged BSAS pursuant to a written agreement to provide business advisory services. Ex. 1. That written agreement contained the arbitration agreement that is the subject of this motion. The engagement of BSAS was terminated in December 2013. Thus, BSAS was involved with Madison Timber Company and Adams for some 17 months, and that association ended many years before Adams' Ponzi scheme was discovered in 2018. BSAS did introduce Adams to potential business partners for his various projects—all of which it believed

were legitimate.  In total, BSAS received $99,250 in fees for this engagement, of which $59,500 represented a monthly retainer fee of $3,500 (which was unrelated to any specific transactions) for the 17 months BSAS was engaged.

## THE AGREEMENT TO ARBITRATE

The August 2012 BSAS engagement is memorialized in an Engagement Contract that consists of a signed engagement letter and attached "Standard Terms and Conditions."  The Standard Terms and Conditions are repeatedly incorporated by reference into the letter.  Ex. 1.  The parties expressly defined the "Engagement Contract" to include both documents:

> This Engagement Letter and the Standard Terms and Conditions attached hereto constitute the engagement contract (the "Engagement Contract") pursuant to which . . . Services . . . will be provided . . . .  (*Id*. at BSAS 124.)

The last portion of the engagement letter—just above Adams' signature—notes in bold type that BSAS was retained upon the terms in the engagement letter itself and the attached Standard Terms and Conditions document:

> **We agree to engage Butler Snow Advisory Services, LLC upon the terms set forth herein and the attached Standard Terms and Conditions.**  (*Id*. at BSAS 126.)

The Standard Terms and Conditions included a detailed arbitration provision.  While the entire provision is relevant to show the parties intention to arbitrate disputes, we focus on the following pertinent portion:

> In the event there is an unresolved legal dispute between the parties and/or any of their respective officers, directors, partners, employees, agents, affiliates or other representatives that involves legal rights or remedies arising from this engagement or any other agreement between you [Adams and Madison Timber Company] and [BSAS] and any of its affiliates, the parties agree to submit their dispute to binding arbitration under the authority of the Federal Arbitration Act. (*Id*. at BSAS 129, ¶ 6.3.)

The Butler Snow Parties invoke this arbitration provision as a defense under Rule 12 and move this Court to dismiss or stay the litigation against them pending arbitration.

## ARGUMENT

**I.     The Federal Arbitration Act requires the Court to dismiss this matter so that it can be arbitrated, or at least stay the litigation pending arbitration.**

The FAA provides that a "written provision in any . . . contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction . . . shall be valid, irrevocable, and enforceable."  9 U.S.C. § 2.  Under the FAA's plain language any arbitration agreement that is (1) written and (2) involves commerce should be enforced.  The August 8, 2012 Engagement Contract satisfies these criteria.  The Engagement Contract is comprised of two parts, both of which are written: an engagement letter and a Standard Terms and Conditions document, attached to the letter and incorporated by reference in the letter's text and in the statement above the signature line.  The Engagement Contract clearly involves "commerce," a term construed as broadly as Congress' power to regulate interstate commerce.  *See Allied-Bruce Terminix Companies, Inc. v. Dobson*, 513 U.S. 265, 273-77 (1995).  The Complaint, on its face, alleges instances of interstate commercial activity, at Paragraphs 46-47.  Thus, the FAA requires enforcement of the arbitration provision in the Engagement Contract.  To enforce the arbitration provision the Court should dismiss or stay this case.[2]

---

[2]     Enforcement can involve referring the matter to arbitration and staying this litigation against the Butler Snow Parties: when a suit is filed that should be referred to arbitration, a federal court "*shall* on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement."  9 U.S.C. § 3 (emphasis added).  This "shall" stay provision in the FAA is mandatory.  *Waste Mgmt., Inc. v. Residuos Industriales Multiquim, S.A. de C.V.*, 372 F.3d 339, 345 (5th Cir. 2004).

**II.     The arbitration provision in the Engagement Contract applies to all of the Butler Snow Parties.**

All of the Butler Snow Parties are entitled to enforce the arbitration provision in the Engagement Contract. BSAS is a party to the agreement, and Thornton is an officer and agent for BSAS who is alleged to have acted in that capacity in committing the acts of which the Receiver complains. *See Mississippi Fleet Card, L.L.C. v. Bilstat, Inc.*, 175 F. Supp. 2d 894, 900 (S.D. Miss. 2001) ("Courts in this circuit recognize that a non-signatory may enforce an arbitration agreement [where] the non-signatory is alleged to be the agent of a signatory."). The arbitration agreement specifically applies to disputes "between the parties and/or any of their respective officers [or] agents." Ex. 1 at BSAS 129, ¶ 6.3.

