UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

| | |
|---|---|
| ALYSSON MILLS, IN HER CAPACITY AS RECEIVER FOR ARTHUR LAMAR ADAMS AND MADISON TIMBER PROPERTIES, LLC, | Case No. 3:18-cv-00866 |
| | Arising out of Case No. 3:18-cv-252, *Securities and Exchange Commission v. Arthur Lamar Adams and Madison Timber Properties, LLC* |
| Plaintiff, | |
| v. | Hon. Carlton W. Reeves, District Judge |
| BUTLER SNOW LLP; BUTLER SNOW ADVISORY SERVICES, LLC; MATT THORNTON; BAKER, DONELSON, BEARMAN, CALDWELL & BERKOWITZ, PC; ALEXANDER SEAWRIGHT, LLC; BRENT ALEXANDER; and JON SEAWRIGHT, | |
| Defendants. | |

## RECEIVER'S OPPOSITION TO BUTLER SNOW'S MOTION TO DISMISS OR STAY PROCEEDINGS PENDING ARBITRATION

Alysson Mills, in her capacity as the court-appointed receiver for Arthur Lamar Adams and Madison Timber Properties, LLC (the "Receiver"), through undersigned counsel, opposes the motion to dismiss or stay proceedings pending arbitration filed by Defendants Butler Snow, LLP, Butler Snow Advisory Services, LLC, and Matt Thornton (collectively, "Butler Snow").

### INTRODUCTION

The primary purpose of a federal equity receivership is "to promote orderly and efficient administration of the estate by the district court for the benefit of creditors." *S.E.C. v. Stanford Int'l Bank, Ltd.*, No. 3:09-CV-298, 2009 WL 8707814, at *3 (N.D. Tex. Oct. 9, 2009) (quoting *S.E.C. v.*

*Hardy*, 803 F.2d 1034, 1038 (9th Cir. 1986)). The parties' agreement, the law, and equity point to this Court as the appropriate forum in which to effectuate that goal.

At issue is a two-part contract between Lamar Adams, on the one hand, and Butler Snow Advisory Services, LLC, on the other, for Butler Snow's provision of services relating to the development of Madison Timber Company, Inc. and Madison Timber Fund, LLC, including the recruitment of investors to the Madison Timber Ponzi scheme ("Engagement Contract").[1] The first part of the contract is the Engagement Letter, addressed to Lamar Adams and written on Butler Snow Advisory Services' letterhead, which provides the specific negotiated terms of the engagement. The second part, attached to the Engagement Letter, is Butler Snow Advisory Services' pre-prepared general "Standard Terms and Conditions." The first part is signed by the parties, the second part is not.

The Engagement Letter and Standard Terms and Conditions each contain a forum clause: the Engagement Letter provides that "any" action arising from the engagement is subject to the "exclusive jurisdiction" of Mississippi courts, and the Standard Terms and Conditions provide that "an unresolved legal dispute" should be arbitrated by the American Arbitration Association. These two provisions cannot be harmonized. The Engagement Letter and the Standard Terms and Conditions, both drafted by Butler Snow, a sophisticated law firm, directly conflict.

Ignoring this conflict, Butler Snow seeks to compel the Receiver to arbitrate her claims not only against Butler Snow Advisory Services and Matt Thornton, its employee, but also against Butler Snow law firm.[2] As shown here, arbitration of the claims in question is contrary to the clear text of the Engagement Contract, the parties' intent, the powers of a federal equity receivership

---

[1] Neither Madison Timber Properties, LLC nor Butler Snow LLP are parties to the Engagement Contract. The Engagement Letter, however, identifies Butler Snow Advisory Services, LLC as a subsidiary of Butler Snow law firm.

[2] Butler Snow's filing evidences its intent to be treated as a single-business enterprise.

court, and the objectives of a federal equity receivership. The veil of arbitration is in no one's interest, except Butler Snow's.

