UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

| | |
|---|---|
| ALYSSON MILLS, IN HER CAPACITY AS RECEIVER FOR ARTHUR LAMAR ADAMS AND MADISON TIMBER PROPERTIES, LLC | Case No. 3:18-cv-866-CWR-FKB |
| | Arising out of Case No. 3:18-cv-252 Securities and Exchange Commission v. Arthur Lamar Adams and Madison Timber Properties, LLC |
| Plaintiff | |
| v. | Hon. Carlton W. Reeves, District Judge |
| BUTLER SNOW LLP; BUTLER SNOW ADVISORY SERVICES, LLC; MATT THORNTON; BAKER, DONELSON, BEARMAN, CALDWELL & BERKOWITZ, PC; ALEXANDER SEAWRIGHT, LLC; BRENT ALEXANDER; and JON SEAWRIGHT | |
| Defendants | |

**BUTLER SNOW PARTIES' REPLY IN SUPPORT OF JOINT
MOTION TO DISMISS OR STAY PROCEEDINGS PENDING ARBITRATION**

The Receiver advances three general arguments to avoid enforcement of the arbitration provision:

First, the Receiver's primary argument is that the arbitration and forum selection provisions cannot be harmonized, and thus that the arbitration provision cannot be enforced;

Second, the Receiver presents a legally novel argument that, even if the arbitration provision is valid, the Receiver can still unilaterally reject it; and

Third, the Receiver presents the additional novel argument that, even if the arbitration provision is valid, the Court should disregard it because the claim is made by a Receiver.

We discuss each of these arguments below.

1

## I.    THE TWO PROVISIONS ARE READILY HARMONIZED AND THEREFORE BOTH MUST BE GIVEN EFFECT.

### A.    The Receiver does not challenge the reading of the forum selection provision that harmonizes with the arbitration provision.

The primary issue this motion presents is whether the forum selection provision can be harmonized with the arbitration provision.  If they can be harmonized, Mississippi law requires that both provisions must be interpreted in a way that gives effect to the entire agreement:

> **[A] contract must be considered as a whole, and from such examination the intent of the parties must be gathered. Such construction should be given the agreement, if possible, as will render all its clauses harmonious, so as to carry into effect the actual purpose and intent of the parties as derived therefrom.**[1]
>
> A construction will not be adopted, if it can be reasonably avoided, which will charge the parties with having bound themselves to provisions which are mutually repugnant, senseless, ineffective, meaningless or incapable of being carried out in the overall context of the transaction consistently with all of the other provisions of all of the several contract documents."[2]

This is a fundamental principle of Mississippi law confirmed many times over by the Mississippi Supreme Court and other courts applying Mississippi law.[3]  This principle is applied in cases like this one, where one party asserts that the contract is ambiguous.  It is clear beyond dispute that Mississippi law requires that the agreement here must read as a whole to determine the intent of the parties and, if possible, the forum selection and arbitration provisions should be harmonized so as to give effect to both.

The Butler Snow Parties' primary Memorandum set forth a clear reading of the forum selection provision which can easily be harmonized with the arbitration provision.  Doc. 21 at

---

[1]    *Roberts v. Roberts*, 381 So. 2d 1333, 1335 (Miss. 1980) (emphasis added).

[2]    *Wilson Indus., Inc. v. Newton Cnty. Bank*, 245 So. 2d 27, 30 (Miss. 1971).

[3]    *E.,g., Gaiennie v.McMillan,* 138 So.3d 131, 135 (Miss. 2014); *Royer Homes of Mississippi, Inc. v. Chandeleur Homes, Inc.,* 867 So.2d 748, 752 (Miss. 2003); *Brown v. Hartford Ins. Co,* 606 F.2d 122, 126 (Miss. 1990).

10-13.  That reading results when the word "jurisdiction" is given its plain and accurate meaning as set out in *Black's Law Dictionary*:  In the context of adjudicating disputes, "jurisdiction" refers to a "**court's power** to decide a case or issue a decree."

Thus, the phrase that "state and federal courts in Mississippi shall have exclusive jurisdiction" means exactly that: Mississippi courts **are the only courts** that have a court's power to exercise adjudicatory capacity with respect to disputes or claims.  It does not foreclose a role for arbitrators, as arbitrators do not exercise "jurisdiction."

In cases where there is no arbitration provision—and thus only judicial forums would be available for dispute resolution—the phrase has the practical effect of providing that all disputes will be resolved by the courts identified in the provision.  But in situations where there is an arbitration provision that provides a different method of dispute resolution, the provision does not have the same effect.  The result in such cases is that the phrase identifies courts that have exclusive jurisdiction for issues that cannot be resolved by arbitration.[4]

The Fifth Circuit, applying Texas law somewhat similar to Mississippi law in a case akin to this one, found similar provisions to have exactly that effect in *Personal Security & Safety Systems Inc. v. Motorola*:

> Standing alone, one could plausibly read the forum selection clause to mean that Texas courts have the exclusive power to resolve all disputes arising under the Stock Purchase Agreement. But the forum selection clause does not stand alone. To the contrary, we must interpret the forum selection clause in the context of the entire contractual arrangement and **we must give effect to all of the terms of that arrangement**. *See Richland Plantation Co. v. Justiss-Mears Oil Co.,*

