UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

| | |
|---|---|
| ALYSSON MILLS, IN HER CAPACITY AS RECEIVER FOR ARTHUR LAMAR ADAMS AND MADISON TIMBER PROPERTIES, LLC,<br><br>    Plaintiff,<br><br>  v.<br><br>BUTLER SNOW LLP; BUTLER SNOW ADVISORY SERVICES, LLC; MATT THORNTON; BAKER, DONELSON, BEARMAN, CALDWELL & BERKOWITZ, PC; ALEXANDER SEAWRIGHT, LLC; BRENT ALEXANDER; and JON SEAWRIGHT,<br><br>    Defendants. | Case No. 3:18-cv-00866<br><br>Arising out of Case No. 3:18-cv-252, *Securities and Exchange Commission v. Arthur Lamar Adams and Madison Timber Properties, LLC*<br><br>Hon. Carlton W. Reeves, District Judge |

## RECEIVER'S OPPOSITION TO ALEXANDER SEAWRIGHT, LLC; BRENT ALEXANDER; AND JON SEAWRIGHT'S MOTION TO DISMISS

Alysson Mills, in her capacity as the court-appointed receiver for Arthur Lamar Adams and Madison Timber Properties, LLC (the "Receiver"), through undersigned counsel, opposes the motion to dismiss filed by Defendants Alexander Seawright, LLC; Brent Alexander; and Jon Seawright (collectively "Alexander and Seawright").

## INTRODUCTION

Alexander and Seawright say they are "victims" who were "duped" by Lamar Adams. They say they merely "coordinated loans" to Madison Timber, and for that they merely received "loan-origination fees." They say they "had no reason to suspect" Madison Timber was a Ponzi scheme.

They contend the Receiver cannot prove they knew that Madison Timber was a fraud ask the Court to dismiss the Receiver's claims.

To be clear, the victims here are the investors who lost money, in many instances their life savings, because individuals including Alexander and Seawright recruited them to invest in the Madison Timber Ponzi scheme.

The facts, as alleged in the Receiver's complaint, are that from 2011 until April 2018, Alexander and Seawright used an investment fund they named after themselves to invest other people's money in Madison Timber and split the "profits" with Adams.[1] They promised the fund offered a "rock stable" and "oversecured" return.[2] They pitched the fund as "safe enough for friends and family" and encouraged potential investors to rely on their affiliation with Baker Donelson and its good reputation.[3] They were persistent salesmen. If an investor said he could invest "either 25k or 30," they urged "$50k would be better for you."[4] They bragged that they had "invest[ed] more than $20 million" of other people's money in Madison Timber.[5] "It has worked so well that we simply send out an email on the 15th of each month and some hours later have collected the investment we need for the next round."[6] On April 19, 2018, the day the Madison Timber Ponzi scheme collapsed, they were getting ready to "take it to the next level"[7] by

---

[1] Doc. 1 at ¶¶ 69-74.

[2] Doc. 1 at ¶ 76.

[3] Doc. 1 at ¶¶ 69-84.

[4] Doc. 1 at ¶ 76.

[5] Doc. 1 at ¶ 104.

[6] Doc. 1 at ¶ 92.

[7] Doc. 1 at ¶ 101.

"deploying at $1 million a month beginning May 1."[8] "We pull this off," Alexander told Seawright, "we get rich."[9]

The complaint alleges claims against Alexander and Seawright for aiding and abetting; civil conspiracy; recklessness, gross negligence, and at a minimum negligence; fraudulent transfer; and violations of Mississippi's Racketeer Influenced and Corrupt Organization Act. It separately alleges Alexander and Seawright are subject to joint venture and alter ego liability. Alexander and Seawright move to dismiss all but the Receiver's fraudulent transfer claim.

Like Baker Donelson, Alexander and Seawright argue the Court must dismiss the Receiver's claims because the Receiver has not proven they had "actual knowledge" that Madison Timber was a Ponzi scheme. The Receiver, however, need not prove Alexander and Seawright's actual knowledge to survive their motions to dismiss.  It is sufficient that the complaint alleges they "knew or should have known that Madison Timber was a Ponzi scheme."[10]  The complaint alleges they ignored numerous glaring red flags[11] and—worse—falsely represented that they personally inspected the timber and "mill contracts" underlying each Madison Timber investment.[12]

What Baker Donelson, Alexander, and Seawright mean by their argument is they do not believe the Receiver will ever obtain direct evidence of their actual knowledge. But this lawsuit is yet young, and regardless the law does not require a smoking gun. A jury properly considers circumstantial evidence, including the many facts recounted in the complaint, in deciding a defendant's fate.

---

[8] Doc. 1 at ¶ 111.

[9] Doc. 1 at ¶ 101.

[10] Doc. 1 at ¶ 129.

[11] Doc. 1 at ¶¶ 94-100.

[12] Doc. 1 at ¶¶ 86-88.

The Receiver responds to Alexander and Seawright's legal arguments below.

## ARGUMENT

A complaint should state "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "When considering a motion to dismiss under Rule 12(b)(6), the Court accepts the plaintiff's factual allegations as true and makes reasonable inferences in the plaintiff's favor." *Handy v. U.S. Foods, Inc.*, No. 3:14-CV-854-CWR-LRA, 2015 WL 1637336, at *1 (S.D. Miss. Apr. 13, 2015) (citing *Iqbal*, 556 U.S. at 678).

### 1. The complaint states a claim for aiding and abetting.

#### A. This Court has recognized a claim for aiding and abetting.

Like Baker Donelson, Alexander and Seawright argue Mississippi law does not recognize a claim for civil aiding and abetting.[13]  Although no Mississippi state court has had the occasion to address the issue, every Mississippi federal court to address the issue has agreed that Mississippi law would recognize a claim for civil aiding and abetting as set forth in the Restatement (Second) of Torts section 876(b).  This includes the United States Bankruptcy Court for the Southern District of Mississippi in *In re Evans*, 467 B.R. 399 (Bankr. S.D. Miss. 2011), which Alexander and Seawright selectively quote in their memorandum.

