

———————————

No. 3:18-CV-866-CWR-FKB

ALYSSON MILLS,

*Plaintiff,*

v.

BUTLER SNOW LLP, ET AL.,

*Defendants.*

———————————

ORDER

———————————

Before CARLTON W. REEVES, *District Judge.*

Defendants Butler Snow LLP, Butler Snow Advisory Services LLC, and Matt Thornton have moved to send this case to arbitration. For the reasons that follow, the motion is denied.

### I. Factual and Procedural History

From at least 2010 until April 2018, Lamar Adams operated timber investment companies called Madison Timber Company LLC and Madison Timber Properties LLC. He told investors they were purchasing shares of timber tracts that

would be harvested and sold to lumber mills at a significant profit. The demand for lumber was so great, he said, he could guarantee investors a fixed rate of return in excess of 10%. Investors believed him. They collectively gave him hundreds of millions of dollars.

Adams was lying. He had, with the help of others, faked everything about the scheme. There were no timber deeds, tracts of land, or lumber mills. He was actually using new investors' money to pay old investors—a classic Ponzi scheme. It worked as long as Adams and his associates could continue to bring in new money.

The scheme collapsed in April 2018. Adams turned himself in to the United States Attorney's Office in Jackson, Mississippi and quickly pleaded guilty to wire fraud. He is now serving a 19.5-year sentence in federal prison. The sentence reflects the significance of the fraud; the criminal proceeding established that Adams' victims lost approximately $85 million.

When the Ponzi scheme collapsed, the U.S. Securities and Exchange Commission asked this Court to appoint a receiver to take charge of Adams' companies and provide some measure of financial relief to his victims. The Court appointed Alysson Mills to be that receiver. To date, she has sold Adams' assets, negotiated settlements with Adams' enablers, and filed lawsuits against persons and entities that contributed to the fraud.

This is one of those lawsuits.

In this action, the receiver alleges that the Butler Snow and Baker Donelson law firms aided and abetted Adams in

carrying out the Ponzi scheme.[1] These firms "lent their influence, their professional expertise, and even their clients to Adams," the complaint alleges. "They made a fraudulent enterprise a fraternity. Defendants contributed to the success of the Madison Timber Ponzi scheme, and therefore to the debts of the Receivership Estate to investors. By this complaint the Receiver seeks to hold Defendants accountable."

What follows will focus on the receiver's allegations against Butler Snow and its affiliates. These allegations are disputed, but must be taken as true at this stage of the case.

In 2009, Adams hired Butler Snow to draft a private placement memorandum (PPM) for Madison Timber Fund LLC. The PPM explained to potential investors that Adams used his "network of contacts cultivated over 20 years" to broker deals between landowners and "various timber mills." It claimed that Adams had a "competitive advantage" and "highly competitive pricing strategy." The PPM also warned investors that timber prices "experience significant variation and have been historically volatile," and cautioned that success would be "substantially dependent" on Adams.

It is not clear whether Butler Snow knew in 2009 that Adams was running a Ponzi scheme. The firm did know, however, that people who helped Adams might need to register as a broker. That year, according to a note in the firm's Madison Timber file, senior partner Don Cannada researched Mississippi law to learn the various penalties one could face for

---

[1] Butler Snow and Baker Donelson are law firms in the southeastern United States. Butler Snow is registered in Delaware but headquartered in Mississippi. Baker Donelson is incorporated in Tennessee and has a satellite office in Mississippi.

profiting as an unlicensed real estate broker. *See* Miss. Code Ann. § 73-35-31. He observed that the law set forth a "very broad definition of what a broker is." He somehow concluded that Mississippi law "[s]ays you can't pay an unlicensed broker, but doesn't provide any penalty if you do so."

The PPM did not attract any formal investors. It succeeded in a different way. In lieu of buying into the fund, receptive investors simply entered into "joint ventures" with Madison Timber. The scheme otherwise worked the same—$100,000 and $200,000 investments came in, while "consistent, uniform returns of 12% to 14%" went out. The fraudulent enterprise continued to grow.

