UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

| | |
|---|---|
| ALYSSON MILLS, IN HER CAPACITY AS RECEIVER FOR ARTHUR LAMAR ADAMS AND MADISON TIMBER PROPERTIES, LLC, | Case No. 3:18-cv-00866 |
| | Arising out of Case No. 3:18-cv-252, *Securities and Exchange Commission v. Arthur Lamar Adams and Madison Timber Properties, LLC* |
| Plaintiff, | |
| v. | Hon. Carlton W. Reeves, District Judge |
| BUTLER SNOW LLP; BUTLER SNOW ADVISORY SERVICES, LLC; MATT THORNTON; BAKER, DONELSON, BEARMAN, CALDWELL & BERKOWITZ, PC; ALEXANDER SEAWRIGHT, LLC; BRENT ALEXANDER; and JON SEAWRIGHT, | |
| Defendants. | |

**RECEIVER'S OPPOSITION TO ALEXANDER SEAWRIGHT, LLC AND BRENT ALEXANDER'S MOTION TO DISMISS**

Alysson Mills, in her capacity as the court-appointed receiver for Arthur Lamar Adams and Madison Timber Properties, LLC (the "Receiver"), through undersigned counsel, opposes the motion to dismiss filed by Defendants Alexander Seawright, LLC and Brent Alexander (sometimes collectively "Alexander Seawright").[1]

---

[1] Jon Seawright filed a Chapter 7 petition for bankruptcy on November 3, 2019. Doc. 1, *In re: Jon Darrell Seawright,* No. 19-03921 (Bankr. S.D. Miss). By filing his petition, Seawright availed himself of the automatic stay of litigation provided to petitioners for bankruptcy pursuant to 11 U.S.C. § 362. The Receiver's allegations against Seawright, however, remain relevant to her claims against Alexander Seawright, LLC and Baker Donelson. His actions cannot be removed from this story.

## INTRODUCTION

On December 19, 2018, the Receiver filed a 45-page complaint against Brent Alexander, Jon Seawright, their company Alexander Seawright, LLC, and their employer Baker Donelson. The complaint was not an average complaint.  It told an unprecedented story in careful detail.  It is not every day that a law firm such as Baker Donelson allows its agents, here Brent Alexander and Jon Seawright, to use their positions of trust and their firm's name and resources to sell investments of any kind—much less investments in a Ponzi scheme—to unsuspecting individuals, including firm clients.

Everyone filed motions to dismiss the Receiver's complaint.  They all argued the Receiver had not stated sufficient facts to establish their liability.  They all argued the Receiver had no standing to sue them to recover money for defrauded investors.

The Receiver pointed out the flaws in everyone's arguments.  The Receiver showed the complaint states more than sufficient facts to meet every element of every claim against everyone. The Receiver showed that she has standing to sue third parties whose actions contributed to the success of the Madison Timber Ponzi scheme and therefore to the debts of the Receivership Estate.

After the motions to dismiss had been fully briefed, Baker Donelson filed two more unsolicited briefs, both insisting that the Receiver is not the proper party to hold Baker Donelson liable because, it argued, she lacked standing to sue it.  On October 1, 2019, the Court instructed the Receiver to file an amended complaint to address Baker Donelson's arguments.

The Receiver filed an amended complaint on November 22, 2019.  The amended complaint states the Receiver's "best case" based on facts known to her.  Alexander Seawright complains that the amended complaint "adds *zero* new factual allegations."[2] That is not entirely true, but

---

[2] Doc. 64 at 4.

admittedly, yes, the amended complaint looks a lot like the original complaint. That is not a weakness. The original complaint was powerful, and the amended complaint is equally or more so.

The amended complaint's most meaningful addition, which Alexander Seawright glosses over, is the addition addressing the Receiver's standing, at paragraphs 5 through 8. For more than a year Defendants have argued that the Receiver lacks standing to sue to recover money for defrauded investors. Defendants are wrong, as the Receiver has and will again show, but because Defendants showed no sign of giving in, for her amended complaint the Receiver took a different tack. To remove any doubt that the Receiver has standing to sue any third party whose actions contributed to the success of the Madison Timber Ponzi scheme, investors voluntarily assigned their claims against Defendants to the Receiver.  The result is that the Receiver now has standing to sue Defendants in not one but two ways: because she is the court-appointed receiver for Madison Timber and also because investors have executed assignments that entrust the right to sue to her.

As for the alleged facts, they are still damning and more than sufficient to establish Alexander Seawright's liability. Alexander Seawright continue to say they are "victims" who were "duped" by Lamar Adams[3]  They continue to say they merely "coordinated loans" to Madison Timber, and for that they merely received "loan-origination fees."[4]  Incredibly, they continue to say they "had no reason to suspect" Madison Timber was a Ponzi scheme.[5]

To be clear, the victims here are the investors who lost money, in many instances their life savings, because individuals including Alexander and Seawright recruited them to invest in the Madison Timber Ponzi scheme. The facts, as alleged in the Receiver's amended complaint, are

---

[3] Doc. 64 at 5.
[4] Doc. 64 at 4.
[5] Doc. 64 at 5.

that from 2011 until April 2018, Alexander Seawright used an investment fund they named after themselves to invest other people's money in Madison Timber and split the "profits" with Adams.[6] They promised the fund offered a "rock stable" and "oversecured" return.[7] They pitched the fund as "safe enough for friends and family" and encouraged potential investors to rely on their affiliation with Baker Donelson and its good reputation.[8] They were persistent salesmen. If an investor said he could invest "either 25k or 30," they urged "$50k would be better for you."[9] They bragged that they had "invest[ed] more than $20 million" of other people's money in Madison Timber.[10] "It has worked so well that we simply send out an email on the 15th of each month and some hours later have collected the investment we need for the next round."[11] On April 19, 2018, the day the Madison Timber Ponzi scheme collapsed, they were getting ready to "take it to the next level"[12] by "deploying at $1 million a month beginning May 1."[13] "We pull this off," Alexander told Seawright, "we get rich."[14]

Contrary to Alexander Seawright's characterization, this case is about a lot more than missed red flags. Although she might do it at trial, the Receiver need not prove Alexander Seawright's actual knowledge that Madison Timber was a Ponzi scheme to survive Alexander Seawright's motion to dismiss. Ponzi scheme or no Ponzi scheme, Alexander Seawright knew their conduct was unlawful. They knew their unlicensed sales of unregistered securities violated

---

[6] Doc. 57 at ¶¶ 72–77.

[7] Doc. 57 at ¶ 79.

[8] Doc. 57 at ¶¶ 78–86.

[9] Doc. 57 at ¶ 79.

[10] Doc. 57 at ¶ 111.

[11] Doc. 57 at ¶ 99.

[12] Doc. 57 at ¶ 108.

[13] Doc. 57 at ¶ 118.

[14] Doc. 57 at ¶ 109.

federal and state law. They knew they made false representations of fact to encourage investments in Madison Timber. As one example, they falsely represented that they personally inspected the timber and "mill contracts" underlying each investment—a factual impossibility.

The Receiver responds to Alexander Seawright's legal arguments below.

## ARGUMENT

A complaint should state "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "When considering a motion to dismiss under Rule 12(b)(6), the Court accepts the plaintiff's factual allegations as true and makes reasonable inferences in the plaintiff's favor." *Handy v. U.S. Foods, Inc.*, No. 3:14-CV-854-CWR-LRA, 2015 WL 1637336, at *1 (S.D. Miss. Apr. 13, 2015) (citing *Iqbal*, 556 U.S. at 678).

### I.     THE RECEIVER HAS STANDING.

Like Baker Donelson, Alexander Seawright argues the Receiver lacks standing to sue Alexander Seawright.  Alexander Seawright's arguments mirror Baker Donelson's and are largely academic. The Court need not write a treatise on federal equity receivers' standing to answer the question, because either way Alexander Seawright loses. The Receiver has standing in two ways. The Receiver has standing to sue any third party whose actions contributed to the success of the Madison Timber Ponzi scheme because 1) she is the court-appointed receiver for Madison Timber and, separately, 2) because investors have executed assignments that entrust the right to sue to her.

### A.  The Receiver has standing because she is the court-appointed receiver for Madison Timber.

Alexander Seawright relies primarily on two recent opinions of the Fifth Circuit—*Ebert v. DeJoria*, 922 F.3d 690 (5th Cir. 2019), and *Securities and Exchange Commission v. Stanford*

*International Bank, Ltd.* (*Lloyds*), 927 F.3d 830 (5th Cir. 2019)—to argue court-appointed receivers lack standing to sue third parties to recover money for defrauded investors. Alexander Seawright entirely ignores an even more recent opinion of the Fifth Circuit, *Zacarias v. Stanford International Bank, Limited* (*Willis*), No. 17-11073, 2019 WL 6907376 (5th Cir. Dec. 19, 2019), which wholly undermines its position.

### *DeJoria*

Alexander Seawright relies on *DeJoria* to argue that the Receiver lacks standing because "an estate's unpaid debts do not injure the estate."[15] Alexander Seawright reads too much into *DeJoria*. In that case the court held a bankruptcy trustee lacked standing to pursue a discrete claim that belonged only to a single distinct creditor.

In *DeJoria*, the company in question, LSI, was a publicly traded company that developed patented technology for the treatment of wastewater for the oil and gas industry. *DeJoria*, 922 F.3d at 693. LSI contracted with Jabil, a manufacturer, to provide equipment to LSI. *Id.* at 696. Jabil delivered the equipment to LSI, but LSI never paid Jabil's invoice. *Id.* After LSI filed for bankruptcy, the bankruptcy trustee leased and eventually sold the equipment. *Id.* Jabil filed a claim for $9.55 million in LSI's bankruptcy proceedings. *Id.* at 694.

The bankruptcy trustee tried to recoup Jabil's loss by suing LSI's officers, who she alleged improperly entered the contract with Jabil. *Id.* at 695. At trial, the trustee argued Jabil specifically had been misled. *Id.* She told the jury to "forget about the other hundred and something creditors . . . focus on Jabil"—"the fraud, the improper conduct, was entering into the Jabil contract." *Id.* The jury found for the trustee. *Id.*

---

[15] Doc. 64 at 11.

The Fifth Circuit vacated the jury's verdict, holding the trustee was not entitled to damages for an injury that Jabil alone suffered. *Id.* at 696. The court observed that LSI itself was not injured by the contract with Jabil: LSI received the equipment without paying for it and even benefited from it by leasing and eventually selling it. *Id.* The court expressly did *not* hold the trustee could never recover damages arising from the defendants' breaches of fiduciary duty—but instead only that under the circumstances, the trustee was not entitled to damages *that belonged solely to a single distinct creditor*. *Id.* at 697 n.6 ("We need not address and therefore do not hold that there could not possibly be an Article III injury in fact stemming from Cohen and DeJoria's breaches of fiduciary duty. Instead, we hold there is no Article III injury stemming from the claims Ebert asserted and Damage Element No. 1 of the jury instruction.").

