**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**
**NORTHERN DIVISION**

**ALYSSON MILLS, *in her capacity as receiver for Arthur Lamar Adams and Madison Timber Properties, LLC*** — **PLAINTIFF**

**V.** — **CAUSE NO. 3:18-CV-866-CWR-FKB**

**BAKER, DONELSON, BEARMAN, CALDWELL & BERKOWITZ, PC; ALEXANDER SEAWRIGHT, LLC; BRENT ALEXANDER; JON SEAWRIGHT** — **DEFENDANTS**

**ORDER**

Before the Court are motions to dismiss filed by Baker, Donelson, Bearman, Caldwell & Berkowitz, PC; Alexander Seawright, LLC; and Brent Alexander. Docket Nos. 59 & 63. On review, Baker Donelson's motion will be denied, while Alexander Seawright, LLC and Alexander's motion will be granted in part and denied in part.

## I. Factual and Procedural History

From at least 2010 until April 2018, Lamar Adams operated timber investment companies called Madison Timber Company LLC and Madison Timber Properties LLC. He told investors they were purchasing shares of timber tracts that would be harvested and sold to lumber mills at a significant profit. The demand for lumber was so great, he said, he could guarantee investors a fixed rate of return in excess of 10%. Investors believed him. They collectively gave him hundreds of millions of dollars.

Adams was lying. He had, with the help of others, faked everything about the scheme. There were no timber deeds, tracts of land, or lumber mills. He was actually using new investors'

money to pay old investors—a classic Ponzi scheme. It worked only as long as Adams and his associates could continue to bring in new money.

The scheme collapsed in April 2018. Adams turned himself in to the United States Attorney's Office in Jackson, Mississippi and quickly pleaded guilty to wire fraud. He is now serving a 19.5-year sentence in federal prison. The sentence reflects the significance of the fraud; the criminal proceeding established that Adams' victims lost approximately $85 million.

When the Ponzi scheme collapsed, the U.S. Securities and Exchange Commission asked this Court to appoint a receiver to take charge of Adams' companies and provide some measure of financial relief to his victims. The Court appointed Alysson Mills to be that receiver. To date, she has sold Adams' assets, negotiated settlements with Adams' enablers, and filed lawsuits against persons and entities that contributed to the fraud. This is one of those lawsuits.

In this action, the receiver alleges that the Baker, Donelson, Bearman, Caldwell & Berkowitz, PC law firm; Alexander Seawright, LLC; Brent Alexander; and Jon Seawright facilitated Adams' fraud.[1] "Defendants lent their influence, their professional expertise, and even their clients to Adams," the receiver alleges. "They made a fraudulent enterprise a fraternity."

The four defendants are deeply intertwined. Baker Donelson is a regional law firm that employed Alexander and Seawright in its Jackson, Mississippi office. Alexander was (and is) a "Senior Public Policy Advisor" at the firm. Seawright was (and is) a transactional attorney and shareholder of the firm.[2] Alexander and Seawright own Alexander Seawright LLC. The LLC was an investment company that the pair ran out of their Baker Donelson offices.

The receiver's amended complaint describes an approximately seven-year-long relationship between the defendants and the Ponzi scheme. It started in 2011, when Alexander

---

[1] Seawright filed for bankruptcy, so the case is presently stayed as to him.

[2] At the time the Ponzi scheme collapsed, Seawright was on the firm's Board of Directors.

and Seawright were looking for investment deals. They met Adams and a partnership was conceived.

Alexander and Seawright used Baker Donelson connections and assets to identify wealthy persons looking for investment opportunities, like Baker Donelson clients. They formed an LLC to pool investors' funds and pitched the investment to potential marks. Alexander and Seawright then funneled the money they raised into Adams' Ponzi scheme. The scheme generated a 10% "return" for the LLC and another 6% in profits for Alexander and Seawright. The amended complaint claims that Alexander and Seawright kept from their victims the true size of their profit.

