### IN THE UNITED STATES DISTRICT COURT
### FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
### NORTHERN DIVISION

| | |
|---|---|
| **ALYSSON MILLS**, *in her capacity as Receiver for Arthur Lamar Adams and Madison Timber Properties, LLC* | **PLAINTIFF** |
| **v.** | **Case No. 3:18-cv-00866-CWR-BWR** |
| **BAKER, DONELSON, BEARMAN, CALDWELL & BERKOWITZ, PC et al.** | **DEFENDANTS** |
| | |
| **ALYSSON MILLS** *in her capacity as Receiver for Arthur Lamar Adams and Madison Timber Properties, LLC* | **PLAINTIFF** |
| **v.** | **Case No. 3:20-cv-00232-CWR-BWR** |
| **JON DARRELL SEAWRIGHT** | **DEFENDANT** |

### MEMORANDUM OPINION AND ORDER GRANTING BAKER DONELSON'S MOTION FOR INVESTOR DISCOVERY

THIS MATTER is before the Court on Defendant Baker, Donelson, Bearman, Caldwell & Berkowitz, PC's (Baker Donelson's) Motion to Conduct Investor Discovery [123] and Memorandum in Support [124]. Alysson Mills, the Court-appointed Receiver for Arthur Lamar Adams and Madison Timber Properties, LLC, has filed a Response [125] and Baker Donelson a Reply [126]. Having considered the matter, Baker Donelson's Motion to Conduct Investor Discovery [123] is granted. A discovery conference will be scheduled to determine the first group of investors to be

deposed and further discuss proportionality and Receiver's objections, if any, to a questionnaire.

## I. BACKGROUND

A.   General History

### 1. Arthur Lamar Adams

From at least 2010 until April 2018, Arthur Lamar Adams (Adams) operated a Ponzi scheme through his purported timber investment companies, Madison Timber Company LLC and Madison Timber Properties LLC (collectively, Madison Timber). *Mills v. Seawright*, No. 3:20-cv-232-CWR-FKB, 2021 WL 785105, at *1 (S.D. Miss. Mar. 1, 2021). Adams pleaded guilty to wire fraud and is serving a 19.5-year sentence in federal prison. Judgment [21], *United States v. Adams,* 3:18-cr-88-CWR-FKB (S.D. Miss. Nov. 8, 2018). Adams is not a Defendant in this suit.

The transcript from Adams's plea hearing shows that Adams agreed that he, aided and abetted by others, "knowingly and intentionally devised a scheme and artifice to defraud investors by soliciting millions of dollars of funds under false pretenses, failing to use the invested funds as promised and misappropriating and converting those investors' funds to [his] own benefit and to the benefit of others without the knowledge or the consent or authorization of the investors." Tr. [14] at 25, *United States v. Adams,* 3:18-cr-88-CWR-FKB (S.D. Miss. May 23, 2018). "Adams entered into investment contracts with investors most often in the form of promissory notes on behalf of Madison Timber." *Id.* at 30-31. "The loans typically

guaranteed investors an interest rate of 12 to 13 percent which was to be repaid to investors over the course of 12 to 13 months." *Id* at 31.

"Adams falsely and fraudulently represented to investors that Madison Timber Properties was in the business of buying timber rights from landowners and then selling the timber rights to lumber mills at a higher price." *Id.* at 30. "The object of the scheme was to cause persons to invest in loans that were purportedly for the purpose of financing such contracts for the purchase of timber rights to be sold to lumber mills. In fact, neither Adams nor Madison Timber Properties had such timber rights or contracts with lumber mills except in only a few instances." *Id.* at 30. "Adams created false timber deeds purporting to be contracts conveying timber rights from landowners to Madison Timber Properties. Adams forged the signatures of landowners whose names were obtained from timber maps. Adams also created false timber deeds purporting to convey those timber rights from Madison Timber Properties to the investors. In fact, Madison Timber Properties did not hold valid timber rights on the parcels of lands described in the false timber deeds which Adams created. To further lull investors, Adams had many of the documents notarized to make the investments appear legitimate. To further conceal the scheme, Adams required the investors to agree not to record their timber deeds unless Madison Timber Properties defaulted on the loan agreement by failing to make a payment." *Id.* at 31-32.

### 2. Jon Seawright and Ted Alexander

Jon Seawright (Seawright) and Ted Alexander (Alexander) are Defendants. They recruited investors to invest in Alexander Seawright Timber Fund I, LLC (ASTFI), which was wholly owned by them, and ASTFI in turn invested in Madison Timber. *Seawright,* 2021 WL 785105, at *2. During the time of the Ponzi scheme, Seawright was employed as an attorney and shareholder at the law firm of Defendant Baker Donelson, and Alexander was employed by Baker Donelson as a public policy advisor. *Id.* at *1-2; Baker Donelson's Answer [84] at 7-9, ¶¶ 14, 72. Seawright and Alexander were criminally charged in connection with their role in the timber rights scheme. Seawright pleaded guilty to conspiracy to commit wire fraud and is serving a sentence of one year and one day in federal prison. Judgment [15], *United States v. Seawright,* 3:22-cr-84-CWR-LGI (S.D. Miss. Nov. 13, 2023). Alexander pleaded guilty to conspiracy to commit wire fraud and is serving five years of probation, with the first two years on home confinement. Judgment [17], *United States v. Alexander,* 3:23-cr-37-CWR-LGI (S.D. Miss. Nov. 13, 2023).

