**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**
**NORTHERN DIVISION**

ALYSSON MILLS, IN HER CAPACITY
AS RECEIVER FOR ARTHUR LAMAR
ADAMS AND MADISON TIMBER
PROPERTIES, LLC,

               Plaintiff,

    v.

BUTLER SNOW LLP et al.,

               Defendants.

Case No. 3:18-cv-00866-CWR-BWR

**Hon. Carlton W. Reeves**

**BAKER, DONELSON, BEARMAN, CALDWELL & BERKOWITZ PC'S**
**STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF ITS**
<u>**MOTION FOR SUMMARY JUDGMENT**</u>

<span style="color:red">**EXHIBIT 1**</span>

Baker, Donelson, Bearman, Caldwell & Berkowitz P.C. ("Baker Donelson") submits the following Statement of Undisputed Facts in support of its Motion for Summary Judgment.

## LAMAR ADAMS AND MADISON TIMBER

**A.     Lamar Adams Operated Madison Timber as a Multimillion-Dollar Ponzi Scheme**

1.      Lamar Adams operated a Ponzi scheme through his company, Madison Timber Properties, LLC ("Madison Timber").  Am. Compl. at 2.  Adams obtained investor money by promising to purchase tracts of standing timber from landowners throughout Mississippi, which he would resell to various timber mills at a profit.  Adams promised investors they would receive substantial returns, which were fixed in advance through twelve post-dated checks to be cashed at monthly intervals.  Each investor received a promissory note along with an executed timber deed, which secured the investment and could be registered if Madison Timber defaulted on payment.  In truth, Madison Timber was a Ponzi scheme.  The timber deeds were forged, and investors were paid with the proceeds from other investors.  Am. Compl. ¶¶ 16–22.

2.      Adams testified he – and he alone – knew Madison Timber was a fraud.  He lied to friends, business associates, and investors.  Ex. 3 (McHenry Trial Tr.) at 130:11–12 ("Q:  Did you tell anybody that this investment was a fraud?  A:  No."); Ex. 2 (Adams FBI Tr.) at 11:21–12:7 ("Q:  So who else did know?  A:  Nobody.  Q:  Nobody in the world?  A:  No.  I have fooled the people that work for me.  I have fooled my family.  I have fooled banks . . ."); Ex. 4 (Adams Tr. Vol. I) at 18:3–20:24 ("Q:  [U]ntil this time, April of 2018, you didn't think that anybody else knew or thought that the timber deals weren't real; correct?  A:  I did not think that.  Q:  You didn't think anybody knew?  A:  Right, uh-huh.").[1]

---

[1] All references to exhibits in this statement are references to motion exhibits.

3.      Adams was the sole owner and director of Madison Timber, which is part of the Receivership Estate. *See* Am. Compl. at 2.  He began his fraud "in approximately 2004." *Id*. ¶ 2 (internal quotation marks omitted).  In 2011, Adams "took in approximately $10 million from investors," and "the Madison Timber Ponzi scheme had been perfected." *Id*. ¶¶ 38–39.  Madison Timber was not a preexisting or otherwise legitimate business, and it "had no revenues whatsoever" outside the Ponzi scheme. *Id*. ¶ 20.  "Madison Timber didn't make money on any kind of product or any kind of sales of timber[.]" Ex. 6 (Adams Sentencing Tr.) at 93:14–19. Adams created and used Madison Timber exclusively as an instrument of his fraud.

4.      Nearly 300 individuals and entities invested in Madison Timber directly or indirectly throughout the course of Adams's scheme. *See* Ex. 17 (Ingram Dep., Exs. 2, 5); Ex. 70 (Ingram Tr.) at 29:6–32:20, 42:7–43:9; *see also* Ex. 9 (Receiver's Accounting of Madison Timber Promissory Notes); Ex. 10 (Receiver's Accounting of Alexander Seawright Timber Fund); Ex. 7 (Mills Tr. Vol. I) at 71:7–11, 181:10–13 (stating those spreadsheets only include investors who were owed money at the time Madison Timber collapsed).

5.      Madison Timber investors included investment advisors, business owners, bankers, physicians, and lawyers. *See, e.g.*, ECF No. 123-6, (Text from Billings to Adams stating:  "We have cultivated (and continue to cultivate) an ultra-high net worth, highly successful and highly sophisticated investor group - and that's the only kind we want to add to it; we do not need or want any dead weight!!"); Ex. 19 (Investor 115[2] Tr.) at 15:8–16:6 (stating that he was the president of an investment company that had over $1 billion in assets when he invested); Ex. 20 (Investor 121 Tr.) at 31:18–32:8 (stating he is the chairman of an investment

---

[2] Pursuant to the Protective Order, Baker Donelson refers to investors by the numbers assigned to them by the Receiver.  ECF No. 6 ¶ 7 (Case No. 3:22-cv-36).  For those investors who were not assigned numbers by the Receiver, Baker Donelson has assigned numbers to them.

advisory firm that manages approximately $8 billion in assets and has worked in the investment management business since 1992).

6. On April 19, 2018, Adams "surrendered to federal authorities and confessed to the Ponzi scheme[.]" Am. Compl. at 2; *see also* Ex. 2 (Adams FBI Tr.). Adams pleaded guilty to the federal crime of wire fraud and "admit[ted] to all of the conduct of the entire scheme and artifice to defraud." Am. Compl. ¶ 24 (quoting Plea Agreement, D.I. 11, *United States v. Adams*, No. 3:18-cr-88 (S.D. Miss. May 9, 2018)).

7. This Court appointed Plaintiff Alysson Mills (the "Receiver") as a federal equity receiver for Madison Timber and the Adams estate. Order Appointing Receiver, *SEC v. Adams*, No. 3:18-cv-252 (S.D. Miss. June 22, 2018), ECF No. 33.

### ALEXANDER AND SEAWRIGHT

**A. Alexander and Seawright Were Employed by Baker Donelson as a Senior Public Policy Advisor and Lawyer, Respectively**

8. Brent Alexander worked as a lobbyist at Baker Donelson's office in Jackson from 2004 until January 31, 2020. Ex. 16 (Baker Donelson 30(b)(6) Dep., Ex. 2) at 4–5.

9. During his employment at Baker Donelson, Alexander provided professional services to firm clients—primarily in the healthcare field—on matters of government relations, public affairs, and lobbying at both the state and federal level. Ex. 11 (Alexander Tr.) at 23:2–8; Ex. 16 (Baker Donelson 30(b)(6) Dep., Ex. 2) at 4–5.

