**Robert L. Gibbs**                                      **Telephone: 601.487.2631**
**Email: rgibbs@gibbstravis.com**                        **Facsimile: 601.366.4295**

July 23, 2025

## EXPERT REPORT OF ROBERT L. GIBBS

I, Robert L. Gibbs, have been retained by counsel for Baker, Donelson, Bearman, Caldwell & Berkowitz, PC, as an expert witness to provide testimony on the use of notarial officers ("notaries") in the State of Mississippi. I am qualified to provide such testimony based upon my 45-year legal career, which includes ten (10) years in the Mississippi Attorney General's Office, including three (3) years as Head of the Civil Litigation Department; seven (7) years and three (3) months as a Circuit Judge; and fourteen (14) years as a practicing lawyer, currently as the founding member of Gibbs Travis PLLC, and, before that, with Brunini, Grantham, Grower & Hewes, PLLC. (My professional biography is available at https://gibbstravis.com/our-team/robert-gibbs). I am a member of the American Board of Trial Advocates, a Fellow of the American College of Trial Lawyers, a Fellow of the Mississippi Bar Foundation, and a Fellow of the American Bar Foundation. I have been named a Top 50 Super Lawyer in Mississippi for a number of years, including in 2025. I was included in the top 10 Leaders in Law in 2010 by the Mississippi Business Journal and received the Professionalism Award by the Capital Area Bar Association in 2013. I have served as President of the Mississippi Bar Foundation (2004-2005), President of the Charles Clark Chapter of the American Inns of Court (2000-2002), President of the Board of Governors for the Bar Association of the Fifth Circuit Bar (2000-2002), and President of the Mississippi Bar (2021-2022). I have handled hundreds of civil matters both at trial and on appeal. I have argued cases before the Mississippi Court of Appeals, the Mississippi Supreme Court, and the United States Court of Appeals for the Fifth Circuit, and I have represented a client in a matter before the United States Supreme Court.

I have been retained several times to provide expert testimony and have been found qualified to give expert testimony in Hinds County Circuit Court and the United States District Court for the Southern District of Mississippi.

Throughout my decades of work as a judge and practicing lawyer in Mississippi, I have had many occasions to consider: evidence of notarial acts having been performed in Mississippi; the requirements that govern Mississippi notaries' performance of notarial acts, including at "signature witnessings"; and the significance to lawyers, businesses, and others of a Mississippi notary's having certified to witnessing the signing of a document. I have participated as a signatory in numerous signature witnessings by Mississippi notaries, and I am familiar with the process and notaries' practices in signature witnessings. I have reviewed the statutes and rules governing notaries and signature witnessings. While a judge, I was a notary public *ex officio* and "possess[ed] all the powers and discharge[d] … the duties belonging to the office of notary public," Miss. Code § 25-33-17 (pre-2021), and I administered oaths and notarized documents. At my law firm, I employ and supervise four Mississippi notaries public. Thus, I am qualified to provide an expert opinion on the matters in this report.

My law firm is being compensated $500 per hour for my time. My compensation is not contingent upon any opinions I may reach or the outcome of the lawsuit against Baker Donelson.

*Confidential Under Protective Order*

In the four years before the date of this report, I have testified as an expert witness in *John Bentley Anderson and Patricia Anderson, vs. J. Mack Varner and Varner, Parker & Sessums, P.A.*, in the Circuit Court of Sharkey County, Civil Action No. 18-028.

I have reviewed the Amended Complaints in *Alysson Mills, in her capacity as Receiver for Arthur Lamar Adams and Madison Timber Properties, LLC. v. The UPS Store, Inc.; Herring Ventures, LLC d/b/a The UPS Store; Austin Elsen; Tammie Elsen; Courtney Herring; Diane Lofton; Chandler Westover; Rawling & MacInnis, PA; Tammy Vinson; and Jeannie Chisholm*, Case No. 3:19-cv-364-CWR-FKB, and *Alysson Mills, in her capacity as Receiver for Arthur Lamar Adams and Madison Timber Properties, LLC. v. Butler Snow LLP; Butler Snow Advisory Services, LLC; Matt Thornton; Baker, Donelson, Bearman, Caldwell & Berkowitz, PC*; *Alexander Seawright, LLC; Brent Alexander; and Jon Seawright*, Case No. 3:18-cv-00866. Both cases were filed in the United States District Court for the Southern District of Mississippi, Northern Division. I also reviewed the deposition testimony of Alysson Mills from May 22, 2025; specimens of timber deeds (MTR_00109874-76, MTR.UPS_002647-59, DADUL_00051-53, MTR.UPS_001106-08, MTR.UPS_002639-41, MTR.UPS_002463-65, DADUL_00115-17, DADUL_00127-29, MTR.UPS_000060-62); the transcript of an April 19, 2018 interview of Lamar Adams by U.S. Department of Justice employees; an expert report of Luke Dove dated June 23, 2025; an expert report of Wolfram Wilke dated June 17, 2025; transcripts of depositions of Diane Lofton, Austin Elsen, Tammie Elsen, Courtney Herring, Chandler Westover, Jeannie Chisholm, and Tammy Vinson (and the exhibits from those depositions to the extent the exhibits contained timber deeds); and the statutes, rules, and authorities cited in this report.

In 2021, the Mississippi Legislature enacted the "Revised Mississippi Law on Notarial Acts." Miss. Code § 25-34-1 (effective July 1, 2021). To the extent this report cites the law or Notary Rules, it will cite the versions in effect before April 2018, when Madison Timber was revealed to have been a Ponzi scheme.

In this matter, my assignment was to provide explanations and opinions, and the basis and reasons for them, on the six questions below.