Butler Snow—the law firm—can enforce the arbitration agreement for numerous reasons. *First*, the Receiver alleges that the law firm is the alter ego and part of a "single business enterprise" with BSAS. *Second*, Butler Snow is the corporate parent of BSAS. *See Sam Reisfeld & Son Imp. Co. v. S. A. Eteco*, 530 F.2d 679, 681 (5th Cir. 1976) ("If the parent corporation was forced to try the case, the arbitration proceedings would be rendered meaningless and the federal policy in favor of arbitration effectively thwarted."). Notably, the arbitration provision in this case specifically applies to disputes "between the parties and/or any of their respective . . . affiliates." Ex.1, at BSAS 129, ¶ 6.3. *Third,* both Thornton and Butler Snow can enforce the arbitration agreement because the claims asserted against BSAS are intertwined with the claims asserted against them. The "intertwined claims" doctrine requires arbitration and a stay—even for non-signatories—"when a non-signatory defendant has a close relationship with one of the signatories and the claims are intimately founded in and intertwined with the underlying contract obligations." *Hays v. HCA Holdings, Inc.*, 838 F.3d 605, 610 (5th Cir. 2016); *Mississippi Fleet Card,* 175 F. Supp. 2d at 900; *First Family Fin. Servs., Inc. v.*

*Fairley*, 173 F. Supp. 2d 565, 573 (S.D. Miss. 2001). Here, the Complaint itself (at Paragraphs 113-94) is replete with allegations that the parties acted in concert. Moreover, the Receiver seeks to impute any liability of BSAS and Thornton to Butler Snow. Complaint at ¶¶ 187-94.

In sum, the starting point for arbitration is the Engagement Contract between BSAS, on one hand, and Madison Timber and Adams, on the other hand. The agreement to arbitrate extends to all of the Butler Snow Parties because of principles of agency, a parent/subsidiary relationship, and the intertwined claims doctrine.

### III. The arbitration agreement binds the Receiver.

A receiver is "bound to the arbitration agreements to the same extent that the receivership entities would have been absent the appointment of the receiver." *Javitch v. First Union Sec., Inc.*, 315 F.3d 619, 627 (6th Cir. 2003); *see also Wiand v. Schneiderman*, 778 F.3d 917, 923 (11th Cir. 2015); *Moran v. Svete*, 366 F. App'x 624, 629-32 (6th Cir. 2010). Put simply, the receiver "stands in the shoes" of the persons or entities subject to the receivership; their agreements to arbitrate become the receiver's agreements. 1 Thomas H. Oehmke & Joan Brovins, *Commercial Arbitration* § 8:13 (Dec. 2018 Update).[3]

The Receiver stands in the shoes of Arthur Lamar Adams, who signed the Engagement Contract with BSAS. The Receiver is bound by that agreement because Adams is bound by it. Adams was BSAS's client under the Engagement Contract. The "Standard Terms and Conditions" made clear in its first paragraph that "you" and "your" as used throughout the

---

[3] At one time the Fifth Circuit reasoned that because receivers act "on behalf of creditors," receivers are not subject to arbitration agreements that creditors did not sign. *Janvey v. Alguire ("Alguire I")*, 628 F.3d 164, 182 (5th Cir. 2010), *opinion withdrawn and superseded*, 647 F.3d 585 (5th Cir. 2011). However, the Fifth Circuit later held "a federal equity receiver has standing to assert only the claims of the entities in receivership, and not the claims of the entities' investor-creditors." *Janvey v. Democratic Senatorial Campaign Comm., Inc.*, 712 F.3d 185, 190 (5th Cir. 2013). Therefore, it is clear that the Fifth Circuit is now in accord with the general rule that receivers are bound by the arbitration agreements of the persons or entities for whom they act. *Cf. Janvey v. Alguire ("Alguire IV")*, 847 F.3d 231, 238-39 (holding that entity within receivership umbrella that had no arbitration agreement was not compelled to arbitrate).