Butler Snow's motion offers an abbreviated version of the facts surrounding its work for and with Lamar Adams. It is both inappropriate and unnecessary to address those facts here. The Receiver's Complaint speaks for itself and the facts it alleges must be taken as true for the purposes of Butler Snow's motion. *Neiman v. Bulmahn*, 854 F.3d 741, 746 (5th Cir. 2017). In deciding Butler Snow's motion, the Court need only read the Engagement Contract itself.

The Court's analysis begins and ends with the plain language of the Engagement Contract's two forum clauses. The parties' use of all-inclusive and mandatory language—Mississippi courts "shall" have "exclusive jurisdiction" over "any" action—in the Engagement Letter's forum clause, but not in the Standard Terms and Conditions, demonstrates that there was no agreement to arbitrate and that instead the parties intended their claims to be tried by Mississippi courts. Because no valid agreement to arbitrate exists, Butler Snow's motion must be denied. Indeed, Butler Snow "irrevocably waive[d]" any right to object to this Court's deciding this case.

Even if, however, the Court determines that the Standard Terms and Conditions' arbitration clause is valid, arbitration of the Receiver's claims is still inappropriate, because the Receiver rejects any agreement to arbitrate as unprofitable to the Receivership Estate. Separately, the Court has the power to deny, and should deny, a motion to compel arbitration, when arbitration would conflict with the fundamental purposes of this federal equity receivership.

## ARGUMENT

### 1.  There is no agreement to arbitrate.

To determine whether parties have agreed to arbitrate a dispute, courts ask two questions: "(1) is there a valid agreement to arbitrate the claims and (2) does the dispute in question fall within the scope of that arbitration agreement." *Sharpe v. AmeriPlan Corp.*, 769 F.3d 909, 914 (5th Cir. 2014) (quoting *Sherer v. Green Tree Servicing, LLC*, 548 F.3d 379, 381 (5th Cir. 2008)). "[T]he question whether an arbitration provision conflicts with other dispute resolution provisions is properly analyzed under the 'validity' step of the arbitration analysis." *Id.* at 915. **Importantly, the policy favoring arbitration does not apply here**. *Klein v. Nabors Drilling USA L.P.*, 710 F.3d 234, 236 (5th Cir. 2013) ("Because arbitration is simply a matter of contract between the parties, the strong federal policy favoring arbitration does not apply to the initial determination of whether there is a valid agreement to arbitrate.") (internal citations and quotation marks omitted). Mississippi's contract principles govern the question of validity. *See id.*

The Court need not go beyond the first question, because there is no valid arbitration agreement.

### A.  The plain language of the Engagement Contract mandates that this action be tried in a Mississippi court.

"[A]rbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed to submit." *B.C. Rogers Poultry, Inc. v. Wedgeworth*, 911 So. 2d 483, 488 (Miss. 2005) (quoting *AT&T Techs., Inc. v. Commun. Workers of Am.*, 475 U.S. 643, 648 (1986)). In Mississippi, because "waiving the right to have access to the courts" is "significant," forgoing that right in favor of arbitration must be "voluntarily and knowingly waived." *Union Planters Bank v. Rogers*, 912 So. 2d 116, 119 (Miss. 2005) (quoting *Ewing v. Adams*, 573 So. 2d 1364, 1369 (Miss. 1990)) ("Submitting to arbitration means giving up the right

4

to file a lawsuit in a court of competent jurisdiction. Waiving that right requires more than implied consent. Waiver presupposes full knowledge of a right existing, and an intentional surrender or relinquishment of that right. . . . We find absolutely no evidence that either of the Rogerses voluntarily and knowingly waived their right to access to the courts.") (internal citations omitted).