---

[4]     As noted in the primary Memorandum, forum selection provisions are often provided in agreements with arbitration provisions because some issues must be decided by courts.  This case is an example, since the arbitration provision's validity must be decided by some court.  Moreover, if issues arise from the arbitration of this dispute, such as enforcement or validity of the arbitration award, then Mississippi courts will have exclusive jurisdiction over those disputes.  Indeed, the arbitration provision here specifically provides that certain disputes as to the award of the arbitrators would be resolved by "a court of law."  The forum selection provision means, in this case, that the exclusive decision to exercise judicial power as to all such issues must be exercised by a court in Mississippi—and not by a court in some far-off state.

> *Inc.,* 671 F.2d 154, 156 (5th Cir.1982) ("**When several documents represent one agreement, all must be construed together in an attempt to discern the intent of the parties, reconciling apparently conflicting provisions and attempting to give effect to all of them, if possible.**").
>
> **Reading the two provisions together, it becomes clear that the forum selection clause does not require the parties to litigate all claims in Texas courts, nor does it expressly forbid arbitration of claims arising under the Stock Purchase Agreement. Instead, we interpret the forum selection clause to mean that the parties must litigate in Texas courts only those disputes that are not subject to arbitration**-for example, a suit to challenge the validity or application of the arbitration clause or an action to enforce an arbitration award. [5]

Even though this argument based on the *Black's Law* meaning of the word "jurisdiction" was plainly the focus of the Butler Snow Parties' primary Memorandum, the Receiver chose to ignore that proposed reading and related argument completely. The Opposition fails to even mention the *Black's Law* definition of the word "jurisdiction" and fails to discuss the plausibility of the reading offered by the Butler Snow Parties.

Thus, while the Receiver's Opposition brief pays lip service to the concepts of "plain language" and "the words employed," it is lip service only. The Receiver does not discuss the "plain meaning" of the words employed. "Jurisdiction" is a word that was employed by the parties, and it has a plain meaning as shown by the dictionary. The Receiver completely ignores the meaning of the word.[6]

Rather than address the plain meaning of the words, the Receiver simply insists upon claiming there is some supposed inconsistency between the provisions, using purely conclusory

---

[5]     297 F.3d 388, 395 (5th Cir. 2002) (emphasis added)

[6]     The Receiver offers no definition of "jurisdiction" at all. Perhaps there may be informal, colloquial or other uses of the word "jurisdiction" that imply some broader concept so as to support the inconsistency which the Receiver claims to exist. However, there is no basis to argue that the word should be read as having any other meanings in this case, since the meaning offered by the movants allows harmonization of the two provisions, which is the goal of interpretation required by Mississippi law.

language.  The Receiver never explains why the Butler Snow Parties' reading cannot be a proper reading.  By not addressing this critical issue—whether the reading offered by the Butler Snow Parties allows the provisions to be harmonized—the Receiver impliedly concedes that the Butler Snow Parties' reading is a plausible reading of the "plain language" and "words employed" which allows the two provisions to be harmonized.

Moreover, the Receiver does not dispute that the meaning of the provisions—using the Butler Snow Parties' reading of the words contained in the forum selection provision—is, to a virtual certainty, exactly what the parties intended.  This reading that gives effect to both provisions makes sense of the fact that the agreement here contains a long and detailed arbitration provision (which happens to be the longest paragraph in the agreement) and thus would effectuate the parties' intent to arbitrate.  This reading makes sense because it is consistent with the reasons why parties often include both provisions (a forum selection provision and an arbitration provision) in a single agreement.  Indeed, this reading makes sense as honoring the intent of the parties for the very same reason that the Fifth Circuit found the two provisions could be reconciled in *Personal Security*.

Because the reading offered by the Butler Snow Parties is a plausible reading of the forum selection provision that is easily harmonized with the arbitration provision in a way that honors the intent of the parties, Mississippi law requires that it be used to construe the agreement so as to give effect to its entirety.

All of this is enough to resolve the motion.  The Butler Snow Parties have offered a reasonable interpretation of the plain meaning of the words actually employed that demonstrates that the two provisions can be readily harmonized.  Giving effect to both provisions is the only result consistent with Mississippi law.

**B.      References to words in the third sentence of the forum selection provision add nothing to the Receiver's argument.**

While the Receiver focuses on the second sentence of the forum selection provision, her Opposition brief from time to time makes scattered references to "irrevocably waive" and similar phrases from the provision's third sentence.  As noted in the Butler Snow Parties' primary Memorandum, that third sentence adds nothing to the Receiver's argument.   The third sentence does not forbid arbitration.  The sentence is easily harmonized with the arbitration provision on the same basis described above and consistent with the reasoning of *Personal Security,* 297 F.3d at 396.