As the *In re Evans* court explained, this Court in *Dale v. Ala Acquisitions, Inc.*, 203 F. Supp. 2d 694 (S.D. Miss. 2002), made an *Erie* guess that Mississippi would recognize a cause of action under section 876(b) of the Restatement "(1) because a majority of other jurisdictions have done so and (2) because Mississippi recognizes the analogous tort of civil conspiracy." *In re Evans*,

---

[13] Doc. 32 at 9.

467 B.R. at 409.[14]  Since *Dale*, this Court has consistently recognized a cause of action for aiding and abetting under Mississippi state law.[15] The *In re Evans* court recognized the viability of a cause of action based on section 876(b) but declined to hold that Mississippi law would recognize a cause of action based on section 876(c). 457 B.R. at 409. The Receiver's cause of action arises under section 876(b), not section 876(c).[16]

### B.  The complaint alleges sufficient facts to state a claim for aiding and abetting.

"For harm resulting to a third person from the tortious conduct of another, one is subject to liability if he knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself." RESTATEMENT (SECOND) OF TORTS § 876(b).

Alexander and Seawright knew that Lamar Adams was the manager of his company, Madison Timber. They therefore knew that Adams owed Madison Timber a fiduciary duty of care. Mississippi law requires a manager to discharge his duties in good faith and with fair dealing, with

---

[14] Alexander and Seawright quote the Fifth Circuit's opinion in *In re Depuy Orthopaedics, Inc., Pinnacle Health Implant Prods. Liab. Litig.*, 888 F.3d 753, 781 (5th Cir. 2018), for the proposition that "[w]hen sitting in diversity, a federal court exceeds the bounds of its legitimacy in fashioning novel causes of action not yet recognized by state courts." They then argue this Court should not recognize a cause of action for aiding and abetting fraud. Doc. 32 at 11. *Depuy* applied Texas law, and the "novel issue" was "an aiding-and-abetting cause of action, outside of the conspiracy context, when the predicate offense sound[ed] in strict liability." 888 F.3d at 781. Unlike the Mississippi Supreme Court, the Texas Supreme Court had explicitly stated that it "has not expressly decided whether Texas recognizes a cause of action for aiding and abetting." *Id.* (quoting *First United Pentecostal Church of Beaumont v. Parker*, 515 S.W.3d 214, 244 (Tex. 2017)).

[15] *See Natchez Reg'l Med. Ctr. v. Quorum Health Res., LLC*, 879 F. Supp. 2d 556, 574 (S.D. Miss. 2012) (declining to grant summary judgment to defendants on an aiding and abetting fraud claim); *Dickens v. A-1 Auto Parts & Repair, Inc.*, No. 1:18CV162-LG-RHW, 2019 WL 508074, at *2 (S.D. Miss. Feb. 8, 2019) ("Federal courts in this district have concluded that Mississippi courts would recognize a claim of aiding and abetting fraud or civil conspiracy under the Restatement (Second) of Torts § 876(b)."); *U-Save Auto Rental of Am., Inc. v. Moses*, No. 1:02CV689GURO, 2006 WL 211955, at *1 (S.D. Miss. Jan. 27, 2006) (denying a motion to dismiss a claim for aiding and abetting breach of contract); *see also Wright v. Life Investors Ins. Co. of Am.*, No. CIV.A. 2:08CV3-P-A, 2008 WL 4450260, at *1 (N.D. Miss. Sept. 26, 2008) (denying a motion to dismiss a claim for aiding and abetting fraud).

[16] Doc. 1 at ¶ 127.

prudence, and in a manner that he reasonably believed was in the best interests of the company. *See* MISS. CODE ANN. § 79-29-123(6)(a). Adams breached those duties by misusing Madison Timber's corporate form to sustain a Ponzi scheme. *E.g.*, *Official Stanford Inv'rs Comm. v. Greenberg Traurig, LLP*, No. 3:12-CV-4641-N, 2014 WL 12572881, at *8 (N.D. Tex. Dec. 17, 2014) ("the underlying fiduciary duties on which Plaintiffs' claims are based are those owed by directors and officers of the Stanford Financial Group to their respective Stanford entities").

The complaint alleges that Alexander and Seawright, by recruiting new investors to the Madison Timber Ponzi scheme, aided and abetted Adams in "committing breaches of duties owed by Adams to Madison Timber and in other tortious conduct."[17] *E.g., Janvey v. Proskauer Rose LLP*, No. 3:13-CV-0477-N, 2015 WL 11121540, at *6 (N.D. Tex. June 23, 2015) ("acts in furtherance of Stanford's scheme amount[ed] to 'substantial assistance'"); *Official Stanford Inv'rs Comm. v. Breazeale Sachse & Wilson LLP*, No. 3:11-CV-0329-N, 2015 WL 13740747, at *9, n.11 and accompanying text (N.D. Tex. Mar. 24, 2015) (allegations that law firm referred clients to Ponzi scheme support "reasonable inference" of substantial assistance).

Alexander and Seawright argue they cannot be liable for aiding and abetting because "the Receiver has not even alleged facts demonstrating that the Alexander Seawright Defendants *knew* about the fraud when they agreed to do business with Adams."[18] But the complaint expressly alleges that they "knew or should have known that Madison Timber was a Ponzi scheme" in view of the numerous red flags described in the complaint.[19] These red flags, summarized in paragraphs 94–100 of the complaint, included the following:

> 95. The timber deeds and cutting agreements between landowners and
> Madison Timber were fake. The landowners' signatures, forged by Adams, often

---

[17] Doc. 1 at ¶ 128.
[18] Doc. 32 at 8 (emphasis in original).
[19] Doc. 1 at ¶ 129.

looked the same. A call to any one of the hundreds of purported landowners, or a simple check of the title for any one of the hundreds of purported tracts of land, would have confirmed the truth. Neither Alexander nor Seawright, nor anyone at Baker Donelson, ever called a landowner or checked a tract's title.

96. Madison Timber also had no real contracts with any mills. A call to any one of the mills for which Madison Timber purported to have contracts would have confirmed the truth. Neither Alexander nor Seawright, nor anyone at Baker Donelson, ever called a mill.