The next phase of Butler Snow's work with Adams kicked off in 2012. That year, Adams hired Butler Snow's new subsidiary, Butler Snow Advisory Services, to expand his "business" and raise $30–50 million. The complaint says that Matt Thornton, the CEO of Butler Snow Advisory Services, "alerted Don Cannada and Barry Cannada, a senior partner and the Vice Chair of Butler Snow, respectively, to the prospects of this new business." Meetings were held; contracts were negotiated.

The parties ultimately agreed that Butler Snow Advisory Services would pitch Adams' timber investments to wealthy people and institutions. In exchange, Adams would pay Butler Snow Advisory Services a $3,500 monthly retainer, commissions for each completed transaction, a fund success fee (comprised of half of the fund's management fees and a quarter of the fund's carried interest), expenses, and an administrative fee.

The legal side of Butler Snow began to update the PPM while the "strategic advisors" at Butler Snow Advisory Services went to work. The advisors made a list of more than 30 potential investors and refined their pitch. Their emails reveal a simple strategy: they knew that Adams had "a seemingly insatiable appetite for cash," and they would find investors to give him that cash—profiting from the ensuing commissions and fees—until Adams "says 'uncle.'"

The receiver has some of Butler Snow Advisory Services' sales pitches. They are illuminating.

Thornton told one potential mark that he could not share specific information about the timber mills because Adams "has an extremely stringent NDA with his mill partners." But that was a lie. There were no NDAs with mill partners; there were no mill partners at all. Thornton also engaged in obfuscation. He told another mark that Adams had "been vetted by several $1.5 billion family office(s) in Texas, encompassing a 75+ day due diligence period [and] as you would imagine, Lamar passed with flying colors!" That conveniently omitted that the billion-dollar family offices had declined to invest with Adams.

Thornton kept the legal side of Butler Snow apprised of his progress. The complaint says he "often" copied Barry Cannada on emails. Thornton also sent emails pressuring Butler Snow lawyers to work faster on Adams' legal needs. The lawyers did so and finished the updated PPM in 2013. As described earlier, investors continued to sign up through joint ventures instead of the fund. Butler Snow Advisory Services still received its commissions. Neither Thornton nor Butler Snow ever registered with the S.E.C.

According to the complaint, Butler Snow's lawyers and salesmen "recklessly ignored numerous red flags." They didn't call a landowner or check a title. They didn't call a mill. They told potential marks that in the event of a default, the investor could "simply file the [timber] deed," but never questioned why investors were told not to record the deed at the outset of the investment. The professionals at Butler Snow also ignored the red flag of the return: Adams promised "a consistent, uniform return of 12% to 14%," a rate of return unavailable in the broader market and at odds with the PPM's express warning that timber prices were volatile.

No one acted on these glaring red flags. Adams got new investors to pay off the old investors, the salesmen at Butler Snow Advisory Services got their commissions, and the lawyers at Butler Snow were paid for their legal work.

Adams and Butler Snow Advisory Services parted ways in December 2013. By then, Adams had realized that he could make more money if he hired one of Butler Snow Advisory Services' key salesmen, Mike Billings, without the framework and fees of the Advisory Services itself. So Adams directly hired Billings to help him defraud investors.[2] Adams also turned to the lawyers at Butler Snow for "regulatory" and "compliance" help with a real estate development company he was setting up.[3]

---

[2] The receiver's claims against Billings were resolved in Cause No. 3:18-CV-679.

[3] The receiver's interest in that real estate development company is being adjudicated in Cause No. 3:18-CV-252.

The complaint says that by spring 2018, Butler Snow found itself in an unusual position. The firm was still sending invoices to Adams—even after he turned himself in to the United States Attorney's Office. The firm simultaneously "purported to represent investors in their demands of Madison Timber," the receiver alleges. And the firm "purported to represent Billings—whose interests clearly were adverse to investors," according to the complaint.

The receiver filed this action in December 2018. She claims that Butler Snow, Butler Snow Advisory Services, and Thornton are liable to the receivership estate for civil conspiracy, aiding and abetting, negligence, gross negligence, and recklessness. She alleges that Butler Snow Advisory Services and Thornton violated Mississippi's fraudulent transfer act and Mississippi's prohibition on organized fraud enterprises (civil RICO). She adds that the Butler Snow law firm is liable to the estate for legal malpractice, negligent retention, and negligent supervision. The receiver seeks monetary, declaratory, and equitable relief.