Context is important. The trustee in *DeJoria* narrowed her case at trial *to a single contract that injured a single creditor*. Although she tried to paint LSI as a fraud from its inception, the court observed both that LSI was a publicly traded company that developed patented technology, *id.* at 693, and that the trustee herself had attempted to find investors to keep LSI operating, *id.* at 694. *LSI was not a Ponzi scheme.*[16] In a Ponzi scheme case, the underlying business is a fraud from

---

[16] Alexander Seawright observes that the Fifth Circuit in *DeJoria* cited approvingly *Reneker v. Offill*, No. 3:08-CV-1394-D, 2009 WL 804134 (N.D. Tex. Mar. 26, 2009), in which a court held a receiver lacked standing to purse claims against a law firm.

*Reneker* was not a Ponzi scheme case.

In addition, the Fifth Circuit's opinion cites *Reneker I* only. Importantly, even in *Reneker I* the court observed that, *unlike here*, the receiver had not alleged that the law firm "increased the [receivership companies'] liability to third parties or caused the [receivership companies] to be liable to third parties when they otherwise would not have been." *Id.* at *6, n.5.

After *Reneker I*, the receiver amended his complaint to expressly allege that the law firm had caused the receivership companies "to incur additional and unnecessary liabilities to third parties." In *Reneker II*, the court held the amendment was sufficient to survive the law firm's motion to dismiss for lack of standing. *Reneker v. Offill*, No. 3:08-CV-1394-D, 2009 WL 3365616 at *2 (N.D. Tex. Oct. 20, 2009).

Years later, *after a fuller development of the case*, the court granted in part the law firm's motion for summary judgment for lack of standing in *Reneker III*. *Reneker v. Offill*, No. 3:08-CV-1394-D, 2012 WL 2158733, at *6 (N.D. Tex. June 14, 2012).

its inception. The Ponzi scheme's perpetrators misuse the underlying business entity to perpetrate *one singular fraudulent scheme* that injures the entity and investors in the same way. The entity and investors both seek recovery to address the same harms sustained by the same conduct. The fact that investors were injured does not mean that the entity was not. This is why, in Ponzi scheme cases, it is often said that investors' injuries are "redundant," *see Lloyds*, 927 F.3d at 844, 850 (Stanford investors' claims were "redundant"), or "derivative," *see id.* at 847–48 (Stanford employees' claims, by contrast, were "non-derivative"), or "duplicative," *see id.* at 844; *Willis*, 2019 WL 6907376 at *7 (investors' lawsuits would result in "duplicative litigation"), of the entity's.

The fact that LSI's trustee lacked standing in *DeJoria* does not mean the Receiver lacks standing here. The injury in *DeJoria*, arising from a single contract, was unique to Jabil—so much so that the trustee told the jury to "forget about the other hundred and something creditors," *DeJoria*, 922 F.3d at 695—and actually benefited LSI, which not only applied the money it owed Jabil to other, arguably legitimate, purposes but also profited from the lease and sale of Jabil's equipment. By contrast, the injury here is not unique to any one party; the fraudulent scheme injured Madison Timber and investors in the exact same way. The fact that investors were injured does not mean that Madison Timber was not.

Alexander Seawright is simply wrong to contend the Receiver, standing in the shoes of Madison Timber, has no injury-in-fact. *DeJoria* is a different case altogether; it is not dispositive of the Receiver's claims.

---

None of the three *Reneker* opinions, all unpublished, support granting Alexander Seawright's motion to dismiss here.

In any event, *Reneker* certainly does not dispose of the Receiver's claims against Alexander Seawright in her capacity as assignee of investors' claims.

*Lloyds*

Alexander Seawright points to the Fifth Circuit's decision in *Securities and Exchange Commission v. Stanford International Bank, Ltd.* (*Lloyds*), 927 F.3d 830 (5th Cir. 2019) for the proposition that "[l]ike a trustee in bankruptcy . . . , an equity receiver may sue only to redress injuries to the entity in receivership[.]"[17] That proposition is not new. For completeness's sake, the actual language from the Fifth Circuit's opinion is as follows:

> [As] to the Receiver's standing: "[l]ike a trustee in bankruptcy or for that matter the plaintiff in a derivative suit, *an equity receiver may sue only to redress injuries to the entity in receivership*, corresponding to the debtor in bankruptcy and the corporation of which the plaintiffs are shareholders in the derivative suit."

*Lloyds*, 927 F.3d at 841 (quoting *Scholes v. Lehmann*, 56 F.3d 750, 753 (7th Cir. 1995)).

Alexander Seawright misuses *Lloyds* to suggest an either/or proposition: either investors are injured, or the entity in receivership is injured, but never both. That proposition is false. The fact that investors are injured does not mean the entity in receivership is not. The fact that investors were injured here does not mean the Receiver may not sue Alexander Seawright to redress injuries to Madison Timber.[18] The question is simply whether the entity in receivership was injured—and here it was: Madison Timber was a fraud from its inception. Lamar Adams misused Madison Timber to perpetrate a Ponzi scheme and Alexander Seawright assisted him. The Receiver alleges an injury-in-fact. An entity in receivership often alleges claims that overlaps with claims of investors, as *Lloyds* illustrates.

---

[17] Doc. 64 at 12 (quoting *Lloyds*, 927 F.3d at 841).

[18] *Scholes*, 56 F.3d at 755 ("We add that if in place of the receiver's actions the investors had brought a class action against the present defendants, or had sued them individually, the defendants would no doubt be arguing that the action was improper because the injury was to the corporations and only derivatively to investors in the corporations.").

In *Lloyds*, the Stanford receiver, Stanford's employees, and certain of Stanford's investors all claimed rights to proceeds from policies issued by Stanford's insurers. The Stanford receiver and the insurers entered a settlement whereby the insurers would pay the Stanford receiver $65 million in exchange for the Stanford receiver's obtaining from the district court an order that barred any actions against the insurers arising from the policies. *Id.* at 838. The settlement would have extinguished both the employees' claims against the insurers arising from the insurers' denials of coverage and the investors' claims against the insurers arising under a state-law statute.

The Fifth Circuit held the Stanford receiver lacked standing to settle *the employees' claims* because they were "independent, non-derivative" of the receiver's claims, *id.* at 843, and the district court furthermore lacked authority to extinguish the employees' claims "without affording them an alternative compensation scheme." *Id.* at 848. *See also id.* at 846–47 ("Rather than extinguish the Appellants' contractual claims, the court could have authorized them to be filed against the Receivership in tandem with the Stanford investors' claims. Such 'channeling orders' are often employed . . . .").

By contrast, the Fifth Circuit readily agreed that the Stanford receiver had standing to settle *the investors' claims*. The investors argued the Stanford receiver had no right to "control the settlement of a claim it does not own." *Id.* at 850. The court agreed with that proposition but explained that "here, the Receiver had standing to pursue *its own* claims," and the investors' claims were merely "redundant." *Id.* (emphasis in original). The fact that investors had claims did not mean that the Stanford receiver did not. Nothing in *Lloyds* calls into question the Receiver's standing. To the contrary, the opinion supports it.

*Willis*

If there remained any doubt that the Receiver has standing to pursue her claims against Alexander Seawright, the Fifth Circuit's opinion in *Willis* dispels it.[19]  In that case the court affirmed the Stanford receiver's standing to allege, and therefore the district court's subject matter jurisdiction to decide, the very same type of claims the Receiver alleges here.

In *Willis*, the Stanford receiver sued two of Stanford's insurance brokers for their participation in the Stanford Ponzi scheme. The Stanford receiver's claims were the very same type of claims the Receiver alleges against Alexander Seawright. Relevant here, as summarized by the Fifth Circuit, the Stanford receiver alleged:

> (1) that Willis and BMB knowingly or recklessly aided, abetted, or participated in the Stanford directors' and officers' breaches of fiduciary duties towards the receivership entities, *resulting in exponentially increased liabilities and the misappropriation of billions of dollars*;
>
> (2) that Willis and BMB violated their duty of care towards the receivership entities by enabling and participating in the Stanford directors' and officers' Ponzi scheme, *resulting in exponentially increased liabilities and the misappropriation of billions of dollars*;
>
> * * *
>
> [and] (5) that Willis and BMB breached their duties of care to the receivership entities in their hiring, supervision, and retention of employees who issued comfort letters in furtherance of the Stanford Ponzi scheme, *causing exponentially increased liabilities and the misappropriation of billions of dollars*[.]

*Willis*, 2019 WL 6907376 at *4 (emphasis added).

The Stanford receiver and the defendants entered a settlement whereby the defendants would pay the receiver $132.85 million in exchange for the Stanford receiver's obtaining from the

---

[19] On rehearing, the Fifth Circuit withdrew and substituted its original opinion. *Zacarias v. Stanford International Bank, Limited* (*Willis*), 931 F.3d 382, 397 (5th Cir. 2019), *opinion withdrawn and superseded on reh'g*, 2019 WL 6907376 (5th Cir. Dec. 19, 2019). The new opinion in *Willis* does not change the analysis or the result.

district court an order that barred any actions against the defendants arising from the Stanford

Ponzi scheme. *Id.* at *5. A group of individual Stanford investors objected to the bar order because

it extinguished claims against the same defendants that the investors had filed in state court. *Id.* at

*6. The district court entered the bar order over the investors' objections.

On appeal, the investors argued the district court lacked subject matter jurisdiction to bar

claims not before it. The Fifth Circuit rejected that argument, observing:

> It is necessarily the case that where a district court appoints a receiver to coordinate
> interests in a troubled entity, that entity's investors will have hypothetical claims
> they could independently bring but for the receivership: the receivership exists
> precisely to gather such interests in the service of equity and aggregate recovery.

*Id.* at *10. It is only through the receivership, the court explained, that a recovery can be

equitably distributed:

> Exercising their jurisdiction under the securities laws, federal district courts can
> utilize a receivership where a troubled entity, bedeviled by their violation, will be
> unable to satisfy all of its liabilities to similarly situated investors in its securities.
> Without a receiver, investors encounter a collective-action problem: each has the
> incentive to bring its own claims against the entity, hoping for full recovery; but if
> all investors take this course of action, latecomers will be left empty-handed. A
> disorderly race to the courthouse ensues, resulting in inefficiency as assets are
> dissipated in piecemeal and duplicative litigation. The results are also potentially
> iniquitous, with vastly divergent results for similarly situated investors.
>
> ***
>
> The receiver, standing in the shoes of the injured corporations, is entitled to pursue
> the corporation's claims "for the benefit not of [the wrongdoers] but of innocent
> investors." The receiver is therefore allowed to curb investors' individual
> advantage-seeking in order to reach settlements for the aggregate benefit of
> investors under the court's supervision. *As directed by the court, a receiver may
> systematically use ancillary litigation against third-party defendants to gather the
> entity's assets.* Once gathered, these assets are distributed through a court-
> supervised administrative process.

*Id.* at *7 (emphasis added).

12

The court next explained that the district court had subject matter jurisdiction to bar the investors' claims as part of the Stanford receiver's settlement with the defendants because the investors' claims are derivative of the Stanford receiver's claims, *for which the Stanford receiver unquestionably had standing*. Relevant here, the Stanford receiver, like the Receiver in this case, alleged injuries only "to the Stanford entities, *including the unsustainable liabilities inflicted by the Ponzi scheme*":

> The case at hand is one of several ancillary suits under the primary SEC action to enforce the federal securities laws against Robert Allen Stanford and his Ponzi-scheme co-conspirators. *There is no dispute that the receiver and Investors' Committee had standing to bring their claims against Willis and BMB. They bring only the claims of the Stanford entities—not of their investors—alleging injury to the Stanford entities, including the unsustainable liabilities inflicted by the Ponzi scheme.* The receiver and Investors' Committee "allege that Defendants' participation in a fraudulent marketing scheme increased the sale of Stanford's CDs, ultimately resulting in greater liability for the Receivership Estate," and that defendants "harmed the Stanford Entities' ability to repay their investors." The receiver and Investors' Committee sought to recover for the Stanford entities' Ponzi-scheme harms, monies the receiver will distribute to investor-claimants. *The district court had subject matter jurisdiction over these claims.*

*Id.* at *9 (emphasis added).