The receiver says Alexander and Seawright repeatedly lied to their victims. They lied when they claimed to have their own money invested in the fund. They lied when they promised to personally inspect the timber tracts in question. (According to the amended complaint, email correspondence reveals that "inspection" meant "[grab] a cooler of beer and make a loop.") And they lied when they promised to inspect Adams' contracts with timber mills. No such contracts existed.

The scheme looked more stable than it was because Baker Donelson was involved. Alexander and Seawright ran the scheme out of their Baker Donelson offices. They described it as a "friends and family" fund for preferred Baker Donelson partners and clients. Seawright, a transactional attorney, drafted subscription agreements and other investment documents, and sent them to Adams from his Baker Donelson email account. The pair also targeted Baker Donelson clients who had recently closed transactions with the firm.

Baker Donelson, in turn, let the two move money through the firm's escrow accounts, lending an air of authenticity and safety to the scheme. It looked like a sanctioned team activity:

other Baker Donelson attorneys referred new victims to Alexander and Seawright, generating clients, while the firm's runners were used to pick up investors' checks, serving the clients. Baker Donelson let Alexander and Seawright use the firm's offices for presentations, meetings, and "closings." The receiver claims that "numerous" other Baker Donelson employees worked with Adams "for the purpose of finalizing investments in Madison Timber."

The receiver alleges that Alexander and Seawright made approximately $1.6 million from the scheme, not including the cash bonuses that Adams occasionally gave them. As the money flowed in, however, neither Alexander, Seawright, nor Baker Donelson ever called a landowner, checked a title, called a lumber mill, or asked why the landowners' signatures often looked the same. They ignored the glaring red flag the guaranteed return represented, and instead marketed it as a sign of stability. They even ignored feedback from prospective investors that the timber market simply didn't work like this, including feedback that this "nearly riskless opportunity" where "lawyers did the tax work" and "the opportunity was unaudited" was, in truth, suspicious. No one acted on these red flags, despite the likelihood that some modicum of due diligence would have brought down the Ponzi scheme.

* * *

The Court appointed the receiver. She has a duty to "identif[y] and pursue[] persons and entities as participants in the Ponzi scheme to recover funds for distribution to investor-claimants." *Zacarias v. Stanford Int'l Bank, Ltd.*, 945 F.3d 883, 891 (5th Cir. 2019). The receiver now alleges that Baker Donelson, Alexander Seawright LLC, Alexander, and Seawright "contributed to Madison Timber's success over time, and therefore to the Receivership Estate's liabilities today." She brings claims of civil conspiracy; aiding and abetting breach of fiduciary duty; and negligence, gross negligence, and recklessness against all defendants. Alexander and

his LLC are allegedly responsible for fraudulent transfer, racketeering, and joint venture liability.[3] Baker Donelson, meanwhile, is claimed to also be liable for negligent retention and supervision.

After receipt of the amended complaint, the defendants filed the present motions to dismiss. Baker Donelson claims that Alexander and Seawright's investment activities were "*unaffiliated*" with the firm (emphasis in original), and suggests that it merely hosted their professional biographies on its firm website. Alexander and his LLC contend that they are victims themselves, that they were "duped by Adams," and that they undertook "meaningful evaluations" of the timber investments.

## II. Legal Standard

When considering a motion to dismiss under Rule 12(b)(6), the Court accepts the plaintiff's factual allegations as true and makes reasonable inferences in the plaintiff's favor. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). To proceed, the complaint "must contain a short and plain statement of the claim showing that the pleader is entitled to relief." *Id.* at 677-78 (quotation marks and citation omitted). This requires "more than an unadorned, the defendant-unlawfully-harmed-me accusation," but the complaint need not have "detailed factual allegations." *Id.* at 678 (quotation marks and citation omitted). The plaintiff's claims must also be plausible on their face, which means there is "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citation omitted).