The material factual bases read at Seawright's and Alexander's plea hearings provide that Seawright and Alexander conspired to commit wire fraud and knowingly and intentionally participated in a scheme and artifice to defraud investors by soliciting millions of dollars of funds under false pretenses and failing to use investors' funds as promised. Tr. [9] at 31, *Seawright,* 3:22-cr-84-CWR-LGI; Tr. [10] at 31-32, *Alexander,* 3:23-cr-37-CWR-LGI. Seawright and Alexander induced investors to entrust money to them resulting in investors suffering

substantial loss, while Seawright and Alexander received undisclosed, upfront payments, and typically invested little or no personal funds through ASTFI into the scheme. Tr. [9] at 34, *Seawright,* 3:22-cr-84-CWR-LGI; Tr. [10] at 34, *Alexander,* 3:23-cr-37-CWR-LGI. Seawright and Alexander falsely and fraudulently promised and warranted to all investors that they would inspect the property related to the timber rights being invested. Tr. [9] at 32, *Seawright,* 3:22-cr-84-CWR-LGI; Tr. [10] at 32, *Alexander,* 3:23-cr-37-CWR-LGI. Seawright and Alexander failed to inspect each piece of property related to the timber rights underlying each investment and failed to verify each executed lumber mill agreement related to each investment. Tr. [9] at 33, *Seawright,* 3:22-cr-84-CWR-LGI; Tr. [10] at 33, *Alexander,* 3:23-cr-37-CWR-LGI. Seawright and Alexander made few or no such inquires, and if they had, would have discovered that the timber deeds, lumber mill agreements, and related documents were not valid. Tr. [9] at 33, *Seawright,* 3:22-cr-84-CWR-LGI; Tr. [10] at 33, *Alexander,* 3:23-cr-37-CWR-LGI.

### 3. Receiver

This case was brought by Receiver, who was appointed by the Court after the Madison Timber Ponzi scheme collapsed. Receiver is tasked with identifying and pursuing persons and entities as participants in the Ponzi scheme to recover funds for distribution to investor victims. *Seawright*, 2021 WL 785105 at *1. In this suit brought by the Receiver, the remaining Defendants are Seawright; Alexander; Alexander Seawright, LLC; and Baker Donelson. The four counts alleged against movant Baker Donelson are the following Mississippi state law claims: civil

conspiracy (Count I), aiding and abetting (Count II); "recklessness, gross negligence, and at a minimum negligence" (Count III); and negligent supervision and retention of Seawright and Alexander (Count VIII). Am. Compl. [57] at 35-50.

B.   Discovery Dispute

This discovery dispute concerns subpoenaing for documents and deposing investors in Madison Timber, both individuals and entities, including those who invested through ASTFI, those who had no active investments at the time Madison Timber collapsed, those who contributed more money than they regained (net losers), and those who regained more money than they contributed (net winners). Lists were provided for in camera review showing names of investors and accountings regarding the money they invested and regained. Baker Donelson has provided a proposed subpoena [123-1] and questionnaire [123-2] that it seeks to serve on all investors and two investors' spouses who represented that they made the decision to invest in Madison Timber. Baker Donelson's Mem. [124] at 3. "Baker Donelson does not propose to depose all investors in Madison Timber [but] first seeks leave to serve subpoenas for documents and a questionnaire on [all] investors, and it will use the information provided in response to identify which investors it wishes to depose." *Id.*

"Baker Donelson is not, as the Receiver suggests, demanding to depose 'all 218' investors, along with their 'financial advisors and accountants.'" Baker Donelson's Reply [126] at 17. Baker Donelson does, however, want to depose "some or all of the 30-plus individuals who invested in ASTFI," any investors Receiver

6

identifies as trial witnesses, and maybe additional investors outside these two categories like those who assigned their claims to Receiver and those who authored a document that Receiver intends to introduce at trial. Baker Donelson's Mem. [124] at 19; Baker Donelson's Ex. [126-1] at 2. Baker Donelson seeks discovery directly from the investors on seven general topics:

(1) investors' interactions (if any) with Baker Donelson, which bear on the Receiver's claim that Baker Donelson knowingly participated in Adams's scheme and defrauded investors;

(2) investors' interactions with Madison Timber, Adams, and his alleged recruiters, which bear on the Receiver's underlying tort claims;

(3) investors' relationship and interactions with Alexander and Seawright and investors' bases for believing that these alleged agents had apparent authority, which bear on the Receiver's theories of vicarious or indirect liability;

(4) investors' understanding of their investments, including their knowledge of the alleged "red flags" that the Receiver contends revealed the fraudulent nature of Madison Timber;

(5) investors' principal invested and returns received—especially from ASTFI—which are the basis for the Receiver's damages calculations;

(6) investors' comparative fault, if any, which must be considered for apportionment of damages under Mississippi law; and

(7) the assignment of claims made by investors to the Receiver, which bears on both the nature and quantum of the claims the Receiver is asserting.

Baker Donelson's Mem. [124] at 7-8.

Receiver's Response provides:

To be clear: The question is not whether Baker Donelson may depose victims the Receiver might call as witnesses at trial (of course it may).

The question is not whether there might exist good cause for Baker Donelson to depose a particular victim, such as one or more of the 34 investors in Alexander Seawright Timber Fund (of course there might).

The question is whether Baker Donelson is entitled to issue subpoenas for documents and written questionnaires and depose all 218 victims (184 investors in Madison Timber, plus the additional 34 who invested through the Alexander Seawright Timber Fund) to whom Madison Timber owes money. In other words, the question is whether Baker Donelson is entitled to wholesale victim discovery. There is nothing proportional about it.