10. Jon Seawright worked as a lawyer at Baker Donelson's office in Jackson from 2001 until May 20, 2021. Ex. 13 (Seawright Tr.) at 13:10–16:10; Ex. 16 (Baker Donelson 30(b)(6) Dep., Ex. 2) at 2–3. He was employed as an associate until January 2008 and then became a firm shareholder in February 2008. *See* Ex. 16 (Baker Donelson 30(b)(6) Dep., Ex. 2) at 2–3.

11.    Seawright's practice at Baker Donelson focused on transactional matters, primarily for firm clients in the field of health law.  Ex. 13 (Seawright Tr.) at 20:12–21:18; Ex. 16 (Baker Donelson 30(b)(6) Dep., Ex. 2) at 2–3.

12.    Seawright was a member of Baker Donelson's Board of Directors from December 14, 2016 until May 3, 2018.  Ex. 16 (Baker Donelson 30(b)(6) Dep., Ex. 2) at 2–3.

13.    Seawright took a leave of absence from Baker Donelson beginning May 21, 2021.  Ex. 16 (Baker Donelson 30(b)(6) Dep., Ex. 2) at 39.  He resigned from the firm on September 3, 2021.  *Id*. at 2–3; *see also* Ex. 13 (Seawright Tr.) at 14:11–16:10.

**B.    Alexander and Seawright Operated a Personal LLC that Lent Its Members' Funds to Madison Timber**

14.    Alexander and Seawright shared an interest in pursuing investment and business opportunities.  *See* Ex. 11 (Alexander Tr.) at 39:20–41:18 ("[W]e were both interested in business and commerce and, I think, had entrepreneurial instincts.  And we thought that it would be fun to -- you know, as a side business, to try to, you know, put some of that in action -- and to see if we could try to participate in a couple of [] business deals. And so, that's why we set up Alexander Seawright to sort of explore those opportunities[.]"); Ex. 14 (Seawright Decl.) ¶¶ 1–2.

15.    Alexander and Seawright formed an LLC named Alexander Seawright, LLC, through which they pursued certain investment and business ventures.  *Id.*; Am. Compl. ¶ 15; *see also* Ex. 13 (Seawright Tr.) at 141:2–147:11 (discussing specific business ventures he and Alexander pursued through Alexander Seawright, LLC).

16.    Alexander and Seawright met Adams in 2011, and Adams offered them an opportunity to lend money to Madison Timber.  Am. Compl. ¶ 73.  They asked Adams about the potential risks to the timber and received assurances of an umbrella insurance policy on all tracts.

*Id.* ¶ 92.  They viewed the opportunity as posing little risk because they were told it was secured by a timber deed.  *Id.* ¶ 73.

17.     Through Alexander Seawright, LLC, Alexander and Seawright formed a separate LLC named Alexander Seawright Timber Fund I, LLC ("ASTFI"), which they used to pool investors' money to lend to Madison Timber for purported timber deals.  Am. Compl. ¶¶ 73, 77; *see also* Ex. 21 (ASTFI Structure Chart).

18.     Alexander and Seawright were the sole owners of Alexander Seawright, LLC, which in turn was the sole managing member of ASTFI.  Ex. 13 (Seawright Tr.) at 125:23–126:10; Ex. 21 (ASTFI Structure Chart).

19.     ASTFI made multiple loans to Madison Timber between 2011 and April 2018.  Am. Compl. ¶ 77.

20.     Prior to April 2018, neither Alexander nor Seawright was aware of the significant number of other investors in Madison Timber.  Ex. 13 (Seawright Tr.) at 60:21–61:19, 133:22–134:4; Ex. 11 (Alexander Tr.) at 65:4–68:12.

21.     Alexander and Seawright gave ASTFI investors "Equity Term Sheets" that described each investment opportunity, and those who decided to invest executed subscription agreements with ASTFI.  *Id.* ¶ 93; *see, e.g.*, Ex. 22 (Equity Term Sheet); Ex. 23 (Subscription Package).

22.     The subscription agreements for ASTFI included a merger clause: "Subscriber acknowledges that the entire terms and conditions of this investment are contained in the LLC Agreement of the Company," which "supersede[s]" any "prior materials or information."  Ex. 23 (Subscription Package) at 10.

23.     The subscription agreements for ASTFI nowhere referenced Baker Donelson. *See* Ex. 23.

24.     Alexander and Seawright kept a portion of the interest paid on the loans to Madison Timber as a management fee.  Am. Compl. ¶ 76; Ex. 11 (Alexander Tr.) at 46:19–49:16.  They also received loan origination fees from Adams when the loans were made, which were paid separately from the interest on the promissory notes.  Am. Compl. ¶ 76; Ex. 11 (Alexander Tr.) at 46:19–49:16.

25.     Alexander and Seawright made plans to launch a second fund named Alexander Seawright Timber Fund II, LLC, but that fund never started operations.  Ex. 13 (Seawright Tr.) at 99:13–22 ("The [Alexander Seawright Timber Fund II, LLC] never consummated any investment.  It never operated."); Ex. 7 (Mills Tr. Vol. I) at 196:19–21.

26.     Alexander and Seawright had no knowledge of Adams's fraud before Adams confessed to authorities in April 2018.  Ex. 11 (Alexander Tr.) at 113:20–114:2 ("[W]e were just absolutely gobsmacked by finding out that this whole thing was a Ponzi scheme. And that's when our world collapsed. I had absolutely no idea that Madison Timber or Lamar Adams had been operating a Ponzi scheme . . ."); Ex. 13 (Seawright Tr.) at 131:23–132:16 (stating that he was not aware of any fraud until Kelly told him the news in April 2018); Ex. 12 (Alexander Decl.) ¶ 8; Ex. 14 (Seawright Decl.) ¶ 9; *see also* Ex. 3 (McHenry Trial Tr.) at 130:11–12 ("Q: Did you tell anybody that this investment was a fraud?  A:  No."); Ex. 2 (Adams FBI Tr.) at 11:21–12:9 (stating that "nobody" knew of the fraud but him); Ex. 4 (Adams Tr.) at 20:13–24 ("Did I think [Seawright and Alexander] knew? No. I don't think they knew, in my mind.").