## 1. WHAT IS A MISSISSIPPI "NOTARY"?

The role of a Mississippi notary is defined by law, and it therefore is clearest to explain the role of a notary by quoting the legal authorities that define the role. "The Governor may appoint notaries public who may serve in any or all counties of this state. A notary public shall hold office for a term of four (4) years." Miss. Code § 25-33-1 (pre-2021). The Secretary of State, "on behalf of the Governor," will issue "a notary commission to any qualified person who submits an application to the Secretary of State in accordance with" the Notary Rules, which require that a Mississippi notary:

> 1. be at least 18 years of age;
>
> 2. [be] a resident of the State of Mississippi and have resided in the county of residence for least thirty (30) days prior to the submission of the application;
>
> 3. [be] a citizen or legal resident of the United States;

2

4. read and write English; and

5. not be convicted of a felony.

Miss. Admin. Code 1-5, R.2.1 (pre-2021). Mississippi notaries are required to post a bond with the Secretary of State. Miss. Admin. Code 1-5, R.2.5 (pre-2021).

As pertinent here, "[a] notary is empowered to perform … notarial acts, including "signature witnessings." Miss. Admin. Code 1-5, R.5.1 (pre-2021).

> 'Signature witnessing' means a notarial act in which an individual at a single time and place:
>
>> A. appears in person before the notary and presents a document;
>>
>> B. is personally known to the notary or identified by the notary through satisfactory evidence; and
>>
>> C. signs the document in the presence of the notary.

Miss. Admin. Code 1-5, R.1.23 (pre-2021). Under Mississippi statute,

> [e]very notary public shall have power to receive the proof or acknowledgment of all instruments of writing relating to commerce … , such as bills of sale … and such other writings as are commonly proved or acknowledged before notaries; and to perform all other duties required of notaries by commercial usage, and also to make declarations … and certify the truth thereof, under his seal of office, concerning all matters done by him in virtue of his office.

Miss. Code § 25-33-11 (pre-2021). "A notary acting in an official capacity in certifying to the subscription of an instrument acts … as a witness." 66 C.J.S. Notaries § 18. "A notary, by setting the marks of notarial sanction on certain kinds of documents, gives them the force of evidence and perpetuates as evidence the facts authenticated therein." 66 C.J.S. Notaries § 19.

The Mississippi Supreme Court (in a case quoted by Receiver Alysson Mills in her complaint against certain notaries and others) has explained the importance of notaries' fulfillment of their responsibilities to Mississippi citizens:

> Notaries are [e]ntrusted with high and important functions. Their certificates are made authentic evidence of titles by which we hold our lands, and by which they pass from one to another, and which endure from generation to generation. Their responsibility is as high as their trust.

*U.S. F.&G. v. State, for Use of Ward*, 211 Miss. 864, 874 (1951) (internal quotation marks and citations omitted).

3

*CONFIDENTIAL*

## 2.  WHAT DOES A MISSISSIPPI NOTARY DO IN A "SIGNATURE WITNESSING"?

Notaries acting in accordance with standard notarial practices in this state conform their conduct to the Mississippi Notary Rules, which are set forth in the Mississippi Administrative Code. In a properly conducted "signature witnessing," a Mississippi notary verifies and certifies that each "Principal"—the "person whose signature is notarized," Miss. Admin. Code 1-5, R.1.19(a) (pre-2021)—has signed the document in the notary's physical presence and is, in fact, the person whose signature is added to the document before the notary. In addition, the notary assesses the signor's demeanor and whether the person is acting under confusion or duress. Under the Notary Rules,

> [a] notary shall not perform a notarial act [including "signature witnessing"] if the principal:
>
> > 1. is not in the notary's presence at the time of notarization;
> >
> > 2. is not personally known to the notary or identified by the notary through satisfactory evidence;
> >
> > 3. shows a demeanor which causes the notary to have a compelling doubt about whether the principal knows the consequences of the transaction requiring a notarial act; or
> >
> > 4. in the notary's judgment, is not acting of his or her own free will.

Miss. Admin. Code 1-5, R.5.1 (pre-2021).

Mississippi signature witnessings occur in-person. To "[a]ppear in person before the notary," "the principal and the notary" must be "physically close enough to see, hear, communicate with, and give identification documents to each other." Miss. Admin. Code 1-5, R. 1.5 (pre-2021).

During properly conducted signature witnessings, Mississippi notaries assess and verify the identities of the persons who appear before them to sign documents and whose signatures the notaries are certifying having witnessed. Regarding Notary Rule 5.1(b)(2) (which, again, requires that the signer be "personally known to the notary or identified by the notary through satisfactory evidence"), "'[p]ersonal knowledge of identity' and 'personally knows' mean [the notary has] familiarity with an individual resulting from interactions with that individual over a period of time sufficient to dispel any reasonable uncertainty that the individual has the identity claimed." Miss. Admin. Code 1-5, R.1.18 (pre-2021). "'Satisfactory evidence of identity' means identification of an individual based on":

> A. at least one current document issued by a federal, state, or tribal government agency bearing the photographic image of the individual's face and signature and a physical description of the individual, though a properly stamped passport without a physical description is acceptable; or

4

> B. the oath or affirmation of one credible witness unaffected by the document or transaction who is personally known to the notary and who personally knows the individual, or of 2 credible witnesses unaffected by the document or transaction who each personally knows the individual and shows to the notary documentary identification as described in Subparagraph (1) of this section

Miss. Admin. Code 1-5, R.1.21 (pre-2021). Mississippi notaries in the ordinary course, consistent with the Notary Rules, verify the identities of the persons whose signatures the notaries witness and certify, nearly always (in the case of persons not known to the notary) by checking the signer's government-issued photographic identification card. "[I]f the principal is not personally known to the notary," the notary in a properly conducted signature witnessing makes a separate record (in his or her "notarial journal") of "the evidence of identity of each principal." Miss. Admin. Code 1-5, R.5.16 (pre-2021).