agreement referred to "Madison Timber Company, Inc. *and/or* A. Lamar Adams." Ex. 1, at BSAS 127 (emphasis added). The Receiver's Complaint correctly alleges that "Adams formally engaged Butler Snow Advisory." Complaint at ¶ 44. The Complaint repeatedly alleges that Adams individually benefited from the engagement with BSAS. *See, e.g.*, *id*. at ¶ 58. Thus, Adams—and therefore the Receiver—is bound for (a) having received the benefits of the Engagement Contract and (b) asserting claims that must be determined in reference to that contract. *Noble Drilling*, 620 F.3d at 473-74. All rights and obligations in the Engagement Contract belonged to Adams, and now belong to the Receiver who stands in Adams' shoes.

Moreover, the Receiver is required to arbitrate on behalf of all entities for which she is Receiver. Throughout the Complaint, the Receiver expressly conflates Madison Timber Company and Madison Timber Properties, treating them as a single entity. Complaint at p. 2. Every allegation made regarding "Madison Timber" applies to both. Madison Timber Company is a party to the Engagement Contract that contained the arbitration provision. Ex. 1 at BSAS 127. Hence, the Receiver has chosen to join Madison Timber Properties entirely with a party bound to arbitrate. In addition, Madison Timber Properties was the fund manager for Madison Timber Fund—another party to the Engagement Contract for the arbitration provision. *Id*. at BSAS 124. As manager for the fund, Madison Timber Properties is bound by the principal/agent doctrine, just as described above. Finally, Madison Timber Properties is bound to arbitrate because it has received the benefits of the Engagement Contract and asserted claims that must be determined in reference to that contract. Thus, the Receiver, standing in the shoes of Adams or Madison Timber Properties, is bound to arbitrate.

**IV.** **Argument in anticipation of Receiver's position: Both the arbitration provision and the forum selection clause must be given effect.**

8

Footnote 10 of the Complaint, at Paragraph 44, signals that the Receiver will argue that the agreement to arbitrate is not valid. The Footnote suggests that the Receiver will argue that some conflict between the arbitration provision and the forum selection clause somehow invalidates the arbitration agreement. To understand the contention foreshadowed by the Footnote to the Complaint, it is helpful to consider the most pertinent portions of these two provisions side-by-side, both of which are found in Exhibit 1:

| Arbitration Provision | Forum Selection Clause |
|---|---|
| In the event there is an unresolved legal dispute between the parties and/or any of their respective officers, directors, partners, employees, agents, affiliates or other representatives that involves legal rights or remedies arising from this engagement or any other agreement between you [Adams and Madison Timber Company] and [BSAS] and any of its affiliates, the parties agree to submit their dispute to binding arbitration under the authority of the Federal Arbitration Act. | **Governing Law and Jurisdiction.** This Engagement Contract shall be governed by and interpreted in accordance with the laws of Mississippi. The state and federal courts in Mississippi shall have exclusive jurisdiction in relation to any claim, dispute or difference concerning this Engagement Contract and any matter arising from it. The parties hereto irrevocably waive any right they may have to object to any action being brought in that Court, to claim that the action has been brought to an inconvenient forum or to claim that that Court does not have jurisdiction. |

Although Footnote 10 does not elaborate on the particular inconsistency that the Receiver will argue causes an invalidation of the arbitration provision, the process of elimination leads us to conclude that she will argue that the "exclusive jurisdiction" language of the second sentence should be read as if it said "all disputes will be determined by courts in Mississippi."[4] Any such argument will have no merit, as discussed in more detail below. There is no inconsistency in the two provisions. The two provisions in the same contract should be harmonized.

**A. Mississippi law requires the Court to harmonize the two provisions.**

---

[4] Though Footnote 10 quotes the second and third sentences of the forum selection provision, the third sentence does not impact application of the arbitration provision. For example, in this case, there is no objection to filing this action in this court, there is no claim that this is an inconvenient forum, and no claim that this court does not have jurisdiction. Still the case must be arbitrated, and the third sentence does not affect that arbitration.