To determine whether a valid arbitration agreement exists, a court must reach a result that is consistent with the plain text of the contract. *See B.C. Rogers Poultry, Inc.*, 911 So. 2d at 488 (citing *EEOC v. Waffle House, Inc.*, 534 U.S. 279, 294 (2002)); *Chrisman Mfg., Inc. v. Rowan-Cornil, Inc.*, 859 F. Supp. 2d 842, 847 (S.D. Miss. 2012) (citing *Tupelo Redevelopment Agency v. Abernathy*, 913 So. 2d 278 (Miss. 2005)) (The Court must first "apply the 'four corners' test, wherein it looks to the language the parties used in expressing their agreement."). Here, the text of the Engagement Contract is clear—the parties not only agreed that "any" action between them would be tried by a Mississippi court, they "irrevocably waive[d]" any objection to a Mississippi court's trying such action.

Although the Engagement Letter purports to incorporate Butler Snow's Standard Terms and Conditions, it contradicts it on its face. The Engagement Letter provides that Mississippi courts "shall have exclusive jurisdiction" over "**any** claim, dispute or difference" arising from the engagement. The Engagement Letter thus expressly contradicts the Standard Terms and Conditions' boilerplate provision, which says the parties will "submit" "an unresolved legal dispute" arising from the engagement to arbitration. Where, as here, two clauses so clearly conflict, one must give way. *Lamb Const. Co. v. Town of Renova*, 573 So. 2d 1378, 1383 (Miss. 1990) ("If one of two conflicting clauses in a contract seem dominant, that clause should be enforced.").

To that end, the words used by each clause matter. Plain language resolves the dispute. *See Miss. Transp. Comm'n v. Ronald Adams Contractor, Inc.*, 753 So. 2d 1077, 1084 (Miss. 2000) (quoting *Warwick v. Gautier Utility Dist.*, 738 So. 2d 212, 215 (Miss. 1999)) ("The court's concern is not nearly so much with what the parties may have intended, but with what they said, since the words employed are by far the best resource for ascertaining intent and assigning meaning with fairness and accuracy."). The parties' use of all-inclusive and mandatory language in the Engagement Letter, which was negotiated and signed by the parties, but not in the Standard Terms and Conditions, makes plain that the parties agreed that Mississippi courts will decide "any" dispute between them. Had Butler Snow intended instead to arbitrate "any" or "all" disputes, it could have said so in its Standard Terms and Conditions. But it did not. What it did say is that Mississippi courts "shall have exclusive jurisdiction" over "**any** claim, dispute or difference," and that the parties "irrevocably waive **any** right they may have to object." Properly understood, the Engagement Letter's negotiated and signed forum clause expressly waives the Standard Terms and Conditions' boilerplate arbitration provision.

The Engagement Contract is thus unambiguous: Any dispute between the parties shall be decided by a Mississippi court, and the parties "irrevocably waive" any objection. The Court's analysis can end here. It would be farfetched indeed to say the Engagement Contract, which includes the Engagement Letter's plainly written forum clause, amounts to "an intentional surrender or relinquishment" of the Receiver's right to file this matter in this Court. *Ewing*, 573 So. 2d at 1369.

### B. Even if the Engagement Contract is ambiguous, the specific language in the Engagement Letter prevails over boilerplate terms and conditions.

The Engagement Contract clearly provides for the adjudication of any claims in Mississippi courts. In the event, however, that the Court determines that the two forum clauses'

inconsistencies render the Engagement Contract ambiguous, any such ambiguity is to be construed against Butler Snow, the sophisticated law firm that drafted the contract. *Rosenfelt v. Mississippi Dev. Auth.*, No. 2017-CA-01120-SCT, 2018 WL 6381173, at \*5 (Miss. Dec. 6, 2018) (it is a cannon of contract construction that a contract be construed against its drafter if the parties' intent cannot be derived from the contract's four corners); *Swartzfager v. Saul*, 213 So. 3d 55, 64 (Miss. 2017) ("A consistent rule of contract construction is that when the terms of a contract are vague or ambiguous, they are always construed more strongly against the party preparing it.") (internal quotation marks omitted); *Woodruff v. Thames*, 143 So. 3d 546, 554 (Miss. 2014) ("[I]f vagueness or ambiguity exist, the terms must be 'strongly construed' against the drafting party."); *Miss. Transp. Comm'n*, 753 So. 2d at 1085 ("[I]t is a well-known canon of contract construction that ambiguities in a contract are to be construed against the party who drafted the contract.").