Here the third sentence has no application whatsoever. The Butler Snow Parties do not object to the Receiver litigating the validity of the arbitration provision in this Court since the forum selection provision makes this an appropriate court to resolve the issue.  The Butler Snow Parties do not claim that this is an inconvenient forum, and do not claim that the Court lacks jurisdiction over the parties.  Thus, this provision is fully consistent with litigation in Mississippi courts "of a non-arbitrable dispute that must be litigated in court."  Thus, for all of the reasons discussed above concerning the second sentence of the forum selection provision, the third sentence can be easily harmonized with the arbitration provision.

**C.      The Receiver's resort to secondary rules of construction is incorrect because the provisions are capable of being harmonized.**

The Receiver does not directly respond to the reading of the forum selection provision offered by the Butler Snow Parties.   The Receiver simply argues that the contract is ambiguous, and that therefore two canons of construction should be applied: that the contract should be interpreted against the drafter; and/or the engagement letter portion should control over the attached terms and conditions portion, because the letter is more specific.

This suggestion that this Court should reach the canons of construction in this case simply misunderstands the process created by Mississippi law to interpret contracts.  Mississippi has adopted a "three tier" process for the interpretation of agreements.  *Pursue Energy Corp. v. Perkins*, 558 So. 2d 349, 351-353 (Miss. 1990).  That three tier process consists of the following:

> First Tier: the court looks at the four corners of the agreement.  Critically, at this first tier, the court uses the following process: "In cases in which an instrument is not so clear (*e.g.,* different provisions of the instrument seem inconsistent or contradictory), the court will, if possible, harmonize the provisions in accord with the parties' apparent intent."  *Id*. at 352.

> Second Tier: if the four corners review does not resolve the issue, the next tier involves the discretionary use of various "canons" of contract interpretation, some of which the Receiver relies upon.

> Third Tier:  if the parties' intent remains unascertainable, the court considers extrinsic or parol evidence.

Importantly, if the provisions can be harmonized, a court has no reason to reach the Second Tier.  For this reason, a court applying Mississippi law should not apply any of the canons of construction relied upon by the Receiver.  As noted in *Royer Homes of Mississippi, Inc. v. Chandeleur Homes, Inc.*:

> This Court has set out a three-tiered approach to contract interpretation. Legal purpose or intent should first be sought in an objective reading of the words employed in the contract to the exclusion of parol or extrinsic evidence.  **First, the four corners test is applied, wherein the reviewing court looks to the language that the parties used in expressing their agreement.**  We must look to the four corners of the contract whenever possible to determine how to interpret it.  **When construing a contract, we will read the contract as a whole, so as to give effect to all of its clauses.**  Our concern is not nearly so much with what the parties may have intended, but with what they said, since the words employed are by far the best resource for ascertaining the intent and assigning meaning with fairness and accuracy.  Thus, the courts are not at liberty to infer intent contrary to that emanating from the text at issue.  **On the other hand, if the contract is unclear or ambiguous, the court should attempt to harmonize the provisions in accord with the parties' apparent intent.**  Only if the contract is unclear or ambiguous can a court go beyond the text to determine the

> parties' true intent. The mere fact that the parties disagree about the meaning of a contract does not make the contract ambiguous as a matter of law.
>
> Secondly, **if the court is unable to translate a clear understanding of the parties' intent, the court should apply the discretionary canons of contract construction.**[7]

This three tier approach was recently restated with approval by Judge Jordan in *Rifenburg Construction, Inc. v. Hatch Mott McDonald, LLC*, No. 3:12CV813-DPJ-FKB, 2015 WL 2381136, at *4 (S.D. Miss. May 19, 2015) (quoting *Dixie S. Indus. Coating, Inc. v. Miss. Power Co.,* 872 So.2d 769, 772 (Miss. Ct. App. 2004)).

In sum, the First Tier requires that the provisions should be harmonized so as to give effect to the entire agreement.  Here, the two provisions can be harmonized.  Because the forum selection provision and the arbitration provision can be harmonized as noted above, there is no basis for a court to even reach the Second Tier or to employ the canons of construction upon which the Receiver's argument relies.

**D.     The Receiver's "forest for the trees" argument is contrary to the controlling Mississippi law.**

The Receiver's "forest for the trees" argument at page 8 of her Opposition brief misses the point entirely.  This Engagement Contract cannot be interpreted by looking at the two provisions and then choosing to enforce the provision that is the "most expansive" or "most inclusive."  To the extent that may be the law in other jurisdictions for some purposes, it is clearly not the law of Mississippi.  No Mississippi authority is cited for that proposition, and none could be cited.

---

[7]     857 So. 2d 748, 752-53 (Miss. 2003) (internal marks, alterations, and citations omitted) (emphasis added).

Any such rule of interpretation is flatly inconsistent with Mississippi law that requires that the provisions be harmonized, if possible, to give effect to all of the provisions of the agreement.

Though the Receiver cited *Personal Security* in this section of her Opposition brief, nothing in that case supports the Receiver's argument.  Indeed, the interpretation given to the somewhat different language in the forum selection provision by the Fifth Circuit reached the same conclusion which Butler Snow Parties offer here.  As noted above, the Fifth Circuit stated:

> Reading the two provisions together, it becomes clear that the forum selection clause does not require the parties to litigate all claims in Texas courts, nor does it expressly forbid arbitration of claims arising under the Stock Purchase Agreement. Instead, we interpret the forum selection clause to mean that the parties must litigate in Texas courts only those disputes that are not subject to arbitration-for example, a suit to challenge the validity or application of the arbitration clause or an action to enforce an arbitration award.[8]

The other cases cited in this section of the Opposition brief simply do not support the arguments of the Receiver.