97. Adams required that an investor agree that he or she would not record the deed by which Madison Timber purported to grant its own rights to the investor unless and until Madison Timber failed to make a payment due under the promissory note. Seawright quipped that "I have been clear that I am no timber expert"—but he is unquestionably a lawyer to whom his clients and investors looked to evaluate the investment's risks. Incredibly, notwithstanding the suspicious "agreement not to record," neither Alexander nor Seawright, nor anyone at Baker Donelson, questioned this requirement.

98. The "profit" that Adams promised was 300% to 400% better than that payable by any other fully collateralized investment and was uniform and consistent. This fact should have been a glaring warning sign but Alexander, who Baker Donelson presents as a qualified and experienced advisor, turned this warning sign into a selling point. Alexander bragged about his "six year perfect track record" of consistent uniform returns under his "beautiful, albeit simple, financial model."

99. Adams purported to have identified mills with an insatiable demand for timber at uniform prices. The market price for timber is readily available from multiple sources, and any one of those sources would have confirmed that the market price for timber actually rises and falls, sometimes dramatically, over short periods of time. Neither Alexander nor Seawright, nor anyone at Baker Donelson, ever evaluated the investment in light of such information. To the contrary, Seawright gloated that "[Adams] has stated that volume is not problem and indicates there are enough opportunities for him to soak up as much capital as we can raise."

100. In 2014 Adams decided that he did not want to have to manage Madison Timber during the month of December. He told his "bird dogs," including Alexander and Seawright, that Madison Timber would not issue checks in December going forward; what had been a 12-month payoff would become a 13-month payoff, skipping the last month of the year. Seawright blindly passed on to investors the dubious explanation that mills shut down in December for OSHA inspections . . . .

Alexander and Seawright point to the purported "universal rule in this country" that "banks, lawyers, brokerage houses, [or] accountants" are not liable for aiding and abetting based on "red flags, smoke, and other irregularities."[20] They borrow the argument from Baker Donelson, who pieced it together using select quotes from *El Camino Res., LTD v. Huntington Nat'l Bank*, 722 F. Supp. 2d 875, 907–08 (W.D. Mich. 2010). As the Receiver wrote in response to Baker Donelson's motion, the only "universal rule" to which the *El Camino* court referred is the purported principle that "a bank's relationship is with its customer and that the bank owes third parties no duty of care to monitor a customer's activities." 722 F. Supp. 2d at 907. That principle is inapplicable here, and in any event, *El Camino* is not binding on this Court. Indeed, in Ponzi scheme cases decided in the Fifth Circuit, awareness that an investment offered "unrealistic rates of return" supports knowledge for aiding and abetting purposes. *Proskauer Rose LLP*, 2015 WL 11121540, at *5.

Moreover, the complaint does not depend on red flags alone. The complaint expressly alleges at paragraphs 86–88 that Alexander and Seawright falsely represented that they personally inspected the timber and "mill contracts" underlying each investment. These representations were knowingly false, because there were no timber and no "mill contracts" to inspect:

> 86. Investors were led to believe that Alexander and Seawright personally inspected the timber underlying each investment. Of course they did not. Alexander and Seawright gave investors "Equity Term Sheets" that described each upcoming investment opportunity. An "Equity Term Sheet" dated March 5, 2017, for instance, explained that for the "minimum investment" of $25,000, an investor would share in the "cutting rights on tracts of land in various counties (the 'Timber Rights')." Like all of Alexander and Seawright's "Equity Term Sheets," the "Equity Term Sheet" dated March 5, 2017, expressly represented that Alexander and Seawright would personally inspect the property in question:

> > Company [Alexander and Seawright] will inspect the property related to the Timber Rights, must receive the original, executed Note and timber deed and will inspect the executed agreement(s) with the timber mill(s).

---

[20] Doc. 32 at 9 n.6.

Alexander and Seawright could not and did not inspect the property in question—nor "the executed agreement(s) with the timber mill(s)"—because such did not exist. These representations were patently false.

87. Alexander and Seawright even devised a "Timber Rights Investment Closing Checklist" that included among its list of things to do "Review Mill Contract" and "Review Land re Timber." Alexander and Seawright could not and did not review any "Mill Contract" or "Land re Timber" because there was no "Mill Contract" or "Land re Timber" to review.

88. On information and belief, Alexander and Seawright "inspected" a purported timber tract only once or twice, at the very inception of their partnership with Adams. The "inspection" was hardly professional. Email traffic indicates "inspection" meant "[grab] a cooler of beer and make a loop."

Reading the complaint's allegations in a light most favorable to the Receiver, and making reasonable inferences in her favor, the complaint states a claim for aiding and abetting.

### 2. The complaint states a claim for civil conspiracy.

A conspiracy is "a combination of persons for the purpose of accomplishing an unlawful purpose or a lawful purpose unlawfully." *Shaw v. Burchfield*, 481 So. 2d 247, 255 (Miss. 1985). An agreement to conspire "may be express, implied, or **based on evidence of a course of conduct**." *Bradley v. Kelley Bros. Contractors*, 117 So. 3d 331, 339 (Miss. Ct. App. 2013) (emphasis added). The three elements of civil conspiracy claim are: "(1) the existence of a conspiracy, (2) an overt act in furtherance of that conspiracy, and (3) damages arising therefrom." *Wells v. Shelter Gen. Ins. Co.*, 217 F. Supp. 2d 744, 753 (S.D. Miss. 2002) (citing *Delta Chem. & Petroleum, Inc. v. Citizens Bank of Byhalia*, 790 So. 2d 862, 877 (Miss. App. 2001)). Facts supporting the "substantial assistance" prong of an aiding and abetting claim also support a showing of "an overt act in furtherance of a [Ponzi scheme] conspiracy." *Rotstain v. Trustmark Nat'l Bank*, No. 3:09-CV-2384-N, 2015 WL 13034513, at *11 (N.D. Tex. Apr. 21, 2015).