Butler Snow, Butler Snow Advisory Services, and Thornton subsequently moved to compel arbitration.

## II. Legal Standards

Today's motion requires an application of both federal and state law. Federal law determines the procedure by which federal courts consider motions to compel arbitration. State law, which in this case is Mississippi law, governs whether the parties actually agreed to arbitrate their dispute.

### A. Arbitration Law

The Federal Arbitration Act "makes written arbitration agreements valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of a contract." *Crawford Prof'l Drugs, Inc. v. CVS Caremark Corp.*, 748 F.3d 249, 257 (5th Cir. 2014) (quotation marks and citation omitted). In other words, "courts must place arbitration agreements on an equal footing with other contracts, and enforce them according to their terms." *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011) (citations omitted). Like any other contract, agreements to arbitrate may "be invalidated by generally applicable contract defenses, such as fraud, duress, or unconscionability." *Id.* (quotation marks and citations omitted).[4]

To determine whether a dispute belongs in arbitration, the Court considers "(1) whether there is a valid agreement to arbitrate between the parties; and (2) whether the dispute in question falls within the scope of that arbitration agreement." *Carey v. 24 Hour Fitness, USA, Inc.*, 669 F.3d 202, 205 (5th Cir. 2012) (quotation marks and citation omitted). If the answers to these questions are "yes," the next question is "whether any federal statute or policy renders the claims nonarbitrable." *Will-Drill Res., Inc. v. Samson Res. Co.*, 352 F.3d 211, 214 (5th Cir. 2003) (quotation marks and citation omitted).

"The FAA . . . does not require parties to arbitrate when they have not agreed to do so." *E.E.O.C. v. Waffle House, Inc.*, 534

---

[4] Mississippi courts approach arbitration agreements similarly. *See Driver Pipeline Co. v. Williams Transport, LLC*, 104 So. 3d 845, 849 (Miss. 2012).

8

U.S. 279, 293 (2002) (quotation marks and citation omitted).[5] That is because arbitration "is a matter of consent, not coercion." *Id.* at 294 (quotation marks and citation omitted).

> The FAA reflects a liberal federal policy favoring arbitration. However, the federal policy favoring arbitration does not apply to the determination of whether there is a valid agreement to arbitrate between the parties. Given the fundamental principle that arbitration is a matter of contract, to determine whether an agreement to arbitrate is valid, courts apply ordinary state-law principles that govern the formation of contracts.

*Carey*, 669 F.3d at 205 (quotation marks and citations omitted).

In this case, Mississippi contract law controls whether the parties agreed to arbitrate this dispute. *See Crawford*, 748 F.3d at 258.

### B. Mississippi Contract Law

In Mississippi, as elsewhere, "[t]he primary purpose of all contract construction principles and methods is to determine and record the intent of the contracting parties." *Royer Homes of Miss., Inc. v. Chandeleur Homes, Inc.*, 857 So. 2d 748, 752 (Miss. 2003) (citation omitted). "A cardinal rule of construction of a contract is to ascertain the mutual intentions of the

---

[5] Mississippi's highest court agrees that "a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *Driver Pipeline*, 104 So. 3d at 850 (quotation marks and citations omitted).

parties." *Union Planters Bank, Nat'l Ass'n v. Rogers*, 912 So. 2d 116, 120 (Miss. 2005) (citation omitted).

The analysis begins (and usually ends) with the plain language of the contract, since the words the parties selected "are by far the best resource for ascertaining the intent and assigning meaning with fairness and accuracy." *Royer Homes*, 857 So. 2d at 752 (citation omitted). The contract is read "as a whole, so as to give effect to all of its clauses." *Id.* (citation omitted). "[I]f the contract is unclear or ambiguous, the court should attempt to harmonize the provisions in accord with the parties' apparent intent." *Id.* (quotation marks and citation omitted). "An instrument that is clear, definite, explicit, harmonious in all its provisions, and is free from ambiguity will be enforced." *Epperson v. SOUTHBank*, 93 So. 3d 10, 16 (Miss. 2012) (quotation marks and citation omitted).