In short, a receiver has standing in a Ponzi scheme case to recover damages from defendants whose acts contributed to the debts of the receivership estate, including from the increase in "unsustainable liabilities inflicted by the Ponzi scheme." This otherwise undisputed proposition is "good law" in the Fifth Circuit.[20] Even Judge Willett, who dissented in *Willis*, did

---

[20] Neither *Willis* nor *DeJoria* overruled other *Stanford* cases explicitly holding that a receiver has standing to bring tort claims against third parties for increased liabilities to the receivership estate. *See, e.g.*, *Rotstain v. Trustmark Nat'l* Bank, No. 3:09-CV-2384-N, 2015 WL 13034513, at *9 (N.D. Tex. Apr. 21, 2015); *Official Stanford Inv'rs Comm. v. Greenberg Traurig, LLP*, No. 3:12-CV-4641-N, 2014 WL 12572881, at *4 (N.D. Tex. Dec. 17, 2014); *Janvey v. Willis of Colorado, Inc.*, No. 3:13-CV-3980-N, 2014 WL 12670763, at *3 (N.D. Tex. Dec. 5, 2014); *Janvey v. Adams & Reese, LLP*, No. 3:12-CV-0495-N, 2013 WL 12320921, at *1 (N.D. Tex. Sept. 11, 2013).

not dispute the Stanford receiver's standing to pursue the Stanford entities' claims. *Id.* at *15 (Willett, J., dissenting). The panel was not divided on the question that matters here.

Given the Receiver's alleged injury in this case is same injury that the Stanford receiver alleged in *Willis*, Alexander Seawright is simply wrong to contend the Receiver lacks standing as the court-appointed receiver for Madison Timber to sue Alexander Seawright.

### B. The Receiver has standing because investors have executed assignments that entrust to her the right to sue.

The Receiver has standing not only because she is the court-appointed receiver for Madison Timber, but also because investors have executed assignments that entrust to her the right to sue.

On October 28, 2019, the Court amended the Receiver's order of appointment to allow the Receiver "to accept on behalf of the Receivership Estate assignments of rights or interests that persons or entities may choose to assign to the Receivership Estate."[21] Since then the Receiver has accepted assignments from investors in the Madison Timber Ponzi scheme.

Alexander Seawright does not and cannot challenge the Receiver's right to accept assignments from investors, nor investors' right to assign their claims to the Receivership Estate. It complains instead that the amended complaint 1) does not identify the assignors' claims and 2) does not identify the assignors.

Alexander Seawright's first complaint can be addressed simply: The assignors' claims are the very claims the amended complaint alleges: Count I: civil conspiracy; Count II: aiding and abetting; Count III: recklessness, gross negligence, and at a minimum, negligence; Count VIII: negligent retention and supervision; and vicarious liability. The Receiver alleges the claims both in her capacity as the court-appointed receiver for Madison Timber[22] and in her capacity as holder

---

[21] Doc. 190.

[22] Doc. 57 at ¶¶ 6–7.

of assignments.[23]  The claims need not be distinct; in either capacity, the Receiver's object is the same: to "seek recovery to address the same harms sustained by the same conduct in the same Ponzi scheme."[24]

That the amended complaint does not identify the assignors by name is no cause to dismiss the amended complaint.[25]  Rule 8 does not require "detailed factual allegations." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. 544, 555 (2007)) ("the pleading standard Rule 8 announces does not require "'detailed factual allegations'").  It is enough that the amended complaint provides Alexander Seawright fair notice of the claims against it and the grounds on which they rest.  *Id.* at 698–99 (citing *Twombly*, 550 U.S. at 555).  The amended complaint amply sets forth the grounds for the claims alleged.  The amended complaint sufficiently identifies the assignors as investors in the Madison Timber Ponzi scheme.[26]  Having insisted for the past year that the Receiver's claims belonged instead to investors, Defendants cannot dispute that investors

---

[23] "[I]n aid of the Receivership Estate's recovery, investors have assigned their claims against Defendants to the Receivership Estate, whose purpose is to maximize assets for investors' benefit. The Receiver therefore also has standing to pursue claims against Defendants as the holder of assignments executed by investors." Doc. 57 at ¶ 8.

[24] *Zacarias v. Stanford International Bank, Limited* (*Willis*), 931 F.3d 382, 397 (5th Cir. 2019), *opinion withdrawn and superseded on reh'g*, 2019 WL 6907376 (5th Cir. Dec. 19, 2019).

[25] Alexander Seawright relies on two out-of-Circuit, inapposite cases for the proposition that the Receiver must identify by name each assignor-investor. In *Perkumpulan Investor Crisis Center Dressel-WBG v. Wong*, No. 09-cv-0526, 2009 WL 10676449 (W.D. Wash. Oct. 30, 2009), the plaintiff sued Regal Financial Bancorp for its alleged participation in a Ponzi scheme. The court found the plaintiff's "naked allegation" that it was "empowered" to sue on behalf of an amorphous group of Indonesian investors insufficient to confer standing. *Id.* at *5. Here, there is no question that the Receiver is "empowered" to accept assignments. *See* Doc. 190 (empowering the Receiver "to accept on behalf of the Receivership Estate assignments of rights or interests that persons or entities may choose to assign to the Receivership Estate"). *MAO-MSO Recovery II, LLC v. Boehringer Ingelheim Pharm., Inc.*, 281 F. Supp. 3d 1278 (S.D. Fla. 2017), is entirely factually distinguishable.  The plaintiffs sued under the Medicare Secondary Payer Act a pharmaceutical company for reimbursement of medical-service costs. There was no federal equity receiver and no express permission given by a court for the plaintiffs to accept assignments, as there is here.

[26] Doc. 57 at ¶ 8.

have standing to pursue claims against third parties such as Alexander Seawright whose actions contributed to the Madison Timber Ponzi scheme's success.

As the Receiver has stated elsewhere,[27] the Receiver takes investors' privacy seriously. Investors are victims of a massive fraud, and the Receiver thus far has protected their names and identifying information from public disclosure.  The Receiver of course will make available to Alexander Seawright any information to which it is entitled, subject to appropriate protections. The Receiver's sensitivity to these important considerations is no basis for Alexander Seawright to question the Receiver's standing.

## II.   THE AMENDED COMPLAINT STATES A CLAIM FOR CIVIL CONSPIRACY.

A conspiracy is "a combination of persons for the purpose of accomplishing an unlawful purpose or a lawful purpose unlawfully." *Shaw v. Burchfield*, 481 So. 2d 247, 255 (Miss. 1985). An agreement to conspire "may be express, implied, or **based on evidence of a course of conduct**." *Bradley v. Kelley Bros. Contractors*, 117 So. 3d 331, 339 (Miss. Ct. App. 2013) (emphasis added). The three elements of a civil conspiracy claim are: "(1) the existence of a conspiracy, (2) an overt act in furtherance of that conspiracy, and (3) damages arising therefrom." *Wells v. Shelter Gen. Ins. Co.*, 217 F. Supp. 2d 744, 753 (S.D. Miss. 2002) (citing *Delta Chem. & Petroleum, Inc. v. Citizens Bank of Byhalia*, 790 So. 2d 862, 877 (Miss. App. 2001)). In determining whether a civil conspiracy exists, damages—as opposed to the agreement—"are the essence." *Rex Distrib. Co., Inc. v. Anheuser-Busch, LLC*, 271 So. 3d 445, 455 (Miss. 2019) (quoting *Bradley*, 117 So. 3d at 339) ("The elements [of a claim for civil conspiracy] are quite similar to those required of a criminal conspiracy, with the distinguishing factor being that an

---

[27] Most recently in support of a protective order in the related case *Alysson Mills vs. The UPS Store, Inc., et al.*, No. 3:19-cv-00364 (S.D. Miss.).

16

agreement is the essence of a criminal conspiracy, while damages are the essence of a civil conspiracy.") (internal quotation marks omitted).

### A. It is enough that the Receiver shows an overt act by Lamar Adams and that Defendants participated in Adams's "course of action."

Alexander Seawright argues the Receiver has failed to establish any "'unlawful overt act' committed by the Alexander Seawright Defendants."[28]  This argument fails.

Although she may do so, the Receiver is not required to show that Defendants committed an overt act in furtherance of the conspiracy, only that they "agreed to and participated in [Lamar Adams's] course of action." *Rex Distrib.*, 271 So. 3d at 455. The Mississippi Supreme Court made clear in a recent opinion that it is "a fundamental misstatement of the nature of civil conspiracy" to contend that liability for civil conspiracy depends on every alleged coconspirator having committed an overt act that damaged the plaintiff. *Id.* Civil conspiracy "exists as a cause of action to hold nonacting parties responsible." *Id.* (emphasis added). To state a claim for civil conspiracy, the Receiver "has to show an unlawful overt act and [she] has to show damages, but the overt act need not be by [Baker Donelson, Alexander, or Seawright]." *Id.* It is enough that the Receiver shows an overt act by Lamar Adams and that Defendants participated in Adams's "course of action."

It is undisputed that Lamar Adams committed unlawful overt acts in furtherance of the Madison Timber Ponzi scheme. The complaint alleges Defendants agreed to and participated in Adams's "course of action" by, among other things, recruiting investors to Madison Timber,

---

[28] Doc. 64 at 18. Alexander Seawright also argues that the Receiver cannot base her civil conspiracy claim on Alexander and Seawright's unlawful sale of unregistered securities. The Receiver does not purport to assert a private right of action for Alexander and Seawright's sale of unregistered securities. The Receiver would be remiss, however, to fail to point to that unlawfulness, which is further "evidence of [Alexander and Seawright's] course of conduct." *Bradley*, 117 So. 3d at 339.

assuring potential investors that Alexander and Seawright had personally inspected Adams's timber and mill contracts, and offering Baker Donelson's backing as additional assurance.[29] Simply put, Defendants "agreed to and participated in [Lamar Adams's] course of action." *Rex Distrib.*, 271 So. 3d at 455. The amended complaint's allegations are more than sufficient to state a claim for civil conspiracy.

### B.  Defendants knew or should have known that Madison Timber was a fraud.

Alexander Seawright argues the Receiver has "not alleged sufficient facts demonstrating that the Alexander Seawright Defendants knew Adams was operating a fraudulent Ponzi scheme."[30]  This argument fails, too, for multiple reasons.

First, Mississippi law holds that a conspiracy can be formed by a "mere tacit understanding between the conspirators to work to a common purpose." *Aetna Ins. Co. v. Robertson*, 94 So. 7, 22 (1922), *modified on suggestion of error for other reason*s, 95 So. 137 (1923). The Receiver need only show that Defendants "agreed to and participated in [Adams's] course of action." *Rex Distrib.*, 271 So. 3d at 455. The amended complaint alleges that Alexander Seawright formed a common purpose with Lamar Adams to "pool other people's money to invest in Madison Timber."[31]

Second, Ponzi scheme or no Ponzi scheme, Alexander Seawright's conduct was unlawful. Alexander and Seawright's unlicensed sales of unregistered securities, out of Baker Donelson's office, violated federal and state law.