A plaintiff that defeats a motion to dismiss does not automatically prevail. Defeating a motion to dismiss simply means that the plaintiff is entitled to discovery—a period in which the

[3] These defendants do not seek to dismiss the fraudulent transfer count.

plaintiff and the defendants obtain evidence from each other and non-parties. After the close of discovery, the defendants are then entitled to file motions for summary judgment, in which they argue to the Court that, given all of the evidence, they are entitled to judgment as a matter of law.

A plaintiff who defeats a motion for summary judgment also does not automatically prevail. Instead, the case is set for trial so that a jury may decide whether the plaintiff has proven her case. Where this Court believes the jury has erred, it has the right to set aside the verdict. If this Court errs, the court of appeals may have the final say.[4]

## III. Discussion

### A. Standing

The defendants first contend that the receiver lacks standing to bring these claims.

The Constitution limits the jurisdiction of federal courts to actual cases and controversies. U.S. Const. art. III, § 2. Parties seeking to invoke federal-court jurisdiction must therefore demonstrate standing, which is shown by three elements: (1) an injury in fact that is concrete and particularized as well as imminent or actual; (2) a causal connection between the injury and the defendant's conduct; and (3) that a favorable decision is likely to redress the injury. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). In a standing analysis, the Court "must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party." *Warth v. Seldin*, 422 U.S. 490, 501-02 (1975).

The defendants' standing arguments are unpersuasive in light of the Fifth Circuit's decision in *Zacarias v. Stanford International Bank*. There, the appellate court upheld a federal equity receiver's standing to sue professionals who conspired with Allen Stanford to carry out a

[4] The lawyers all know this procedure, but these paragraphs are for the benefit of any Ponzi scheme victims who may read this Order.

Ponzi scheme. The court found "no dispute" that the receiver had standing to bring such claims. 945 F.3d at 899. It reasoned as follows:

> They bring only the claims of the Stanford entities—not of their investors—alleging injury to the Stanford entities, including the unsustainable liabilities inflicted by the Ponzi scheme. The receiver and Investors' Committee "allege that Defendants' participation in a fraudulent marketing scheme increased the sale of Stanford's CDs, ultimately resulting in greater liability for the Receivership Estate," and that defendants "harmed the Stanford Entities' ability to repay their investors." The receiver and Investors' Committee sought to recover for the Stanford entities' Ponzi-scheme harms, monies the receiver will distribute to investor-claimants. The district court had subject matter jurisdiction over these claims.

*Id.*

We are presented with the same essential structure here. The receiver has sued a law firm and its employees that, she alleges, conspired with the Ponzi scheme principals to further the Ponzi scheme and cause greater liabilities to the receivership estate. *See id.* at 901. She seeks to recover for injuries to the Madison Timber entities' "unsustainable liabilities inflicted by the Ponzi scheme," and distribute that money to investor-claimants. *Id.* at 899. As in *Zacarias*, there can be "no dispute" that she has standing.[5]

**B. Vicarious Liability**

Baker Donelson argues that it has no responsibility for Alexander and Seawright because they acted outside the scope of their employment. Its brief cites caselaw to imply that the pair may have been involved in "independent criminal conduct."

"Some actions are so clearly beyond an employee's course and scope of employment that they cannot form the basis for a claim of vicarious liability, as a matter of law." *Baker Donelson Bearman Caldwell & Berkowitz, P.C. v. Seay*, 42 So. 3d 474, 488 (Miss. 2010) (citation and brackets omitted). This is not one of those actions.

[5] The Court has not considered whether the receiver also has standing via assignments from investor-victims.

The receiver has sufficiently alleged that this investment scheme, including the subscription agreements Seawright drafted for it, was part and parcel of a bundle of services Baker Donelson provided to its preferred transactional clients; that these services occurred during Baker Donelson's working hours and in its offices; and that they served Baker Donelson's interests. Far from being an unaffiliated frolic, the receiver's allegations regarding consistent, repeated use of Baker Donelson staff and resources—most glaringly, the firm's escrow account—suggest that there was knowledge of and some benefit to the firm from knowingly facilitating Alexander and Seawright's investment activities. The case is therefore unlike those where sexual affairs were deemed unrelated to the course and scope of employment as a matter of law. *See id.*[6]

**C. Civil Conspiracy**

The defendants then argue that the receiver has failed to state a claim for civil conspiracy.