At the heart of the Baker Donelson Motion are the twin themes that it requires exhaustive investor discovery to determine whether Messrs. Alexander and Seawright made misrepresentations, whether investors relied on Alexander and Seawright, and Baker Donelson and the calculation of claimed damages.

There can be no legitimate debate now that Alexander and Seawright made material misrepresentations. They have pled guilty to doing so. And the damages claimed are the sum of the principal amount owed under the notes. Exhaustive investor discovery is not required to perform that simple calculation.

Receiver's Resp. [125] at 2.

Receiver represents that there is no precedent for the discovery Baker Donelson seeks "and in fact precedent forecloses the discovery Baker Donelson seeks." Receiver's Resp. [125] at 8. In support of this representation, Receiver cites her "many hours reviewing the dockets of the [R. Allen] Stanford [Ponzi Scheme] receivers aiding and abetting cases" and the following opinions: *Rotstain v. Trustmark Nat'l Bank*, 3:09-cv-2384-N-BQ, 2020 WL 12968652 (N.D. Tex. Feb. 27, 2020); *Ciuffitelli v. Deloitte & Touche LLP*, 3:16-cv-00580-AC, 2018 WL 7893052 (D. Or. Dec. 10, 2018); and *Levinson v. Westport Nat'l Bank*, 3:09-cv-00269-VLB, 2011 WL 13237887 (D. Conn. May 10, 2011).

Receiver finds Baker Donelson's topics for discovery to investors permissible to the extent they "seek[ ] information relating to Baker Donelson, Messrs. Alexander and Seawright's . . ., or any other current or former defendants' own relationship with Adams," but objectionable to the extent they probe into investors' personal decision to invest in Madison Timber and ask for investors' personal bank statements, checks, communications, tax or accounting treatment of Madison Timber investments, profession or occupation, level of education, professional licenses, income, and net worth. Receiver's Resp. [125] at 17-23. Receiver believes that the investors should not be required to disclose who they communicated with about Madison Timber unless that person is a former or current Defendant. *Id.* at 18. Receiver asserts that requests seeking information about the investors' "reliance, and relatedly, good faith" are objectionable because these "are not elements of the Receiver's claims" and "not relevant to damages." *Id.*

Receiver has provided Madison Timber's QuickBooks files, bank statements, promissory notes to investors, and Receiver's accountings of the investors' losses. *Id.* at 16. Receiver argues that Baker Donelson "has everything it needs to calculate, for itself, Madison Timber's additional liability to investors," and information from investors to account for their losses is cumulative. *Id.* at 14-15. Receiver objects to Baker Donelson's proposed subpoena's questionnaire as procedurally improper, submitting that Baker Donelson "must comply with Rule 31, which allows for deposition by written question to any party, but limits such depositions to ten in number absent stipulation or court order." *Id.* at 22 (citing Fed. R. Civ. P. 31(a)(2)).

9

## II.  DISCUSSION

A.    <u>Discovery Standards</u>

Federal Rule of Civil Procedure 26(b)(1) provides that

[p]arties may obtain discovery regarding any nonprivileged matter
that is relevant to any party's claim or defense and proportional to the
needs of the case, considering the importance of the issues at stake in
the action, the amount in controversy, the parties' relative access to
relevant information, the parties' resources, the importance of the
discovery in resolving the issues, and whether the burden or expense of
the proposed discovery outweighs its likely benefit.

Fed. R. Civ. P. 26(b)(1).

Among the limitations Rule 26(b) provides is the direction that the Court
must limit the extent of discovery if it determines that the discovery sought is
irrelevant or "unreasonably cumulative or duplicative, or can be obtained from some
other source that is more convenient, less burdensome, or less expensive." Fed. R.
Civ. P. 26(b)(2)(C)(i) and (iii). Rule 26(c) provides that "[t]he court may for good
cause, issue an order to protect a party or person from annoyance, embarrassment,
oppression, or undue burden or expense" by, for example, "forbidding the disclosure
or discovery," or "forbidding inquiry into certain matters, or limiting the scope of
disclosure or discovery to certain matters."  Fed. R. Civ. P. 26(c)(1)(A) and (D). The
party seeking a protective order has the burden to show the necessity of the
issuance of a protective order, which contemplates a particular and specific
demonstration of facts as distinguished from stereotyped and conclusory
statements. *In re Terra Int'l, Inc.*, 134 F.3d 302, 306 (5th Cir. 1998).

B.    <u>Analysis</u>

This discovery dispute is not about whether investors have discoverable information. Receiver's Rule 26(a) initial disclosures concede as much by providing that "actual or potential investors in [ASTFI]" "likely have discoverable information that [Receiver] may use to support her claims." Receiver's Initial Disc. [126-2] at 6. Receiver has not identified her potential investor witnesses or the subject matter of each's testimony. Receiver's briefing states that "of course" Baker Donelson may depose certain investors who Receiver might call at trial but then does not identify those investors. Receiver's Resp. [125] at 2. Receiver submits that "[v]ictims who meaningfully interacted with Messrs. Alexander or Seawright or Baker Donelson . . . might well be proper subjects for deposition," but Receiver does not disclose the investors that she believes meaningfully interacted with Alexander, Seawright, or Baker Donelson. *Id.* at 15.