27.     Alexander and Seawright operated ASTFI for their own profit and for their own personal interests.  They were not motivated by a desire to benefit Baker Donelson.  Ex. 12

(Alexander Decl.) ¶ 3; Ex. 14 (Seawright Decl.) ¶ 3; *see also* Ex. 11 (Alexander Tr.) at 47:1–6 (stating that he and Seawright wanted "to make money from the fund").

28.     Baker Donelson never represented ASTFI or Alexander Seawright, LLC, and the firm was never an owner or member of those LLCs.  Ex. 12 (Alexander Decl.) ¶ 5; Ex. 14 (Seawright Decl.) ¶ 5; Ex. 13 (Seawright Tr.) at 125:23–126:10; Ex. 16 (Baker Donelson 30(b)(6) Dep., Ex. 2) at 22.

29.     On May 20, 2021, criminal indictments of Brent Alexander and Jon Seawright were unsealed.  *See* Order Granting Government's Motion to Unseal the Indictment, *United States v. Alexander et al.*, No. 3:20-cr-31 (S.D. Miss. May 20, 2021), ECF No. 8.  The confidential indictments had been returned 15 months earlier—sealed from the public—on February 25, 2020.  *See* Indictment, *United States v. Alexander et al.*, No. 3:20-cr-31, ECF No. 4.

30.     The criminal indictments against Alexander and Seawright did not allege knowing complicity in the Madison Timber Ponzi scheme.  *Id.*

31.     Alexander and Seawright each pled guilty to one felony count of conspiracy to commit wire fraud.  *See* Plea Agreement, *United States v. Seawright,* No. 3:22-cr-84 (S.D. Miss. July 13, 2022), ECF No. 5; Plea Agreement, *United States v. Alexander,* No. 3:23-cr-37 (S.D. Miss. Apr. 26, 2023), ECF No. 4.

32.     The charging documents to which Alexander and Seawright pled guilty did not allege knowing complicity in the Madison Timber Ponzi scheme; they alleged Alexander and Seawright misled investors in ASTFI about the extent of their due diligence into Madison Timber and about the payment they received from Madison Timber.  *See* Information, *United States v. Seawright,* No. 3:22-cr-84 (S.D. Miss. July 13, 2022), ECF No. 1; Information, *United States v. Alexander,* No. 3:23-cr-37 (S.D. Miss. Apr. 26, 2023), ECF No. l.

33.     Alexander and Seawright did not admit to complicity in the Madison Timber Ponzi scheme as part of their guilty pleas, and they have always denied it.  *See* Plea Agreement, *United States v. Seawright,* No. 3:22-cr-84 (S.D. Miss. July 13, 2022), ECF No. 5; Plea Agreement, *United States v. Alexander,* No. 3:23-cr-37 (S.D. Miss. Apr. 26, 2023), ECF No. 4; *supra*. ¶ 26.

34.     This Court ordered Alexander and Seawright together pay restitution in the amount of $977,044.52.  *See* Judgment, *United States v. Seawright,* No. 3:22-cr-84 (S.D. Miss. Nov. 13, 2023), ECF No. 15; Judgment, *United States v. Alexander,* No. 3:23-cr-37 (S.D. Miss. Nov. 13, 2023), ECF No. l7.

35.     Alexander and Seawright paid their restitution in full, and those funds have been in the Receiver's bank account for over a year.  *See* Receiver's Status Report, *SEC v. Adams*, No. 3:18-cv-252 (S.D. Miss. Sept. 30, 2024), ECF No. 414 at 4 ("In my last report, I reported that the U.S. Attorney's Office had collected and tendered a total of $942,308.77 to the Receivership Estate.  Since my last report, it has collected and tendered an additional $34,735.75."); *see also* Receiver's Status Report, *SEC v. Adams*, No. 3:18-cv-252 (S.D. Miss. Sept. 30, 2025), ECF No. 424 at 4 (reporting that Alexander's and Seawright's restitution is still in the Receivership Estate's possession).

## BAKER DONELSON

36.     Baker Donelson is a law firm.  Am. Compl. ¶ 84.

37.     Between 2011 and 2018, Baker Donelson employed more than 600 attorneys and public policy advisors around the country, including in its Jackson, Mississippi office.  *See, e.g.,* Ex. 25 (archive of BD's website as it appeared in May 2013, reflecting that it had "more than 650 attorneys and advisors" nationwide); Ex. 26 (archive of the firm's website as it appeared on 01/29/2017, showing that it had "more than 800 attorneys and advisors" nationwide); Ex. 27

(archive of BD's website as it appeared on 11/01/2013, reflecting that the Jackson office had 82 professionals); Ex. 28 (archive of the firm's website, reflecting that the Jackson office had 108 professionals as of 01/29/2017).

38.     Baker Donelson is not an investment firm, financial advisor or broker dealer; the services it offers do not include soliciting, advising, brokering, or managing investments.  Am. Compl. ¶ 84.

39.     Baker Donelson does not employ anyone to perform investment management or investment advisory services for clients.  *See id.*; Ex. 69 ("As the 79th largest law firm in the U.S., Baker Donelson gives clients access to a team of more than 700 ***attorneys and public policy advisors*." (emphasis added)).[3]

40.     Madison Timber was never a client of Baker Donelson, and the firm did no legal work relating to Madison Timber.  Ex. 4 (Adams Tr. Vol. I) at 144:17–147:23 (testifying "[t]he law firm of Baker Donelson was not ever Madison Timber's lawyer" and there was "never any engagement letter or other agreement between Madison Timber and Baker Donelson"); Ex. 7 (Mills Tr. Vol. I) at 175:8–177:24.

41.     Nor were Alexander's and Seawright's LLCs ever clients of Baker Donelson.  Ex. 12 (Alexander Decl.) ¶ 5; Ex. 14 (Seawright Decl.) ¶ 5; Ex. 16 (Baker Donelson 30(b)(6) Dep., Ex. 2) at 22.

42.     Baker Donelson did not invest in Madison Timber or ASTFI.  *See* Ex. G (Receiver's Accounting of Madison Timber Promissory Notes); Ex. H (Receiver's Accounting of Alexander Seawright Timber Fund).

---

[3] Available at bakerdonelson.com/Our-Firm.

43.     Baker Donelson received no payments from the Madison Timber Ponzi scheme. *See, e.g.*, Ex. 7 (Mills Tr. Vol. I.) at 175:15–176:20 (stating that the Receiver reviewed Adams's and Madison Timber's bank statements "going back several years" and that she did not recall ever seeing any payments made by them to Baker Donelson); Ex. 29 (Fuller Decl.) at 1–2 (CPA who prepared Adams's and Madison Timber's tax returns for tax years 2010 through 2016 testified that she "reviewed bank statements and other records for Mr. Adams' and the Madison Timber entities' accounts at [five separate banks]" and received other information necessary to track Madison Timber's income and expenses, and that she had "*no knowledge of any involvement on the part of the Baker Donelson law firm with Mr. Adams or his businesses*" (emphasis added)).