Notaries acting properly also confirm the presence of, and pay careful attention to the language of, the "[n]otarial certificate," which is defined as "the part of, or attachment to, a notarized document that is completed by the notary, bears the notary's signature and seal, and states the facts attested by the notary in a particular notarization." Miss. Admin. Code 1-5, R.1.13 (pre-2021). Although notaries are not "responsible for the form of the certificate, its wording and legal sufficiency," and although notaries are "not required to draft, edit or amend a certificate where the document presented does not contain an acceptable certificate," a notary presented with an unacceptable certificate will "refuse[] to notarize the document pursuant to [Notary] Rule 5.6." Miss. Admin. Code 1-5, R.6.1 (pre-2021). A Mississippi notary acting properly will "not notarize a signature … on a document without notarial certificate wording." Miss. Admin. Code 1-5, R.5.6 (pre-2021). Nor will he or she "notarize a signature … on a blank or incomplete document." *Id.*

During a "signature witnessing," the notary puts the notary's "official seal" (a sort of stamp, examples of which appear below) on the document that the principals (whose identities the notary has verified) have signed in the notary's physical presence. Under Mississippi statute, "[e]ach seal shall have the name of the county of the notary's residence with that of the state and his own name on the margin thereof, and the words 'notary public' across the center; and his official acts shall be attested by his seal of office." Miss. Code § 25-33-3 (pre-2021). "An image of the official seal shall be affixed by the notary on every paper document notarized." Miss. Admin. Code 1-5, R.5.19 (pre-2021). A notary will affix his or her seal "only at the time the notarial act is performed." *Id.*

Mississippi notaries are careful to protect the physical stamps or devices they use to imprint documents with their official seals. Indeed, given the importance that recipients of notarized documents reasonably put on notarizations, Mississippi has adopted Notary Rules to safeguard notaries' "official seals," and notaries are careful to follow them:

> A. … The seal shall not be possessed or used by any other person
>
> ….
>
> D. When not in use, the seal shall be kept secure and accessible only to the notary.

*CONFIDENTIAL*

E.  Within 10 days after the seal of a notary is stolen, after informing the appropriate law enforcement agency, or lost, the notary shall notify the Secretary of State by submitting an Application for Replacement Commission, SOS Form NP 006.  The Notary shall also provide a copy or number of any pertinent police report….

F.  As soon as reasonably practicable after resignation, revocation, or expiration of a notary commission or death of the notary, the seal shall be destroyed or defaced so that it may not be misused.

*Id.*

Mississippi notaries also keep and update a physical "notarial journal," which is typically in the form of a paginated notebook.  This standard practice is in keeping with a statutory and regulatory requirement: "Every notary public shall keep a fair register of all his official acts, and shall give a certified copy of his record, or any part thereof, to any person applying for it and paying the legal fees therefor."  Miss. Code § 25-33-5 (pre-2021).  "A notary shall keep, maintain, protect, and provide for lawful inspection a chronological official journal of notarial acts a permanently bound book with numbered pages."  Miss. Admin. Code 1-5, R.5.15 (pre-2021).  Notarial journals are of sufficient importance that Mississippi notaries (and Mississippi law) safeguard those as well.  "When not in use, the journal shall be kept in a secure area under the exclusive control of the notary, and shall not be used by any other notary nor surrendered to an employer upon termination of employment…."  Miss. Admin. Code 1-5, R.5.17.  Mississippi notaries' standard practice is to comply with the state law providing that, "[i]n the case of the death, resignation, disqualification or expiration of the term of office of any notary public, his registers and other public papers shall, within thirty (30) days, be lodged in the office of the clerk of the circuit court of the county of his residence."  Miss. Code § 25-33-7 (pre-2021).  This requirement underscores the importance of signature witnessings and other notarial acts as proof establishing that the events to which a notary has certified actually occurred as described in the notarial certificate.

Mississippi notaries acting properly, and in accordance with standard notarial practices, are careful to perform their notarial acts with due care.  As the Mississippi Supreme Court has explained, "[a] notary public is not an insurer, but he is under a duty to his clients to act honestly, skillfully and with reasonable diligence."  *U.S. F.& G.*, 211 Miss. at 877 (a notary may be "liable for any loss proximately resulting" from a notarial act done "carelessly").  *See also Gulledge v. Shaw*, 880 So.2d 288, 294 (Miss. 2004) (Mississippi notaries must perform notarial acts reasonably and diligently).  A treatise that the Mississippi Supreme Court has cited with approval explains that notaries are careful in the ordinary performance of their tasks:

> Notaries must perform their official duties with integrity, diligence, and skill.  A notary's duty is not confined to the one to whom the notary directly renders service, but it extends to all persons who may be affected by the notarial act.  A notary is not an insurer but is held to the care and diligence of a reasonably prudent person and a notary's liability, if any, must be based on negligence, willful misconduct, or corruption.  It is the notary's duty to become

6

*CONFIDENTIAL*

informed of the facts to which the notary intends to certify and not
to rely on hearsay.

66 C.J.S. Notaries § 27.

In recognition of the importance of notaries' faithfully discharging their duties, the
Mississippi legislature passed a law requiring that "[e]ach notary public … take the oath of office
prescribed by Section 268 of the Constitution," Miss. Code § 25-33-1 (pre-2021), which requires
that each Mississippi notary "solemnly swear (or affirm) that" he or she "will faithfully discharge
the duties of the office upon which I am about to enter. So help me God." Miss. Const. § 268. In
my long experience with signature witnessings, notaries are careful to conform their actions to the
governing legal requirements.