As discussed below, there is no substantial basis for asserting any inconsistency between the arbitration provision and the forum selection clause. However, if there were any question, Mississippi law[5] requires that the arbitration provision and the forum selection clause be harmonized to give effect to both. The Court must "read the contract as a whole, so as to give effect to all of its clauses.'" *Gaiennie v. McMillin*, 138 So. 3d 131, 135 (Miss. 2014) (quoting *Facilities, Inc. v. Rogers–Usry Chevrolet, Inc.*, 908 So.2d 107, 111 (Miss.2005). If the "contract is unclear or ambiguous, the court should attempt to 'harmonize the provisions in accord with the parties' apparent intent." *Id.; West v. West*, 891 So. 2d 203, 212 (Miss. 2004); *Royer Homes of Mississippi, Inc. v. Chandeleur Homes, Inc.*, 857 So. 2d 748, 753 (Miss. 2003). Moreover, Mississippi law provides that any ambiguity or uncertainty regarding whether the parties formed a valid agreement to arbitrate must be resolved in favor of arbitration. *Harrison Cnty. Commercial Lot, LLC v. H. Gordon Myrick, Inc.*, 107 So. 3d 943, 950 (Miss. 2013).

Those principles clearly apply here. "[I]nstruments executed at the same time, by the same contracting parties, for the same purpose, and in the course of the same transaction will be considered and construed together, since they are, in the eyes of the law, one contract." *Gilchrist Tractor Co. v. Stribling*, 192 So. 2d 409, 417 (Miss. 1966) (quoting 17 Am.Jur.2d Contracts § 264 (1964)). There is no merit to the implication of Footnote 10 of the Complaint that the arbitration provision contained in the Standard Terms and Conditions is not of equal stature to the forum selection clause contained in the August 8 engagement letter. Both provisions are part of the same Engagement Contract executed at the same time. The parties' intent to be equally bound by both is made clear by the signature line on the August 8 engagement letter, placed just

---

[5] Whether there is a valid agreement to arbitrate is an issue that must be decided under Mississippi law. "In answering the first question of contract validity" federal courts apply "'ordinary state-law principles that govern the formation of contracts.'" *Graves v. BP Am., Inc.*, 568 F.3d 221, 222 (5th Cir. 2009) (quoting *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995)).

below a statement in bold print, which makes it clear that both the letter and the Standard Terms and Conditions constitute the "Terms of Engagement." Thus, there is no basis for any claim that the forum selection clause somehow "trumps" the arbitration provision.

### B. These provisions are readily harmonized.

If, in fact, the Receiver's contention is that the "exclusive jurisdiction" language of the second sentence should be read as if it said "all disputes will be determined by courts in Mississippi," that contention has no merit. The word "jurisdiction" has a very precise and well-established legal meaning. **In the context of adjudicating disputes, "jurisdiction" refers to a "court's power to decide a case or issue a decree."** *Black's Law Dictionary* (10th ed. 2014) (emphasis added). In recognition that the word "jurisdiction" is sometimes misused, the Supreme Court of the United States has explicitly cautioned federal courts to only apply the jurisdictional label to "**a court's adjudicatory capacity**." *Henderson ex rel. Henderson v. Shinseki*, 562 U.S. 428, 435 (2011).

Thus, the statement that Mississippi courts have "exclusive jurisdiction" is accurately read to mean that it is only in the Mississippi courts that a party can invoke a "**court's power**" to decide a case or issue a decree." The second sentence provides that the exclusive right to exercise the **"adjudicatory capacity of a court"** with respect to any dispute, claim or difference lies in the Mississippi courts.

This provision by its own terms does not provide that all disputes, claims, or differences will be resolved by courts. Instead, the plain meaning of the words is that if there is any exercise of the adjudicatory power of courts—using "jurisdiction" in its clear and precise legal sense as defined by *Black's*—that judicial power can only be exercised by courts in Mississippi. Had the

11

provision been intended to provide that "all disputes will be resolved by courts" it could have been written that way if that was the intent of the parties.

Accordingly, reading the word "jurisdiction" in light of its actual and technically accurate meaning leads to the inescapable result that the forum selection clause is fully consistent with the arbitration provision. Importantly, this reading—based on the meaning of the literal words—is supported by common sense experience as to the intent of parties who purposefully include both an arbitration provision and a forum selection clause in the same agreement. Their intent is that (a) both provisions will be enforced and (b) the forum selection clause will establish which courts would be involved if a judicial decision becomes necessary. The reason why parties included both provisions in the same agreement—with the intention that both will be enforced— is illustrated by what is happening in this very case. Here, the arbitration provision's validity must be decided by some court. The forum selection clause means, in this case, that the exclusive decision to exercise judicial power as to that issue must be exercised by a court in Mississippi—and not by a court in some far-off state. Moreover, if issues arise from the arbitration of this dispute, such as enforcement or validity of the arbitration award, then Mississippi courts will have exclusive jurisdiction over those disputes. Indeed, the arbitration provision here specifically provides that certain disputes as to the award of the arbitrators would be resolved by "a court of law." The forum selection clause vests exclusive judicial power to consider those issues in the Mississippi courts.