Because the two forum clauses cannot be reconciled, one must prevail. Mississippi law is clear that "special provisions inserted in a contract govern over boilerplate provisions." *Miss. Transp. Comm'n*, 753 So. 2d at 1085; *Ronald Adams Contractor, Inc. v. Miss. Transp. Comm'n*, 777 So. 2d 649, 656–57 (Miss. 2000) ("special provisions drafted specifically for this contract supercede [sic] any conflicting standard specifications"). Federal courts across the country have reached the same result. *See, e.g.*, *Goldman, Sachs & Co. v. City of Reno*, 747 F.3d 733, 744 (9th Cir. 2014) ("forum selection clauses need only be sufficiently specific to impute to the contracting parties the reasonable expectation that they would litigate any disputes in federal court, thereby superseding . . . [the] obligation to arbitrate . . . "); *Goldman, Sachs & Co. v. Golden Empire Sch. Fin. Auth.*, 764 F.3d 210, 215 (2d Cir. 2014) (citing *Applied Energetics, Inc. v. NewOak Capital Markets, LLC*, 645 F.3d 522, 525 (2d Cir. 2011)) ("[A]n arbitration agreement [is] superseded by

7

an agreement stating that 'any dispute arising out of this Agreement shall be adjudicated in' New York courts.").

The boilerplate arbitration clause in Butler Snow's Standard Terms and Conditions "runs head long" into the specific forum clause in the Engagement Letter, which was negotiated and signed by the parties. *See Miss. Transp. Comm'n*, 753 So. 2d at 1085. Butler Snow cannot dispute that its Standard Terms and Conditions are just that—standard, boilerplate terms, substantially all of which are likely used in each of Butler Snow Advisory Services' engagements. The Engagement Letter, on the other hand, is addressed to Madison Timber Company, Inc. and Lamar Adams, describes that the purpose of the engagement is to provide services that "will focus on strategic business development for Madison Timber Company, Inc. and Madison Timber Fund, LLC," and is signed by Butler Snow and Lamar Adams. Notably, the Standard Terms and Conditions is neither signed nor initialed by any party.

Because the forum clause in the Engagement Letter was drafted specifically by Butler Snow for the provision of services to Lamar Adams, it "supplant[s] any inconsistent general provisions found in the [Standard Terms and Conditions] and incorporated by reference." *Id.*

### C.  Butler Snow's motion's arguments miss the forest for the trees.

Butler Snow cannot dispute the Engagement Letter's forum clause's validity. It thus insists instead that it can be harmonized with the Standard Terms and Conditions' agreement to arbitrate. Butler Snow's motion's semantics misses the forest for the trees. This is not a situation in which a narrow forum clause interacts with an expansive arbitration clause, such that the forum clause governs only *if* a claim is not otherwise arbitrable. Indeed the opposite is true. The Engagement Letter's forum clause is expansive, all-inclusive, and mandatory, whereas the Standard Terms and Conditions' arbitration clause is not. *Cf. Personal Sec. & Safety Sys., Inc. v. Motorola, Inc.*, 297

F.3d 388, 396 (5th Cir. 2002) (unlike here, arbitration clause required parties to arbitrate "any and all" claims and actions). The Engagement Letter's forum clause contains no permissive "if" language—it instead mandates that Mississippi courts "**shall** have exclusive jurisdiction" over "**any** claim, dispute or difference" arising from the Engagement Contract. *See Bentley v. Mut. Benefits Corp.*, 237 F. Supp. 2d 699, 701 (S.D. Miss. 2002) ("[A] mandatory forum selection clause has express language limiting the action to the courts of a specific locale which is clear, unequivocal and mandatory. . . . On the other hand, a permissive forum selection clause authorizes jurisdiction or venue in a selected forum, but does not prohibit litigation elsewhere.").