The sole case applying Mississippi law, *Bentley v.  Mutual Benefits Corporation*, 237 F. Supp. 2d 699 (S.D. Miss. 2002), is completely irrelevant.  *Bentley* did not even involve an alleged conflict between a forum selection provision and an arbitration provision—or even any claimed any conflict with any other provision.  It merely deals with the application of a forum selection provision.

The three snippets of the results in various cases from other jurisdictions cited on page 7 and again on page 9 of the Opposition brief, are also irrelevant.  They involve the different language found in far different agreements and involve analysis under bodies of law other than Mississippi law.  They involve such a variety of differences that all of those differences need not

---

[8]     297 F.3d at 395-96.

be discussed in detail.  Suffice it to say that all three of the out-of-state cases cited (twice) by the Receiver[9] are not on point, since the allegedly-conflicting arbitration and forum selection provisions were found in completely separate agreements.  Thus, they do not deal with two provisions in the same set of documents executed at the same time, nor with the concern as to whether they should be harmonized.  Moreover, the cases involve documents with much different language.  Finally some were decided under the law of the Second Circuit as to when provisions in later agreements supersede provisions in prior agreements.  In short, they are not on point as to the facts in this case for a great number of reasons which are apparent to any reader.  Even more importantly, they do not even attempt to apply Mississippi law.

      E.    **Mississippi law requires that any uncertainty as to whether the parties agreed to arbitrate must be resolved in favor of arbitration.**

In light of the foregoing, this point is not of great moment.  Because the two provisions can be readily harmonized, this is not a close case and this rule need not be applied.

However, to state the law correctly, the Butler Snow Parties' primary Memorandum noted that Mississippi law provides that any ambiguity or uncertainty as to whether the parties formed a valid agreement to arbitrate must be resolved in favor of arbitration.  *Harrison Cnty. Commercial Lot, LLC v. H. Gordon Myrick, Inc.*, 107 So. 3d 943, 950 (Miss. 2013).  The Receiver takes issue with that argument—pointing out (correctly but irrelevantly) that **federal law** itself does not confer special favor on arbitration at the "validity" step of arbitration analysis.

The Receiver has overlooked that (a) **Mississippi law** is used to determine the validity of the arbitration provision; and (b) **Mississippi law** requires that any uncertainty as to whether the

---

[9]    *Goldman, Sachs & Co. v. City of Reno*, 747 F.3d 733 (9th Cir. 2014); *Applied Energetics, Inc. v. NewOak Capital Markets, LLC*, 645 F.3d 522 (2d Cir. 2011); *SLSJ, LLC v. Kleban*, No. 3:14-CV-390 CSH, 2015 WL 1973307, at *22 (D. Conn. Apr. 30, 2015).

parties agreed to arbitrate must be resolved in favor of arbitration, as enunciated in *Harrison County Commercial Lot*.

Here, there should be no uncertainty, since harmonizing the provisions as required by Mississippi law makes it clear that the arbitration provision is valid.  But if this were a close case, Mississippi law favors a reading which renders the arbitration provision enforceable.

## II.    THE RECEIVER CANNOT UNILATERALLY REJECT THE ARBITRATION PROVISION.

The Receiver's second major argument is premised on a novel theory that has not been adopted in bankruptcy proceedings—and then extending application of that novel theory to receivership proceedings.  She argues, that even if the arbitration provision is valid, she has the power to "reject" the arbitration provision as an "executory contract."  That assertion, which the Receiver attempts to ground by reference to bankruptcy law and bankruptcy trustees, has no legal support.

The Federal Arbitration Act (FAA) mandates enforcement of a valid arbitration provision even in bankruptcy.  The Receiver has no basis to override the FAA's mandate in a receivership.

### A.    The Engagement Contract is not an "executory contract."

The 2012 Engagement Contract between BSAS and Adams is not an executory contract, even in bankruptcy.  Commonly understood, an executory contract is one where performance remains due by all of the parties.  In bankruptcy, executory contracts are even more narrowly construed.  The most frequently cited definition of an "executory contract" is from Professor Countryman: "A contract under which the obligation of both the bankrupt and the other party to the contract are so far unperformed that the failure of either to complete performance would constitute a material breach excusing the performance of the other." Vern Countryman, *Executory Contracts in Bankruptcy: Part I*, 57 Minn. L. Rev. 439, 460 (1973).

11

In this case, no performance remains due under the Engagement Contract.  The Contract was fully performed by December 2013, when BSAS and Adams terminated their engagement. It would be impossible to breach the operative terms of a contract the parties already performed. The Engagement Contract is a non-executory contract; therefore, the Receiver has no legal basis for avoiding the Engagement Contract's arbitration provision.