Alexander and Seawright argue the Receiver has "not alleged sufficient facts demonstrating that the Alexander Seawright Defendants knew Adams was operating a fraudulent Ponzi scheme."[21] This argument fails on two grounds. First, and again, the complaint expressly alleges that Alexander and Seawright "knew or should have known that Madison Timber was a Ponzi scheme"[22] in view of the red flags summarized in paragraphs 94–100 and reproduced above. Moreover, and again, the complaint does not depend on red flags alone. The complaint expressly alleges at paragraphs 86–88 that Alexander and Seawright falsely represented that they personally inspected the timber and "mill contracts" underlying each investment. These representations were knowingly false, because there were no timber and no "mill contracts" to inspect.

Second, Mississippi law holds that a conspiracy can be formed by a "mere tacit understanding between the conspirators to work to a common purpose." *Aetna Ins. Co. v. Robertson*, 94 So. 7, 22 (1922), *modified on suggestion of error for other reason*s, 95 So. 137 (1923).  Alexander and Seawright formed a common purpose with Lamar Adams to "pool other people's money to invest in Madison Timber," and through Alexander Seawright, LLC, they furthered that purpose.[23] *See, e.g.*, *Rotstain*, 2015 WL 13034513, at \*11 (even the provision of "routine [professional] services" is "sufficient to allege substantial assistance and an overt act in furtherance of a conspiracy" if those services "inherently facilitated the financial transactions and operations that formed the lifeblood of the [Ponzi] scheme").

Like Baker Donelson, Alexander and Seawright cite *Midwest Feeders, Inc. v. Bank of Franklin*, 886 F.3d 507, 520 (5th Cir. 2018), for the general proposition that civil conspiracy requires proof that the coconspirator "knew of [the] fraudulent scheme." In fact, in affirming

---

[21] Doc. 32 at 9.

[22] Doc. 1 at ¶ 120.

[23] Doc. 1 at ¶ 70.

summary judgment in that case, the Fifth Circuit nevertheless observed that "civil conspiracy can be—and often is—established through circumstantial evidence." *Id.* at 520.  Indeed, the district court in *Midwest Feeders* denied a motion to dismiss because alleged "circumstantial evidence" created "a factual inquiry regarding a civil conspiracy." *Midwest Feeders, Inc. v. Bank of Franklin*, 114 F. Supp. 3d 419, 431 (S.D. Miss. 2015).  Where one conspirator had "confessed to fraudulent activity," it was sufficient, at the motion to dismiss stage, that his coconspirators were alleged to have failed to investigate.  *Id.*

Applying this precedent, and reading the complaint's allegations in a light most favorable to the Receiver and making reasonable inferences in her favor, the complaint unquestionably alleges facts supporting a civil conspiracy claim sufficient to survive a motion to dismiss.

### 3. The complaint states a claim for recklessness, gross negligence, and at a minimum negligence.

"Negligence is a failure to do what the reasonable person would do under the same or similar circumstances." *Estate of St. Martin v. Hixson*, 145 So. 3d 1124, 1128 (Miss. 2014). Recklessness "is a failure or refusal to exercise any care." *Maldonado v. Kelly*, 768 So. 2d 906, 910 (Miss. 2000).[24]

Alexander and Seawright argue the Receiver has not shown they owed a duty to Adams or Madison Timber. In fact, as Adams and Madison Timber's joint venture partners, Alexander and Seawright owed a statutory duty to Adams and Madison Timber to refrain from "engaging in grossly negligent or reckless conduct, intentional misconduct, or a knowing violation of law." MISS. CODE ANN. § 79-13-404(c). Separately, as a general proposition, "all individuals owe a duty

---

[24] *See also Dame v. Estes*, 101 So. 2d 644, 645 (Miss. 1958) ("Gross negligence is that course of conduct which, under the particular circumstances, discloses a reckless indifference to consequences without the exertion of any substantial effort to avoid them.").

to exercise reasonable care to avoid foreseeable injury to others . . . ." *Fed. Sav. & Loan v. Tex. Real Estate Counselors, Inc.*, 955 F.2d 261, 265 (5th Cir. 1992).[25]

Alexander and Seawright contend that their relationship with Adams and Madison Timber was "strictly limited to the loans that Alexander Seawright coordinated to be made by Timber Fund I to Madison Timber and payment of related loan-origination fees."[26] But the complaint tells a different story. The complaint alleges that from 2011 until April 2018, Alexander and Seawright used a fund they named after themselves to invest other people's money in Madison Timber and split the "profits" with Adams.[27] They worked closely with Adams for seven years. They "were in advantageous positions to discover Adams's fraud" and "[i]n view of the numerous red flags described in this complaint, a reasonable person in the same or similar circumstances would have discovered Adams's fraud."[28] Alexander and Seawright had a duty to exercise reasonable care to avoid foreseeable injury to others, including Madison Timber.[29] They breached this duty when they "not only failed to exercise due care, they failed or refused to exercise any care at all in their dealings with Adams."[30]

---

[25] *See also Doe ex rel. Doe v. Wright Sec. Servs., Inc.*, 950 So. 2d 1076, 1079 (Miss. Ct. App. 2007) ("The general duty is to act as a reasonable prudent person would under the circumstances.").

[26] Doc. 32 at 13.

[27] Doc. 1 at ¶¶ 69-74.

[28] Doc. 1 at ¶ 138.

[29] *See* Doc. 1 at ¶ 139. In a footnote, Alexander and Seawright adopt Baker Donelson's argument that the complaint does not allege that Adams or Madison Timber were clients of Baker Donelson or Alexander and Seawright. Correct. The complaint does not currently allege a claim for professional negligence, or professional malpractice, against Baker Donelson or Alexander and Seawright.

[30] Doc. 1 at ¶ 139. In a footnote, Alexander and Seawright offer that "reckless disregard" means "knowingly or intentionally doing a thing or a wrongful act," and contend the complaint "is devoid of any facts" which would establish that "they *knowingly* or *intentionally* breached [any] duty." Doc. 32 at 23 n.9. Not true. Again, the complaint expressly alleges that Alexander and Seawright "knew or should have known that Madison Timber was a Ponzi scheme" in view of numerous red flags described in the complaint—and, worse, that they knowingly falsely represented that they personally inspected the timber and "mill contracts" underlying each Madison Timber investment.