The Mississippi Supreme Court defines "ambiguity" as "a susceptibility to two reasonable interpretations." *Dalton v. Cellular S., Inc.*, 20 So. 3d 1227, 1232 (Miss. 2009) (quotation marks and citations omitted).

> An "ambiguous" word or phrase is one capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business.

*Id.* (citation omitted). "[I]nternal conflict or uncertainty can provide the necessary condition precedent to find

ambiguity." *Mississippi Farm Bureau Mut. Ins. Co. v. Walters*, 908 So. 2d 765, 769 (Miss. 2005) (citation omitted).

In *Dalton*, the Mississippi Supreme Court looked at a business contract with contradictory terms. "Clause 3.5 allows either party to terminate at will," the Court found, while "Clause 3.4 and the unnumbered paragraph following clause 3.5 allow [the plaintiff] to terminate with cause under certain circumstances." 20 So. 3d at 1233. Because "reasonable minds could reach different conclusions after reading the whole contract, in discerning the intent of the parties, while giving effect to each separate clause," the contract was ambiguous. *Id.*

In these situations—*i.e.*, where "the Court is unable to ascertain the meaning of the contract and the intent of the parties within the four corners of the contract"—it must "apply the canons of contract construction." *Epperson*, 93 So. 3d at 17 (quotation marks and citation omitted). "Where the language of an otherwise enforceable contract is subject to more than one fair reading, the reading applied will be the one most favorable to the non-drafting party." *Id.* (quotation marks and citation omitted). "The reason for this rule is to protect the party who did not choose the language from an unintended or unfair result." *Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 63 (1995).

### III. Discussion

#### A. The Contract

Among Adams' various relationships with Butler Snow's lawyers and advisors, the parties have identified only one contract. It is seven pages long.

The first three pages are on Butler Snow Advisory Services' letterhead. These pages comprise the "Engagement Letter." Martin Willoughby signed the Engagement Letter on behalf of Butler Snow Advisory Services on August 8, 2012. Lamar Adams signed it four days later on behalf of Madison Timber Company, Inc.

The final four pages are the "Standard Terms and Conditions." They are referenced in and incorporated by the Engagement Letter—so we know they belong with the Engagement Letter—but are not otherwise dated or signed.

The dilemma can be stated simply. In the Engagement Letter, the parties agreed to the following:

> The state and federal courts in Mississippi shall have exclusive jurisdiction in relation to any claim, dispute or difference concerning this Engagement Contract and any matter arising from it. The parties hereto irrevocably waive any right they may have to object to any action being brought in that Court, to claim that the action has been brought to an inconvenient forum or to claim that that Court does not have jurisdiction.

This is a typical forum selection clause.

In the Standard Terms, however, the parties agreed "to submit their dispute to binding arbitration under the authority of the Federal Arbitration Act. . . . [T]he parties hereby waive trial in a court of law or by jury."

The parties disagree as to which term applies to this case.

## B. The Textual Analysis

The main question is whether the above conflict renders the contract ambiguous.

In the forum selection clause, the parties agreed to resolve "any claim, dispute or difference" they might have in "the state and federal courts in Mississippi." The parties agreed that those courts would have "exclusive jurisdiction" over "any" such claims. All objections to that forum or jurisdiction were explicitly waived. The arbitration provision, however, directly contradicts the forum selection clause. It sends disputes "to binding arbitration" instead of "a court of law."

It is not possible to reconcile the arbitration provision with the forum selection clause. Reasonable minds cannot, after reading the entire contract, determine which of these clauses the parties intended to control. "Both provisions are all-inclusive, both are mandatory, and neither admits the possibility of the other." *Sharpe v. AmeriPlan Corp.*, 769 F.3d 909, 917 (5th Cir. 2014) (quotation marks and citation omitted). The competing terms render this part of the contract ambiguous.[6]

The Butler Snow parties endeavor mightily to harmonize the provisions. A close reading, they say, "leads to the inescapable result that the forum selection clause is fully consistent with the arbitration provision." Their strongest argument is that the parties intended to arbitrate their dispute and, subsequently, have any arbitration award confirmed (or vacated) in court.