---

[29] *See, e.g.*, Doc. 57 at ¶¶ 78–90, 92–95.

[30] Doc. 64 at 17.

[31] Doc. 57 at ¶ 73.

Third, this is not simply a "red flags" case.[32]   Alexander and Seawright made false representations of fact to encourage investments in Madison Timber, and they knew those representations were false. The amended complaint expressly alleges at paragraphs 93–95 that Alexander and Seawright falsely represented that they personally inspected the timber and "mill contracts" underlying each investment:

> 93. Investors were led to believe that Alexander and Seawright personally inspected the timber underlying each investment. Of course they did not. Alexander and Seawright lied to investors. Alexander and Seawright gave investors "Equity Term Sheets" that described each upcoming investment opportunity. An "Equity Term Sheet" dated March 5, 2017, for instance, explained that for the "minimum investment" of $25,000, an investor would share in the "cutting rights on tracts of land in various counties (the 'Timber Rights')." Like all of Alexander and Seawright's "Equity Term Sheets," the "Equity Term Sheet" dated March 5, 2017, expressly represented that Alexander and Seawright would personally inspect the property in question:

>> Company [Alexander and Seawright] will inspect the property related to the Timber Rights, must receive the original, executed Note and timber deed and will inspect the executed agreement(s) with the timber mill(s).

> Alexander and Seawright could not and did not inspect the property in question— nor "the executed agreement(s) with the timber mill(s)"—because such did not exist. These representations were patently false.

> 94. Alexander and Seawright even devised a "Timber Rights Investment Closing Checklist" that included among its list of things to do "Review Mill Contract" and "Review Land re Timber." Alexander and Seawright could not and did not review any "Mill Contract" or "Land re Timber" because there was no "Mill Contract" or "Land re Timber" to review.

> 95. On information and belief, Alexander and Seawright "inspected" a purported timber tract only once or twice, at the very inception of their partnership with Adams. The "inspection" was hardly professional. Email traffic indicates "inspection" meant "[grab] a cooler of beer and make a loop."

Alexander Seawright argues that "[f]ailing to do something that a person arguably should do in connection with a transaction does not mean that person knows that the transaction is part of a

---

[32] Doc. 64 at 14–15.

Ponzi scheme."[33] Alexander Seawright misses the point. Alexander and Seawright did not on occasion fail to read a document. The documents never existed. There was no timber and no "mill contracts." For every investment, Alexander and Seawright told investors in writing that they personally inspected the underlying timber and "mill contracts." Alexander and Seawright knew those representations were false.

Alexander Seawright cites *Midwest Feeders, Inc. v. Bank of Franklin*, 886 F.3d 507, 520 (5th Cir. 2018), for the general proposition that civil conspiracy requires proof that the coconspirator "knew of [the] fraudulent scheme."[34] In fact, in affirming summary judgment in that case, the Fifth Circuit nevertheless observed that "civil conspiracy can be—and often is— established through circumstantial evidence." *Id.* at 520. Indeed, the district court in *Midwest Feeders* denied a motion to dismiss because alleged "circumstantial evidence" created "a factual inquiry regarding a civil conspiracy." *Midwest Feeders, Inc. v. Bank of Franklin*, 114 F. Supp. 3d 419, 431 (S.D. Miss. 2015). Where one conspirator had "confessed to fraudulent activity," it was sufficient, at the motion to dismiss stage, that his coconspirators were alleged to have failed to investigate. *Id.*

In any event, the amended complaint alleges facts sufficient to establish Alexander Seawright "knew of the fraudulent scheme." While this is not simply a "missed 'red flags'" case, there were numerous red flags, any one of which should have alerted Alexander Seawright that Madison Timber was a Ponzi scheme:

> 102. The timber deeds and cutting agreements between landowners and Madison Timber were fake. The landowners' signatures, forged by Adams, often looked the same. A call to any one of the hundreds of purported landowners, or a simple check of the title for any one of the hundreds of purported tracts of land,

---

[33] Doc. 64 at 16.
[34] Doc. 64 at 17.

would have confirmed the truth. Neither Alexander nor Seawright, nor anyone at Baker Donelson, ever called a landowner or checked a tract's title.

103. Madison Timber also had no real contracts with any mills. A call to any one of the mills for which Madison Timber purported to have contracts would have confirmed the truth. Neither Alexander nor Seawright, nor anyone at Baker Donelson, ever called a mill.

104. Adams required that an investor agree that he or she would not record the deed by which Madison Timber purported to grant its own rights to the investor unless and until Madison Timber failed to make a payment under the promissory note. Seawright quipped that "I have been clear that I am no timber expert"—but he is unquestionably a lawyer to whom his clients and investors looked to evaluate the investment's risks. Incredibly, notwithstanding the suspicious "agreement not to record," neither Alexander nor Seawright, nor anyone at Baker Donelson, questioned this requirement.

105. The "profit" that Adams promised was 300% to 400% better than that payable by any other fully asset-backed investment and was uniform and consistent. This fact should have been a glaring warning sign but Alexander, who Baker Donelson presents as a qualified and experienced advisor, turned this warning sign into a selling point. Alexander bragged about his "six year perfect track record" of consistent uniform returns under his "beautiful, albeit simple, financial model."

106. Adams purported to have identified mills with an insatiable demand for timber at uniform prices. The market price for timber is readily available from multiple sources, and any one of those sources would have confirmed that the market price for timber actually rises and falls, sometimes dramatically, over short periods of time. Neither Alexander nor Seawright, nor anyone at Baker Donelson, ever evaluated the investment in light of such information. To the contrary, Seawright gloated that "[Adams] has stated that volume is not problem and indicates there are enough opportunities for him to soak up as much capital as we can raise."

107. In 2014 Adams decided that he did not want to have to manage Madison Timber during the month of December. He told his "bird dogs," including Alexander and Seawright, that Madison Timber would not issue checks in December going forward; what had been a 12-month payoff would become a 13-month payoff, skipping the last month of the year. Seawright blindly passed on to investors the dubious explanation that mills shut down in December for OSHA inspections . . . .

In light of Alexander and Seawright's knowingly false representations; their violations of federal and state law; and numerous red flags, the answer is easy. Applying precedent and reading the amended complaint's allegations in a light most favorable to the Receiver and indulging

reasonable inferences in her favor, the amended complaint unquestionably states facts supporting

a civil conspiracy claim sufficient to survive a motion to dismiss.

### III.   THE AMENDED COMPLAINT STATES A CLAIM FOR AIDING AND ABETTING.

**A.  This Court has recognized a claim for aiding and abetting.**

Like Baker Donelson, Alexander Seawright argues Mississippi law does not recognize a

claim for civil aiding and abetting.[35]  Although no Mississippi state court has had the occasion to

address the issue, every Mississippi federal court to address the issue has agreed that Mississippi

law would recognize a claim for civil aiding and abetting as set forth in the Restatement (Second)

of Torts section 876(b).  This includes the United States Bankruptcy Court for the Southern District

of Mississippi in *In re Evans*, 467 B.R. 399 (Bankr. S.D. Miss. 2011), which Alexander Seawright

selectively quotes in its memorandum.

As the *In re Evans* court explained, this Court in *Dale v. Ala Acquisitions, Inc*., 203 F.

Supp. 2d 694 (S.D. Miss. 2002), made an *Erie* guess that Mississippi would recognize a cause of

action under section 876(b) of the Restatement "(1) because a majority of other jurisdictions have

done so and (2) because Mississippi recognizes the analogous tort of civil conspiracy." *In re Evans*,

467 B.R. at 409.[36]  Since *Dale*, this Court has consistently recognized a cause of action for aiding

---

[35] Doc. 64 at 34.

[36] Alexander Seawright quotes the Fifth Circuit's opinion in *In re Depuy Orthopaedics, Inc., Pinnacle Health Implant Prods. Liab. Litig.*, 888 F.3d 753, 781 (5th Cir. 2018), for the proposition that "[w]hen sitting in diversity, a federal court exceeds the bounds of its legitimacy in fashioning novel causes of action not yet recognized by state courts." It then argues this Court should not recognize a cause of action for aiding and abetting fraud. Doc. 64 at 34. *Depuy* applied Texas law, and the "novel issue" was "an aiding-and-abetting cause of action, outside of the conspiracy context, when the predicate offense sound[ed] in strict liability." 888 F.3d at 781. Unlike the Mississippi Supreme Court, the Texas Supreme Court had explicitly stated that it "has not expressly decided whether Texas recognizes a cause of action for aiding and abetting." *Id.* (quoting *First United Pentecostal Church of Beaumont v. Parker*, 515 S.W.3d 214, 244 (Tex. 2017)).

and abetting under Mississippi state law.[37] The *In re Evans* court recognized the viability of a cause

of action based on section 876(b) but declined to hold that Mississippi law would recognize a cause

of action based on section 876(c). 457 B.R. at 409. The Receiver's cause of action arises under

section 876(b), not section 876(c).[38]

### B. The amended complaint alleges sufficient facts to state a claim for aiding and abetting.

"For harm resulting to a third person from the tortious conduct of another, one is subject to

liability if he knows that the other's conduct constitutes a breach of duty and gives substantial

assistance or encouragement to the other so to conduct himself." RESTATEMENT (SECOND) OF

TORTS § 876(b).

Alexander and Seawright knew that Lamar Adams was the manager of his company,

Madison Timber. They therefore knew that Adams owed Madison Timber a fiduciary duty of care.

Mississippi law requires a manager to discharge his duties in good faith and with fair dealing, with

prudence, and in a manner that he reasonably believed was in the best interests of the company.

*See* MISS. CODE ANN. § 79-29-123(6)(a). Adams breached those duties by misusing Madison

Timber's corporate form to sustain a Ponzi scheme. *E.g.*, *Official Stanford Inv'rs Comm. v.

Greenberg Traurig, LLP*, No. 3:12-CV-4641-N, 2014 WL 12572881, at *8 (N.D. Tex. Dec. 17,

---

[37] *See Natchez Reg'l Med. Ctr. v. Quorum Health Res., LLC*, 879 F. Supp. 2d 556, 574 (S.D. Miss. 2012) (declining to grant summary judgment to defendants on an aiding and abetting fraud claim); *Dickens v. A-1 Auto Parts & Repair, Inc.*, No. 1:18CV162-LG-RHW, 2019 WL 508074, at *2 (S.D. Miss. Feb. 8, 2019) ("Federal courts in this district have concluded that Mississippi courts would recognize a claim of aiding and abetting fraud or civil conspiracy under the Restatement (Second) of Torts § 876(b)."); *U-Save Auto Rental of Am., Inc. v. Moses*, No. 1:02CV689GURO, 2006 WL 211955, at *1 (S.D. Miss. Jan. 27, 2006) (denying a motion to dismiss a claim for aiding and abetting breach of contract); *see also Wright v. Life Investors Ins. Co. of Am.*, No. CIV.A. 2:08CV3-P-A, 2008 WL 4450260, at *1 (N.D. Miss. Sept. 26, 2008) (denying a motion to dismiss a claim for aiding and abetting fraud).