In Mississippi, "the elements of a civil conspiracy are: (1) an agreement between two or more persons, (2) to accomplish an unlawful purpose or a lawful purpose unlawfully, (3) an overt act in furtherance of the conspiracy, (4) and damages to the plaintiff as a proximate result." *Rex Distrib. Co., Inc. v. Anheuser-busch, LLC*, 271 So. 3d 445, 455 (Miss. 2019) (quotation marks and citation omitted). "[D]amages are the essence of a civil conspiracy." *Id.* (quotation marks and citation omitted).

A conspiratorial agreement to commit a wrong can be "tacit." *Gallagher Bassett Servs., Inc. v. Jeffcoat*, 887 So. 2d 777, 786 (Miss. 2004). The Mississippi Supreme Court adds that a defendant need not commit an overt act to be liable for civil conspiracy. While the plaintiff "has to show an unlawful overt act and it has to show damages," that court held recently, "the overt

[6] The Court has not considered whether the receiver has sufficiently alleged that Alexander and Seawright had apparent authority to act for Baker Donelson.

act need not be by [the defendant]." *Rex Distrib.*, 271 So. 3d at 455 (citation omitted). Civil conspiracy "exists as a cause of action to hold nonacting parties responsible," the court explained. *Id.*

To this, the defendants argue that the claim fails because they lacked actual knowledge that Adams was running a Ponzi scheme.[7]

The amended complaint plausibly alleges that the defendants had actual knowledge of wrongdoing. It specifically recites that Alexander and Seawright enticed unwitting investors through a pattern of lies and omissions: they lied about contracts that didn't exist, they lied about inspecting parcels of land, and they omitted from their victims their true compensation. Baker Donelson knew that Alexander and Seawright were using firm resources, personnel, and its escrow account to sell securities, and actively assisted them.[8] All involved also ignored the guaranteed rate of return. *See Janvey v. Proskauer Rose LLP*, No. 3:13-CV-477-N, 2015 WL 11121540, at *5 (N.D. Tex. June 23, 2015) (finding that allegation of defendant's knowledge of "unrealistic rates of return," among other things, stated a plausible claim that defendant had knowledge of a fraudulent enterprise). The pattern of activities meets Mississippi's definition of "actual knowledge," *see Collier v. Trustmark Nat'l Bank*, 678 So. 2d 693, 697 (Miss. 1996), and states a claim for a tacit agreement to accomplish an unlawful purpose.

---

[7] The term "actual knowledge" is not used in these cases. While the Mississippi Court of Appeals has written that "the alleged confederates must be aware of the fraud or wrongful conduct at the beginning of the agreement," *Bradley v. Kelley Bros. Contractors*, 117 So. 3d 331, 339 (Miss. Ct. App. 2013) (citing a treatise), and the Fifth Circuit relied on that line in *Midwest Feeders, Inc. v. Bank of Franklin*, 886 F.3d 507, 519 (5th Cir. 2018), none of the earlier or later Mississippi Supreme Court cases have adopted that verbiage, *see Rex Distrib.*, 271 So. 3d at 455 and *Gallagher Bassett Servs., Inc. v. Jeffcoat*, 887 So. 2d 777, 786 (Miss. 2004) (collecting cases).

[8] Baker Donelson says this is not enough to state a claim for civil conspiracy, because it is not a tort. But Mississippi law holds that no tort is required for a civil conspiracy claim. *See Rex Distrib.*, 271 So. 3d at 455.

Whether the defendants will succeed at summary judgment, as the defendant did in their preferred case, *Midwest Feeders, Inc. v. Bank of Franklin*, 886 F.3d 507, 519 (5th Cir. 2018), is reserved for future proceedings.

**D. Aiding and Abetting**

Next, the defendants argue that the aiding and abetting breach of fiduciary duty claim does not exist in Mississippi.