It is not cooperative for Receiver to state, "of course there might" be "good cause for Baker Donelson to depose a particular victim, such as one or more of the 34 investors in [ASTFI]" and then offer no explanation regarding why there might be good cause to depose a particular ASTFI victim but not all ASTFI investors, or all Madison Timber investors. *Id.* At this stage of the case, withholding the names of witnesses with discoverable information that the disclosing party may use to support its claims or defenses, and the subject matter of the discoverable information, is not justified or harmless and defies the rule that a party has an ongoing obligation to supplement initial disclosures. Fed. R. Civ. P. 26(a)(1)(A)(i),

(e)(1)(B). That Receiver has not yet identified her potential investor witnesses and the subject matter of each's discoverable information sours Receiver's arguments opposing the proposed investor discovery.

Through opposing Baker Donelson's proposed investor discovery, Receiver seeks to limit the (1) number of investors to be subpoenaed and deposed and (2) information that the investors are required to provide. Receiver does not suggest a number that is the correct number of investors to be subpoenaed and deposed but simply refuses the position that Baker Donelson can subpoena and depose all investors. Over two and half years ago in the consolidated discovery proceeding, Receiver suggested permit[ting] the parties to conduct up to 100 [investor] depositions." Receiver's Ex. [109-4] at 2. Receiver has not made a "particular and specific demonstration of fact" explaining why fewer than all investors should be deposed, and it is her burden to show the necessity of a protective order. Receiver is attempting to collect damages to distribute to all investor victims, not just 100. The Court does not know how many investors assigned their claims to Receiver. A party cannot "refuse discovery simply by making a boilerplate objection that it is not proportional." Fed. R. Civ. P. 26 advisory committee's note to 2015 amendment.

The relevancy objection running throughout Receiver's opposition to the proposed investor discovery is that Defendants should not be able to litigate whether the alleged $100 million in damages should be reduced or precluded because some of the investors lacked reasonable reliance or good faith. Receiver's Resp. [125] at 11, 12, 17-23. To the extent Receiver alleges that investor fault is

irrelevant, that argument is rejected because it has already been determined that comparative fault may apply. In *Mills v. BankPlus* the Court stated that "principles of comparative fault might warrant a line on the verdict form asking whether Madison Timber, or perhaps investor-victims, bear some percentage of responsibility for the losses shown by the evidence." Order [221] at 1, 3:19-cv-196-CWR-FKB (Jan. 17, 2023). The Court remarked during a motions hearing in *BankPlus* that some investors "might have participated in the fraud because they've been making money off the fraud." Tr. [124] at 12, *Mills v. BankPlus,* 3:19-cv-196-CWR-FKB (June 11, 2021). The Court continued by observing that

> this case involves very sophisticated people who engaged in this – who might have -- who had some ability to know that guaranteed premiums is suspect; who might know that timber deeds, you know, if you buy -- if you're investing in land, that there are deeds out there which show that others might know that something is wrong when you get these predated checks and you're told to deposit the check and magically money will appear in your account every month on a specific day.

*Id.* at 13.

Presumably, Receiver intends to offer investor testimony to establish that the investors were duped. Receiver has not presented a persuasive reason why Baker Donelson cannot defend against at least the negligence claims by proving that some investors were not duped or proving that everyone except Adams was duped. Baker Donelson maintains that "Adams alone is at fault, and that both Defendants and investors were defrauded by his conduct." Defs.' Mem. [636] at 15, *In re Consolidated Discovery,* 3:22-cv-36-CWR-FKB (S.D. Miss. Apr. 21, 2023). "Baker Donelson expects the evidence to show that Alexander and Seawright neither knew

nor had any reasonable basis to believe that Madison Timber was a Ponzi scheme." Baker Donelson's Mem. [124] at 10. "Baker Donelson does not intend to suggest that all investors – or, perhaps, any investors – bear fault for Adams's fraud. But to the extent the Receiver seeks to establish liability based on a theory of 'red flags' or other negligence, alleged fault would be apportioned among all individuals who were negligent in missing those alleged flags." Baker Donelson's Mem. [124] at 16. Receiver's Amended Complaint alleges that a "glaring warning sign" to Alexander, "who Baker Donelson present[ed] as a qualified and experienced advisor," should have been "[t]he 'profit' that Adams promised." Am. Compl. [57] at ¶ 105. It is fair and relevant for Baker Donelson to explore whether investors should have perceived this "glaring warning sign."

Receiver alleges that "[i]nvestors reasonably believed that their investment[s] in Madison Timber" were "backed and promoted by, and had been vetted by, Baker Donelson." *Id.* at ¶ 82. Receiver has alleged what investors believed about Madison Timber, meaning it is fair for Baker Donelson to explore what investors believed about Madison Timber. Investors can be asked who they communicated with about Madison Timber, regardless of whether that communication was with a current or former Defendant. The Court has observed that why "some people might have participated" in Madison Timber is that they were told by their sister to "get involved," or they told a "brother to get involved, because it is making money." Tr. [124] at 12, *Mills v. BankPlus,* 3:19-cv-196-CWR-LGI (S.D. June 11, 2021). Imposing a blanket order barring Defendants from asking investors about their

investment sophistication and potential fault, and only allowing investors to speak about their contacts with Defendants and not others, would provide an incomplete picture of the circumstances surrounding the Ponzi scheme. While Receiver submits that some investors were "of very low sophistication," Tr. [316] at 75, *Mills v. The UPS Store, Inc.,* 3:19-cv-364-CWR-BWR (S.D. Miss. Dec. 7, 2021), others were in the business of investing; some were incredibly wealthy; some profited and stopped investing in Madison Timber before its collapse; and some, Receiver excluded from distributions. This type of factual context may be needed to resolve disputed dispositive issues because there is no clear, universal law dictating how this case, with these claims and defenses, and a receiver as the only plaintiff, should be tried or how discovery should proceed. Most of Receiver's arguments opposing investor discovery presuppose that her dispositive arguments will prevail.