A.     **Alexander's and Seawright's Timber Fund Was a Separate Business from Baker Donelson**

44.     Baker Donelson was never an owner or member of ASTFI or Alexander Seawright, LLC.  Ex. 13 (Seawright Tr.) at 125:23–126:10; Ex. 16 (Baker Donelson 30(b)(6) Dep., Ex. 2) at 22.

45.     Baker Donelson's escrow account was never used for any activities relating to Alexander's and Seawright's LLCs.  Ex. 15 (Baker Donelson 30(b)(6) Tr.) at 276:4–25 ("There were no transfers of funds in and out of our accounts for anything related to Alexander Seawright, either Alexander Seawright, LLC, or Alexander Seawright Timber Fund I or any other Alexander Seawright entity.").  *See also* Ex. 7 (Mills Tr.) at 179:13–16 ("Q.  [Y]ou're not aware of any evidence the escrow account at Baker Donelson was ever used?  A.  No.").

46.     Baker Donelson received no compensation from ASTFI or Alexander Seawright, LLC.  Ex. 15 (Baker Donelson 30(b)(6) Tr.) at 276:4–25 ("There were no transfers of funds in and out of our accounts for anything related to Alexander Seawright, either Alexander

Seawright, LLC, or Alexander Seawright Timber Fund I or any other Alexander Seawright entity.").

47.     Alexander testified that ASTFI "was completely separate and apart from Baker Donelson," which Seawright corroborated.  Ex. 11 (Alexander Tr.) at 75:1–76:22; Ex. 14 (Seawright Decl.) ¶ 2 ("[ASTFI] was a personal business unaffiliated with my employment at Baker Donelson.").

48.     Alexander and Seawright had their own bank accounts, logo, and letterhead for Alexander Seawright, LLC and ASTFI.  *See* Ex. 30 (Schnabel Rpt.) at 7 n.5 (observing that "Alexander Seawright, LLC had its own bank accounts, letterhead and business cards which reflected cell phone numbers and Alexander's home address"); Ex. 31 (BAKER_MILLS_ 0013760) (email discussing the logo, letterhead, and business cards for Alexander Seawright, LLC).

49.     Alexander and Seawright had business cards for Alexander Seawright, LLC— which they gave to ASTFI investors—that listed their personal contact information, not Baker Donelson's.  Ex. 30 (Schnabel Rpt.) at 7 n.5; Ex. 51 (AS.30 Tr.) at 92:1–94:16.

50.     Alexander and Seawright purchased office supplies for their LLCs "*so costs are completely separate from firm*."  Ex. 32 (BAKER_MILLS_0013132) (emphasis added).

51.     Baker Donelson was not a party to any of the documents executed for investments in ASTFI, and the firm's name did not appear in them or in any of the term sheets provided to investors or potential investors for ASTFI.  *See, e.g.*, Ex. 23 (Form Subscription Agreement); Ex. 22 (Equity Term Sheet).

52.     Seawright drafted the subscription and security agreement for ASTFI investors to execute and purchase membership interests in ASTFI's loans to Madison Timber, as well as

the equity term sheet that outlined the terms of each investment round. Ex. 13 (Seawright Tr.) at 57:7–60:20. He drafted those documents on his personal laptop. Ex. 14 (Seawright Decl.) ¶ 8.

53.     Seawright was not acting in his capacity as an attorney for Baker Donelson when he drafted documents for ASTFI. Ex. 14 (Seawright Decl.) ¶ 8; Ex. 11 (Alexander Tr.) at 225:19–226:8.

54.     No one who invested in ASTFI was a client of Baker Donelson at the time they first invested. Ex. 16 (Baker Donelson 30(b)(6) Dep., Ex. 2) at 26–27.

55.     Two former clients of Baker Donelson (AS.38 and AS.26) invested in ASTFI. *Id*.

56.     Two individuals (AS.37 and AS.06) were constituents of former institutional clients of the firm at the time they first invested in the fund. *Id*. Both testified they understood the timber fund was Alexander's and Seawright's side business. Ex. 33 (AS.06 Tr.) at 62:15–63:2 (stating that he understood ASTFI was "a side venture" for Alexander and Seawright); Ex. 34 (AS.37 Tr.) at 47:10–48:20 ("I never got the impression that it was part of the law firm, you know. . . I thought it was Jon and Brent's own company.").

57.     Some individuals who invested in ASTFI later became Baker Donelson clients, or entities with which they served as employees, owners, members, or directors later became clients, at a time after the individuals first invested in ASTF. Ex. 16 (Baker Donelson 30(b)(6) Dep., Ex. 2) at 26–27. There is no evidence those individuals thought that ASTFI was operated or approved by or on behalf of Baker Donelson.

58.     None of the more than 200 direct Madison Timber investors—i.e., those who gave funds to Madison Timber directly and not through ASTFI—was a client of Baker Donelson. *See* Ex. 7 (Mills Tr. Vol. I ) at 97:23–98:19 (stating that, for more than 200 of the

investors in Madison Timber, she "do[esn't] have information" indicating they were a client of Baker Donelson or ever spoke with Baker Donelson).

59.     None of the more than 200 individuals and entities who never invested through ASTFI but did invest directly with Madison Timber communicated with anyone who worked at Baker Donelson about their investments.

60.     Six Baker Donelson attorneys made investments in ASTFI.  Ex. 13 (Seawright Tr.) at 72:3–25.

61.     Of the six Baker Donelson attorneys who invested in ASTFI, only one was deposed, and he testified he learned about ASTFI from someone outside of Baker Donelson and could not recall ever discussing the timber investments with other firm lawyers.  Ex. 35 (AS.21 Tr.) at 15:3–16:11, 25:1–19, 41:1–11, 47:10–22.

62.     None of the six Baker Donelson attorneys who invested in ASTFI was a Baker Donelson director, officer, or office managing shareholder at the time they invested.  Ex. 16 (Baker Donelson 30(b)(6) Dep., Ex. 2) at 22–23; Ex. 15 (Baker Donelson 30(b)(6) Tr.) at 251:4–255:8.