### 3. DO PEOPLE TYPICALLY AND REASONABLY RELY ON CERTIFICATIONS AND SIGNATURE WITNESSINGS BY MISSISSIPPI NOTARIES?

Yes. In view of the stringent laws, rules, and professional standards of diligence and care
that govern Mississippi notaries' performance of their duties, lawyers, judges, businesses,
investors, and others routinely and reasonably rely on notaries' certifications and seals to be
assured that the person who signed a notarized document actually exists; that the person's identity
was verified by the notary at the time of signature; that the person signed the document in the
physical presence of the notary; and that the person's demeanor did not suggest that he or she was
confused or acting under duress at the time of the signature. For the notarized timber deeds that I
reviewed (reflecting apparent transfers of timber rights to Madison Timber by
landowners/grantors), the recipients of those timber deeds should have been assured of each of the
foregoing facts based on the certifications and the appearance of the timber deeds.

### 4. IF THE PURPORTED LANDOWNERS/GRANTORS WHOSE PURPORTED SIGNATURES APPEAR ON NOTARIZED TIMBER DEEDS DID NOT SIGN THE DEEDS IN THE PHYSICAL PRESENCE OF THE NOTARIES WHO SIGNED AND SEALED THOSE DEEDS, DID THOSE NOTARIES FULFILL THEIR PROFESSIONAL OBLIGATIONS AND COMPLY WITH STANDARD NOTARIAL PRACTICES?

No. The notaries breached their professional obligations and deviated from standard
notarial practices in Mississippi if they signed and affixed their official seals, and certified that
"the within named two" signatories (or two specific persons) "PERSONALLY appeared" before
the notary for a signature witnessing, if the purported landowners/grantors did not sign the timber

*CONFIDENTIAL*

deeds in the physical presence of the notaries and have their identities verified at that time, including with respect to the certifications excerpted below:

Date: 7·3·17

W.C. Chisholm                                    Madison Timber Properties, LLC

BY:                                              BY:

**GRANTOR**                                      **GRANTEE**

STATE OF MISSISSIPPI
COUNTY OF _Madison_
The foregoing PERSONALLY appeared before me, the undersigned notary public for the
jurisdiction aforesaid on the _31st_ day of _July_, 2017, the within named two, who
acknowledged that they signed, executed and delivered the above foregoing instrument, after first
having been duly authorized to do so.

NOTARY PUBLIC                                    My Commission Expires: _May 6, 2018_

---

**The Freddie S. Green Family, LP**
**H.J. Martin, Managing Member    Madison Timber Properties, LLC**
                                  **Lamar Adams, Manager**

**GRANTOR**                                      **GRANTEE**

STATE OF MISSISSIPPI
COUNTY OF _Madison_

PERSONALLY appeared before me, the undersigned notary public for the jurisdiction aforesaid
on the _3rd_ day of _May_, 2016, the within named H.J. Martin, Managing Member of
Freddie S. Green Family, LP, and Lamar Adams, Manager of Madison Timber Properties, LLC
who acknowledged that they signed, executed and delivered the above foregoing instrument,
after first having been duly authorized to do so.

NOTARY PUBLIC

My Commission Expires _2/28/2017_

STATE OF MISSISSIPPI
NOTARY PUBLIC
ID # 43224
TAMMY M. VINSON
Commission Expires
Feb. 28, 2017
MADISON COUNTY

8

*CONFIDENTIAL*

Dated: __1-8__, 2018
Dungan Black                          Madison Timber Properties, LLC

BY: _Dungan Black_

**GRANTOR**                          **GRANTEE**

STATE OF MISSISSIPPI
COUNTY OF __Madison__
The foregoing PERSONALLY appeared before me, the undersigned notary public for the
jurisdiction aforesaid on the __8th__ day of __January__, 2018, the within named two, who
acknowledged that they signed, executed and delivered the above foregoing instrument, after first
having been duly authorized to do so.

My Commission Expires: __08/11/2018__        _Chandler Westover_
                                             NOTARY PUBLIC

---

DATED: __6-21__, 2017
B. N. Sumrall, Jr.                  Madison Timber Properties, LLC

_B. N. Sumrall, Jr._

**GRANTOR**                          **GRANTEE**

STATE OF MISSISSIPPI
COUNTY OF __Madison__

PERSONALLY appeared before me, the undersigned notary public for the jurisdiction aforesaid
on the __21st__ day of __June__, 2017, the within named B.N. Sumrall, Jr., and Lamar Adams,
Manager of Madison Timber Properties, LLC, who acknowledged that he signed, executed and
delivered the above foregoing instrument, after first having been duly authorized to do so.

_Jennie Chisholm_

NOTARY PUBLIC

My Commission Expires: __7/12/20__

9

*CONFIDENTIAL*

Date: _____                      Madison Timber Properties, LLC
Ronnie West

BY: _____                        BY: _____
**GRANTOR**                                **GRANTEE**

STATE OF MISSISSIPPI
COUNTY OF _____
The foregoing PERSONALLY appeared before me, the undersigned notary public for the
jurisdiction aforesaid on the ____ day of _____ 2017, the within named two, who
acknowledged that they signed, executed and delivered the above foregoing instrument, after first
having been duly authorized to do so.

My Commission Expires _____        _____
                                              NOTARY PUBLIC

---

Date: 4-4-18                               Madison Timber Properties, LLC
Joe Dewane

BY: _Joe Dewane_                           BY: _____
**GRANTOR**                                **GRANTEE**
STATE OF MISSISSIPPI
COUNTY OF Madison
The foregoing PERSONALLY appeared before me, the undersigned notary public for the
jurisdiction aforesaid on the 4 day of ~~August~~ April 2018, the within named two, who
acknowledged that they signed, executed and delivered the above foregoing instrument, after first
having been duly authorized to do so.

My Commission Expires: October 13, 2021      _Diane Lofton_
                                              NOTARY PUBLIC

STATE OF MISSISSIPPI
NOTARY PUBLIC
ID # 79051
**DIANE LOFTON**
Commission Expires
Oct. 13, 2021
MADISON COUNTY

*CONFIDENTIAL*

Dated: 3/28 ,2018
William Robertson

BY: _Bill Robertson_

**GRANTOR**

Madison Timber Properties, LLC

_____
**GRANTEE**

STATE OF MISSISSIPPI
COUNTY OF Madison
The foregoing PERSONALLY appeared before me, the undersigned notary public for the
jurisdiction aforesaid on the 28th day of March , 2018, the within named two, who
acknowledged that they signed, executed and delivered the above foregoing instrument, after first
having been duly authorized to do so.