Here, the intent of the parties that both provisions be enforced is clear from the fact that both are contained in the same agreement.[6] The two provisions can be readily harmonized.

---

[6] An intent that both provisions be enforced is clear here. The lengthy arbitration provision in the Standard Terms and Conditions document (which is part of the Engagement Contract) manifests a clear intent to arbitrate, and the engagement letter repeatedly incorporates that document by reference and conditions the parties' agreement on it. Had the parties intended the forum selection clause to void the agreement to arbitrate, surely they would have

12

There is a clear and logical reading of the forum selection clause based on the plain meaning of the words that is not inconsistent with the arbitration provision. That meaning is consistent with the apparent intent of parties that include arbitration provisions and forum selection clauses in the same agreement that both should be enforced. Thus, under Mississippi law, both provisions of this agreement must be given effect.

**V.       Questions regarding the scope of arbitration should be resolved by the arbitrators.**

The parties to the Engagement Contract reached *some* agreement to arbitrate. Any issues as to the scope of arbitration must be decided by the arbitrators. Parties to an arbitration may refer such questions to the arbitrator either by including express referral language in the arbitration agreement itself or by incorporating the AAA Rules of arbitration into their agreement.[7] Here, as in *Henry Schein, Inc. v. Archer & White Sales, Inc.*, No. 17-1272, 2019 WL 122164, at *3 (U.S. Jan. 8, 2019), the arbitration provision referenced the rules of the American Arbitration Association (AAA). Those rules plainly delegate to the arbitrators the power to rule on objections as to the scope of the arbitration agreement.[8]

## CONCLUSION

The Court should dismiss the case so that it can be arbitrated, or at least stay litigation of the claims asserted against the Butler Snow Parties pending arbitration.

---

done so expressly by omitting the arbitration clause or included some language that negated the arbitration provision by name. *See, e.g.*, *Reading Health Sys. v. Bear Stearns & Co.*, 900 F.3d 87, 103 (3d Cir. 2018).

[7]       *Houston Ref., L.P. v. United Steel, Paper & Forestry, Rubber, Mfg.*, 765 F.3d 396, 408 (5th Cir. 2014); *Petrofac, Inc. v. DynMcDermott Petroleum Operations Co.*, 687 F.3d 671, 675 (5th Cir. 2012).

[8]       The AAA rules are publicly available at https://www.adr.org/sites/default/files/Employment%20Rules.pdf.

Respectfully submitted this 24th day of January, 2019.

| | |
|---|---|
| /s/ Edward Blackmon | /s/ Alan Perry |
| Edward Blackmon, Jr. (MB No. 3354) | Alan W. Perry (MB No. 4127) |
| Bradford J. Blackmon (MB No. 104848) | Simon Bailey (MB No. 103925) |
| | Michael Casey Williams (MB No. 104537) |
| | |
| Blackmon & Blackmon, PLLC | Bradley Arant Boult Cummings LLP |
| 907 W. Peace Street | Suite 450, One Jackson Place |
| Canton, MS 39046 | 188 East Capitol Street |
| Phone: (601) 859-1567 | Post Office Box 1789 |
| Facsimile: (601) 859-2311 | Jackson, MS  39215-1789 |
| edblackmon@blackmonlawfirm.com | Phone:  (601) 948-8000 |
| bjblackmon@blackmonlawfirm.com | Facsimile:  (601) 948-3000 |
| | aperry@bradley.com |
| | sbailey@bradley.com |
| | mcwilliams@bradley.com |
| | |
| *Attorneys for Butler Snow Advisory LLC and Matt Thornton* | *Attorneys for Butler Snow LLP* |

## **CERTIFICATE OF SERVICE**

I, Alan W. Perry, certify that on January 24, 2019, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

/s/      Alan Perry