Courts around the country would agree. For example, the U.S. District Court for the District of Connecticut considered language nearly identical to that in the Engagement Letter and found that:

> it is clear from the language of this forum selection provision that the clause is mandatory—stating that each of the parties submits to the 'exclusive jurisdiction' of any "state or federal court" in Fairfield County—and all inclusive—pertaining to "any action or proceeding arising out of or relating to this Agreement." The explicit reference to "court" makes clear that the parties intended a judicial, as opposed to arbitration, forum and the "exclusive jurisdiction" with respect to "any action or proceeding" precludes resolution by any other means.

*SLSJ, LLC v. Kleban*, No. 3:14-CV-390 CSH, 2015 WL 1973307, at *22 (D. Conn. Apr. 30, 2015); *see also City of Reno*, 747 F.3d at 746 ("[W]e will give full effect to the all-inclusive breadth of the forum selection clauses ('all actions and proceedings'), their mandatory nature ('shall'), and their reference to a judicial forum ('the United States District Court for the District of Nevada'). We therefore conclude that the forum selection clauses superseded Goldman's default obligation to arbitrate under the FINRA Rules and that, by agreeing to these clauses, Reno disclaimed any right it might otherwise have had to the FINRA arbitration forum."); *Applied Energetics*, 645 F.3d at 525 (a forum clause requiring that "any dispute arising out of" the agreement be brought in New

9

York courts "specifically preclude[d] arbitration" because the forum clause was "all-inclusive" and "mandatory").

Because the forum clause in the Engagement Letter is all-inclusive and mandatory, it cannot be harmonized with the Standard Terms and Conditions' boilerplate arbitration provision. The two clauses cannot stand together. Especially when construed against the drafter, Butler Snow, the parties' intent is clear—any claim relating to the provision of services to Lamar Adams by Butler Snow must be adjudicated in this Court.

### 2. Even if an agreement to arbitrate exists, the Court should deny Butler Snow's motion.

### A. The Receiver rejects any agreement to arbitrate.

Receivers, like bankruptcy trustees, generally can assume or reject executory contracts, including arbitration agreements, especially if they are unprofitable to the estate. *See Janvey v. Alguire*, No. 3:09-cv-0724, 2014 WL 12654910, at *10 (N.D. Tex. July 30, 2014)[3] ("If the Court required the Receiver to adopt these arbitration agreements, it would greatly burden and deplete the receivership estate."). This power is consistent with other receivership law that allows a receiver to do things to protect innocent creditors' interests, even if the receivership entities could not have done those things previously. *Jones v. Wells Fargo Bank, N.A.*, 666 F.3d 955, 966 (5th Cir. 2012) ("[W]hen the receiver acts to protect innocent creditors . . . he can maintain and defend actions done in fraud of creditors even though the corporation would not be permitted to do so.") (internal quotation marks omitted).

---

[3] In *Janvey v. Alguire*, the district court denied defendants' motions to compel arbitration, finding that the receiver in that case had not adopted the arbitration agreements and that arbitrating the receiver's claims would frustrate a central purpose of the equity receivership. On appeal, the Fifth Circuit affirmed the district court's denial of the motions to compel arbitration, but on the alternate basis that the receiver was entitled to bring the claims on behalf of Stanford International Bank, which was a separate receivership entity that was not a signatory to the arbitration agreement. The Fifth Circuit therefore did not reach the issues addressed by the district court.