**B.      No authority empowers the Receiver to reject an arbitration provision within a non-executory contract.**

Nor can the Receiver separate the arbitration provision from the rest of the Engagement Contract, and treat that provision itself as a standalone executory contract.  Arbitration provisions within non-executory contracts are included in "the general rule binding trustees"—and by analogy receivers—to a debtor's "non-executory contracts."  A seminal decision on this matter was rendered by the Third Circuit, which held:

> We see no reason to make an exception for arbitration agreements to the general rule binding trustees to pre-petition non-executory contracts, especially in face of the strong federal policy favoring arbitration . . . .

*Hays & Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 885 F.2d 1149, 1153 (3d Cir. 1989)(footnote omitted). [10] *Hays* was cited with approval by the Fifth Circuit in I*n Matter of National Gypsum Company*, 118 F. 3d 1056, 1066 (5th Cir.  1997).

Moreover, as the Fifth Circuit subsequently noted in *Gandy*:

> While it is generally accepted that **a bankruptcy court has no discretion to refuse to compel the arbitration of matters not involving "core" bankruptcy proceedings** under 28 U.S.C. § 157(b), this court has held that a bankruptcy court may decline to stay a proceeding whose underlying nature derives exclusively from the provisions of the Bankruptcy Code. (Emphasis added.)

---

[10]      *See also Sec. & Exch. Comm'n v. Colonial Tidewater Realty Income Partners, LLC, No. CV ELH-15-2401*, 2015 WL 9460121, at *16 (D. Md. Dec. 22, 2015) (reasoning that a "Receiver cannot alter the terms of a non-executory contract"); *Nw. Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 321 B.R. 120, 123 (Bankr. D. Del. 2005); *In re Farmland Indus., Inc.*, 309 B.R. 14, 18 (Bankr. W.D. Mo. 2004).

This is consistent with the general accepted rule that in bankruptcy matters courts enforce arbitration agreements as to "non-core" matters. *E.g., In re: Lehman Bros. Holdings Inc.*, 663 F. App'x 65, 67 (2d Cir. 2016).

Circuits that have considered the issue in the context of a federal receivership have also held that a federal equity receiver is similarly bound to the underlying entity's arbitration agreements. *Wiand v. Schneiderman*, 778 F.3d 917, 923 (11th Cir. 2015); *Javitch v. First Union Sec., Inc.*, 315 F.3d 619, 627 (6th Cir. 2003).

The two principal cases the Receiver cites as support for her claimed power to reject an arbitration provision—*Janvey v. Alguire*[11] and *Jones v. Wells Fargo Bank, N.A.*[12]—provide no support her position.

The Receiver relies almost exclusively on the unpublished *Janvey* district court opinion—while burying in the footnotes of her Opposition brief reference to the majority opinion of the Fifth Circuit Court of Appeals, which declined to follow the trial court's reasoning. Instead, the Fifth Circuit decided the *Janvey* case on different and much narrower grounds. In so doing, the Fifth Circuit explicitly refused to accept the "broader policy argument" upon which the district court based its opinion, and upon which the Receiver relies here:

> **[W]e are wary of endorsing these broad policy arguments in the absence of specific direction from the Supreme Court.** *Cf., e.g., DIRECTV, Inc. v. Imburgia*, —— U.S. ——, 136 S.Ct. 463, 471, 193 L.Ed.2d 365 (2015) (rejecting interpretation of law that "does not give 'due regard ... to the federal policy favoring arbitration' ") (quoting *Volt Info. Scis., Inc. v. Bd. of Trustees of Leland Stanford Junior Univ.*, 489 U.S. 468, 476, 109 S.Ct. 1248, 103 L.Ed.2d 488 (1989)).[13]

---

[11]   No. 3:09-CV-0724-N, 2014 WL 12654910 (N.D. Tex. July 30, 2014).

[12]   666 F.3d 955 (5th Cir. 2012).

[13]   *Janvey v. Alguire*, 847 F.3d 231, 245 (5th Cir. 2017)(emphasis added).

In other words, in light of the FAA's clear mandate and the lack of any contrary mandate from the Supreme Court, the Fifth Circuit was unwilling to permit a receiver to unilaterally reject an otherwise-valid arbitration provision.  There is no reason to believe that the Fifth Circuit has changed its position.  Notably, in the five years since the *Janvey* district court opinion, the opinion has not been followed by other courts.  There is no reason to believe that the *Janvey* district court opinion—whose reasoning the Fifth Circuit expressly refused to adopt—has gained any currency as a source of federal law.