12

Alexander and Seawright's acts, which they undertook in concert with Adams, increased Madison Timber's liabilities and, today, the Receivership Estate's debts. *E.g.*, *Greenberg Traurig, LLP*, 2014 WL 12572881, at *6 (defendants caused damages to the Stanford receivership estate because "they contributed to the size and scope of the underlying scheme, which ultimately resulted in Stanford's financial ruin").

In short, the complaint alleges facts sufficient to establish each of the elements of recklessness, gross negligence, and at a minimum negligence.  Alexander and Seawright have stated no basis for dismissing the Receiver's claim.

### 4.   The complaint states a claim for joint venture liability.

Mississippi courts use a three-pronged test to determine whether a joint venture existed: "(1) the intent of the parties, (2) the control question, and (3) profit sharing." *Smith v. Redd*, 593 So. 2d 989, 994 (Miss. 1993).

Alexander and Seawright argue they did not form a joint venture with Adams as a matter of law, but the only case they cite in support is *Walker v. Williamson*, No. 1:14-CV-381-KS-JCG, 2016 WL 2771792 (S.D. Miss. May 12, 2016). In *Walker*, the plaintiffs sought to establish that the defendants had formed a partnership to solicit and represent personal injury clients, but the plaintiffs alleged only that the defendants had "worked together in the past on specific cases." *Id.* at *3.  Because the plaintiffs' complaint contained "no factual allegations" of intent or control, their "weak" allegations of shared profits were not enough, on their own, to establish a partnership. *Id.* at *3, *4.  Here, by contrast, the complaint alleges facts sufficient to establish each of the three prongs.

*"(1) the intent of the parties"*

The intent prong does not require, as Alexander and Seawright contend, that Alexander and Seawright expressly "intended to join a fraudulent scheme."[31] It requires only that the parties "expressed an intention to form a partnership" or a joint venture. *Smith*, 593 So. 2d at 994. The complaint alleges that it was Alexander and Seawright's "stated intent to form a fund to invest other people's money in Madison Timber and to split the 'profits' with Adams."[32]

For good measure, intent also may "be implied, or established from the surrounding circumstances." *Smith*, 593 So. 2d at 994. The complaint alleges numerous factual circumstances, too numerous to summarize here, from which a jury might reasonably conclude that Alexander and Seawright intended to form a joint venture with Adams. At paragraphs 72–74, for example, the complaint alleges Adams, Alexander, and Seawright together determined essential terms of the investments in Madison Timber (called "joint ventures"[33]), including each investor's return and how to "split" the "profit," and collaborated on the drafting of the investments' essential underlying documents.[34]

*"(2) the control question"*

Alexander and Seawright argue the complaint does not allege that they "had any control whatsoever over Madison Timber and Adams."[35] But the "control question" asks whether one had any control over the joint venture's business. *See Smith*, 593 So. 2d at 995.  The question, then, is

---

[31] Doc. 32 at 15 (emphasis removed).

[32] Doc. 1 at ¶ 161.

[33] Doc. 1 at ¶ 35.

[34] See also Doc. 35-1, attached as Exhibit A to the Receiver's opposition to Baker Donelson's motion to dismiss. "When a plaintiff quotes from a document used as a foundation for allegations in the complaint, the Court may examine the entire document to review a motion to dismiss." *Thornton v. Micrografix, Inc.*, 878 F. Supp. 931, 933 (N.D. Tex. 1995). Paragraph 72 of the complaint quotes the email that is Exhibit A.

[35] Doc. 32 at 15.

not whether Alexander or Seawright controlled Adams or Madison Timber—but instead whether they controlled any aspect of the joint venture that they and Adams undertook.

"[P]artnership-like control varies by the circumstances of each particular partnership, and in some cases all the partners may not be equal participants in running the operations." *Peoples Bank v. Bryan Bros. Cattle Co.*, 504 F.3d 549, 556 (5th Cir. 2007). When "[a]ll parties ma[k]e business decisions," they all exercise partner-like control over the business, even if one partner alone "handle[s] the financial matters." *Smith*, 593 So. 2d 989 at 995. *See also Century 21 Deep S. Properties, Ltd. v. Keys*, 652 So. 2d 707, 715 (Miss. 1995) (concluding that, indeed, "lack of control is not enough by itself to disprove partnership").

The complaint alleges more than enough facts to establish that Alexander and Seawright controlled many aspects of their joint venture with Adams. As described above, Alexander and Seawright made key business decisions as to the essential terms of the investments in Madison Timber—including how they would "split" the "profit" and what the underlying documents would say.[36] They relied heavily on their affiliation with Baker Donelson, and on Baker Donelson's resources, in securing investments.[37] They used their own professional networks, which included Baker Donelson colleagues and clients, to identify new investors.[38] They told potential investors that they personally "fronted the expenses for the design, implementation, operation, and management" of the fund,[39] which invested solely in Madison Timber. Unquestionably, Alexander and Seawright had partner-like control over the joint venture with Adams.

---

[36] Doc. 1 at ¶¶ 72-74, 86. See also Doc. 35-1.

[37] Doc. 1 at ¶¶ 79-84. Discovery likely will show that several Baker Donelson employees assisted Alexander and Seawright with their Madison Timber business.

[38] Doc. 1 at ¶¶ 75-78.

[39] Doc. 1 at ¶ 106.

15

*(3) profit sharing*

"The one factor which is the most important in determining the existence of a partnership is profit sharing." *Century 21 Deep S. Properties*, 652 So. 2d at 715.  In fact, the Mississippi Uniform Partnership Act provides that the receipt of profits is *prima facie* evidence that a person is a partner in a business. MISS. CODE ANN. § 79–12–13(4).

Alexander and Seawright argue the complaint only "state[s] that Madison Timber paid Alexander Seawright loan-origination fees."[40] That is not true. The complaint expressly alleges Adams, Alexander, and Seawright "split" their "profits":

> 72.    Alexander and Seawright's "share" [of the profits] would include a portion of each investment's return, what Adams called a "birddog fee." Adams told Alexander and Seawright that he could ensure a 14% "profit" with a 2% "birddog fee" built-in, but Alexander and Seawright could decide "how you guys want the split done."