---

[6] Where a conflict in the provisions exists, the Mississippi Supreme Court has declined to enforce the arbitration agreement. *See Driver Pipeline*, 104 So. 3d at 849–50.

The parties certainly *could* have written that in their contract.[7] Different contracts have been interpreted in that way. *E.g.*, *id.* at 916 (harmonizing dispute resolution provision with arbitration provision as to one of the plaintiffs). But these parties did not. The plain language of the contract contains no such two-step process.[8]

The Butler Snow parties then assert that "this very case" proves that the contract needed both provisions, because "the arbitration provision's validity must be decided by some court." But that brings us back to the central problem. This Court cannot adjudicate the validity of the arbitration provision, because it cannot determine which provision the parties intended to be dispositive.

The Butler Snow parties have not pointed to a single case where an identical conflict was ordered to arbitration. The closest case they identify—which they raised for the first time in their reply brief—is *Personal Security & Safety Systems Inc. v. Motorola Inc.*, 297 F.3d 388 (5th Cir. 2002). In *Motorola*, though, the parties' forum selection clause was much narrower than ours; it did not cover all "disputes" or all "claims." *Id. at* 396. And the Fifth Circuit has been careful to distinguish *Motorola* when interpreting contracts with more expansive language. *See Sharpe*, 769 F.3d at 917–18 (finding that the "expansive dispute resolution provisions" in three of the plaintiffs' contracts

---

[7] Butler Snow is undoubtedly a sophisticated law firm with many talented attorneys.

[8] Although the location of the terms is not controlling, a reader of the entire contract will observe that rather than dovetailing with one another, the forum selection clause and the arbitration provision contradict each other from distant and in fact distinct parts of the parties' contract.

14

"cannot be harmonized with the similarly expansive arbitration provision"). After all, "different contractual language should be read differently." *Id.* at 919.

Because the forum selection clause and the arbitration provision conflict, this part of the contract must be read favorably to the non-drafting party. *See Miss. Transp. Com'n v. Ronald Adams Contractor, Inc.*, 753 So. 2d 1077, 1085 (Miss. 2000). Butler Snow Advisory Services drafted this contract. In this case, therefore, the conflict in terms must be read favorably to the receiver. *See Mastrobuono*, 514 U.S. at 63.

The receiver prefers to litigate in court rather than submit this dispute to arbitration. Accordingly, the forum selection clause, and not the arbitration provision, shall apply to the receiver's claims against the Butler Snow parties.

### C. Other Arguments

In the alternative, the receiver presents another textual argument—that special terms control boilerplate provisions. *See, e.g., Travelers Prop. Cas. Co. of Am. v. Federated Rural Elec. Ins. Exch.,* No. 3:08-CV-83-DPJ-JC, 2009 WL 2900027, at *3 (S.D. Miss. Sept. 3, 2009) ("As a matter of general construction, special provisions supersede generic. Furthermore, Mississippi law is clear that 'special provisions inserted in a contract govern over boilerplate provisions.'").

The parties have also briefed whether the receiver has rejected the arbitration clause and "whether any federal statute or policy renders the claims nonarbitrable." *Will-Drill*, 352 F.3d at 214 (quotation marks and citation omitted). The receiver contends that if the contract is not ambiguous, either she or the Court may reject the arbitration provision as inconsistent with the purpose of a federal equity receivership. *See Janvey v.*

*Alguire*, No. 3:09-CV-0724-N, 2014 WL 12654910, at *21–22 (N.D. Tex. July 30, 2014). The Butler Snow parties disagree.

Given the contract and the applicable law, the Court need not reach either of these arguments today.

### IV. Conclusion

The motion to compel arbitration is denied. The receiver's claims against the Butler Snow parties shall remain stayed pending the movants' interlocutory appeal.

**SO ORDERED**, this the 12th day of September, 2019.

s/ CARLTON W. REEVES<br>*United States District Judge*