[38] Doc. 57 at ¶ 138.

2014) ("the underlying fiduciary duties on which Plaintiffs' claims are based are those owed by directors and officers of the Stanford Financial Group to their respective Stanford entities").

The amended complaint alleges that Alexander Seawright, by recruiting new investors to the Madison Timber Ponzi scheme, aided and abetted Adams in "committing breaches of duties owed by Adams to Madison Timber and in other tortious conduct."[39] *E.g., Janvey v. Proskauer Rose LLP*, No. 3:13-CV-0477-N, 2015 WL 11121540, at *6 (N.D. Tex. June 23, 2015) ("acts in furtherance of Stanford's scheme amount[ed] to 'substantial assistance'"); *Official Stanford Inv'rs Comm. v. Breazeale Sachse & Wilson LLP*, No. 3:11-CV-0329-N, 2015 WL 13740747, at *9, n.11 and accompanying text (N.D. Tex. Mar. 24, 2015) (allegations that law firm referred clients to Ponzi scheme support "reasonable inference" of substantial assistance).

Alexander Seawright argues it cannot be liable for aiding and abetting because "the Receiver has not even alleged facts demonstrating that the Alexander Seawright Defendants *knew* about the fraud when they agreed to do business with Adams."[40] But as the amended complaint explains, "Defendants need not have known that Madison Timber was a Ponzi scheme to unlawfully aid and abet Adams."[41] Instead, "Defendants knew their conduct was unlawful."[42] Alexander and Seawright knew their unlicensed sales of unregistered securities violated federal law.[43] Alexander and Seawright falsely represented that they personally inspected the timber and "mill contracts."[44] Those false representations "give rise to the strong inference" that Defendants "knew Madison Timber was a Ponzi scheme."[45] And as set forth above, the amended complaint

---

[39] Doc. 57 at ¶ 139.

[40] Doc. 64 at 34 (emphasis in original).

[41] Doc. 57 at ¶ 141.

[42] Doc. 57 at ¶ 141.

[43] Doc. 57 at ¶ 141.

[44] Doc. 57 at ¶ 141.

[45] Doc. 57 at ¶ 142.

details numerous red flags, any one of which should have alerted Defendants that Madison Timber
was a Ponzi scheme.

Like Baker Donelson, Alexander Seawright also relies on the purported "universal rule in
this country" that "banks, lawyers, brokerage houses, [or] accountants" are not liable for aiding
and abetting a fraudulent scheme based on "red flags, smoke, and other irregularities."[46] Like
Baker Donelson, they cite *El Camino Res., LTD v. Huntington Nat'l Bank*, 722 F. Supp. 2d 875,
907–08 (W.D. Mich. 2010). The only "universal rule" to which the *El Camino* court referred is the
purported principle that "a bank's relationship is with its customer and that the bank owes third
parties no duty of care to monitor a customer's activities." 722 F. Supp. 2d at 907. That principle
is inapplicable here, and in any event, *El Camino* is not binding on this Court. Indeed, in Ponzi
scheme cases decided in the Fifth Circuit, awareness that an investment offered "unrealistic rates
of return" supports knowledge for aiding and abetting purposes. *Janvey v. Proskauer Rose LLP*,
No. 3:13-CV-0477-N, 2015 WL 11121540, at *5 (N.D. Tex. June 23, 2015).

Reading the amended complaint's allegations in a light most favorable to the Receiver, and
indulging reasonable inferences in her favor, the complaint states a claim for aiding and abetting.

## IV.  THE AMENDED COMPLAINT STATES A CLAIM FOR RECKLESSNESS, GROSS NEGLIGENCE, AND AT A MINIMUM NEGLIGENCE.

"Negligence is a failure to do what the reasonable person would do under the same or
similar circumstances." *Estate of St. Martin v. Hixson*, 145 So. 3d 1124, 1128 (Miss. 2014).
Recklessness "is a failure or refusal to exercise any care." *Maldonado v. Kelly*, 768 So. 2d 906,
910 (Miss. 2000).[47]

---

[46] Doc. 64 at 20, n.10.

[47] *See also Dame v. Estes*, 101 So. 2d 644, 645 (Miss. 1958) ("Gross negligence is that course of conduct
which, under the particular circumstances, discloses a reckless indifference to consequences without the
exertion of any substantial effort to avoid them.").

"To prevail in any type of negligence action, a plaintiff must first prove the existence of a duty." *Griffith v. Entergy Mississippi, Inc.*, 203 So. 3d 579, 585 (Miss. 2016) (quoting *Enter. Leasing Co. S. Cent. v. Bardin*, 8 So. 3d 866, 868 (Miss. 2009) (citing *Laurel Yamaha, Inc. v. Freeman*, 956 So. 2d 897, 904 (Miss. 2007)). "In the context of an ordinary negligence action the duty of care is the requirement 'to conform to a specific standard for the protection of others against the unreasonable risk of injury. . . .'" *Clausell v. Bourque*, 158 So. 3d 384, 391 (Miss. Ct. App. 2015) (quoting *Laurel Yamaha, Inc. v. Freeman*, 956 So. 2d 897, 904 (Miss. 2007)). Alexander Seawright argues the Receiver has not shown it owed a duty to Adams or Madison Timber.[48]

In fact, as Adams and Madison Timber's joint venture partners, Alexander Seawright owed a statutory duty to Adams and Madison Timber to refrain from "engaging in grossly negligent or reckless conduct, intentional misconduct, or a knowing violation of law." MISS. CODE ANN. § 79-13-404(c). Separately, as a general proposition, "all individuals owe a duty to exercise reasonable care to avoid foreseeable injury to others . . . ." *Fed. Sav. & Loan v. Tex. Real Estate Counselors, Inc.*, 955 F.2d 261, 265 (5th Cir. 1992).[49]  Alexander Seawright thus had a duty to use ordinary

---

[48] Alexander Seawright's assertion that Alexander and Seawright had no duty to stop criminal conduct is a red herring. *See* Doc. 64 at 26, n. 18. The cases Alexander Seawright cites in support are inapposite. *Cuyler v. United States*, 362 F.3d 949, 954 (7th Cir. 2004) (recognizing "exceptions to the rule that there is no common law duty to warn or rescue" in case about whether medical personnel at Naval hospital were negligent in not reporting child's babysitter for previous abuse against another child); *Oden v. Pepsi Cola Bottling Co. of Decatur*, 621 So. 2d 953 (Ala. 1993) (granting summary judgment in favor of Pepsi for claims brought by administrator of estate of minor who was killed when soft drink vending machine fell on him while attempting to steal soft drinks from machine). In *Oden*, the majority opinion does not expressly discuss duty at all. The concurrence, however, found Pepsi owed a duty to the minor in light of numerous red flags—Pepsi knew that vending machines were being tipped for the purpose of stealing drinks, that such criminal activity had resulted in serious injuries and death, and that Pepsi refused to take any action to prevent such injuries. "Pepsi should not go unpunished for its wanton disregard of the danger posed by its vending machines." *Id.* at 961.

As alleged in the amended complaint, Alexander Seawright didn't just fail to stop the Madison Timber Ponzi scheme—they were part of it. There is no question that Alexander Seawright owed duties to the Receivership Estate, and ultimately to Madison Timber investors.

[49] *See also Doe ex rel. Doe v. Wright Sec. Servs., Inc.*, 950 So. 2d 1076, 1079 (Miss. Ct. App. 2007) ("The general duty is to act as a reasonable prudent person would under the circumstances.").

26

care, that is to observe reasonable commercial standards, in the conduct of their business. They breached that duty.

Alexander Seawright contends that Alexander and Seawright's relationship with Adams and Madison Timber was "strictly limited to the loans that Alexander Seawright coordinated to be made by Timber Fund I to Madison Timber and payment of related loan-origination fees."[50] But the amended complaint tells a different story. The amended complaint alleges that from 2011 until April 2018, Alexander and Seawright used a fund they named after themselves to invest other people's money in Madison Timber and split the "profits" with Adams.[51] They worked closely with Adams for seven years. They "were in advantageous positions to discover Adams's fraud" and "[i]n view of the numerous red flags described in this complaint, a reasonable person in the same or similar circumstances would have discovered Adams's fraud."[52]

Far from "negligence in the air,"[53] the amended complaint's allegations are rooted in inescapable facts: Alexander Seawright pitched the Madison Timber investments as "safe enough for friends and family" while knowingly falsely representing that they personally inspected the timber and "mill contracts" underlying each Madison Timber investment. Alexander Seawright had a duty to exercise reasonable care to avoid foreseeable injury to others, including Madison

---

[50] Doc. 64 at 25.

[51] Doc. 57 at ¶¶ 72–77.

[52] Doc. 57 at ¶ 152.

[53] *See* Doc. 64 at 25–26.

Timber.[54] They breached this duty when they "not only failed to exercise due care, they failed or refused to exercise any care at all in their dealings with Adams."[55]

Alexander Seawright's acts, which they undertook in concert with Adams, increased Madison Timber's liabilities and, today, the Receivership Estate's debts. *E.g.*, *Greenberg Traurig, LLP*, 2014 WL 12572881, at *6 (defendants caused damages to the Stanford receivership estate because "they contributed to the size and scope of the underlying scheme, which ultimately resulted in Stanford's financial ruin").

In short, the amended complaint alleges facts sufficient to establish each of the elements of recklessness, gross negligence, and at a minimum negligence.  Alexander Seawright has stated no basis for dismissing the Receiver's claim.

## V.   THE AMENDED COMPLAINT STATES A CLAIM FOR JOINT VENTURE LIABILITY.

Mississippi courts use a three-pronged test to determine whether a joint venture existed: "(1) the intent of the parties, (2) the control question, and (3) profit sharing." *Smith v. Redd*, 593 So. 2d 989, 994 (Miss. 1993).

Alexander Seawright argues it did not form a joint venture with Adams as a matter of law, but the only case they cite in support is *Walker v. Williamson*, No. 1:14-CV-381-KS-JCG, 2016

---

[54] *See* Doc. 57 at ¶ 153. In a footnote, Alexander Seawright adopts Baker Donelson's argument that the amended complaint does not allege that Adams or Madison Timber were clients of Baker Donelson or Alexander Seawright. Correct. The amended complaint does not currently allege a claim for professional negligence, or professional malpractice, against Baker Donelson or Alexander Seawright.

[55] Doc. 57 at ¶ 153. In a footnote, Alexander Seawright offers that "reckless disregard" means "knowingly or intentionally doing a thing or a wrongful act," and contend the amended complaint "is devoid of any facts" which would establish that "they *knowingly* or *intentionally* breached [any] duty." Doc. 64 at 25, n.17. Not true. Again, the amended complaint expressly alleges that Alexander Seawright "knew or should have known that Madison Timber was a Ponzi scheme" in view of numerous red flags described in the amended complaint—and, worse, that they knowingly falsely represented that they personally inspected the timber and "mill contracts" underlying each Madison Timber investment.

WL 2771792 (S.D. Miss. May 12, 2016). In *Walker*, the plaintiffs sought to establish that the defendants had formed a partnership to solicit and represent personal injury clients, but the plaintiffs alleged only that the defendants had "worked together in the past on specific cases." *Id.* at *3. Because the plaintiffs' complaint contained "no factual allegations" of intent or control, their "weak" allegations of shared profits were not enough, on their own, to establish a partnership. *Id.* at *3, *4. Here, by contrast, the amended complaint alleges facts sufficient to establish each of the three prongs.