The receiver's claim for aiding and abetting liability is based on § 876(b) of the *Restatement (Second) of Torts*. The section provides, in relevant part, that "one is subject to liability if he . . . knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself." The theory here is that the defendants knew that Lamar Adams' conduct constituted a breach of his fiduciary duties toward Madison Timber, but nevertheless provided him with substantial assistance.

The state courts of Mississippi have not expressed an opinion on whether § 876(b) provides a viable cause of action in this state. It falls to this Court to make an *Erie*-guess into how Mississippi courts would rule. As the Fifth Circuit put it, "in the absence of on-point Mississippi law, our primary obligation is to make an *Erie* guess as to how the Mississippi Supreme Court would decide the question before us." *Keen v. Miller Envtl. Grp., Inc.*, 702 F.3d 239, 243 (5th Cir. 2012).

The standard for making an *Erie*-guess is familiar.

> We base our forecast on (1) decisions of the Mississippi Supreme Court in analogous cases, (2) the rationales and analyses underlying Mississippi Supreme Court decisions on related issues, (3) dicta by the Mississippi Supreme Court, (4) lower state court decisions, (5) the general rule on the question, (6) the rulings of courts of other states to which Mississippi courts look when formulating substantive law and (7) other available sources, such as treatises and legal commentaries. *Absent evidence to the contrary, we presume that the Mississippi courts would adopt the prevailing rule if called upon to do so.*

*Centennial Ins. Co. v. Ryder Truck Rental, Inc.*, 149 F.3d 378, 382 (5th Cir. 1998) (quotation marks, citations, and brackets omitted) (emphasis added).

Applying this standard, two colleagues on this Court have concluded that the Mississippi Supreme Court would recognize a § 876(b) claim for aiding and abetting fraud. *See Dale v. Ala Acquisitions, Inc.*, 203 F. Supp. 2d 694 (S.D. Miss. 2002); *Jones v. KPMG LLP*, No. 1:17-CV-319-LG-RHW, 2018 WL 5018469, at *2 (S.D. Miss. Oct. 16, 2018). The *Dale* court's analysis showed that "the majority of jurisdictions that have addressed the validity of a claim for aiding and abetting under § 876(b) have held that such a claim exists." 203 F. Supp. 2d at 700.

Alexander and his LLC argue that this was error. They point to this statement from the Fifth Circuit: "When sitting in diversity, a federal court exceeds the bounds of its legitimacy in fashioning novel causes of action not yet recognized by the state courts." *In re DePuy Orthopaedics, Inc., Pinnacle Hip Implant Prod. Liab. Litig.*, 888 F.3d 753, 781 (5th Cir. 2018). The *DePuy* court rejected a § 876(b) aiding and abetting claim under Texas law, at least in the particular product liability circumstances that case presented.

Strictly as a textual matter, these defendants' preferred sentence does not apply. Jurisdiction in this case is predicated upon a federal question, rather than diversity. More to the point, though, to the extent aiding and abetting breach of duty in the product liability context is too "novel," too close to "inventing a new framework" of state-law liability (and thus prohibited), the claim in our case is not. *Id.* Aiding and abetting "has been recognized in the breach of fiduciary context" in Texas, among other places. *In re Houston Reg'l Sports Network, L.P.*, 547 B.R. 717, 758 (Bankr. S.D. Tex. 2016).

That said, the undersigned also believes that controlling authority instructs that this Court must make an *Erie*-guess, in accordance with the standard recited above, when squarely

presented with a question of state law over which it cannot decline supplemental jurisdiction. *E.g.*, *Keen*, 702 F.3d at 243; *Centennial Ins.*, 149 F.3d at 382; *Midwest Feeders*, 886 F.3d at 515-16; *Stacy v. Aetna Cas. & Sur. Co.*, 484 F.2d 289, 292 (5th Cir. 1973) (predicting that "the Mississippi courts would now adopt the rule of 324A"); *Howe ex rel. Howe v. Scottsdale Ins. Co.*, 204 F.3d 624, 627 (5th Cir. 2000) ("If the Louisiana Supreme Court has not ruled on this issue, then this Court **must** make an "Erie guess" and "determine as best it can" what the Louisiana Supreme Court would decide.") (emphasis added).