For example, significant briefing is devoted to the parties' dispute over whether "investor reliance and relatedly, good faith" are relevant to proving or defending against the claims of conspiracy and aiding and abetting. For discovery purposes, if the information is relevant to any claim or defense, it does not matter whether "investor reliance and relatedly, good faith" are relevant to another claim or defense. The type of evidence Baker Donelson is seeking, whether termed as evidence about investor fault, reliance, or good faith, is relevant at least to Count III for "recklessness, gross negligence, and at a minimum negligence." The claims for conspiracy and aiding and abetting, like the negligence claim, have a proximate cause requirement. The Amended Complaint acknowledges a proximate cause

requirement by alleging in the conspiracy Count that "Defendants' and Adams' civil conspiracy is a proximate cause of the debts of the Receivership Estate." Am. Compl. [57] at ¶ 134. It alleges in the aiding and abetting Count that "Defendants' substantial assistance and encouragement is a proximate cause of the debts of the Receivership Estate," and "Defendants are jointly and severally liable for the debts of the Receivership Estate, which their substantial assistance and encouragement proximately caused." *Id.* at ¶¶ 145-146. It cannot be presupposed whether proximate cause for the conspiracy and aiding and abetting claims can be disproven in whole or part by showing that some investors knew about the fraud or should have known about the fraud.

The parties also do not know whether investor fraud and negligence should be considered when calculating damages. Receiver claims that the Receivership Estate is due every penny owed on outstanding promissory notes. Receiver's Resp. [125] at 2. Receiver argues that Baker Donelson cannot look beyond what is owed on the promissory notes because damages "are the debts of the Receivership Estate." *Id.* at 12-13. Receiver cites *Zacarias v. Stanford Int'l Bank, Ltd.*, 945 F.3d 883 (5th Cir. 2019) for this proposition. *Id.* at 12-13. Baker Donelson maintains that Receiver's position on damages is illogical because it would allow distributions to investors who knew about the fraud. Baker Donelson's Mem. [124] at 15. Baker Donelson argues that "[i]f the Receivership has defenses against an investor's claim – whether due to lack of justifiable reliance or otherwise – then that investor is

16

owed nothing by the Receivership Estate and any previous returns of interest or profit would be subject to clawback." *Id.*

*Zacarias* does not answer the question of whether Baker Donelson is prohibited from looking beyond what is owed on the promissory notes to attempt to whittle away at Receiver's damages calculations. *Zacarias* addressed pro rata, equitable distribution of receivership assets to defrauded investors versus allowing individual lawsuits that result in "latecomers being left empty-handed." *Id.* at 895-96. *Zacarias* underscores Receiver's acknowledgment that she "do[es] not represent the investors individually." Tr. [316] at 55, *Mills v. The UPS Store, Inc.,* 3:19-cv-364-CWR-BWR (S.D. Miss. Dec. 7, 2021). Receiver's duty is to the estate, not the individual investors. *Id.* When investors called Receiver about the subpoenas issued to them in *The UPS Store* before those subpoenas were quashed, she informed them that she could not tell them what to do because she is not their lawyer. *Id.* at 54.

Receiver's theory of damages, which would allow investors who knew about the fraud to recover from the Receivership Estate, so long as they had an outstanding promissory note, has not been tested through a dispositive motion. To ensure that information potentially needed to calculate damages is available at the dispositive motion stage, Baker Donelson may pursue through investor discovery its theory that the Receivership Estate's damages are at most the principal outstanding to good-faith investors, less amounts subject to clawback from investors or others who knew or should have known that Madison Timber was a Ponzi scheme.

Receiver cites three opinions as examples of "courts refusing the victim discovery that Baker Donelson seeks." Receiver's Resp. [125] at 4-7. The cases relied on by Receiver are *Rotstain v. Trustmark Nat'l Bank*, 3:09-cv-2384-N-BQ, 2020 WL 12968652 (N.D. Tex. Feb. 27, 2020); *Ciuffitelli v. Deloitte & Touche LLP*, 3:16-cv-00580-AC, 2018 WL 7893052 (D. Or. Dec. 10, 2018); and *Levinson v. Westport Nat'l Bank*, 3:09-cv-00269-VLB, 2011 WL 13237887 (D. Conn. May 10, 2011). Baker Donelson responds by citing *Newman v. Mayer Brown, LLP*, 252 So. 3d 755 (Fla. Dist. Ct. App. 2018). None of the four cases cited are binding. None address Mississippi law. All have different underlying fact patterns. Receiver's cited opinions address class actions in the pre-certification stages brought by investors, not a receiver. All four opinions will be discussed later, but first discussed are two 26(b) factors that favor Baker Donelson followed by a rejection of the privacy and undue burden objections that Receiver makes on behalf of investors.

First, the amount in controversy undermines Receiver's claim that Baker Donelson is seeking disproportionate discovery. Receiver claims that Baker Donelson is liable, jointly and severally, for the entire Ponzi scheme. Am. Compl. [57] at ¶¶ 135, 146. Receiver seeks more than $100 million dollars. Receiver's Initial Disclosures [126-2] at 5, *In re Consolidated Discovery,* 3:22-cv-36-BWR-FKB. Receiver seeks punitive damages and attorney fees. Am. Compl. [57] at ¶¶ 136, 147, 158, 200. Baker Donelson proposed a stipulation that would have removed over 180 non-ASTFI investors from receiving a subpoena for documents, but Receiver does not agree with Baker Donelson that "any liability imposed on Baker Donelson must

be limited to injuries to investors who invested through ASTFI." Baker Donelson's Mem. [124] at 16-18, Ex. 1, [126-1] at 2.