63.     The six Baker Donelson attorneys who invested in ASTFI represented a small fraction of the approximately 80-100 total attorneys and other professionals who worked in the firm's Jackson office between 2011 and 2018, and a smaller fraction of the approximately 650-800 total firm professionals nationwide.  Ex. 27 (archive of BD's website as it appeared on 11/01/2013, reflecting that the Jackson office had 82 professionals); Ex. 28 (archive of the firm's website, reflecting that the Jackson office had 108 professionals as of 01/29/2017); Ex. 25 (archive of BD's website as it appeared in May 2013, reflecting that it had "more than 650

attorneys and advisors" nationwide); Ex. 26 (archive of the firm's website as it appeared on 01/29/2017, showing that it had "more than 800 attorneys and advisors" nationwide).

64.     No other firm employees invested in ASTFI or Madison Timber.

65.     Only one Baker Donelson attorney ever referred a potential investor to Alexander and Seawright for their timber fund, and that person did not invest.  Ex. 36 (BAKER_MILLS_0007529); Ex. 11 (Alexander Tr.) at 129:16–133:10; Ex. 13 (Seawright Tr.) at 128:14–130:5 (stating that he and Alexander "never met with anybody that [the Baker Donelson attorney] introduced us to or connected us with" and that he did not recall "other instances where [he and Alexander] sought introductions to contacts of attorneys with Baker Donelson"); *see also* Ex. 7 (Mills Tr. Vol. I) at 203:16–204:8 (stating that she was only aware of one Baker Donelson attorney who referred a potential investor to Alexander and Seawright).

66.     In describing ASTFI to that Baker Donelson attorney, Alexander wrote: "Jon and I have a small investment firm, Alexander Seawright, LLC. We do a little merchant banking, private equity and venture capital.  We have done well, with investments in energy, transportation, finance, timber and commodities. ***This entity is separate and apart from our position at Baker Donelson, which has no role in its operations***."  Ex. 36 (BAKER_MILLS_ 0007529).

67.     Across the approximately seven-year period during which Alexander and Seawright operated ASTFI, they were active, full-time employees of Baker Donelson.  Ex. 72 (Houseal Rpt., Ex. A); Ex. 71 (Houseal Tr.) at 17:20–18:4, 62:22–67:4.

68.     On occasion, Alexander and Seawright directed clerical staff of Baker Donelson to perform certain tasks for ASTFI, such as "printing documents, printing envelopes, making labels" and "book[ing] conference rooms."  *See* Ex. 37 (Acquilano Tr.) at 137:16–138:14

(testifying she recalls "printing documents, printing envelopes, making labels" and she made "[p]hotocopies," "[b]ooked conference rooms[,] and brought documents downstairs [] to the receptionist to be picked up by other people"); Ex. 38 (Cloer Tr.) at 80:15–81:9 (stating she "made copies of some documents" for Alexander on "[a] couple of occasions"); Ex. 39 (Jenkins Tr.) at 143:23–144:9 (stating she performed "certain administrative tasks that related to [ASTFI]," including printing, calendaring, and sending correspondence on Alexander's behalf); Ex. 40 (Warrington Tr.) at 112:5–15 (testifying she booked conference rooms "[o]n occasion" for Seawright to meet with Adams or Kelly, and she does not recall "print[ing] documents for meetings like that"); Ex. 41 (Wasser Tr.) at 27:5–24, 56:12–57:6 (stating she performed work for Alexander's and Seawright's outside LLCs "[e]very few months"); *see also* Ex. 5 (Adams Tr. Vol. II) at 370:7–17 (stating he left documents relating to ASTFI with Baker Donelson's receptionist "from time to time").

69.     Alexander and Seawright also sometimes used conference rooms in the space leased by Baker Donelson for meetings relating to ASTFI.  Ex. 13 (Seawright Tr.) at 36:14–20.

70.     The clerical staff who performed tasks at the direction of Alexander and Seawright related to the timber fund uniformly understood that Alexander's and Seawright's timber fund was a personal business separate from Baker Donelson.  Ex. 37 (Acquilano Tr.) at 246:25–247:9 ("This was not firm business.  It was [Alexander and Seawright's] private, personal investment company."); Ex. 38 (Cloer Tr.) at 89:10–90:19 (testifying that she thought the tasks she performed for Alexander's and Seawright's timber fund was "personal in nature"); Ex. 39 (Jenkins Tr.) at 48:21–49:1 ("Brent and Jon Seawright had a business interest together **outside of Baker Donelson**, and they were very close friends.") (emphasis added); Ex. 41

(Wasser Tr.) at 74:14–18 (testifying that she understood Seawright and Alexander's relationship to be "[f]riends, partners in **personal business**") (emphasis added).

71.     The Receiver's expert in law-firm management testified that she has used her law firm's resources for personal reasons.  Ex. 67 (Schnabel Tr). at 72:8–74:16, 79:24–81:24.

72.     There is no evidence Adams believed Alexander or Seawright were acting on behalf of Baker Donelson when ASTFI loaned money to Madison Timber.  *See* Ex. 4 (Adams Tr.) at 145:8– 148:23 (agreeing "there was never any engagement letter or other agreement between Madison Timber and Baker Donelson" and stating, from his perspective, ASTFI was the entity who invested in Madison Timber).

73.     Adams never made any checks out to Baker Donelson, never received any checks from Baker Donelson, and never signed a promissory note or deed in favor of Baker Donelson.  Ex. 4 (Adams Tr.) at 146:19–148:23.

74.     Wayne Kelly, who acted as an intermediary between Adams, on the one hand, and Alexander and Seawright, on the other hand, understood ASTFI was "something [Alexander and Seawright] were doing on the side."  Ex. 42 (Kelly Tr.) at 67:25–68:20, 98:17–99:5.