My Commission Expires: 1/21/2022

NOTARY PUBLIC

*[Notary seal: STATE OF MISSISSIPPI NOTARY PUBLIC ID # 122695 COURTNEY HERRING Commission Expires Jan. 21 2022 MADISON COUNTY]*

---

DATED: 4/9 ,2018
**Mac Drennan**

_Mac Drennan_

**GRANTOR**

**Madison Timber Properties, LLC**

_____
**GRANTEE**

STATE OF MISSISSIPPI
COUNTY OF Madison

PERSONALLY appeared before me, the undersigned notary public for the jurisdiction aforesaid
on the 9 day of April , 2018, the within named two, who acknowledged that they
signed, executed, and delivered the above foregoing instrument, after first having been duly
authorized to do so.

_William Nye_

NOTARY PUBLIC

My Commission Expires: 1/21/22

*[Notary seal: STATE OF MISSISSIPPI NOTARY PUBLIC ID # 122694 WILLIAM NYE Commission Expires Jan. 21, 2022 MADISON COUNTY]*

11

*CONFIDENTIAL*

I observe that the timber deeds that the notaries signed, and to which they affixed their official seals, are documents that quite obviously, on their faces, contemplate signatures by two persons.  These timber deeds are short (only three pages); they are titled "TIMBER DEED AND CUTTING *AGREEMENT*" (emphasis added), thus contemplating more than one signature; they contain numerous and pervasive references to both a "GRANTOR" and "GRANTEE" taking action by and through the deed (e.g., from one timber deed notarized by Ms. Chisholm, "Grantor guarantees…," "Grantor hereby agrees to furnish any necessary easements…," "Grantor will be liable to the Grantee … to determine the boundary," "Grantor will assume liability for the same," "Grantor represents and warrants … that … there are no boundary line disputes," "Grantor hereby agrees to reimburse Grantee for the volume," "Grantor recognizes and agrees," and "Grantor shall select one (1) arbitrator"); and the timber deeds typically state, in the paragraph immediately above

12

*CONFIDENTIAL*

the signature block and notarial certification, that the "Grantor and Grantee" in the timber deed are acting "mutually." Here is an example of that final paragraph:



The first sentence on the first page of the three-page timber deeds—immediately below the title—states the name of the purported grantor/landowner who supposedly is acting through the timber deeds that the notaries notarized. Here's an example:

# TIMBER DEED AND CUTTING AGREEMENT

For and In Consideration of the sum of Ten Dollars ($10.00), cash in hand paid, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, R. Andrew Carson, does hereby warrant

*CONFIDENTIAL*

And here is what appears to be Ms. Vinson's notarization of the purported signature of R. Andrew Carson on the same timber deed:



Ms. Mills has stated that the defendant notaries "knew or should have known that the timer deeds were fake." Mills Notary Am. Compl. ¶ 104. Accepting her statement of fact, the notaries did not act with reasonable care: a notary requested to notarize one signature on a timber deed that, on its face, contemplates signature by two persons should have, in the exercise of due care, declined to notarize the deed or made clear on the face of the deed that only Lamar Adams had signed in the notary's presence (e.g., by adding to the document a prominent, handwritten statement to that effect).

Lamar Adams told Department of Justice (U.S. Attorney's Office and FBI) investigators that he obtained false notarizations of timber deeds from notaries:

> [AUSA] LAMARCA: [W]ho[] notarized all your fake timber deeds?
>
> MR. ADAMS: I kind of fooled them on that, too. I was doing so many, and I would go in and I would put six or seven in together. And like the landowner. The landowner would be mixed in with it, and there may be five deeds with my name down at the bottom saying I'm authorized to do it, and then there would be one that was different that would say ["]the within named two people.["]  And the [UPS Store] in Madison did a good many and [Rawlings & MacInnis].  And I would just go in and start a conversation with them and hand them to her and she has done so many real estate stuff

14

*CONFIDENTIAL*

> and legitimate timber deals over the years that she just really didn't
> look. She trusted me.

DOJ Interview Transcript at MTR_0039163-64. Consistent with Mr. Adams' statement to federal law enforcement, some notaries have testified that Mr. Adams would present multiple documents to them for notarization at the same time. Westover Tr. at 55; Lofton Tr. at 81-82. Mr. Adams would be unable to procure false notarizations if the notaries had adhered to the standard practices and professional standards that govern notarial signature witnessings.

The notaries whose depositions were provided to me were employees of a UPS Store franchisee with a location in Madison, Mississippi, or of the law firm Rawlings & MacInnis. In their depositions, some of the notaries denied that they would have violated the Notary Rules, such as by notarizing the purported signature of a landowner/grantor without that person's signing in their physical presence and presenting identification. Multiple of the notaries admitted, however, that they were given little or no training by their employers (or anyone else), and that they had never read the Notary Rules, despite the fact that familiarity with the Notary Rules is a requirement for obtaining a notarial commission from the Secretary of State.

For example, UPS Store manager Diane Lofton never received any notary training, nor did she ever "review any materials of the Mississippi Secretary of State pertaining to being a notary." Lofton Tr. at 39-40. Ms. Lofton did not "do anything to learn what [her] duties were." *Id.* at 66-67. She mistakenly believed "it was not required for [notaries] to record" notarial actions, and, "[a]fter several months of [Adams] coming in several times a week, [she] just assumed [she] already had all the information [she] needed to keep record of in my notary journal; so, therefore, [she] did not take down his information at that time" in her log. Lofton Tr. at 65, 95.