The Receiver has a duty to maximize the value of the Receivership Estate for the benefit of victims.  Consistent with that duty, the Receiver filed this action against Butler Snow in this Court. Although the Receiver's claims arise from Lamar Adams's relationship with Butler Snow, they do not depend on the existence of the Engagement Contract, much less the Standard Terms and Conditions' alleged agreement to arbitrate. The Receiver does not attempt to enforce a contractual duty of Butler Snow, but instead to, *inter alia*, "unwind [the Engagement Contract] and reclaim the benefits fraudulently distributed to defendants under the contract[]."*Alguire*, 847 F.3d 231, 243 (5th Cir. 2017). By filing this action in this Court, the Receiver rejected any alleged agreement to arbitrate in the Engagement Contract. *Alguire*, 2014 WL 12654910, at *10 ("The Court deems the Receiver's actions in filing this lawsuit in federal court against the Employee Defendants as a rejection of the arbitration agreement."); *Pac. W. Oil Co. v. McDuffie*, 69 F.2d 208, 213 (9th Cir. 1934) ("In order for a receiver to become bound by a contract, he must positively indicate his intention to adopt it; the receiver is not bound until he has affirmed it and assumed its burdens under the direction of the court.").

The Receiver rejects any alleged agreement to arbitrate in the Engagement Contract for the primary reason that it is unprofitable to the Receivership Estate and conflicts with the Receiver's charge to "take such action as necessary and appropriate for the preservation of Receivership Property or to prevent the dissipation or concealment of Receivership Property." Docket No. 33 at 8. The Receiver's claims against Butler Snow and its co-defendants, including the Baker Donelson law firm, overlap factually and legally. The Receiver alleges claims for civil conspiracy, aiding and abetting the establishment and growth of the Madison Timber Ponzi scheme, negligence, violations of Mississippi's Fraudulent Transfer and RICO acts, joint venture liability, and vicarious liability against Butler Snow and Baker Donelson. Trying all of these claims in a single

action is efficient and in the interests of the Receivership Estate. If the Receiver was required to arbitrate her claims against Butler Snow, she would be forced to prove claims currently pending in a single action in this Court in two distinct forums, this Court **and** AAA—meaning she would spend at least two-times the time and money, not to mention the fees that accompany AAA arbitration, all at the Receivership Estate's expense. Not only costly and time-intensive, such duplication of proceedings risks inconsistent findings of fact and law.

It furthermore bears mention that the Engagement Contract and any alleged agreement to arbitrate were borne out of Butler Snow's assistance to the criminal enterprise now known as the Madison Timber Ponzi scheme. This is not an ordinary situation in which two private parties agree to resolve a private dispute out of court, through arbitration. The public, and certainly victims, have an interest in this action. The veil of arbitration is in no one's interest, except Butler Snow's. *Janvey v. Alguire*, 847 F.3d 231, 248 (5th Cir. 2017) (Higginbotham, J., concurring) ("Swindlers can use arbitration to mitigate discovery and cabin attending risk of exposing fraudulent activity while presenting arbitration, not as a tool of fraud, but as business as usual.").

In summary, because arbitration is "unprofitable" and "undesirable" to the Receivership Estate, the Receiver rejects any agreement to arbitrate. *See U.S. Tr. Co. v. Wabash W. Ry. Co.*, 150 U.S. 287, 299 (1893) ("[A] receiver is not bound to adopt the contracts . . . if, in [her] opinion, it would be unprofitable or undesirable to do so.").

### B. The Court has the power to reject any agreement to arbitrate.

Alternatively, if the Court concludes that the Receiver is bound by the Engagement Contract's alleged agreement to arbitrate and cannot reject it as an executory contract, the Court should exercise its discretion to reject the agreement to arbitrate itself because arbitration here conflicts with the central purposes and objectives of this federal equity receivership. The Federal

Arbitration Act's mandate can be overridden if a "federal statute or policy renders the claims nonarbitrable." *Dealer Computer Servs., Inc. v. Old Colony Motors, Inc.*, 588 F.3d 884, 886 (5th Cir. 2009). A claim is nonarbitrable, and a district court has discretion to refuse arbitration, when there exists "an inherent conflict between arbitration and [a] statute's underlying purpose." *Shearson/American Express, Inc. v. McMahon*, 482 U.S. 220, 226 (1987). The broad statutory provisions governing federal equity receiverships[4] bolster the common law's recognition that the primary purpose of a receivership is "to promote orderly and efficient administration of the estate by the district court for the benefit of creditors." *Stanford Int'l Bank, Ltd.*, 2009 WL 8707814, at *3 (quoting *Hardy*, 803 F.2d at 1038).