The *Janvey* district court based its ruling that the arbitration contract was executory in reliance on the theory advanced by a writer on bankruptcy matters, Professor Jay Westbrook, which suggested that the arbitration agreement should be viewed as a separate and executory agreement.   The theory relied upon by the district court in *Janvey* was the subject of criticism in a recent article, which, after summarizing the theory of Professor Westbrook, stated as follows:

> Despite the "logical attraction" of treating arbitration agreements as rejectable, executory contracts, **no court has adopted this framework in a bankruptcy case.** In fact, courts have invoked the principle of separability in a different manner. **For instance, several courts faced with rejected principal agreements have compelled arbitration of disputes arising under the rejected agreements, reasoning that the arbitration agreement survives the §365 rejection**. Although such treatment may emphasize the doctrine of separability--by permitting the insolvent to reject the principal agreement while at the same time compelling arbitration under the agreement--it is actually consistent with the idea that rejection of an executory contract does not equate to termination of that contract. Rather, rejection "cuts off any right of the contracting creditor to require the estate to perform the remaining executory portions of the contract and limits the creditor's claim to breach of contract."  .  .  .
>
> **An additional factor that may explain why courts have been reluctant to adopt this approach is the general rule that a debtor-in-possession or trustee must assume or reject the *entire* contract. A piecemeal assumption or rejection is prohibited.** Although under *Prima Paint* an arbitration agreement is a separate contract, a court may be hesitant to allow parties to treat a contract in piecemeal fashion for

purpose of rejection under § 365. Put differently, courts may view the application of the doctrine of separability in a § 365 context as a perverse use of the doctrine because it grants the debtor-in-possession or trustee the unilateral power to reject the contractual obligation to arbitrate disputes that arise under the principal agreement. Even further, such use of the doctrine flies in the face of the pro-arbitration tenets the Supreme Court relied on in first recognizing the doctrine of separability. **For now, it is safe to say that given the strong policy towards enforcing arbitration agreements in the United States, this approach is unlikely to find suitors in the near term unless Congress elects to amend the Code, which, again, is something that is unlikely.**[14]

Thus, the Receiver is inviting this Court to create a new doctrine based on part of a single, outlier district court opinion, toward which the Fifth Circuit has expressed wariness, and which has been the subject of scholarly skepticism. The rule contended for by the Receiver is inconsistent with bankruptcy law across the country; any change that affects the FAA in that rule should be made by Congress. In addition, if such a change in the law were to be accepted by this Court and then approved by the Fifth Circuit, it would place this circuit on a path of conflict with the other circuits who have enunciated rules in the bankruptcy context and with the other circuits who hold that receivers are bound by arbitration provisions. *Wiand*, 778 F.3d at 923; *Javitch*, 315 F.3d at 627. This Court should reject that invitation.

The only other case the Receiver cites for her claimed power to unilaterally reject arbitration, *Jones*, simply is not on point. The Receiver quotes from that case that a receiver can "maintain and defend actions" where "the corporation would not be permitted to do so." *Jones v. Wells Fargo*, 666 F.3d at 966. But that quote refers to the Court's analysis of the *in pari delicto* defense under Texas law: the Court reasoned that under Texas law the receiver's action in that

---

[14]    Julian Ellis, *A Comparative Law Approach: Enforceability of Arbitration Agreements in American Insolvency Proceedings*, 92 Am. Bankr. L.J. 141, 189-92 (2018) (footnotes omitted, including a reference to the district court decision in *Janvey* and the Fifth Circuit deciding the case on other grounds).

case would not be barred by the wrongdoing of individual corporate actors.  That is a much different issue and that case simply does not speak to whether a receiver must arbitrate claims.

### C.     The Receiver has not rejected the Engagement Contract; it is the source of BSAS' duties.

Even assuming, for the sake of argument, that the Receiver could reject the Engagement Contract, she has not actually done so.  She has merely picked the contractual provisions she likes and sued on those, while attempting to dodge the provision she does not like—the arbitration provision.   In short, if there is anything, it is a selective rejection which is not permitted.[15]  The Receiver's Complaint makes reference to the rights and obligations BSAS undertook through the Engagement Contract.  *E,g.*, Complaint ¶¶ 43-44, 57.  That is the only engagement BSAS had with Adams and Madison Timber.  It is the source of whatever duties BSAS possessed.  BSAS would not have owed any professional services had it not been engaged via the Engagement Contract.

This is a major point made in the American Bankruptcy Law Journal quoted above with respect to the theory that the receiver could reject only the arbitration provision.  The Receiver simply cannot "have it both ways" by suing on the Engagement Contract while at the same time disavowing portions of the Contract.  Allowing such a "pick and choose" approach to the

---

[15]     A party who assumes an executory contract must assume it in its entirety; it may not be assumed in part and rejected in part. *See, e.g., NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 531 (1984). In other words, a debtor cannot assume the benefits of an executory contract without assuming its burdens as well. *See, e.g., Covington v. Covington Land L.P.*, 71 F.3d 1221, 1226 (6th Cir. 1995) ("When a debtor assumes the lease or contract under § 365, it must assume both the benefits and the burdens of the contract. Neither the debtor nor the bankruptcy court may excise material obligations owing to the non-debtor contracting party."); *In re Pacific Exp. Inc.*, 780 F.2d 1482 (9th Cir. 1986); *In re Godwin Bevers Co., Inc.*, 575 F.2d 805, 807 (10th Cir. 1978) (trustee who accepts executory contract takes burdens with benefits); *In re Fitch*, 174 B.R. 96, 101 (Bankr. S.D. Ill. 1994) ("debtor cannot change the nature of a contract merely by . . . assum[ing] it . . . debtor may not 'conditionally' assume such a contract, and . . . must assume its burdens as well as its benefits"); *In re Monroeville Dodge, Ltd.*, 166 B.R. 264, 267 (E.D. Pa. 1994) (debtor-in-possession takes contract cum onere); *In re MacDaniel*, 89 B.R. 861, 863 (Bankr. E.D. Wash. 1988); *In re Maine*, 32 B.R. 452, 455 (Bankr. W.D.N.Y. 1983); *In re Yonkers Hamilton Sanitarium, Inc.*, 22 B.R. 427 (Bankr. S.D.N.Y. 1982). The debtor must perform "in full, just as if the bankruptcy had not intervened." *In re Frontier Properties*, 979 F.2d 1358, 1367 (9th Cir. 1992); *In re Airlift Int 'l*, 761 F.2d 1503 (11th Cir. 1985); *In re Steelship Corp.*, 576 F.2d 128, 132 (8th Cir. 1978)