> 73.    Seawright proposed instead that each investment's promissory note bear 13% interest, of which investors would receive 10% and Alexander and Seawright would keep 3%. Separately Alexander and Seawright negotiated an additional 3% commission for themselves. As a result, Alexander and Seawright's "share" of each investment's return included the 3% they disclosed to investors, plus an extra undisclosed 3% that Adams paid them directly.

In short, the complaint alleges facts sufficient to establish each of the elements of joint venture liability.

**5.    The complaint states a claim under Mississippi's RICO Act.**

Mississippi's Racketeer Influenced and Corrupt Organization ("RICO") Act makes it "unlawful for any person employed by, or associated with, any enterprise to conduct or participate, directly or indirectly, in such enterprise through a pattern of racketeering activity or the collection of an unlawful debt." MISS. CODE ANN. § 97-43-5(3).  "Such enterprise" means "an organized theft

---

[40] Doc. 32 at 15.

or fraud enterprise," which includes one conducted by "mail or other means of communication." § 97-43-3.1.

Alexander and Seawright call it "outlandish" to suggest their conduct falls within the RICO Act's scope.  But they do not, and cannot, dispute the complaint's allegation that Madison Timber was a fraud enterprise,[41] or that they were associated with and participated in Madison Timber's business.[42]

Alexander and Seawright's only real argument is that the complaint does not allege that they "were aware" that Madison Timber was a fraud "much less that they knowingly participated."[43] But that is not true. The complaint expressly alleges that Alexander and Seawright "knew or should have known that Madison Timber was a Ponzi scheme" in view of the red flags summarized in paragraphs 94–100 and reproduced above.

Alexander and Seawright argue red flags "are simply not enough." In support, they cite *Chaney v. Dreyfus Service Corp.*, 595 F.3d 219 (5th Cir. 2010). Actually, the *Chaney* court explained that the red flags in that case would have been sufficient "to someone trained to recognize the 'red flags' associated with money laundering," but the parties agreed that the defendant's employees "were not so trained." *Id.* at 240.  Here, by contrast, the complaint alleges, among other things, that the "profits" Adams promised—300% to 400% better than that payable by any other fully collateralized investment—were sufficient to alert Alexander, a "qualified and experienced" investment advisor, that Madison Timber was a fraud.[44] Among other things, the agreements not to record were sufficient to alert Seawright, "a lawyer to whom his clients and

---

[41] Doc. 1 at ¶ 152.

[42] Doc. 1 at ¶ 154.

[43] Doc. 32 at 14.

[44] Doc. 1 at ¶ 98.

investors looked to evaluate the investment's risks," that something was amiss.[45] Having held themselves out as professionals knowledgeable in such matters, they cannot avoid liability simply by proclaiming their ignorance in a motion to dismiss.

But more damning for Alexander and Seawright: The complaint does not rely solely on red flags. The complaint expressly alleges at paragraphs 86–88 that Alexander and Seawright falsely represented that they personally inspected the timber and "mill contracts" underlying each investment. These representations were knowingly false, because there were no timber and no "mill contracts" to inspect.

In a footnote, Alexander and Seawright attempt to argue that the complaint does not allege a RICO "enterprise."[46] Alexander and Seawright define a RICO enterprise as  a "pattern of racketeering activity" by a "group of persons or entities associating together for the common purpose of engaging in a course of conduct," and the associated group must have "an existence that can be defined apart from the commission of the predicate acts."[47]  They do not explain how the complaint fails to allege any of the elements they identify.[48]  Surely Alexander and Seawright

---

[45] Doc. 1 at ¶ 97.

[46] Doc. 32 at 14, n.10.

[47] Doc. 32 at 14, n.10 (quoting *Zastrow v. Houston Auto Imports Greenway, Ltd.*, 789 F.3d 553, 559–62 (5th Cir. 2015).  Alexander and Seawright seem to rely on *Zastrow* for its statement that the association must have "an existence that can be defined apart from the commission of the predicate acts." *Id.* at 562. It thus merits mention that Alexander and Seawright's association with Adams plainly can be defined apart from Adams's commission of the predicate crimes.

But it also merits mention that the quote on which Alexander and Seawright rely is misleading. The *Zastrow* court was in turn quoting *Montesano v. Seafirst Commercial Corp.*, 818 F.2d 423 (5th Cir. 1987), in which the Fifth Circuit cited *U.S. v. Turkette*, 452 U.S. 576 (1981). The Supreme Court clarified its holding in *Turkette* in 2009 in *Boyle v. United States*, 556 U.S. 938 (2009), explaining that while "the existence of an enterprise is an element distinct from the pattern of racketeering activity," the evidence used to prove both elements "may in particular cases coalesce"; in other words, "proof of a pattern of racketeering activity may be sufficient . . . to infer the existence of an association-in-fact enterprise." *Id.* at 947, 951 (internal quotations omitted).

[48] Alexander and Seawright borrow the elements from federal case law. There is scant Mississippi case law applying Mississippi's RICO Act, but the statute is "modeled after the Federal RICO Act." *State v. Roderick*, 704 So. 2d 49, 54 (Miss. 1997) (citation omitted).

do not dispute that they are persons who, along with the entity Alexander Seawright, LLC, associated with Adams for the common purpose of recruiting new investors to Madison Timber.[49]

Reading the complaint's allegations in a light most favorable to the Receiver and making reasonable inferences in her favor, the complaint alleges the existence of a RICO enterprise with which Alexander and Seawright were associated.

### 6.   Alexander, Seawright, and Alexander Seawright, LLC are alter egos.

This Court has explained that "[t]he Mississippi Supreme Court defines alter ego as '[a] corporation used by an individual in conducting personal business, the result being that a court may impose liability on the individual by piercing the corporate veil when fraud has been perpetrated on someone dealing with the corporation.'" *Jordan v. Maxfield & Oberton Holdings LLC*, 173 F. Supp. 3d 355, 360 (S.D. Miss. 2016) (quoting *Tanfield Eng'g Sys., Inc. v. Thornton*, 97 So. 3d 694, 702 (Miss. 2012) (some internal quotation marks omitted)).