*"(1) the intent of the parties"*

The intent prong does not require, as Alexander Seawright contends, that Alexander and Seawright expressly "intended to join a fraudulent scheme."[56] It requires only that the parties "expressed an intention to form a partnership" or a joint venture. *Smith*, 593 So. 2d at 994. The amended complaint alleges that it was Alexander Seawright's "stated intent to form a fund to invest other people's money in Madison Timber and to split the 'profits' with Adams."[57]

For good measure, intent also may "be implied, or established from the surrounding circumstances." *Smith*, 593 So. 2d at 994. The amended complaint alleges numerous factual circumstances, too numerous to summarize here, from which a jury might reasonably conclude that Alexander Seawright intended to form a joint venture with Adams. At paragraphs 75–77, for example, the amended complaint alleges Adams, Alexander, and Seawright together determined essential terms of the investments in Madison Timber (called "joint ventures"[58]), including each

---

[56] Doc. 64 at 22 (emphasis removed).
[57] Doc. 57 at ¶ 175.
[58] Doc. 57 at ¶ 38.

investor's return and how to "split" the "profit," and collaborated on the drafting of the investments' essential underlying documents.[59]

*"(2) the control question"*

Alexander Seawright argues the amended complaint does not allege that they "had any control whatsoever over Madison Timber and Adams."[60] But the "control question" asks whether one had any control over the joint venture's business. *See Smith*, 593 So. 2d at 995. The question, then, is not whether Alexander or Seawright controlled Adams or Madison Timber—but instead whether they controlled any aspect of the joint venture that they and Adams undertook.

"[P]artnership-like control varies by the circumstances of each particular partnership, and in some cases all the partners may not be equal participants in running the operations." *Peoples Bank v. Bryan Bros. Cattle Co.*, 504 F.3d 549, 556 (5th Cir. 2007). When "[a]ll parties ma[k]e business decisions," they all exercise partner-like control over the business, even if one partner alone "handle[s] the financial matters." *Smith*, 593 So. 2d 989 at 995. *See also Century 21 Deep S. Properties, Ltd. v. Keys*, 652 So. 2d 707, 715 (Miss. 1995) (concluding that, indeed, "lack of control is not enough by itself to disprove partnership").

The amended complaint alleges more than enough facts to establish that Alexander Seawright controlled many aspects of their joint venture with Adams. As described above, Alexander Seawright made key business decisions as to the essential terms of the investments in Madison Timber—including how they would "split" the "profit" and what the underlying

---

[59] *See also* Exhibit A to the Receiver's opposition to Baker Donelson's motion to dismiss. "When a plaintiff quotes from a document used as a foundation for allegations in the complaint, the Court may examine the entire document to review a motion to dismiss." *Thornton v. Micrografix, Inc.*, 878 F. Supp. 931, 933 (N.D. Tex. 1995). Paragraph 75 of the amended complaint quotes the email that is Exhibit A.

[60] Doc. 64 at 22.

documents would say.[61] They relied heavily on their affiliation with Baker Donelson, and on Baker Donelson's resources, in securing investments.[62] They used their own professional networks, which included Baker Donelson colleagues and clients, to identify new investors.[63] They told potential investors that they personally "fronted the expenses for the design, implementation, operation, and management" of the fund,[64] which invested solely in Madison Timber. Unquestionably, Alexander Seawright had partner-like control over the joint venture with Adams.

*(3) profit sharing*

"The one factor which is the most important in determining the existence of a partnership is profit sharing." *Century 21 Deep S. Properties*, 652 So. 2d at 715. In fact, the Mississippi Uniform Partnership Act provides that the receipt of profits creates the presumption that a person is a partner in a business. MISS. CODE ANN. § 79–12–13(4).

Alexander Seawright argues the amended complaint only "state[s] that Madison Timber paid Alexander Seawright loan-origination fees."[65] That is not true. The amended complaint expressly alleges Adams, Alexander, and Seawright "split" their "profits":

> 75. Alexander and Seawright's "share" [of the profits] would include a portion of each investment's return, what Adams called a "birddog fee." Adams told Alexander and Seawright that he could ensure a 14% "profit" with a 2% "birddog fee" built-in, but Alexander and Seawright could decide "how you guys want the split done."

> 76. Seawright proposed instead that each investment's promissory note bear 13% interest, of which investors would receive 10% and Alexander and Seawright would keep 3%. Separately Alexander and Seawright negotiated an additional 3% commission for themselves. As a result, Alexander and Seawright's

---

[61] Doc. 57 at ¶¶ 75–77, 93. *See also* Exhibit A to the Receiver's opposition to Baker Donelson's motion to dismiss.

[62] Doc. 57 at ¶¶ 82–91. Discovery likely will show that several Baker Donelson employees assisted Alexander Seawright with its Madison Timber business.

[63] Doc. 57 at ¶¶ 78–81.

[64] Doc. 57 at ¶ 113.

[65] Doc. 64 at 22.

"share" of each investment's return included the 3% they disclosed to investors, plus an extra undisclosed 3% that Adams paid them directly.

In short, the amended complaint alleges facts sufficient to establish each of the elements of joint venture liability.

## VI.  THE AMENDED COMPLAINT STATES A CLAIM FOR VIOLATION OF MISSISSIPPI'S RICO ACT.

Mississippi's Racketeer Influenced and Corrupt Organization Act (the "Mississippi RICO Act") makes it unlawful for any person "employed by, or associated with, any [fraud] enterprise to conduct or participate, directly or indirectly, in such enterprise through a pattern of racketeering activity . . . ." MISS. CODE ANN. § 97-43-5.

The amended complaint alleges that Alexander and Seawright "associated with"[66] the Madison Timber "fraud enterprise." An enterprise, as defined by the Mississippi RICO statute, is "any individual, sole proprietorship, partnership, corporation, union or other legal entity, or any association or group of individuals **associated in fact** although not a legal entity." MISS. CODE ANN. § 97-43-3(c) (emphasis added).[67] Madison Timber was a "fraud enterprise" because a fraud enterprise includes one conducted by "mail or other means of communication," and Lamar Adams was convicted of wire fraud. *See* MISS. CODE ANN. § 97-43-3.1 Alexander and Seawright "associated together [with Madison Timber] for a common purpose of engaging in a course of conduct." *Boyle*, 556 U.S. at 946 (quoting *U.S. v. Turkette*, 452 U.S. 576, 583 (1981)) ("[A]n

---

[66] *See* Miss. Code Ann. § 97-43-3 ("It is unlawful for any person employed by, or associated with, any enterprise to conduct or participate, directly or indirectly, in such enterprise through a pattern of racketeering activity or the collection of an unlawful debt.").

[67] "[T]he existence of an enterprise is an element distinct from the pattern of racketeering activity" *Boyle v. United States*, 556 U.S. 938, 947 (2009). But the evidence used to prove both elements "may in particular cases coalesce"; in other words, "proof of a pattern of racketeering activity may be sufficient . . . to infer the existence of an association-in-fact enterprise." *Id.* at 947, 951 (internal quotation marks omitted).

association-in-fact enterprise is 'a group of persons associated together for a common purpose of engaging in a course of conduct.'").

At the motion to dismiss stage, an association-in-fact is sufficiently alleged if a complaint "alleges the relationships among the individuals associated with the enterprise, the purpose of the enterprise . . . , and longevity" sufficient to permit the associates to pursue the enterprise's purpose. *See Hanover Am. Ins. Co. v. Gibbs*, No. 15-cv-559, 2015 WL 5971139, at *5 (E.D. La. Oct. 14, 2015).

Alexander Seawright does not dispute the amended complaint's allegation that Madison Timber was a fraud enterprise.[68] Indeed, it cannot. Alexander and Seawright made knowingly false representations to encourage investments in Madison Timber.[69] They agreed to recruit investors to Madison Timber for Adams and in exchange Adams paid them commissions.[70] Seeing "a big opportunity in Madison Timber," they worked to raise "significant capital" for Adams.[71] Adams relied on Alexander and Seawright and their relationship with Baker Donelson to grow Madison Timber.

The purpose of Alexander and Seawright's association with Madison Timber is clear— they assisted Madison Timber's growth by recruiting new investors to Madison Timber, because "[l]ike any Ponzi scheme, Madison Timber had to continuously grow."[72] The longevity of Madison

---

[68] Doc. 57 at ¶ 166.

[69] Doc. 57 at ¶ 168.

[70] Doc. 57 at ¶ 76.

[71] Doc. 57 at ¶ 74.

[72] Doc. 57 at ¶ 21. *See also, e.g.*, Doc. 57 at ¶ 21 ("Adams relied on recruiters, including [Alexander Seawright], to attract new investors."); ¶ 83 ("Alexander and Seawright relied heavily on their affiliation with Baker Donelson to recruit investors."); ¶ 85 ("Baker Donelson knew Alexander and Seawright relied on their affiliation with Baker Donelson to recruit investors, and Baker Donelson allowed it.").

Timber depended on Alexander and Seawright's encouragement and assistance to achieve that purpose.[73]

The amended complaint alleges that Alexander and Seawright participated in the "fraud enterprise" that was Madison Timber. Mississippi's RICO statute has a lower standard than its federal analog for the "participation" element—Mississippi law prohibits participation in the enterprise's course of conduct generally, **directly or indirectly**. *Compare* MISS. CODE ANN. § 97-43-5(3) ("It is unlawful for any person . . . to . . . participate, **directly or indirectly**, in such enterprise . . .") (emphasis added) *with* 18 U.S.C. § 1962(c) ("It shall be unlawful for any person . . . to . . . participate . . . in the conduct of such enterprise's affairs . . ."). The amended complaint expressly alleges Alexander and Seawright's general participation in Madison Timber's course of conduct:  Alexander and Seawright "pitched their fund" to recruit new investors into Madison Timber, drafted subscription agreements and accompanying closing documents for investments in Madison Timber, and helped Adams to hold "closings" with investors at Baker Donelson's Jackson office.[74]

In a footnote, Alexander Seawright argues that the amended complaint does not allege a pattern of racketeering activity.[75] For there to be a pattern, there must be "at least two (2) incidents

---

[73] Doc. 57 at ¶ 21; *see also* Doc. 57 at ¶ 71 ("Adams and Madison Timber's relationship with Baker Donelson [and therefore Alexander Seawright began in 2011 and continued until Adams turned himself in on April 19, 2018.").

[74] Doc. 57 at ¶¶ 78, 87, 90.

[75] Doc. 64 at 21, n.11 (quoting *Zastrow v. Houston Auto Imports Greenway, Ltd.*, 789 F.3d 553, 559–62 (5th Cir. 2015).  Alexander Seawright seems to rely on *Zastrow* for its statement that the association must have "an existence that can be defined apart from the commission of the predicate acts." *Id.* at 562. It thus merits mention that Alexander and Seawright's association with Adams plainly can be defined apart from Adams's commission of the predicate crimes.