Here, because there is no evidence that Mississippi would not adopt the prevailing rule, *see Centennial Ins.*, 149 F.3d at 382, this Court concurs with its colleague that an aiding and abetting breach of fiduciary duty claim under § 876(b) would likely be adopted by the Mississippi Supreme Court. *See Dale*, 203 F. Supp. 2d at 701.

Baker Donelson presses that the amended complaint still fails to state a plausible aiding and abetting cause of action. Respectfully, the undersigned disagrees. The lies and omissions set forth above suggest that the defendants knew what they were doing was a breach of duty. The motions to dismiss this claim are denied.

**E. Negligence, Gross Negligence, and Recklessness**

Next, the defendants contend that the receiver has failed to state a claim for negligence, gross negligence, or recklessness.

"To succeed on a claim for negligence, the plaintiff must prove duty, breach, causation and injury." *Rein v. Benchmark Const. Co.*, 865 So. 2d 1134, 1143 (Miss. 2004). Negligence is the failure to use ordinary care. *See George B. Gilmore Co. v. Garrett*, 582 So. 2d 387, 391 (Miss. 1991).

"[T]here is no precise definition of gross negligence, but one of the approximate definitions may be thus expressed: gross negligence is that course of conduct which, under the particular circumstances, disclosed a reckless indifference to consequences without the exertion of any substantial effort to avoid them." *Turner v. City of Ruleville*, 735 So. 2d 226, 229 (Miss. 1999) (citation omitted).

"Recklessness" has been defined as "that degree of fault which lies between intent to do wrong, and the mere reasonable risk of harm involved in ordinary negligence." *Maldonado v. Kelly*, 768 So. 2d 906, 910 (Miss. 2000) (citation omitted). The Mississippi Supreme Court added that recklessness is conduct "so far from a proper state of mind that it is treated in many respects as if harm was intended." *Id.* (citation and emphasis omitted).

The defendants claim that none of the elements of negligence, gross negligence, or recklessness are sufficiently alleged. The Court disagrees. The defendants had a duty to use ordinary care. The Mississippi Legislature has further defined "ordinary care" for entities dealing with negotiable instruments to mean "observance of reasonable commercial standards, prevailing in the area in which the person is located, with respect to the business in which the person is engaged." Miss. Code Ann. § 75-3-103(a)(9). A member of a joint venture has a duty to his fellow venturers "to refrain[] from engaging in grossly negligent or reckless conduct, intentional misconduct, or a knowing violation of law." *Id.* § 79-13-404(c).

The amended complaint is rife with allegations of the defendants failing to use ordinary care. The pattern of lies described above, actively allowed and facilitated by Baker Donelson, states a claim for failure to abide ordinary commercial standards. The allegations set forth a textbook example of defendants who display "a reckless indifference to consequences without

the exertion of any substantial effort to avoid them." *Turner*, 735 So. 2d at 229. The present arguments are, therefore, denied.

**F. Negligent Retention and Supervision**

A "claim of negligent hiring, retention and supervision . . . is simply a negligence claim, requiring a finding of duty, breach of duty, causation and damage." *Roman Catholic Diocese of Jackson v. Morrison*, 905 So. 2d 1213, 1229 (Miss. 2005). "In Mississippi, an employer will be liable for negligent hiring or retention of his employee when an employee injures a third party if the employer knew or should have known of the employee's incompetence or unfitness." *Parmenter v. J & B Enterprises, Inc.*, 99 So. 3d 207, 217 (Miss. Ct. App. 2012) (quotation marks and citation omitted).