Second, "the parties relative access to relevant information" favors Baker Donelson. The Case Management Order in the consolidated discovery proceeding limited the initial phase of discovery and required a notice of intent to serve a subpoena on an investor to be filed, and Receiver had fourteen days to move to quash or limit the subpoena. Case Mgmt. Order [7] at 3, *In re Consolidated Discovery,* 3:22-cv-36-CWR-BWR (S.D. Miss. Jan. 31, 2022). Receiver's objections and the parties' inability to reach an agreement about the objections without a Court order have resulted in the issue of investor discovery being stalled since early 2022. Baker Donelson has been prevented from proceeding with subpoenaing investors for documents and depositions since then, while Receiver has had the advantage of communicating and obtaining documents directly from the investors for years.

Receiver's assertion of privacy on behalf of investors was rejected in the related case, *Mills v. The UPS Store, Inc.,* 3:22-cv-36-CWR-BWR, and is rejected here. On February 7, 2022, Magistrate Judge Ball issued a discovery Order in *The UPS Store, Inc.* that provided:

> As for the Receiver's argument that some requests in the subpoenas seek private information (specifically, financial, accounting, and tax documents and information), the Receiver has no standing to assert this objection. *Frazier v. RadioShack Corp.*, No. 10-855, 2021 WL 832285, at *1 (M.D. La. Mar. 12, 2012) ("[A] plaintiff cannot challenge a Rule 45 subpoena directed to a third party on the basis that it violates another person's privacy rights . . . ."). The Court notes, however, that the information is relevant and discoverable and that

such information may be protected from public disclosure by the subpoenaed investor designating the information as confidential under the protective order already entered by this Court.

Order [320] at 2 n.3, 3:19-cv-364-CWR-FKB (S.D. Miss. Feb. 7, 2022).

Magistrate Judge Ball also found – regarding information provided by investors to the FBI, United States Attorney's Office, or other government and investigative agencies – that "[a]lthough certain privileges and protections may apply to those agencies' files, those privileges and protections do not apply to the investors' own documents merely because they may have provided them to those agencies." *Id.* at 1 n.2.

Like objections on privacy grounds, "the issue of whether the burden imposed by compliance with [a] subpoena is properly raised by . . . the third-party required by the subpoena to produce the documents." *Midwest Feeders, Inc. v. Bank of Franklin*, No. 5:14-cv-78-DCB-MTP, 2016 WL 7422560, at *8 (S.D. Miss. May 16, 2016). While Receiver emphasizes that the investors "are not even parties" and mentions that "the court must be sensitive to the nonparty's compliance costs," [125] at 5, these general statements are not "a particular and specific demonstration of fact, as distinguished from stereotyped and conclusory statements." *In re Terra Int'l, Inc.*, 134 F.3d at 306. The investors due money are unlike traditional nonparties because they have a direct financial interest in the litigation. The investors who assigned their claims to Receiver are also unlike traditional nonparties.

20

Receiver has provided no affidavits or other evidence to support the assertion of undue burden, and the investor lists submitted suggest that some investors could not credibly claim undue burden. Roughly 100 investors in Madison Timber invested more than one hundred thousand dollars, and seven invested over ten million dollars. One investor allegedly lost over thirteen million in the Ponzi scheme, and eight lost over one million. Some investors responded to subpoenas for documents issued in *The UPS Store, Inc.* before the subpoenas were quashed. Order [320] at 2, 3:19-cv-364-CWR-FKB (S.D. Miss. Feb. 7, 2022). Counsel for The UPS Store, Inc. averred then that they "ha[d] been contacted by several of the Investors or their counsel and none of them . . . raised any objection to producing the requested documents." TUPSS's Resp. [224] at 1, *Mills. v. The UPS Store, Inc.,* 3:19-cv-364-CWR-FKB (S.D. Miss. July 1, 2021). That some investors were responsive before indicates that some may be now.

Next discussed are the opinions in *Rotstain, Ciuffitelli, Levinson,* and *Mayer Brown.* Receiver cites *Rotstain*, which addressed a complaint brought by The Official Stanford Investors Committee (OSIC) against a bank to recover alleged fraudulent transfers made to the bank and damages for the bank's alleged aiding and abetting in the diversion of billions of dollars from unsuspecting investors in a Ponzi scheme involving Stanford International Bank, Limited (SIBL). Am. Intervenor Compl. [403] at 2, *Rotstain v. Trustmark Nat'l Bank*, 3:09-cv-2384-N-BQ (N.D. Tex. Nov. 4, 2016). OSIC advanced claims for avoidance and recovery of fraudulent transfers, aiding abetting or participating in fraudulent transfers, aiding

abetting or participating in a fraudulent scheme, aiding abetting or participating in conversion, civil conspiracy, aiding abetting or participating in violation of the Texas Securities Act, and aiding abetting or participating in breach of fiduciary duty. *Id.* at 23-32.