**B.     Investors' Testimony**

75.     Nearly all of the ASTFI investors (i.e., the relatively small number of investors who invested in Madison Timber through ASTFI, rather than directly) who testified admitted they understood ASTFI was not operated by or on behalf of Baker Donelson.  *See, e.g.*, Ex. 43 (AS.35 Tr.) at 89:7–90:12 (stating that he "assume[d] that" ASTFI was "something Alexander and Seawright were doing on their own" and nobody told him Baker Donelson was operating the fund or had approved it); Ex. 44 (AS.04 Tr.) at 58:3–20 (testifying he understood ASTFI was "a side business" "not related to [Alexander's and Seawright's] work at Baker Donelson" and he "was never under the impression" Baker Donelson management had approved ASTFI); Ex. 45

(AS.36 Decl.) ¶ 10 ("I never had reason to believe--and never did believe--that Baker Donelson had any involvement in ASTFI. I met Mr. Seawright once at Baker Donelson, but Mr. Seawright stated the only reason we were meeting there was because he worked there. Mr. Seawright was very clear that Baker Donelson had no involvement in ASTFI."); Ex. 34 (AS.37 Tr.) at 47:10–48:20 (stating he never got the impression that it was part of the law firm" and Alexander and Seawright "didn't imply" it was); Ex. 46 (Investor 152 Tr.) at 125:25–127:17 (testifying "[i]t was understood that it was [Seawright] and Brent Alexander that did [ASTFI]" on their own, separate from Baker Donelson, and he was not under the impression the firm authorized it); Ex. 47 (AS.39 Decl.) ¶ 8 ("I never had reason to believe—and never did believe—that Baker Donelson had any involvement in ASTFI. I always understood that ASTFI was a side business of Mr. Seawright's that was distinct from his work at Baker Donelson."); Ex. 48 (AS.29.A Decl.) ¶ 12 ("Although I may have delivered materials to Mr. Seawright or Mr. Alexander at Baker Donelson's offices, I never had reason to believe—and never did believe—that Baker Donelson had any involvement in ASTFI. I always understood that ASTFI was a side business of Mr. Seawright's and Mr. Alexander's that was separate from their work at Baker Donelson."); Ex. 49 (AS.29.B Decl.) ¶ 11 (same);  Ex. 50 (AS.40 Decl.) ¶ 16 ("Although I met with Mr. Seawright at the offices of Baker Donelson, I never had reason to believe that Baker Donelson had any involvement in ASTFI. I understood that ASTFI was a side business that was distinct from Mr. Seawright's work at Baker Donelson. Indeed, Mr. Seawright told me that he and a partner were operating ASTFI as a side business distinct from the business of Baker Donelson."); Ex. 51 (AS.30 Tr.) at 98:10–99:13 (stating he understood ASTFI was "something Alexander and Seawright were doing on their own", and that nobody ever told him that Baker Donelson was operating ASTFI or that the firm's management had approved the fund).

76.     Three ASTFI investors testified they believed Baker Donelson was involved in

the timber investments:

- **AS.05.A** is a former CEO who has been convicted of fraud and bribery.  Ex. 52, Washington Post (July 11, 1997) (quoting AS.05.A's testimony that "I committed fraud. I cheated insurance companies, and I benefited with my bonuses").  He did not invest any of his own money in ASTFI, but he held his wife's power of attorney and invested her money.  Ex. 68 (AS.05.B Tr.) at 8:20–10:23.  He claims to have believed that "100 percent of the shareholders in Baker Donelson had invested their retirements" in the Timber Fund. Ex. 53 (AS.05.A Tr.) at 51:5–7, 56:10–56:24.  These were inferences he drew from conversations that he had with Seawright and another Baker Donelson attorney who told him (accurately) that some Baker Donelson attorneys had invested.  *Id*. at 56:10–58:22 ("Q.  So AS.08 told you partners were invested in it -- and you drew the inference that all partners were invested in it?  A. Yeah.").[4]

- **AS.11.A** is AS.05.A's business partner.  Ex. 54 (AS.11.A Tr.) at 10:25–15:1. He did not invest in ASTFI, but his wife did.  *Id*. at 7:19–21.  AS.11.A testified "we saw Jonathan Seawright [and] Baker Donelson as the same" and he believed the timber fund was "a retirement fund of Baker Donelson."  *Id*. at 29:8–30:7, 68:3–24.  That understanding was based on the fact that, three years before his wife invested, Baker Donelson had handled the sale of a company in which he had owned a 25% stake.  *Id*. at 8:19–9:2, 11:20–21, 29:8–31:10.  AS.11.A agreed the term sheet and subscription agreement for ASTFI said nothing about Baker Donelson.  *Id*. at 75:10–77:10.  He never discussed the timber investments with anyone who worked at Baker Donelson apart from Seawright.  *Id*. at 37:4–14, 68:3–69:3.

- **AS.11.B** is the spouse of AS.11.A, and she testified AS.05.A and her husband were the "sole sources" for her belief the retirement fund of Baker Donelson was invested in ASTFI.  Ex. 55 (AS.11.B Tr.) at 32:7–13.  She never spoke to anyone at the firm about her investments apart from Seawright.  *Id*. at 28:14–29:3.

77.     As for the more than 200 direct Madison Timber investors, only six testified

they had heard Baker Donelson "mentioned" or referenced in connection with Madison Timber

or Adams.

- **Investor 4** stated two individuals outside of Baker Donelson, Jay and Ron Reesor, "mentioned the names Butler Snow, Baker Donelson, BankPlus," and

---

[4] Baker Donelson is a professional corporation; it has no partners, its owners are shareholders. *See* Ex. 16 (Baker Donelson 30(b)(6) Dep., Ex. 2) at 7–8.

that "provided clout" for the investment and "meant a lot to [him]." Ex. 56 (Investor 4 Tr.) at 50:1–54:19, 83:6–84:6. He testified he never communicated with anyone who worked at Baker Donelson, never went to the firm's offices, never hired them to be his lawyers, never made checks payable to Baker Donelson, and the firm's name did not appear anywhere on the promissory note and deeds for his investments. *Id*. at 46:16–24, 50:1–54:19, 68:10–23.

- **Investor 13** stated he never communicated with anyone at Baker Donelson, but he understood it was one of the law firms involved in Madison Timber based on information he received from "either [Investor 115] or [Mike] Billings," though he could not recall "any description of that [alleged] involvement." Ex. 57 (Investor 13 Tr.) at 170:17–177:22, 192:4–196:13.

- **Investor 29** testified Mike Billings—who worked at Butler Snow Advisory Services for a time, but never worked at Baker Donelson—told him Baker Donelson was involved in Madison Timber, but he did not know or communicate with anyone at Baker Donelson, never went to Baker Donelson's offices, and the firm's name did not appear anywhere in his investment documents. Ex. 58 (Investor 29 Tr.) at 65:7–70:12, 72:9–73:20; *see also* Am. Compl. ¶¶ 43–51, 67 (describing Billings's relationship with Adams, including during his employment at Butler Snow).