The untrained Ms. Lofton, in turn, provided other UPS Store notaries the little training they received. Mr. Westover testified that the "only training I got would have been from [Ms. Lofton] just showing me what to do to get the notary done," and Mr. Westover never "receive[d] any training from the UPS Store, Inc. regarding notary services." Westover Tr. at 187-88. The only training Austin Elsen received was to see Ms. Lofton "do like a couple and then she would oversee us and then that was basically it." A. Elsen at 14. Some of the notaries also were given inaccurate training that is contrary to notarial standard practices, such as the incorrect direction from Ms. Lofton to her subordinates that it was unnecessary to maintain a notarial log when witnessing Mr. Adams' signings. T. Elsen Tr. at 54, 61. None of Austin Elsen, Mr. Westover, or Ms. Herring recalls even reading the Notary Rules. Westover Tr. at 28, 38-39; A. Elsen Tr. at 20-21; Herring Tr. at 75. Ms. Elsen "do[es] not recall any training," and she also never read the Notary Rules. T. Elsen Tr. at 20-21. She "did not know" "that it is required by regulations" that "notaries in the State of Mississippi maintain notary ledgers." T. Elsen Tr. at 89-90. Ms. Chisholm (from Rawlings & MacInnis) was unfamiliar with the Notary Rule requiring the filing of her logbook with the clerk of court to ensure its preservation, and she burned hers. Chisholm Tr. at 52-53. Contrary to notarial standards and legal requirements, Ms. Herring left her logbook with her employer when she stopped being a notary. Herring Tr. at 40-41.

Like Ms. Lofton (Lofton Tr. at 95), Mr. Westover, Ms. Elsen, Mr. Elsen, Ms. Herring, and Ms. Vinson did not log most witnessings of signatures by Mr. Adams, contrary to standard notarial practice and the Notary Rules. Westover Tr. at 46, 48-49; T. Elsen Tr. at 153; A. Elsen at 22-23;

15

Herring Tr. at 35-36; Vinson Tr. at 56. Although it is standard notarial practice (and Notary Rule 5.19 requires) that, "[w]hen not in use, the seal shall be kept secure and accessible only to the notary," at least some of the notaries left their official seals in an unlocked drawer accessible to persons other than themselves. Westover Tr. at 32-35. Mr. Westover moved to Florida and left his official seal at The UPS Store location in Madison, contrary to the practice (and legal requirement) reflected in Notary Rule 5.19. *Id.* at 31.

Several notaries whose depositions I reviewed admitted that Lamar Adams had never appeared before them for a signature witnessing accompanied by another person, and all of them admitted that timber deeds apparently bearing the simultaneous signatures of landowners/grantors and Lamar Adams—and the notarial certification that "the within named two" or similar verbiage indicating the presence of a second signer—also appear to contain their handwriting, their notarial signatures, and their official seals, sometimes within or overlapping with the text of their notarial certifications. Lofton Tr. at 16, 105-06; A. Elsen at 32-33, 37, 40-43; T. Elsen at 66, 68, 73, 81-95, 98-102, 107, 109-123, 124, 126-146; Herring Tr. at 41, 45-46, 50, 54, 62; Westover Tr. at 71-72, 74, 79, 80, 82-83, 86, 97, 108-109, 115-130, 133-155, 157-186; Chisholm Tr. at 65-70, 72-80.

Mr. Westover admits to having notarized documents with blanks (which Mr. Adams later could have filled). Westover Tr. at 71-72, 97, 108-109, 115-116, 130-131. Here are examples:



16

EXCEPTIONS TO WHICH SET FORTH BELOW:

Date: 6/28/16

Madison Timber Properties, LLC

BY: _____

**GRANTOR**

Leo or Sherry Russell

BY: _____

**GRANTEE**

STATE OF MISSISSIPPI.
COUNTY OF _Madison_
The foregoing PERSONALLY appeared before me, the undersigned notary public for the jurisdiction aforesaid on the 28th day of _June_, 2016, the within named Lamar Adams, Manager of Madison Timber Properties, LLC, who acknowledged that he signed, executed and delivered the above foregoing instrument, after first having been duly authorized to do so.

My Commission Expires: August 11, 2018

_Chandler Westover_
NOTARY PUBLIC

---

EXCEPTIONS TO WHICH SET FORTH BELOW:

Date: 9/6/16

Madison Timber Properties, LLC

BY: _____

**GRANTOR**

Madison Trust Company, Custodian
Connie Paxton IRA

BY: _____

**GRANTEE**

STATE OF MISSISSIPPI
COUNTY OF _Madison_
The foregoing PERSONALLY appeared before me, the undersigned notary public for the jurisdiction aforesaid on the 6th day of _September_, 2016, the within named Lamar Adams, Manager of Madison Timber Properties, LLC, who acknowledged that he signed, executed and delivered the above foregoing instrument, after first having been duly authorized to do so.

My Commission Expires: August 11, 2018

_Chandler Westover_
NOTARY PUBLIC

---

17

*CONFIDENTIAL*

Dated: 6/16 2017
Madison Timber Properties, LLC

Madison Trust Company, Custodian
for David Nichols, IRA

BY: _____

**GRANTOR**                    **GRANTEE**

STATE OF MISSISSIPPI
COUNTY OF _____ Madison _____
The foregoing PERSONALLY appeared before me, the undersigned notary public for the
jurisdiction aforesaid on the 26th day of _June_ _____ 2017, the within named Lamar
Adams, Manager of Madison Timber Properties, LLC, who acknowledged that he signed,
executed and delivered the above foregoing instrument, after first having been duly authorized to
do so.