Although the Fifth Circuit has not considered whether the arbitration of a receiver's claims would conflict with the purpose of the receivership statutes, it has done so in the bankruptcy context. The Fifth Circuit has identified ways in which the FAA conflicts with the purposes of the Bankruptcy Code, "including the goal of centralized resolution of purely bankruptcy issues, the need to protect creditors and reorganizing debtors from piecemeal litigation, and the undisputed power of a bankruptcy court to enforce its own orders." *See In re Gandy*, 299 F.3d 489, 500 (5th Cir. 2002) (quoting *In re Nat'l Gypsum Co.*, 118 F.3d 1056, 1068 (5th Cir. 1997)). These underlying goals mirror those of a federal equity receivership. The policy concerns that permit a bankruptcy trustee to avoid its debtor's agreement to arbitrate apply with equal force to a federal equity receiver. As stated by the *Stanford* court,

> [a]rbitration decentralizes, deconsolidates, strips the court and the receiver of
> exclusive jurisdiction over the receivership assets, interferes with the broad powers

---

[4] *See* 28 U.S.C. § 754 ("A receiver appointed in any civil action or proceeding involving property, real, personal or mixed, situated in different districts shall, upon giving bond as required by the court, be vested with complete jurisdiction and control of all such property with the right to take possession thereof."); 28 U.S.C. § 1692 ("In proceedings in a district court where a receiver is appointed for property, real, personal, or mixed, situated in different districts, process may issue and be executed in any such district as if the property lay wholly within one district . . . .").

> of both the court and the receiver to adjudicate all issues affecting receivership
> assets, and opens the door to the possibility of a distribution process that becomes,
> in part, "first-come, first-served."

*Alguire*, 2014 WL 12654910, at *21. Requiring the Receiver to arbitrate her claims thwarts her ability to effectuate the efficient and equitable distribution of receivership assets to victims.

## CONCLUSION

This Court has "retained jurisdiction over any claims related to the Receivership Estate." Docket No. 44. The Receiver's claims against Butler Snow are no exception. The plain language of the Engagement Contract evidences that the parties agreed not only that any action between them would be tried by a Mississippi court, but that they "irrevocably waive[d]" any objection to a Mississippi court's trying such action. Alternatively, both the Receiver and the Court have the power to reject arbitration for the benefit of the Receivership Estate and victims. Butler Snow's motion to compel arbitration must be denied.

February 7, 2019

Respectfully submitted,

*/s/ Lilli Evans Bass*                              */s/ Kristen D. Amond*

BROWN BASS & JETER, PLLC            FISHMAN HAYGOOD, LLP
Lilli Evans Bass, Miss. Bar No. 102896      *Admitted pro hac vice*
LaToya T. Jeter, Miss. Bar No. 102213       Brent B. Barriere, *Primary Counsel*
1755 Lelia Drive, Suite 400                 Jason W. Burge
Jackson, Mississippi 39216                  Kristen D. Amond
Tel: 601-487-8448                           Rebekka C. Veith
Fax: 601-510-9934                           201 St. Charles Avenue, Suite 4600
bass@bbjlawyers.com                         New Orleans, Louisiana 70170
*Receiver's counsel*                        Tel: 504-586-5253
                                            Fax: 504-586-5250
                                            bbarriere@fishmanhaygood.com
                                            jburge@fishmanhaygood.com
                                            kamond@fishmanhaygood.com
                                            rveith@fishmanhaygood.com
                                            *Receiver's counsel*

## CERTIFICATE OF SERVICE

I certify that I electronically filed the foregoing with the Clerk of Court using the ECF

system which sent notification of filing to all counsel of record.


Date:   February 7, 2019                    */s/ Kristen D. Amond*