contract would not only violate basic fairness, but also violate the federal mandate to place arbitration provisions on "equal footing with all other contracts."  *21st Fin. Servs., L.L.C. v. Manchester Fin. Bank*, 747 F.3d 331, 335 (5th Cir. 2014) (citing *Hall St. Assocs., L.L.C. v. Mattel, Inc.*, 552 U.S. 576, 581 (2008)).  The Receiver is not free to invoke the duties BSAS undertook in the Engagement Contract but still disfavor the arbitration provision within the Contract.

## III.   THE COURT CANNOT DISREGARD AN OTHERWISE-VALID ARBITRATION PROVISION MERELY BECAUSE THIS CASE ARISES OUT OF A RECEIVERSHIP.

Finally, the Receiver asserts that, even if she cannot unilaterally reject the arbitration provision, the Court has "discretion" to do so if it deems arbitration inconsistent with the purposes of receiverships, generally.  Again, the Receiver invites this Court to create a rule that would be unprecedented and clearly inconsistent with the policy embodied in the Federal Arbitration Act.

The Receiver once again relies on the unpublished district court *Janvey* opinion's policy pronouncements—the same pronouncements the Fifth Circuit declined to adopt "in the absence of specific direction from the Supreme Court."  *Janvey*, 847 F.3d at 245.

Moreover, even assuming, for the sake of argument, that a court could ever disregard a valid arbitration provision in a receivership case, this case does not even fall within the scope of the district court's reasoning in *Janvey*. [16]  That is because the types of claims the Receiver

---

[16]     The Receiver's suggestion that bankruptcy law principles control arbitration rules in receiverships are indulged only for the sake of argument.  As the Eleventh Circuit reasoned in *Wiand*, the bankruptcy code provides a specific **place** to adjudicate particular claims, whereas the receivership statutes merely provide a specific **person** (a receiver) to prosecute claims, not a **place**.  778 F.3d at 922-24.  The Receiver does not assert a single claim that is created by receivership law; all of the claims are creatures of Mississippi statutory and decisional law which are routinely litigated and arbitrated.  So while there might, theoretically, be an irreconcilable conflict between the **bankruptcy code** and arbitration for some subset of claims in bankruptcy, that conflict does not exist when it comes to the receivership statutes.  *Id*.

asserts are starkly different from the claims asserted in *Janvey*.  The district court in *Janvey* denied arbitration as to "fraudulent transfer claims" because the court analogized those claims in a receivership to "fraudulent transfer claims to recover bankruptcy estate assets."  Such claims in bankruptcy may not be arbitrable because they are part of a core bankruptcy proceeding and created by a federal bankruptcy statute.  2014 WL 12654910, at *19-21.  In *Janvey,* the only asserted claims were fraudulent transfer claims (and equivalent unjust enrichment claims).  Thus, the *Janvey* court district court characterized the claims at issue there as analogous to the "core" claims discussed above, as to which a bankruptcy court may have discretion. *Id*. n. 45.

It is not clear that the fraudulent transfer claim in *Janvey* were actually analogous to "core" bankruptcy claims.  But even assuming *arguendo* that the district court in *Janvey* was right in its analysis of fraudulent transfer claims as being analogous to "core" claims in bankruptcy, that would not support the Receiver's argument in this case—because here the Receiver asserts numerous "non-core" common law and statutory claims, such as conspiracy, aiding and abetting, negligence, RICO, and malpractice. These are claims created by state law. They are not analogous to claims created by federal bankruptcy law and therefore would have to be arbitrated even in bankruptcy court.

The bankruptcy law authorities cited by the Receiver—assuming, for the sake of argument, that bankruptcy law is relevant—highlight this important distinction based on the types of claims in a case.  *In re: National Gympsum Co*.—a bankruptcy case cited by the Receiver—distinguishes between "actions derived from the debtor," on one hand, and "federal bankruptcy rights wholly divorced" from the debtor's inherited claims—*i.e*. claims "created by the Bankruptcy Code"—on the other hand.  118 F.3d 1056, 1068 (5th Cir. 1997).  The former are arbitrable under bankruptcy law, while the latter, standing alone, are not.  *Id*. at 1067-1070.