Alexander and Seawright argue the complaint's allegations do not satisfy "the three-prong test for piercing the veil of corporations."[50] The test on which they rely would require "(a) some frustration of contractual expectations regarding the party to whom [the plaintiff] looked for performance; (b) the flagrant disregard of corporate formalities by the defendant corporation and its principals; (c) a demonstration of fraud or other equivalent misfeasance on the part of the

---

[49] In other words, to borrow from federal case law, they were an "association-in-fact." *Boyle v. United States*, 556 U.S. 938, 946 (2009) ("[A]n association-in-fact enterprise is 'a group of persons associated together for a common purpose of engaging in a course of conduct.'") (quoting *United States v. Turkette*, 452 U.S. 576, 583 (1981)).

[50] Doc. 32 at 19.

corporate shareholder."[51]   The complaint sufficiently alleges facts, described herein, that if true would satisfy each prong of the test for piercing the corporate veil.[52]

But the alter ego doctrine, while "often discussed in conjunction with piercing the corporate veil," has "a different application and analysis." *Jordan*, 173 F. Supp. 3d at 360 (quoting Jackson & Miller, 3 Encyclopedia of Mississippi Law § 22:37 (2001) (noting the two phrases are "generally used without great specificity of meaning")). Alter ego liability "has an unmistakable air of equity." *Id.* at 361 (quoting Jackson & Miller, 3 Encyclopedia of Mississippi Law § 22:38 (2001)).

In *Jordan*, this Court found an individual was a corporation's alter ego where he used the corporation's revenues "for his personal legal defense fund," which suggested a "comingling of corporate with personal assets, as well as a unity of interest between [the corporation] and [the individual]." *Id.* The complaint here alleges that between 2011 and April 2018, Alexander and Seawright withdrew over $980,000 from the Alexander Seawright Timber Fund I, representing their "shares" of investors' returns.[53] Adams separately paid Alexander Seawright, LLC over $600,000 representing Alexander and Seawright's undisclosed "birddog fees."[54] Alexander Seawright Timber Fund I's "profits" became Alexander Seawright, LLC's income, which was Alexander and Seawright's personal fund. The commingling and unity of interest are clear.

Separately, this Court observed in *Jordan* that failing to apply the alter ego doctrine in that case "could sanction a fraud." *Id.*   The same risk applies here. It risks sanctioning a fraud indeed

---

[51] Doc. 32 at 20 (quoting *Gray v. Edgewater Landing, Inc.*, 541 So. 2d 1044, 1047 (Miss. 1989)).

[52] But see *Phillips v. MSM, Inc.,* No. 3:12-CV-175-CWR-FKB, 2015 WL 420327 (S.D. Miss. Feb. 2, 2015): "Mississippi law . . . allows for exceptions to the three-part standard [for veil-piercing] where rigidly maintaining the corporate entity would subvert the ends of justice." *Id.* at *9.  In *Phillips*, although there was no evidence the defendants had disregarded corporate formalities, they had transferred assets from one corporation to another, which "served to avoid liability" for a judgment. *See id.* Those transfers created a question of fact as to whether defendants had "subverted justice." *Id.*

[53] Doc. 1 at ¶ 89.

[54] Doc. 1 at ¶ 89.

to use the legal fiction of corporate separateness to relieve from liability two men who are alleged to have knowingly and falsely represented that they personally inspected the timber and "mill contracts" underlying each Madison Timber investment they sold.[55]

### 7.  The doctrine of *in pari delicto* does not bar the Receiver's claims.

The doctrine of *in pari delicto* is an equitable, affirmative defense, which provides that "a wrongdoer is not entitled to compel contribution from a joint tortfeasor." *Sneed v. Ford Motor Co.*, 735 So. 2d 306, 308 (Miss. 1999). Alexander and Seawright adopt Baker Donelson's argument that the Receiver's claims are barred by the doctrine of *in pari delicto* because the Receiver, having "stepped into the shoes" of Adams and Madison Timber, can have no right of action against Alexander and Seawright.  Like Baker Donelson, Alexander and Seawright are wrong.

In federal equity receiverships, the Fifth Circuit has adopted what Baker Donelson's motion calls the "innocent successor" exception to the doctrine of *in pari delicto*. This exception allows a receiver to assert tort claims against professionals even though she has stepped into the wrongdoer's shoes. The rationale for applying the "innocent successor" exception in a federal equity receivership such as this is straightforward: A receiver has a duty to maximize the value of a receivership estate for the benefit of victims, and "[a]pplication of *in pari delicto* would undermine one of the primary purposes of the receivership." *Jones v. Wells Fargo Bank, N.A.*, 666 F.3d 955, 966 (5th Cir. 2012). Application of *in pari delicto* in a federal equity receivership would also "be inconsistent with the purposes of the [*in pari delicto*] doctrine," which is "not for the benefit of either party and not to punish either of them, but for the benefit of the public." *Id.* (quoting *Lewis v. Davis*, 145 Tex. 468, 199 S.W.2d 146, 151 (1947)). *See also Janvey v. Adams &*

---

[55] Doc. 1 at ¶¶ 86-88.

*Reese, LLP*, No. 3:12-CV-0495-N, 2013 WL 12320921, at *3 (N.D. Tex. Sept. 11, 2013) ("In other words, whether to apply *in pari delicto* typically depends on what best serves public policy.").

"It is [therefore] well established [in the Fifth Circuit] that when the receiver acts to protect innocent creditors . . . [s]he can maintain and defend actions done in fraud of creditors even though the corporation would not be permitted to do so." *Jones*, 666 F.3d at 966 (internal quotation marks and citation omitted). Indeed, the *Stanford* court has refused to apply the doctrine of *in pari delicto* to that receiver's claims against professionals. *See, e.g.*, *Greenberg Traurig, LLP*, 2014 WL 12572881, at *4 ("This Court has already held that the *in pari delicto* defense has little application when a receiver seeks to reclaim assets for innocent investors."); *Janvey v. Willis of Colorado, Inc.*, No. 3:13-CV-3980-N, 2014 WL 12670763, at *4 (N.D. Tex. Dec. 5, 2014) (same); *Adams & Reese, LLP*, 2013 WL 12320921, at *3 ("The Fifth Circuit, when applying Texas law, seems to hold the view that when a receiver is protecting innocent creditors or recovering assets for investors and creditors, the defense of *in pari delicto* should be rejected generally.").