But it also merits mention that the quote on which Alexander Seawright relies is misleading. The *Zastrow* court was in turn quoting *Montesano v. Seafirst Commercial Corp.*, 818 F.2d 423 (5th Cir. 1987), in which the Fifth Circuit cited *U.S. v. Turkette*, 452 U.S. 576 (1981). The Supreme Court clarified its holding in *Turkette* in 2009 in *Boyle v. United States*, 556 U.S. 938 (2009), explaining that while "the existence of an enterprise is an element distinct from the pattern of racketeering activity," the evidence used to prove both

of racketeering conduct." MISS. CODE ANN. § 97-43-3(d). The incidents must "have the same or similar intents, results, accomplices, victims, or methods of commission or otherwise are interrelated by distinguishing characteristics and are not isolated incidents." *Id.* Racketeering activity means "to commit, to attempt to commit, **to conspire** to commit . . . any crime which is chargeable under [Mississippi's RICO Act]." MISS. CODE ANN. § 97-43-3 (emphasis added).

The amended complaint alleges that Adams was convicted of wire fraud and pleaded guilty to a "scheme and artifice to defraud,"[76] a crime Adams committed with the assistance of, and in conspiracy with, Alexander and Seawright. Alleging that Alexander and Seawright conspired with Adams to commit wire fraud is enough—but the amended complaint goes farther. It alleges that Alexander Seawright's association with Madison Timber "began in 2011 and continued until Adams turned himself in on April 19, 2018," and that Alexander and Seawright's "participation allowed the Madison Timber 'fraud enterprise' to continuously grow."[77] The amended complaint then details specific incidents—certainly more than the two required—in which Alexander and Seawright participated in Madison Timber's scheme. The amended complaint alleges that, among other things, Alexander and Seawright created an LLC that would pool other people's money into Madison Timber,[78] pitched Madison Timber to Baker Donelson's clients,[79] and used their specially created Madison Timber fund to invest other people's money in Madison Timber.[80]

---

elements "may in particular cases coalesce"; in other words, "proof of a pattern of racketeering activity may be sufficient . . . to infer the existence of an association-in-fact enterprise." *Id.* at 947, 951 (internal quotations omitted).

[76] Doc. 57 at ¶ 24.

[77] Doc. 57 at ¶ 169.

[78] Doc. 57 at ¶ 73.

[79] Doc. 57 at ¶¶ 74, 78.

[80] Doc. 57 at ¶ 77.

Finally, the amended complaint alleges facts sufficient to show that Alexander and Seawright had knowledge of the racketeering activity. Alexander Seawright argues the amended complaint does not allege that it was "aware of" the wrongful activity. Alexander Seawright ignores the allegations made in paragraphs 95 through 97 of the amended complaint, which expressly allege Alexander and Seawright's actual knowledge: Alexander and Seawright falsely represented that they personally inspected the timber and "mill contracts" underlying each investment. These representations were knowingly false, because there were no timber and no "mill contracts" to inspect.

Alexander Seawright argues instead that red flags "are simply not enough." The amended complaint does not rely on red flags alone—but even so, the alleged red flags are sufficient to show that Alexander and Seawright were "subjectively aware of a high probability" that Madison Timber was a fraud. *Chaney v. Dreyfus Service Corp.*, 595 F.3d 219 (5th Cir. 2010).

Alexander Seawright's reliance on the Fifth Circuit's opinion in *Chaney* for the proposition that "red flags" are insufficient to plead knowledge of unlawful actions does not help Alexander Seawright. In *Chaney*, the Fifth Circuit affirmed the district court's grant of summary judgment on a receiver's RICO claim because "the record [did] not establish that any individual at [the defendant's office] was subjectively aware of a high probability that [the fraudster] was engaged in money laundering." *Id.* The "red flags" in *Chaney* were insufficient to establish knowledge for RICO purposes only because the defendant's employees were not trained to recognize the "red flags" associated with money laundering. *Id.* The court recognized that "red flags" may have been sufficient to establish knowledge if the defendant's employees were "trained to recognize the 'red flags' associated with money laundering." *Id.*

Here, by contrast, the amended complaint alleges, among other things, that the "profits" Adams promised—300% to 400% better than that payable by any other fully collateralized investment—were sufficient to alert Alexander, a "qualified and experienced" investment advisor, that Madison Timber was a fraud.[81] Among other things, the agreements not to record were sufficient to alert Seawright, "a lawyer to whom his clients and investors looked to evaluate the investment's risks," that something was amiss.[82] Having held themselves out as professionals knowledgeable in such matters, they cannot avoid liability simply by proclaiming their ignorance in a motion to dismiss. Alexander and Seawright are exactly the type of RICO defendants the Court in *Chaney* observed are "subjectively aware of a high probability that [a fraudster] was engaged in money laundering." *Chaney*, 595 F.3d at 240.

The amended complaint states a claim for RICO liability under Mississippi law.

## VII.  ALEXANDER, SEAWRIGHT, AND ALEXANDER SEAWRIGHT, LLC ARE ALTER EGOS.

This Court has explained that "[t]he Mississippi Supreme Court defines alter ego as '[a] corporation used by an individual in conducting personal business, the result being that a court may impose liability on the individual by piercing the corporate veil when fraud has been perpetrated on someone dealing with the corporation.'" *Jordan v. Maxfield & Oberton Holdings LLC*, 173 F. Supp. 3d 355, 360 (S.D. Miss. 2016) (quoting *Tanfield Eng'g Sys., Inc. v. Thornton*, 97 So. 3d 694, 702 (Miss. 2012) (some internal quotation marks omitted)).

Alexander Seawright argues the amended complaint's allegations do not satisfy "the three-prong test for piercing the veil of corporations."[83] The test on which they rely would require "(a)

---

[81] Doc. 57 at ¶ 105.
[82] Doc. 57 at ¶ 104.
[83] Doc. 64 at 30.

some frustration of contractual expectations regarding the party to whom [the plaintiff] looked for performance; (b) the flagrant disregard of corporate formalities by the defendant corporation and its principals; (c) a demonstration of fraud or other equivalent misfeasance on the part of the corporate shareholder."[84]   The amended complaint sufficiently alleges facts, described herein, that if true would satisfy each prong of the test for piercing the corporate veil.[85]

But the alter ego doctrine, while "often discussed in conjunction with piercing the corporate veil," has "a different application and analysis." *Jordan*, 173 F. Supp. 3d at 360 (quoting Jackson & Miller, 3 Encyclopedia of Mississippi Law § 22:37 (2001) (noting the two phrases are "generally used without great specificity of meaning")).  Alter ego liability "has an unmistakable air of equity." *Id.* at 361 (quoting Jackson & Miller, 3 Encyclopedia of Mississippi Law § 22:38 (2001)).

In *Jordan*, this Court found an individual was a corporation's alter ego where he used the corporation's revenues "for his personal legal defense fund," which suggested a "comingling of corporate with personal assets, as well as a unity of interest between [the corporation] and [the individual]." *Id.* The amended complaint here alleges that between 2011 and April 2018, Alexander and Seawright withdrew over $980,000 from the Alexander Seawright Timber Fund I, representing their "shares" of investors' returns.[86] Adams separately paid Alexander Seawright, LLC over $600,000 representing Alexander and Seawright's undisclosed "birddog fees."[87]

---

[84] Doc. 64 at 31 (quoting *Gray v. Edgewater Landing, Inc.*, 541 So. 2d 1044, 1047 (Miss. 1989)).

[85] But see *Phillips v. MSM, Inc.*, No. 3:12-CV-175-CWR-FKB, 2015 WL 420327 (S.D. Miss. Feb. 2, 2015): "Mississippi law . . .  allows for exceptions to the three-part standard [for veil-piercing] where rigidly maintaining the corporate entity would subvert the ends of justice." *Id.* at *9.  In *Phillips*, although there was no evidence the defendants had disregarded corporate formalities, they had transferred assets from one corporation to another, which "served to avoid liability" for a judgment. *See id.* Those transfers created a question of fact as to whether defendants had "subverted justice." *Id.*

[86] Doc. 57 at ¶ 96.

[87] Doc. 57 at ¶ 96.

Alexander Seawright Timber Fund I's "profits" became Alexander Seawright, LLC's income, which was Alexander Seawright's personal fund. The commingling and unity of interest are clear.

Separately, this Court observed in *Jordan* that failing to apply the alter ego doctrine in that case "could sanction a fraud." *Id.* The same risk applies here. It risks sanctioning a fraud indeed to use the legal fiction of corporate separateness to relieve from liability two men who are alleged to have knowingly and falsely represented that they personally inspected the timber and "mill contracts" underlying each Madison Timber investment they sold.[88]

## VIII. THE DOCTRINE OF *IN PARI DELICTO* DOES NOT BAR THE RECEIVER'S CLAIMS.

Alexander Seawright argues the Receiver's claims against them are barred by the *in pari delicto* doctrine. The doctrine is an equitable, affirmative defense, which provides that "a wrongdoer is not entitled to compel contribution from a joint tortfeasor." *Sneed v. Ford Motor Co.*, 735 So. 2d 306, 308 (Miss. 1999). Alexander Seawright adopts Baker Donelson's argument that the Receiver, having "stepped into the shoes" of Adams and Madison Timber, can have no right of action against Alexander Seawright.[89] Now that the Receiver stands in the shoes of investors, too, the argument is academic. Nevertheless, like Baker Donelson, Alexander Seawright is wrong.

---

[88] Doc. 57 at ¶¶ 93–95.

[89] Baker Donelson and Alexander Seawright contend the doctrine relieves it of liability because an "active wrongdoer" is more at fault than a "passive wrongdoer," and, according to Baker Donelson and Alexander Seawright, Lamar Adams was the "active" wrongdoer. Doc. 60 at 31. Baker Donelson cites *Long Term Care, Inc. v. Jesco, Inc.*, 560 So. 2d 717 (Miss. 1990), for the proposition that an "active wrongdoer" is more at fault than a "passive wrongdoer." Doc. 60 at 31. *Long Term Care* considered whether, under the doctrine of "common law indemnity," a tortfeasor who volunteered payment to the injured plaintiff in a premises liability case was entitled to indemnity from its fellow tortfeasor. The question here is not one of indemnity. And this is not a premises liability case. *Reed v. D & D Drilling & Expl., Inc.*, 27 So. 3d 414, 416 (Miss. Ct. App. 2009) (declining to consider an argument related to passive negligence because the case was not a premises liability case). In any event, neither Baker Donelson nor Alexander Seawright were "passive wrongdoers." *See Borne v. Estate of Carraway*, 118 So. 3d 571, 588 (Miss. 2013) (quoting *Titus v. Williams*, 844 So. 2d 459, 466 (Miss. 2003) ("One is only passively negligent if he merely fails to act in fulfillment of duty of care which law imposes upon him, while one is actively negligent if he participates in some manner in conduct or omission which caused injury."); *J.B. Hunt Transp., Inc. v. Forrest Gen.*

In federal equity receiverships, the Fifth Circuit has adopted what Baker Donelson's motion calls the "innocent successor" exception to the doctrine of *in pari delicto*. This exception allows a receiver to assert tort claims against professionals even though she has stepped into the wrongdoer's shoes. The rationale for applying the "innocent successor" exception in a federal equity receivership such as this is straightforward: A receiver has a duty to maximize the value of a receivership estate for the benefit of victims, and "[a]pplication of *in pari delicto* would undermine one of the primary purposes of the receivership." *Jones v. Wells Fargo Bank, N.A.*, 666 F.3d 955, 966 (5th Cir. 2012). Applying the *in pari delicto* in a federal equity receivership would also "be inconsistent with the purposes of the [*in pari delicto*] doctrine," which is "not for the benefit of either party and not to punish either of them, but for the benefit of the public." *Id.* (quoting *Lewis v. Davis*, 145 Tex. 468, 199 S.W.2d 146, 151 (1947)). *See also Janvey v. Adams & Reese, LLP*, No. 3:12-CV-0495-N, 2013 WL 12320921, at *3 (N.D. Tex. Sept. 11, 2013) ("In other words, whether to apply *in pari delicto* typically depends on what best serves public policy.").