Baker Donelson argues that this claim fails because it didn't know Alexander and Seawright were part of a Ponzi scheme. In a similar case arising out of the Stanford litigation, however, the district court found that "an ordinary degree of supervision" supports an inference that the employing firm was "aware to some degree of [its employees] tortious conduct." *Janvey*, 2015 WL 11121540, at *8. "Any further analysis of this issue requires factual development more appropriately considered on a motion for summary judgment." *Id.* This Court agrees.

Of particular salience, to this claim and others, are the questions about the use of Baker Donelson's escrow account. It is one thing to secretly operate a side business out of your office. An employer cannot know everything you do on company time. Suppose the evidence generated through discovery shows that Alexander and Seawright were truly out on their own, abusing their positions without their employer's knowledge. In that case, Baker Donelson will have strong arguments at summary judgment. On the other hand, the allegations regarding the use of the firm's escrow account presently suggest Baker Donelson's knowledge and ratification of the

investment scheme. An escrow account is subject to greater oversight than, for example, one's work email account. Discovery is the right place to determine to what extent the evidence bears out this allegation.

For these reasons, the motions to dismiss this claim are denied.

### G. State Racketeering

Alexander and his LLC argue that the receiver has not sufficiently alleged a violation of Mississippi's Racketeer Influenced and Corrupt Organization Act (RICO). They are correct.

Under the relevant statute, "[a]ny aggrieved person may institute a civil proceeding under subsection (1) of this section against any person or enterprise *convicted* of engaging in activity in violation of this chapter." Miss. Code Ann. § 97-43-9(5) (emphasis added).

At present, none of today's defendants have been convicted of anything relating to this Ponzi scheme. It follows that the receiver's state RICO claim cannot proceed.

### H. Joint Venture Liability

Alexander Seawright LLC and Alexander next contend that the amended complaint fails to show that they and Adams entered into a joint venture or partnership.

In Mississippi,

> no exact definition could be given of a joint venture, [as] the answer in each case depended upon the terms of the agreement, the acts of the parties, the nature of the undertaking and other facts. We broadly defined a joint venture as an association of persons to carry out a single business enterprise for profit, for which purpose they combine their property, money, efforts, skill and knowledge. We said it exists when two or more persons combine in a joint business enterprise for their mutual benefit **with an understanding that they are to share in profits or losses and each to have a voice in its management. We noted a condition precedent for its existence was a joint proprietary interest in the enterprise and right of mutual control**. The joint purpose of the enterprise distinguishes it from a mere tenancy in common. We further held an agreement, express or implied, for sharing in the profits is essential, but there need be no specific agreement to share in the losses, and if the nature of the undertaking was such that no losses other than those of time and labor in carrying it out was likely to occur, an agreement to share in the profits

> might stamp it as a joint venture, although nothing was said about the losses. We said a contract between the parties was necessary, but it need not be embodied in a formal agreement, but might be inferred from the facts, circumstances and conduct of the parties. Finally, we said it differed from a general partnership because it related to a single transaction, while a partnership usually related to a general and continuing business, and that a joint venture was of a shorter duration, and the agreement was less formal.

*Pittman v. Weber Energy Corp.*, 790 So. 2d 823, 826–27 (Miss. 2001) (citation omitted).

Here, the amended complaint thoroughly sets forth an association between Adams, Alexander Seawright LLC, and Alexander to carry out a timber investment partnership or joint venture. Adams supposedly contributed the timber expertise; the LLC and Alexander actually contributed the working capital and "papering everything"; and all involved contributed their time and sales expertise. The parties shared in the profits together, and as for losses, well, this enterprise fits exactly into the Mississippi Supreme Court's description, "if the nature of the undertaking was such that no losses other than those of time and labor in carrying it out was likely to occur, an agreement to share in the profits might stamp it as a joint venture." *Id.*

Whether the evidence will actually bear out a joint venture or partnership, *see Boyanton v. Bros. Produce, Inc.*, 312 So. 3d 363, 374 (Miss. Ct. App. 2020) (granting summary judgment given the record evidence), remains to be seen. For present purposes, though, the allegations in the amended complaint are satisfactory.