Receiver cites *Rotstain* for the proposition that questioning a Madison Timber investor about the (1) decision to invest in Madison Timber, (2) losses in Madison Timber, (3) Madison-Timber-related investment experience, and (4) awareness of any supposed "red flags" that Madison Timber was a Ponzi scheme has "no bearing on whether Baker Donelson aided and abetted Lamar Adams" because what is relevant to aiding and abetting is Baker Donelson's relationship with Adams. Receiver's Resp. [125] at 5. In *Rotstain,* OSIC sought to quash the deposition of an investor who was also an OSIC member. *Rotstain,* 2020 WL 12968652 at 1. The magistrate judge agreed with OSIC that the investor's "personal investment encounters with the Stanford scheme 'have no bearing on' the disputed matters raised by the parties' pleadings herein, e.g., *TD Bank's relationship* with Stanford, whether and why it served as SIBL's main U.S. dollar correspondent bank, and whether it 'knew or had general awareness that Allen Stanford was causing his entities to violate securities law . . . or committing fraud.'" *Id.* at *7 (emphasis in original).

What Receiver does not mention is that there was no negligence claim in *Rotstain,* and the investor at issue in *Rotstain* had "been deposed twice, where parties examined her at length about her and her late husband's CD investments

with Stanford, the reasons why they made the investments, and her trip to Antigua etc." *Id.* (internal quotations omitted). This is the same type of information that Baker Donelson seeks, and Baker Donelson is requesting a first deposition, not a third, in a case with negligence claims. The magistrate judge in *Rotstain* prevented "additional testimony" from the investor about her and her husband's personal decision to invest in the Ponzi scheme. *Id.* at 8. *Rotstain* addressed a putative class action in the precertification stage, and *Rotstain* was never tried. Am. Intervenor Compl. [403] at ¶ 14, *Rotstain v. Trustmark Nat'l Bank,* 3:09-cv-2384-N-BQ (N.D. Tex. Nov. 4, 2016); *Rotstain v. Trustmark Nat'l Bank et al.*, 4:22-cv-800 (S.D. Tex. dismissed May 31, 2024).

Like *Rotstain,* Receiver cites *Ciuffitelli* for the proposition that investors' personal communications have no bearing on Defendants' own relationship with Adams. Receiver's Resp. [125] at 7, 17-23. *Ciuffitelli* also addressed a putative class action in the pre-certification stages that ultimately settled before trial. 2018 WL 7893052, at *1. The investors in *Ciuffitelli* sued to recover losses on securities they purchased from Aequitas Capital Management entities. *Id.* The suit alleged that Aequitas securities were sold in violation of Oregon securities law because they were not registered and were sold by means of untrue statements or omission of material facts. *Id.* at *1-2. Violation of Oregon securities law was the only cause of action. Compl. [257] at 160, 3:16-cv-580-AC (D. Or. Sept. 8, 2017).

Aequitas investors sued Deloitte & Touche, LLP (Deloitte), who performed auditing and accounting services for Aequitas, alleging that Deloitte participated or

materially aided in the sales of Aequitas securities. Deloitte moved to compel the investors to produce "documents pertaining to Plaintiffs' financial condition," including tax returns, investment statements, bank statements, and other account statements showing income, assets, and liabilities. *Ciuffitelli,* 2018 WL 7893052, at *1-2. Deloitte argued in part that "Plaintiffs' financial condition and investment experience is relevant to Plaintiffs' knowledge and understanding of the risks of their investments." *Id.* at *3. The plaintiffs counterargued that financial condition documents were "not relevant whatsoever to whether they knew of any untrue statements or omissions relating to Aequitas and [Aequitas's] financial condition." *Id.* at *3. The plaintiffs also argued that financial condition documents did "not bear on any issue pertaining to class certification because the affirmative defenses of unclean hand[s] and *in pari delicto* posited by Deloitte [were] not available under Oregon Securities law." *Id.*

Deloitte's motion to compel the investors to provide financial condition documents was denied. *Id.* The motion to compel was denied primarily because the plaintiffs' status as accredited investors was not in dispute and because "under ORS § 59.115(1)(b), only a purchaser's actual knowledge of a misrepresentation [was] relevant, and the statute provide[d] for strict liability for nonsellers who participate and materially aid the sale." *Id.* The *Ciuffitelli* court observed that Deloitte failed to show that what it argued was "distinct from comparative negligence," and Deloitte "ha[d] not established that under Oregon law any equitable defenses are available as part of the statute's design or purpose." *Id.* at *4. *Ciuffitelli* was not a

comparative negligence case, and Receiver is not proceeding under a strict liability statute like Oregon Revised Statute § 59.115(1)(b).

Receiver cites *Levinson,* also an opinion addressing a class action in the precertification stage, for the proposition that Baker Donelson is not entitled to individualized investor discovery regarding whether investors in Madison Timber saw the same "red flags" that Baker Donelson is accused of missing. Receiver's Resp. [125] at 6. Receiver posits that the *Levinson* court "reject[ed] the same arguments Baker Donelson makes here." *Id.* Receiver highlights the following sentence from *Levinson*: "WNB's suggestion that Thomas Ridzon's knowledge of BLMIS is commensurate with its own because he obtained two out of the dozens of monthly account statements given to WNB is far-fetched." *Id.* at 3 (citing *Levinson,* 2011 WL 13237887, at *3).

*Levinson* did not reject Baker Donelson's argument about comparative negligence because *Levinson* mentions the words "proximate cause and comparative negligence" once and only then as part of reciting the bank defendant's allegations. *Levinson,* 2011 WL 13237887, at *2. The *Levinson* court based its discovery ruling on whether the financial condition documents sought were relevant to disprove superior knowledge, a concept pertinent to the breach of fiduciary duty claim. *Id.* at 2-3. *Levinson* alternatively denied the motion to compel on grounds that disproving superior knowledge was "not addressed to class-wide liability issues." *Id.* For reasons that cannot be discerned from the opinion, *Levinson* did not address the bank's recited argument that "red flags" evidence was relevant to issues of

proximate cause and comparative negligence. Thus, *Levinson* is not instructive about whether "red flags" evidence is appropriate here.