- **Investor 115** stated Mike Billings and "potentially Adams" made references to Baker Donelson, but he never communicated with anyone at the firm and the firm was not mentioned on any of his investment materials. Ex. 19 (Investor 115 Tr.) at 166:18–167:11, 187:15–196:4.

- **Investor 121** stated Mike Billings told him Adams "dealt with the two best law firms in [Mississippi] you know, Butler Snow and Baker Donelson," but he did not know the source of that information and never contacted or had any communications with anybody at Baker Donelson. Ex. 20 (Investor 121 Tr.) at 37:24–39:9.

- **Investor 41** stated he "believe[s] personally Baker Donelson has liability" based on "what's come out in the court case and some of the details that [he's] been told," but could not identify any "details" or facts supporting that belief. Ex. 59 (Investor 41 Tr.) at 33:25–36:7. He was recruited by Mike Billings to invest in Madison Timber. *Id*. at 19:24–21:3. He does not know anyone at Baker Donelson and never communicated with anyone who works at the firm. *Id*. 73:5–20.

78.     None of those six Madison Timber investors knew Alexander or Seawright or communicated with anyone at Baker Donelson. Ex. 56 (Investor 4 Tr.) at 46:16–24, 50:1–9; Ex. 57 (Investor 13 Tr.) at 192:4–196:13; Ex. 58 (Investor 29 Tr.) at 65:7–70:12; Ex. 19 (Investor

115 Tr.) at 187:15–191:8; Ex. 20 (Investor 121 Tr.) at 38:14–39:9; Ex. 59 (Investor 41 Tr.) at 73:5–20.

79.     None of those six Madison Timber investors believed Baker Donelson was operating or sponsoring Madison Timber.  Ex. 56 (Investor 4 Tr.) at 50:1–54:19, 83:6–84:6; Ex. 57 (Investor 13 Tr.) at 170:17–177:22; Ex. 58 (Investor 29 Tr.) at 67:4–69:24; Ex. 19 (Investor 115 Tr.) at 166:18–167:11; Ex. 20 (Investor 121 Tr.) at 38:14–39:9; Ex. 59 (Investor 41 Tr.) at 34:10–36:7.

80.     Of those six Madison Timber investors, five identified Mike Billings as the source for their belief there was some connection between Baker Donelson and Madison Timber.  Ex. 57 (Investor 13 Tr.) at 170:17–173:10; Ex. 58 (Investor 29 Tr.) at 67:4–68:25; Ex. 19 (Investor 115 Tr.) at 166:18–167:11; Ex. 20 (Investor 121 Tr.) at 38:14–39:9; Ex. 59 (Investor 41 Tr.) at 34:10–36:7.

81.     Mike Billings was one of Adams's "bird dogs."  Am. Compl. ¶ 27, *Mills v. Billings et al.*, No. 3:18-cv-679 (S.D. Miss. Oct. 17, 2018), ECF No. 15.

82.     Mike Billings worked at Butler Snow Advisory Services for a time.  *See* Am. Compl. ¶¶ 43–51, 67.  He never worked at Baker Donelson.

83.     When asked why certain investors he recruited had referenced Baker Donelson during their depositions, Mike Billings testified: "Well, that's somewhat surprising because I never -- I wouldn't have had any basis to say that Baker Donelson [ ] blessed it as an investment because I never spoke with anybody at Baker Donelson."  Ex. 60 (Billings Tr.) at 130:20–131:16; *see also id*. at 131:17–24 ("Q.  So if investors believe you referred to Baker Donelson having [done] due diligence, they would be in error or can you offer any other explanation?

A.  They would be confused because I would have never told anyone that there was any due diligence that I did related to Baker Donelson.").

### C.    Baker Donelson's Knowledge

84.     Apart from Seawright, no Baker Donelson director, officer, or office managing shareholder knew of ASTFI's existence or operations before April 2018.  Ex. 16 (Baker Donelson 30(b)(6) Dep., Ex. 2) at 22; Ex. 73 (Hicks Decl.) ¶ 7; Ex. 61 (B. Adams Tr.) at 8:8–17, 27:15–28:4 (testifying that he was Chairman/CEO of Baker Donelson from 2003 to 2019 and he first learned of Seawright's involvement with Alexander Seawright, LLC "at some point after the news broke to the public about the whole Lamar Adams scheme blowing up"); Ex. 7 (Mills Tr. Vol. I.) at 216:16–218:19 (stating that, apart from Seawright, she could not identify anyone on Baker Donelson's board of directors who knew about ASTFI).  Neither of the practice group leaders with supervisory authority over Alexander or Seawright knew about ASTFI's existence of operations before April 2018.  Ex. 15 (Baker Donelson 30(b)(6) Tr.) at 250:19–253:2; Ex. 73 (Hicks Decl.) ¶ 7.

85.     In 2011, Seawright disclosed to Baker Donelson his ownership interest in Fondren Sushi, LLC and Alexander Seawright, LLC, as well as a position with the Mississippi Symphony Orchestra.  Ex. 24 (BAKER_MILLS_0030991).

86.     Seawright did not disclose ASTFI or ASTFII as part of his 2011 disclosure.  *Id.*

87.     Neither Seawright nor Alexander ever disclosed any additional information to Baker Donelson management regarding their outside business activities prior to April 2018.  Ex. 13 (Seawright Tr.) at 147:15–148:19 ("The only information I recall provided was the [2011] disclosure we went over earlier."); Ex. 14 (Seawright Decl.) ¶¶ 6–7; Ex. 12 (Alexander Decl.) ¶¶ 6–7; *see also* Ex. 15 (Baker Donelson 30(b)(6) Tr.) at 240:16–241:18 ("I believe that the manner

in which this disclosure was solicited is that if your prior years' disclosure remain unchanged, you don't have to submit one.").

88.     Before April 2018, no Baker Donelson director, officer, or office managing shareholder (apart from Seawright) knew about Alexander's and Seawright's use of the firm's conference rooms or their instructions to clerical personnel in connection with their lending activities.  *See* Ex. 16 (Baker Donelson 30(b)(6) Dep., Ex. 2) at 24.

89.     The Receiver testified that she was unable to identify any member of Baker Donelson's Board of Directors (apart from Seawright) who knew about Alexander's and Seawright's timber fund.  Ex. 7 (Mills Tr. Vol. I) at 215:11–218:19 ("Q:  You haven't developed any evidence that anyone apart from [Seawright] knew about this?  A:  [S]hort answer, no.").