My Commission Expires _August 11, 2018_    _____
                                            NOTARY PUBLIC

---

Dated: 6/16 2017
Madison Timber Properties, LLC

Madison Trust Company, Custodian
for David Nichols, IRA

BY: _____

**GRANTOR**                    **GRANTEE**

STATE OF MISSISSIPPI
COUNTY OF _____ Madison _____
The foregoing PERSONALLY appeared before me, the undersigned notary public for the
jurisdiction aforesaid on the 26th day of _June_ _____ 2017, the within named Lamar
Adams, Manager of Madison Timber Properties, LLC, who acknowledged that he signed,
executed and delivered the above foregoing instrument, after first having been duly authorized to
do so.

My Commission Expires _August 11, 2018_    _____
                                            NOTARY PUBLIC

18

*CONFIDENTIAL*

Dated: 7/17 2017                          Timbercreek Investments, LLC
Madison Timber Properties, LLC

BY:

**GRANTOR**                                **GRANTEE**

STATE OF MISSISSIPPI
COUNTY OF __Madison__
The foregoing PERSONALLY appeared before me, the undersigned notary public for the
jurisdiction aforesaid on the _17th_ day of __July__ , 2017, the within named Lamar
Adams, Manager of Madison Timber Properties, LLC, who acknowledged that he signed,
executed and delivered the above foregoing instrument, after first having been duly authorized to
do so.

My Commission Expires: __August 11, 2018__          _____
                                                     NOTARY PUBLIC

---

DATED: _____ 2017                      777 Aspen, LLC
**Madison Timber Properties, LLC**

**GRANTOR**                                **GRANTEE**

STATE OF MISSISSIPPI
COUNTY OF __Madison__

   PERSONALLY appeared before me  the undersigned notary public for the jurisdiction aforesaid
on the _27th_ day of __November__  2017  the within named Lamar Adams  Manager of Madison
Timber Properties  LLC  who acknowledged that he signed  executed and delivered the above
foregoing instrument  after first having been duly authorized to do so.

_____
NOTARY PUBLIC

My Commission Expires  __08/11/2018__

19

*CONFIDENTIAL*



Receiver Alysson Mills has sued a number of notaries and their employers, and she has told the Court (in her Amended Complaint against those defendants) that "Adams routinely presented [the Defendant Notaries] with stacks of timber deeds to notarize and they did so, without examining the deeds to establish that the requested notarizations were appropriate, in direct violation of [Notary] Rule 5.6." Mills Notary Compl. ¶ 71. She also told the Court:

> [The Defendant Notaries] notarized the signatures of purported grantors-landowners who were not present, in direct violation of [Notary] Rule 5.1.
>
> [The Defendant Notaries] notarized timber deeds for which the grantors-landowners☐ signatures were blank, in direct violation of [Notary] Rule 5.6
>
> [The Defendant Notaries] knew or should have known that their attestations were false because [the Defendant Notaries] knew, at a minimum, that the purported grantors-landowners never personally appeared before them.

*Id.* ¶¶ 47-51. *See also id.* ¶¶ 63, 64, 65, 73. Ms. Mills recently testified under oath (after the dates of the notary depositions):

> Q. … So you've testified that one of the things that you—you think that should have alerted the notaries to this being a fraud—

*CONFIDENTIAL*

A. Uh-huh.

Q. —is that Adams came in with a stack of documents—

A. Uh-huh.

Q. —and asked the notary to notarize a stack of documents at the same time?

A. Yes. But I can't—did I say that today already? But yes, that's part of it. Yeah.

Mills Dep. (May 22, 2025) at 69:14 to 69:25.

Q. Well, I could be wrong, but earlier, I thought you said that you thought he did distinguish in his interview between how the documents were presented to The UPS Store versus Rawlings & MacInnis?

A. No. My recollection was that he—I think what I said is he said he took a stack of documents to The UPS Store. I mean, that's not inconsistent with six or seven in together. I'm probably thinking of this and his deposition testimony at the same time because I think at his deposition, he said, "I took a stack of documents in, and I left them and would come back." I think he said that. But that's not in here.

Q. Do you have any reason to think that he didn't bring stacks—a stack of documents into Rawlings & MacInnis to have them notarized?

A. I don't have any reason, you know, to think that it was different.

*Id.* at 137:24 to 138:15.

[Q.] Do you agree that you can't look at one of the documents produced in this case and determine whether the landowner's signature was forged by Adams before the notary stamped it or after the notary stamped it?

A. I'm not trying to argue with you about it. I'm just saying the names are there. The attestation says "the within-named two." I've not heard testimony—maybe you have, but I haven't listened to every single thing. My understanding is most of the time, maybe 99 percent of the time, they were already filled out. And if I look at the document, it just looks like it is what it is. Whether I can, you know, tell you myself with a hundred percent certainty that it was there when the notary stamped it, I can't do that.

*CONFIDENTIAL*

> Q. When you say "it was there," are you saying the—the landowner's signature was there? Is that what you meant by "it"?
>
> A. The grantor?
>
> Q. Yeah.
>
> A. Yes.

*Id.* at 74:19 to 75:14. Assuming that Ms. Mills' statements are accurate, the notarized timber deeds reflecting purported signature witnessings for the transfers of timber rights from landowners/grantors to Madison Timber were notarized in violation of ordinary, careful notarial practices, and those timber deeds never would have been notarized if the notaries had exercised ordinary care.

Luke Dove, a Mississippi lawyer whom Ms. Mills' counsel has hired as an expert witness, has written in an expert report (again, after the dates of the notaries' depositions):

> The Notaries acted negligently in failing to follow the Notary Rules. I have reviewed deposition testimony and documents and the applicable Notary Rules, which reveal that the Notaries failed to review the Notary Rules and otherwise violated several provisions by, *inter alia*, the following actions or omissions: …
>
> > d.    Notarizing a document with blank space and an attestation clause including the "within named two";
> >
> > e.    Notarizing incomplete or blank documents; and
> >
> > f.    Failing to require an individual executing a signature on a document to appear personally.