All or at least most of the claims in this case would fall in the category of claims that must be arbitrated, even if bankruptcy law applied.  The Receiver's various common law and statutory claims are "derived from" Adams and Madison Timber; they are not "core" claims created by federal bankruptcy law (or receivership law, if the bankruptcy law could be deemed analogous).[17]  **Hence, they would be required to be arbitrated in bankruptcy and, of course, must be arbitrated in this case.**

The Receiver cites *In re: Gandy,*[18] which makes this point quite clearly:

> A bankruptcy court does possess discretion, however, to refuse to enforce an otherwise applicable arbitration agreement when the underlying nature of a proceeding **derives exclusively** from the provisions of the Bankruptcy Code and the arbitration of the proceeding conflicts with the purpose of the Code.

In *Gandy*, the debtor-in-possession asserted "three causes of action that derive entirely from the federal rights conferred by the Bankruptcy Code."  299 F. 3d at 495-96.  Although the debtor had other state law causes of action, the Court found that the "bankruptcy causes of action predominate" and implicate the state law issues "only in the most peripheral manner." *Id*. at 497-500.  Based on this finding—that the case really only involved core claims created by bankruptcy law—the Court found the "derive exclusively" requirement to be sufficiently satisfied and declined to compel arbitration.  *Id*.

Here, by contrast to the facts in *Gandy*, the Receiver's numerous state law causes of action for damages derive from state law.[19]  There is no authority empowering a Court to reject a

---

[17]    In the bankruptcy context, the Receiver's claims would be arbitrable: *In re RDM Sports Grp., Inc*., 260 B.R. 905, 912 (Bankr. N.D. Ga. 2001) (conspiracy); *In re TEU Holdings, Inc*., 287 B.R. 26, 41 (Bankr. D. Del. 2002) (negligence arising out of contractual undertaking); *Hays & Co*., 885 F.2d at 1162 (RICO).

[18]    299 F.3d 489, 495 (5th Cir. 2002) (emphasis added).

[19]    Assuming, *arguendo*, that there may be some claims here that might be analogous to core claims, that does not help the Receiver.  Any such claims are dwarfed by the state law claims.  Butler Snow only received $28,428.92

valid arbitration provision, based on the standard enunciated in *Gandy*.  Therefore, the Receiver has presented no basis for the Court to reject a valid arbitration provision for which the FAA mandates enforcement.

Finally, the Receiver makes conclusory assertions that it will be more expensive or time consuming to arbitrate her claims, and that this assumed expense contravenes the receivership statutes and thus invalidates the arbitration agreement. [20]  Any unsubstantiated inconvenience to the Receiver is not a basis to ignore the clear statutory mandate of the Federal Arbitration Act.

In sum, the Receiver has stated no reason for this Court to deny arbitration in this case.

## CONCLUSION

The Receiver's Opposition brief does not provide any reason to deny the motion.  The Court should grant the motion, either dismissing this case so that it can be arbitrated or staying the case pending arbitration.

---

for representing Madison Timber in the preparation of private placement memoranda; BSAS only received $99,250 for its work.

[20]      In any event, Congress has found that arbitration is often a "less expensive alternative to litigation."  *Allied-Bruce Terminix Companies, Inc. v. Dobson*, 513 U.S. 265, 280 (1995) (citing congressional findings).  There is no basis for any assumption that it will be more expensive to arbitrate with the Butler Snow Parties than to litigate. Similarly, the Receiver claims that she will have to put on evidence twice (once for the Baker Donelson Parties in court, and another time for the Butler Snow Parties in arbitration).  That also is very much overstated.  The Butler Snow Parties acted in a different time period under different circumstances than the Baker Donelson Parties.  There will be two very different stories and bodies of proof for these defendants, regardless of the forum for adjudication. In fact, it would probably save money for all concerned for the Receiver to assert her claims against the two groups of defendants in separate forums –since the details of involvement by each group may take a great deal of time to present. In any event, the issue of divided claims is present in many cases and is not the basis to deny effect to an arbitration agreement.

Respectfully submitted this 14th day of February, 2019.

| /s/ Edward Blackmon | /s/ Alan Perry |
|---|---|
| Edward Blackmon, Jr. (MB No. 3354) | Alan W. Perry (MB No. 4127) |
| Bradford J. Blackmon (MB No. 104848) | Simon Bailey (MB No. 103925) |
| | Michael Casey Williams (MB No. 104537) |
| | |
| Blackmon & Blackmon, PLLC | Bradley Arant Boult Cummings LLP |
| 907 W. Peace Street | Suite 450, One Jackson Place |
| Canton, MS 39046 | 188 East Capitol Street |
| Phone: (601) 859-1567 | Post Office Box 1789 |
| Facsimile: (601) 859-2311 | Jackson, MS  39215-1789 |
| edblackmon@blackmonlawfirm.com | Phone:  (601) 948-8000 |
| bjblackmon@blackmonlawfirm.com | Facsimile:  (601) 948-3000 |
| | aperry@bradley.com |
| | sbailey@bradley.com |
| | mcwilliams@bradley.com |
| | |
| *Attorneys for Butler Snow Advisory LLC* | *Attorneys for Butler Snow LLP* |
| *  and Matt Thornton* | |

## <u>CERTIFICATE OF SERVICE</u>

I, Alan W. Perry, certify that on February 14, 2019, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

/s/ Alan Perry