Baker Donelson's motion contended "Mississippi courts have not yet spoken on the question" and speculated that, if asked, they would find that the "innocent successor" exception does not apply here.[56] Baker Donelson premised its argument, which Alexander and Seawright adopt, on case law from the Seventh Circuit and from New York, which it characterized as a "clear trend."[57] Neither Baker Donelson nor Alexander and Seawright explain why they believe Mississippi courts would look to courts in the Seventh Circuit or New York for guidance, when courts in the Fifth Circuit have addressed the issue repeatedly and convincingly. Neither Baker

---

[56] Doc. 29 at 17.
[57] Doc. 29 at 19.

Donelson nor Alexander and Seawright explain why they believe Mississippi courts would reject the Fifth Circuit's rationale in virtually identical cases.

Indeed, Mississippi courts have long recognized "important limitations" to the *in pari delicto* doctrine. *Morrissey v. Bologna*, 123 So. 2d 537, 543 (Miss. 1960). "Even where the contracting parties are *in pari delicto*, the courts may interfere from motives of public policy. Whenever public policy is considered as advanced by allowing either party to sue for relief against the transaction, then relief is given to him." *Id.*; *see also Rideout v. Mars*, 54 So. 801, 802 (Miss. 1911) ("However, there is a well-defined exception to that rule, which is that, where the paramount public interest demands it, the court will intervene in favor of one as against the other.").

Baker Donelson and Alexander and Seawright also fail to address the important public policy reasons for not applying *in pari delicto* in this case. *Adams & Reese*, 2013 WL 12320921, at * 3 ("The parties have not briefed any public policy rationales, and thus the Court declines to dismiss the Receiver's claims on *in pari delicto* grounds."). Plainly, there is a "paramount public interest" in the Receiver's recovery. There is no public interest in, and the purpose of the *in pari delicto* doctrine is not served by, barring the Receiver from pursuing claims against defendants who are alleged to have knowingly and falsely represented that they personally inspected the timber and "mill contracts" underlying each Madison Timber investment.[58] Excepting the Receiver from the *in pari delicto* doctrine is prudent and consistent with Fifth Circuit **and** Mississippi law.

Presumably Alexander and Seawright also adopt Baker Donelson's argument that, even if the "innocent successor" exception to the doctrine of *in pari delicto* applies, it should apply to the Receiver's fraudulent transfer claims only, not to the tort claims the Receiver alleges against Alexander and Seawright. As the Receiver wrote in response to Baker Donelson's motion, courts

---

[58] Doc. 1 at ¶¶ 86-88.

in the Fifth Circuit have flatly rejected the argument that the "innocent successor" exception applies only to tort claims.  A federal equity receiver may pursue any claims against any third parties whose actions contributed to the success of a Ponzi scheme, and therefore to the debts of a receivership estate. *See, e.g., Rotstain*, 2015 WL 13034513, at *9 ("The Court has rejected [the argument that the Receiver has no standing to bring tort claims] in the past and held that the Receiver has standing to assert tort claims based on the harm to the Receivership Estate's ability to repay its creditors."); *Greenberg Traurig, LLP*,  2014 WL 12572881, at *4 ("This Court has held that the Receiver may assert tort claims against third parties based on allegations that the third parties' torts contributed to the liabilities of the Receivership Estate."); *Willis of Colorado, Inc.*, 2014 WL 12670763, at *3 (N.D. Tex. Dec. 4, 2015) (allowing the receiver to pursue "common law tort claims because they allege that Defendants' participation in a fraudulent marketing scheme increased the sale of Stanford's CDs, ultimately resulting in greater liability for the Receivership Estate"); *Adams & Reese, LLP*, 2013 WL 12320921, at *1 (N.D. Tex. Sept. 11, 2013) (allowing the receiver to pursue civil conspiracy claim is for conspiracy to commit fraud, breaches of fiduciary duty, fraudulent transfers, and conversion because the lawyer defendants "were in advantageous positions to discover Stanford's fraud and . . . they either failed to discover it or discovered it and chose not to act because they benefitted from the enterprise through their director fees or legal fees"). Like the courts before it, this Court too should find "*in pari delicto* no impediment to the Receiver's standing to assert [her] tort claims." *Greenberg Traurig, LLP*, 2014 WL 12572881, at *4.

24

## CONCLUSION

Alexander and Seawright have not stated a basis for dismissing any of the Receiver's claims against Alexander, Seawright, or Alexander Seawright, LLC.  The Receiver asks to be permitted to proceed with discovery, in anticipation of presenting of her case to a jury.

March 15, 2019

Respectfully submitted,

/s/ Lilli Evans Bass

BROWN BASS & JETER, PLLC
Lilli Evans Bass, Miss. Bar No. 102896
LaToya T. Jeter, Miss. Bar No. 102213
1755 Lelia Drive, Suite 400
Jackson, Mississippi 39216
Tel: 601-487-8448
Fax: 601-510-9934
bass@bbjlawyers.com
Receiver's counsel

/s/ Rebekka C. Veith

FISHMAN HAYGOOD, LLP
Admitted pro hac vice
Brent B. Barriere, Primary Counsel
Jason W. Burge
Kristen D. Amond
Rebekka C. Veith
201 St. Charles Avenue, Suite 4600
New Orleans, Louisiana 70170
Tel: 504-586-5253
Fax: 504-586-5250
bbarriere@fishmanhaygood.com
jburge@fishmanhaygood.com
kamond@fishmanhaygood.com
rveith@fishmanhaygood.com
Receiver's counsel

**CERTIFICATE OF SERVICE**

I certify that I electronically filed the foregoing with the Clerk of Court using the ECF system which sent notification of filing to all counsel of record.


Date:   March 15, 2019                    */s/*      *Rebekka C. Veith*