"It is [therefore] well established [in the Fifth Circuit] that when the receiver acts to protect innocent creditors . . . [s]he can maintain and defend actions done in fraud of creditors even though the corporation would not be permitted to do so." *Jones*, 666 F.3d at 966 (internal quotation marks and citation omitted).[90] Indeed, the *Stanford* court has refused to apply the doctrine of *in pari*

---

*Hosp.*, 34 So. 3d 1171, 1174 (Miss. 2010) (for a wrongdoer to be "passive," he must be "free of fault" and must not have "actively or affirmatively participate[d] in the wrong"). As expressly alleged in the amended complaint, Baker Donelson and Alexander Seawright actively participated in growing the Madison Timber Ponzi scheme.

[90] Alexander Seawright, apparently in an attempt to avoid Fifth Circuit and Mississippi law supporting the Receiver's claims, states that the Receiver's argument is "based in large part" on the Fifth Circuit's ruling in *Jones*. Alexander Seawright's analysis of *Jones* is flawed and misses the point. First, the Receiver was appointed for the estate of Madison Timber *and* Lamar Adams. Second, *Jones* makes clear that the receiver in that case "brought this suit on behalf of [the receivership entity] to recover funds for defrauded investors and other innocent victims. Application of *in pari delicto* would undermine one of the primary purposes of the receivership established in this case, and would thus be inconsistent with the purposes of the doctrine." *Jones*, 666 F.3d at 966. This is exactly what the Receiver is charged to do in this case. It's not just *Jones*,

*delicto* to that receiver's claims against professionals. *See, e.g.*, *Greenberg Traurig, LLP*, 2014 WL 12572881, at *4 ("This Court has already held that the *in pari delicto* defense has little application when a receiver seeks to reclaim assets for innocent investors."); *Janvey v. Willis of Colorado, Inc.*, No. 3:13-CV-3980-N, 2014 WL 12670763, at *4 (N.D. Tex. Dec. 5, 2014) (same); *Adams & Reese, LLP*, 2013 WL 12320921, at *3 ("The Fifth Circuit, when applying Texas law, seems to hold the view that when a receiver is protecting innocent creditors or recovering assets for investors and creditors, the defense of *in pari delicto* should be rejected generally.").

Alexander Seawright, like Baker Donelson, speculates that Mississippi would not recognize the "innocent successor" exception.[91] Baker Donelson premised its argument, which Alexander Seawright adopts, on case law from the Seventh Circuit and from New York. Neither Baker Donelson nor Alexander Seawright explain why they believe Mississippi courts would look to courts in the Seventh Circuit or New York for guidance, when courts in the Fifth Circuit have addressed the issue repeatedly and convincingly. Neither Baker Donelson nor Alexander Seawright explain why they believe Mississippi courts would reject the Fifth Circuit's rationale in virtually identical cases.

Indeed, Mississippi courts have long recognized "important limitations" to the *in pari delicto* doctrine. *Morrissey v. Bologna*, 123 So. 2d 537, 543 (Miss. 1960).[92] "Even where the

---

but the litany of other Fifth Circuit and Mississippi law, that support the Receiver's standing to bring claims against Alexander Seawright.

Speaking of *Jones*, Alexander Seawright presumably did not read it closely. In footnote 20 of their brief, Alexander Seawright cites to cases from other circuits for the proposition that "[l]ike bankruptcy trustees, the Receiver stands in the shoes of debtors." Doc. 64 at 27. But *Jones* expressly found that very argument lacking—"Wells Fargo relies upon a number of cases that have applied the *in pari delicto* doctrine against bankruptcy trustees. These cases, however, are plainly distinguishable . . . . **We therefore are not persuaded by Well Fargo's analogy to bankruptcy trustees**." *Jones*, 666 F.3d at 967–68 (emphasis added).

[91] Doc. 60 at 27.

[92] Alexander Seawright cites *Latham v. Johnson*, which states only the black-letter law that the *in pari delicto* doctrine "only applies where the plaintiff is equally or more culpable than the defendant or acts with

contracting parties are *in pari delicto*, the courts may interfere from motives of public policy. Whenever public policy is considered as advanced by allowing either party to sue for relief against the transaction, then relief is given to him." *Id.*; *see also Rideout v. Mars*, 54 So. 801, 802 (Miss. 1911) ("However, there is a well-defined exception to that rule, which is that, where the paramount public interest demands it, the court will intervene in favor of one as against the other.").

Alexander Seawright provides only slight lip service to the important public policy reasons for not applying *in pari delicto* in this case, stating that "there are no 'policy considerations' or 'equitable considerations' that should prevent the Court from applying *in pari delicto*."[93] *Adams & Reese*, 2013 WL 12320921, at * 3 ("The parties have not briefed any public policy rationales, and thus the Court declines to dismiss the Receiver's claims on *in pari delicto* grounds."). Plainly, there is a "paramount public interest" in the Receiver's recovery. There is no public interest in, and the purpose of the *in pari delicto* doctrine is not served by, barring the Receiver from pursuing claims against defendants who are alleged to have knowingly and falsely represented that they personally inspected the timber and "mill contracts" underlying each Madison Timber investment.[94] Excepting the Receiver from the *in pari delicto* doctrine is prudent and consistent with Fifth Circuit **and** Mississippi law.

Alexander Seawright argues that, even if the "innocent successor" exception to the doctrine of *in pari delicto* applies, it should apply to the Receiver's fraudulent transfer claims only, not to the Receiver's tort claims. Courts in the Fifth Circuit have flatly rejected this argument. A federal

---

the same or greater knowledge as to the illegality or wrongfulness of the transaction." 262 So. 3d 569, 582 (Miss. Ct. App. 2018). The issue in *Latham* was whether the defendant waived the affirmative defense of *in pari delicto* by failing to plead the defense in its answer. *Latham* did not address the merits of the *in pari delicto* doctrine in Mississippi and did not involve a federal equity receivership.

[93] Doc. 64 at 29, n.23.

[94] Doc. 57 at ¶¶ 93–95.

equity receiver may pursue any claims against any third parties whose actions contributed to the success of a Ponzi scheme, and therefore to the debts of a receivership estate. *See, e.g., Zacarias v. Stanford Int'l Bank, Ltd. (Willis)*, No. 17-11073, 2019 WL 6907376, at *7 (5th Cir. Dec. 19, 2019) ("There is no dispute that the receiver and Investors' Committee had standing to bring their [aiding and abetting, breach of fiduciary duty, and other tort claims] against Willis and BMB. They bring only the claims of the Stanford entities—not of their investors—alleging injuries only to the Stanford entities, including the unsustainable liabilities inflicted by the Ponzi scheme."); *Rotstain v. Trustmark Nat'l Bank*, No. 3:09-CV-2384-N, 2015 WL 13034513, at *9 (N.D. Tex. Apr. 21, 2015) ("The Court has rejected [the argument that the Receiver has no standing to bring tort claims] in the past and held that the Receiver has standing to assert tort claims based on the harm to the Receivership Estate's ability to repay its creditors."); *Greenberg Traurig, LLP*, 2014 WL 12572881, at *4 ("This Court has held that the Receiver may assert tort claims against third parties based on allegations that the third parties' torts contributed to the liabilities of the Receivership Estate."); *Willis of Colorado, Inc.*, 2014 WL 12670763, at *3 (N.D. Tex. Dec. 4, 2015) (allowing the receiver to pursue "common law tort claims because they allege that Defendants' participation in a fraudulent marketing scheme increased the sale of Stanford's CDs, ultimately resulting in greater liability for the Receivership Estate"); *Adams & Reese, LLP*, 2013 WL 12320921, at *1 (N.D. Tex. Sept. 11, 2013) (allowing the receiver to pursue civil conspiracy claim is for conspiracy to commit fraud, breaches of fiduciary duty, fraudulent transfers, and conversion because the lawyer defendants "were in advantageous positions to discover Stanford's fraud and . . . they either failed to discover it or discovered it and chose not to act because they benefitted from the enterprise through their director fees or legal fees"); *see also Marion v. TDI Inc*., 591 F.3d 137, 148 (3d Cir. 2010) ("[a] receiver no doubt has standing to bring a suit on behalf of the [receivership entity]

against third parties who allegedly helped that [receivership entity's] management harm the [receivership entity].").[95]

Like the courts before it, this Court too should find "*in pari delicto* no impediment to the Receiver's standing to assert [her] tort claims." *Greenberg Traurig, LLP*, 2014 WL 12572881, at *4.[96]

## CONCLUSION

Alexander Seawright has not stated a basis for dismissing any of the Receiver's claims against Alexander, Seawright, or Alexander Seawright, LLC. The Receiver asks to be permitted to proceed with discovery, in anticipation of presenting of her case to a jury.

---

[95] This Court too, in a related action in which the Receiver asserts nearly identical claims against Defendants who contributed to the growth of the Madison Timber Ponzi scheme, has found that "Fifth Circuit and Mississippi law support the Receiver's causes of actions." Doc. 49, *Alysson Mills v. The UPS Store, Inc., et al.*, No. 3:19-cv-00364 (S.D. Miss.); *see also* Doc. 134 at p. 3, *S.E.C. v. Adams, et al.*, No. 3:18-cv-252 (S.D. Miss.) (noting that the Receiver has standing to pursue a variety of actions, including tort actions, against third parties).

[96] The Receiver maintains that she has standing to brings her claims on behalf of the Receivership Estate. But it is beyond question that the investors, and therefore the Receiver as the assignee of the investors' claims, has standing to bring the amended complaint's claims against Alexander Seawright.

January 10, 2020

Respectfully submitted,

/s/ Lilli Evans Bass                          /s/ Kristen D. Amond

BROWN BASS & JETER, PLLC          FISHMAN HAYGOOD, LLP
Lilli Evans Bass, Miss. Bar No. 102896    *Admitted pro hac vice*
LaToya T. Jeter, Miss. Bar No. 102213     Brent B. Barriere, *Primary Counsel*
1755 Lelia Drive, Suite 400               Jason W. Burge
Jackson, Mississippi 39216                Kristen D. Amond
Tel: 601-487-8448                         Rebekka C. Veith
Fax: 601-510-9934                         201 St. Charles Avenue, Suite 4600
bass@bbjlawyers.com                       New Orleans, Louisiana 70170
*Receiver's counsel*                      Tel: 504-586-5253
                                          Fax: 504-586-5250
                                          bbarriere@fishmanhaygood.com
                                          jburge@fishmanhaygood.com
                                          kamond@fishmanhaygood.com
                                          rveith@fishmanhaygood.com
                                          *Receiver's counsel*

## CERTIFICATE OF SERVICE

I certify that I electronically filed the foregoing with the Clerk of Court using the ECF

system which sent notification of filing to all counsel of record.


Date:   January 10, 2020                  /s/     Kristen D. Amond