### I. *In Pari Delicto*

Lastly, the defendants contend that the doctrine of *in pari delicto* bars this suit.

"The phrase 'in pari delicto' is Latin for 'in equal fault.' The doctrine of in pari delicto refers to the principle that a plaintiff who has participated in a wrongdoing may not recover damages resulting from the wrongdoing." *Latham v. Johnson*, 262 So. 3d 569, 581 (Miss. Ct. App. 2018) (quotation marks, citation, and brackets omitted). "The doctrine . . . is undergirded

by the concerns, first, that courts should not lend their good offices to mediating disputes among wrongdoers; and second, that denying judicial relief to an admitted wrongdoer is an effective means of deterring illegality." *Jones v. Wells Fargo Bank, N.A.*, 666 F.3d 955, 965 (5th Cir. 2012) (citation omitted). "*In pari delicto* is an equitable, affirmative defense, which is controlled by state common law." *Id.* (citations omitted).

The defects with the defendants' argument were well-explained by the *Jones* court. The Fifth Circuit started by reciting that "[a] receiver is the representative and protector of the interests of all persons, including creditors, shareholders and others, in the property of the receivership." *Id.* at 966. It then explained,

> Although a receiver generally has no greater powers than the corporation had as of the date of the receivership, it is well established that when the receiver acts to protect innocent creditors he can maintain and defend actions done in fraud of creditors even though the corporation would not be permitted to do so. The receiver thus acts on behalf of the corporation as a whole, an entity separate from its individual bad actors.

*Id.* (quotation marks, citations, and ellipses omitted). The *Jones* court declined to apply the *in pari delicto* doctrine.

Under this precedent, the receiver and the receivership estate are legally distinct from Adams and Madison Timber. Where, as here, the receiver is acting on behalf of innocent investor-victims, she "does not stand *in pari delicto* to [her bank], even if" Adams would. *Id.* And, as in *Jones*, "[a]pplication of *in pari delicto* would undermine one of the primary purposes of the receivership established in this case, and would thus be inconsistent with the purposes of the doctrine." *Id.* (citation omitted).

Mississippi's wrongful conduct rule is also unavailing. The rule provides that "no court will lend its aid to a party who grounds his action upon an immoral or illegal act." *Price v. Purdue Pharma Co.*, 920 So. 2d 479, 484 (Miss. 2006) (citation omitted). The Mississippi

Supreme Court long ago explained that the judicial system, "from a consideration of its own pecuniary interests, and of the interests of other litigants, may wisely refuse to assist in adjusting equities between persons who have been engaged in an unlawful action." *W. Union Tel. Co. v. McLaurin*, 66 So. 739, 740 (Miss. 1914).

There are no inequities here in permitting the receiver to proceed. Just as with the doctrine of *in pari delicto*, the receivership estate is not limited by the wrongful conduct of Adams and Madison Timber. "The appointment of the receiver removed the wrongdoer from the scene." *Scholes v. Lehmann*, 56 F.3d 750, 754 (7th Cir. 1995). And the equities favor permitting investor-victims to recover from a receiver's suit against those culpable in the Ponzi scheme.

For these reasons, the defendants' equitable arguments for dismissal are denied, without prejudice to their re-urging at the summary judgment stage.

### J. Piercing the Veil

Finally, Alexander and his LLC contend that the allegations are insufficient to pierce the corporate veil of their LLC. For the reasons stated in *Phillips v. MSM, Inc.*, No. 3:12-CV-175-CWR-FKB, 2015 WL 420327, at *9 (S.D. Miss. Feb. 2, 2015), the argument is denied without prejudice.

## IV. Conclusion

The Court has considered all arguments raised by the parties; those not addressed in this Order would not have changed the result. Baker Donelson's motion is denied, while Alexander Seawright, LLC and Alexander's motion is granted in part and denied in part.

**SO ORDERED**, this the 5th day of May, 2021.

s/ Carlton W. Reeves
UNITED STATES DISTRICT JUDGE