The *Mayer Brown* opinion offered by Baker Donelson addresses a case more like this one than *Rotstain, Ciuffitelli,* and *Levinson.* In *Mayer Brown,* a receiver sued a law firm alleging that the law firm was guilty of (1) professional malpractice; (2) aiding and abetting breaches of fiduciary duty; (3) aiding and abetting fraud; (4) aiding and abetting breaches of statutory duties; (5) negligent misrepresentation; and (6) fraud. *Mayer Brown*, 252 So. 3d at 756 n.4. The receiver represented "thirty-eight investor entities and individuals" who had assigned their claims to the receiver. *Id.* at 756. The law firm defendant moved to compel the receiver to produce documents on behalf of the investors and comply with investor deposition requests. *Id.* at 757. The trial court granted the law firm's motion to compel. *Id.* The receiver filed a petition for writ of certiorari, arguing that the trial court erred in compelling discovery because the investors were nonparties and could not take part in discovery without a subpoena. *Id.*

The Florida appellate court denied the receiver's petition for certiorari, holding that "because assignors retained substantial, financial interests in their assigned claims, they could be treated as de facto parties for purposes of discovery." *Id.* at 758. The Florida appellate court recognized that "it would be patently unfair to allow assignors to use the assignment contract as both a shield and a sword, allowing them on one hand to evade good faith discovery requests by adverse parties, and on the other ultimately reap the benefits of any damages awarded to

them by way of their assigned actions." *Id.* at 758. *Mayer Brown* is not instructive regarding the breadth of information sought from each investor because it does not reveal the specific information requested from the investors, but *Mayer Brown* muddies Receiver's position about individualized investor discovery in an aiding and abetting case. *Mayer Brown* also raises the issue of whether Receiver's obtainment of assignments from investors brings associated discovery responsibilities. Receiver has not addressed the arguments Baker Donelson makes based on *Mayer Brown*.

Receiver claims that Baker Donelson's focus on her negligence claims "does not solve the problem that the Stanford receiver's aiding and abetting cases present, because many of those cases included negligence claims, too." Receiver's Mem. [125] at 4. Receiver then drops a footnote to support that statement which provides in full:

> *See, e.g.*, Doc. 287 at 96, Plaintiffs' Second Amended Complaint, *Janvey v. Greenberg Traurig*, No. 3:12-cv-4641 (N.D. Tex.) ("RECEIVER CLAIMS … Negligence"); Doc. 302 at 100, Plaintiffs' First Amended Complaint, *Janvey v. Proskauer Rose*, No. 3:13-cv-477 (N.D. Tex.) ("COUNT 1: Negligence"); Doc. 7 at 56, Plaintiffs' First Amended Complaint, *Janvey v. Willis of Colorado*, No. 3:13-cv-3980 (N.D. Tex.) ("Negligence"); Doc. 30 at 42, *OSIC [as assignee of the Stanford receiver's claims] v. BDO USA*, No. 3:12-cv-1447 ("COUNT 1: Negligence/Gross Negligence").

*Id.* at n.6.

Receiver is urging a conclusion based on lack of evidence rather than actual evidence, which is unreliable logic. There may be other plausible reasons why the defendants in these four cases did not pursue individualized investor discovery. The

dockets of these cases show that discovery was scarcely addressed, and the cases settled before they were tried.

The Court already remarked in *BankPlus* that "[i]n discovery as in everything else, the particulars are instructive." Order [221] at 1, 3:19-cv-196-CWR-FKB (Jan. 17, 2023). Applying Rule 26 to these claims and defenses and this fact pattern, Receiver's relevancy objections are overruled, and her disproportionality arguments severely undermined by (1) the amount in controversy, (2) Baker Donelson's inability for years to obtain investor discovery while Receiver has had it, and (3) Receiver's failure to reveal, years into the case, who her potential investor witnesses are and the subject matter of each's testimony.

The proportionality of investor discovery will be managed by deposing investors in groups. It will not be determined now that all investors cannot be subpoenaed or deposed. There will be a discovery conference to proceed with choosing the first group of investors to be deposed, and proportionality will be further discussed through finalizing the terms of a subpoena to investors, and addressing Receiver's objections to a questionnaire, if any. Previously, Receiver indicated that a questionnaire "could be very productive" in determining "the basics underlying an investor's relationship to Madison Timber." Tr. [100-1] at 43, *In re Consolidated Discovery,* 3:22-cv-36-CWR-BWR (S.D. Miss. Dec. 7, 2021). Baker Donelson should be prepared to address at the discovery conference whether already having Madison Timber's QuickBooks files, bank statements, checks, and wire logs, means some of their document requests to investors are unreasonably

28

cumulative, duplicative, or overbroad. Baker Donelson should be prepared to support its position that the amount of detail and documents requested sought from investors is proportional to the needs of the case. Receiver should be prepared to discuss the assignments that she obtained from investors.

## III. CONCLUSION

**IT IS THEREFORE ORDERED** that Baker Donelson's Motion to Conduct Investor Discovery [123] is **GRANTED**.

**IT IS FURTHER ORDERED** that **October 11, 2024** is the deadline for all parties to supplement their initial disclosures in the detail and manner dictated by Federal Rule of Civil Procedure 26(a)(1) and (e).

**SO ORDERED** this 27th day of September 2024.

s/ *Bradley W. Rath*

BRADLEY W. RATH
UNITED STATES MAGISTRATE JUDGE