90.     The Receiver testified regarding her allegations that Alexander and Seawright "relied on their affiliation with Baker Donelson to recruit investors" and "were targeting clients of Baker Donelson" that she could not "identify a single person at Baker Donelson" who had knowledge of this alleged reliance or targeting.  Ex. 7 (Mills Tr. Vol. I) at 190:9–13, 204:11–205:17.

91.     "Brent Alexander terminated his employment with Baker Donelson on January 31, 2020, before the indictments were unsealed [on May 20, 2021].  Jon Seawright took a voluntary leave of absence the day after the indictments were unsealed."  Ex. 16 (Baker Donelson 30(b)(6) Dep., Ex. 2) at 35.

92.     Alexander and Seawright maintained their innocence until they pleaded guilty. *See* Minute Entry, *United States v. Alexander et al.*, No. 3:20-cr-31 (S.D. Miss. May 20, 2021) (stating that Alexander and Seawright "entered a plea of not guilty to all counts").

93. Adams's closest colleagues, including Wayne Kelly, Bill McHenry, and Mike Billings, testified they did not know Madison Timber was a Ponzi scheme. Ex. 42 (Kelly Tr.) at 10:15–19 ("Q. Did you know that Madison Timber was a fraud? A. No, sir. Q. Did Lamar Adams fool you? A. Obviously."); Ex. 62 (McHenry Tr.) at 9:3–10 ("[Adams] fooled me, and he has made me destitute. I lost everything that I owned…"); Ex. 60 (Billings Tr.) at 10:11–15 ("Q. Before April 2018, did you know that Madison Timber was a fraud? A. I did not. Q. Did Lamar Adams fool you? A. He did.").

94. Since 2018, Baker Donelson has stated "Alexander and Seawright operated their LLC separately from the business of the law firm." Answer, ECF No. 84 at 2–3; *see also* Mem. Supp. Baker Donelson's Mot. Dismiss Am. Compl., ECF No. 60 at 2, 17, 27; Mem. Supp. Baker Donelson's Mot. Dismiss Compl., ECF No. 29 at 1, 7–8; Ex. 66, Law 360 (Apr. 26, 2023) at 2.

95. Since 2018, Baker Donelson has stated it "had no knowledge of Adams's fraudulent conduct." Answer, ECF No. 84 at 5; *see also* Mem. Supp. Baker Donelson's Mot. Dismiss Am. Compl., ECF No. 60 at 1 ("[N]o one at Baker Donelson knew Adams was engaged in fraud[.]").

96. The Receiver testified that her claims against Baker Donelson for civil conspiracy (Count I), aiding and abetting (Count II), and recklessness, gross negligence, and negligence (Count III) are based solely on the law firm's alleged vicarious liability for the conduct of John Seawright and Brent Alexander. Ex. 8 (Mills Tr. Vol. II) at 222:11–225:20.

97. The Receiver testified that she could not identify anyone at Baker Donelson, apart from Alexander or Seawright, who she claims engaged in a negligent act. *Id*. at 225:1–20.

## DAMAGES

98. The Receiver has calculated that 184 investors had outstanding Madison Timber promissory notes in April 2018. Ex. 9 (MTR_ 00331006) at 47.

99. ASTFI was an investor in Madison Timber. *Id.* at 1.

100. The Receiver has identified 34 ASTFI investors as having outstanding promissory notes from ASTFI in April 2018. Ex. 10 (MTR_ 00394267) at 74.

101. The Receiver has calculated as of April 2018 what she calls investors' "priority 1" losses—each investor's unpaid principal less the amount of money the investor previously received. *See, e.g.*, ECF No. 265 (Case No. 3:18-cv-252) at 7.

102. The Receiver calculated the total "priority 1" losses of all Madison Timber investors as of April 2018 to be $52,015,104.91. Ex. 63 (MTR_ 00394291) at 5.

103. The Receiver calculated the total "priority 1" losses of all ASTFI investors as of April 2018 to be $1,437,362.22. *Id.* at 7.

104. In a first distribution, the Receiver distributed $16,999,983.95 to Madison Timber investors and $460,317.36 to ASTFI investors. *Id.* at 5, 7.

105. In a second distribution, the Receiver distributed $14,044,078.33 to Madison Timber investors and $380,269.27 to ASTI investors. *Id.*

106. The Receiver has calculated the outstanding "priority 1" losses to Madison Timbers as $20,970,617.76. *Id.*

107. The Receiver has calculated the outstanding "priority 1" losses to ASTFI investors as $596,775.59. *Id.*

108. As of September 30, 2025, the Receiver had $1,632,516.07 in her bank account. ECF No. 424 (Case No. 3:18-cv-252) at 11.

109.     Some of the funds that have been recovered by the Receivership Estate were paid to the Receiver and her attorneys and have not been distributed to investors.   Ex. 7 (Mills Tr. Vol. I) at 49:9–58:12 (discussing the fees that she and her attorneys have received, including more than $6 million in contingency fees).

110.     The Receiver has not distributed $977,044.52 "[t]he Court ordered Seawright and Alexander to together pay . . . in restitution, which the U.S. Attorney's Office already collected and tendered to the Receivership Estate."  ECF No. 424 (Case No. 3:18-cv-252) at 4, 13.

111.     Dozens of investors in Madison Timber and ASTFI were "net winners"—i.e., they received more money back than they paid in.  Ex. 18 (Ingram Dep., Ex. 11).

112.     Dozens of net winners were never asked by the Receiver to return any of their Madison Timber profits to the Receivership Estate.  *See* Ex. 7 (Mills Tr. Vol. I) at 45:8–46:19, 106:22–119:21; Ex. 64 (Investor 83 Tr.) at 53:15–54:24 (stating he has never been asked to repay his net winnings of more than $450,000); Ex. 65 (Investor 171 Tr.) at 79:16–82:23 (stating the Receiver has never asked him to return any winnings and, in fact, sent him two distribution checks totaling $8,674.15).

113.     One net winner testified that he was open to "hav[ing] discussions with [his] siblings" about giving back some of his Madison Timber profits.  *See* Ex. 65 (Investor 171 Tr.) at 79:16–82:23.

114.     The Receiver has not asserted a fraudulent transfer claim seeking recovery of the profits Madison Timber paid to scores of net winners.  *See* Ex. 7 (Mills Tr. Vol. I) at 45:8–46:19; Ex. 18 (Ingram Dep., Ex. 11).

115.     The Receiver has not asserted a direct fraudulent transfer claim against Baker Donelson.