Dove Expt. Rpt. at 3-4. Mr. Dove also wrote: "They also notarized incomplete or blank documents for Adams. In my opinion, each notarial act constituted a separate violation or violation(s) of the Notary Rules." *Id.*

It has been suggested that, on at least some occasions, Mr. Adams may have modified timber deeds on his computer to make it appear that they had been properly notarized. A forensic computer specialist hired by Ms. Mills' counsel conducted an analysis of electronic files seized from Mr. Adams and Madison Timber, however, and made the following findings:

> [T]here is no indication within the documents or metadata that show that Mr. Adams modified the PDF documents directly to alter wording or add additional signature lines. None of these Word documents appear to exist on the data available for examination. In fact, I was unable to identify any Word documents that relate to the PDF files. Even if the documents were converted to Word from PDF, it would be unlikely that the scanned images of the notary

*CONFIDENTIAL*

signatures would have accurately converted to Word format. While possible, the document structure would most likely have been corrupted and require significant editing by Mr. Adams to fix.

Wilke Rpt. at 12. In addition, the computer specialist Mr. Wilke wrote:

It is my opinion, to a reasonable degree of certainty in my field of expertise, that:

• PDF documents on the computer show no indication that any alterations were performed or saved.

• Word documents on the computer do not contain any notary signatures, stamps, Seller signatures, or images of the same relating to Ms. Vinson and are unsigned documents.

• PDF documents containing Ms. Vinson's notary stamp and signature were scanned in from paper into electronic format and not saved from an altered Word document as purported by Mr. Adams.

*Id.*

On this topic, Ms. Mills testified:

Q. —you interviewed or spoke to Adams, and he—you and he talked about his computer?

A. Yeah, we wanted his computer, and we talked about his computer. And I also asked if, you know, he did anything, you know, to manipulate the deeds using his computer, and he said, "I tried." And he said it didn't work.

Mills Dep. (May 22, 2025) at 120:6 to 120:12.

Q. With respect to the language "the within-named two," I think you've testified that you looked at these documents and to your eye, it doesn't look like that language was altered or modified in the document you're looking at?

A. Yeah, I'm also not aware of any evidence that they were.

*Id.* at 77:16 to 77:22.

I note the foregoing statements by Ms. Mills and her counsel's expert witnesses because one predicate for some of my opinions is the assumption that Ms. Mills or her counsel's expert witnesses are correct in their factual assertions about what occurred at the signature witnessings. I note them for the additional reasons that their assertions both corroborate and provide additional

*CONFIDENTIAL*

support for my opinion that the notaries did not comply with standard notarial practices and did not fulfill their professional obligations if the notaries certified purported signatures by landowners without the purportedly signing landowners' being physically present and having their identities verified at the signature witnessings to which the notaries certified.

5.  **DID THE MISSISSIPPI NOTARIES IDENTIFIED IN THE PROVIDED TIMBER DEEDS FULFILL THEIR PROFESSIONAL OBLIGATIONS AND FOLLOW STANDARD NOTARIAL PRACTICES IF THEY DID NOT KEEP A FAIR REGISTER OF ALL THEIR NOTARIAL ACTS?**

No.  As I explained above, Mississippi notaries' standard (indeed, legally required) practice is to keep a fair, chronological register of all of their notarial acts.

Ms. Mills has told this Court that certain notaries whom she sued "did not enter in a chronological official journal of notarial acts the notarial acts that they performed for Adams, in direct violation of [Notary] Rules 5.15 and 5.16.  They did not keep an official journal at all." Mills Notary Am. Compl. ¶ 74.  As for other notaries, Ms. Mills has told this Court that those notaries

> did not enter in a chronological official journal of notarial acts the notarial acts that they performed for Adams, in direct violation of Rules 5.15 and 5.16.  On information and belief, The UPS employees maintained an official journal but altogether ceased entering the notarial acts that they performed for Adams when it became too cumbersome.

*Id.* ¶ 66.

The Receiver's expert witness Mr. Dove has written that "the Notaries failed to review the Notary Rules and otherwise violated several provisions by … [f]ailing to maintain their notarial journals; … [f]ailing to record each notarial act as a separate entry in their notarial journals; … [and] [f]ailing to securely maintain custody and control of their notarial journals when not in use." Dove Expt. Rpt. at 3-4.  He has written: "Under the Notary Rules, the Notaries were required to log each and every notarial act they performed for Adams.  They did not do so, despite each performing hundreds of discrete notarial acts for him over several years, which span the Policy Periods." *Id.*

For this opinion, I assume the accuracy of the facts stated by Ms. Mills and her counsel's expert witness concerning notarial journals.  Ms. Mills' and her counsel's expert witness's statements also provide further support for, and corroborate, my opinion that, if the notaries did not keep a fair register of all their notarial acts, they did not fulfill their professional obligations and deviated from standard notarial practice.

*CONFIDENTIAL*

6. **WHAT CONCLUSION SHOULD RECIPIENTS OF THE PROVIDED TIMBER DEEDS HAVE DRAWN ABOUT THE NOTARIES' AND PURPORTED LANDOWNERS' ACTIONS?**

Recipients of the timber deeds that were provided to me (reflecting purported transfers by landowners/grantors to Madison Timber) reasonably should have concluded that the landowners/grantors who purportedly signed those timber deeds exist; that the landowners'/grantors' identities were verified by the certifying Mississippi notary through, for example, checking their government-issued photo identification card at the signature witnessing; that the landowners/grantors signed the timber deeds in the physical presence of the notary; and that the notaries evaluated the landowners'/grantors' demeanors for signs of confusion or duress during the signature witnessings.

\*      \*      \*

My opinions expressed herein are given to a reasonable degree of professional certainty.

Sincerely,

Robert L. Gibbs

*CONFIDENTIAL*

## Disclaimer

I reserve the right to change, alter, or amend any/or all findings and conclusions contained herein should information that would warrant such changes become available.

*CONFIDENTIAL*