UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

| | |
|---|---|
| ALYSSON MILLS, IN HER CAPACITY AS RECEIVER FOR ARTHUR LAMAR ADAMS AND MADISON TIMBER PROPERTIES, LLC,<br><br>Plaintiff,<br><br>v.<br><br>BUTLER SNOW LLP; BUTLER SNOW ADVISORY SERVICES, LLC; MATT THORNTON; BAKER, DONELSON, BEARMAN, CALDWELL & BERKOWITZ, PC; ALEXANDER SEAWRIGHT, LLC; BRENT ALEXANDER; and JON SEAWRIGHT,<br><br>Defendants. | Case No. 3:18-cv-866-CWR-BWR<br><br>Arising out of Case No. 3:18-cv-252, *Securities and Exchange Commission v. Arthur Lamar Adams and Madison Timber Properties, LLC*<br><br>Carlton W. Reeves, District Judge<br>Bradley W. Rath, Magistrate Judge |

**MEMORANDUM IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT ON SPECIFIC MATTERS PERTAINING TO DAMAGES**

Alysson Mills, in her capacity as the court-appointed receiver for Arthur Lamar Adams and Madison Timber Properties, LLC, respectfully submits this memorandum in support of her motion for partial summary judgment on specific matters pertaining to damages.

For the reasons shown, the Receiver is entitled to a partial summary judgment stating that the Receivership Estate's damages, which include $53 million in net losses, are not reduced by an "aggregation" of losses or winnings of "related" investors; by hypothetical recoveries from investors who are "net winners"; by investors' sophistication or, relatedly, an absence of their "reliance" on specific misrepresentations; or by settlements with other defendants.

# INTRODUCTION

There are specific matters pertaining to damages in this case for which there can be no genuine dispute. In fact, the Court has already addressed some of these matters in prior rulings. For the avoidance of doubt and the waste of the jury's time at trial, the Receiver moves for summary judgment on the following:

1. The Receivership Estate's damages include $53 million in net losses.

A receivership estate's damages are its total debts to investors. That is the law.

Here, investors are noteholders. They either hold one or more Madison Timber promissory notes with an amount still due or hold an interest in a Madison Timber promissory note through the Alexander Seawright Timber Fund. After years of discovery, the Receiver's and Defendants' experts confirm the Receiver's accounting of those notes. There is no genuine dispute that the combined total amount due is, at minimum, $103,554,698.19, of which total principal due is $83,025,374.50.

This Court previously held investors are not entitled to the total amounts due under their notes. Instead, they are entitled to their net losses. [127] That additional math is straightforward: You take the principal still due under an investor's notes and subtract any interest the investor ever received. For investors with net losses, the total net losses are approximately $53 million.

2. There is no basis for reducing the $53 million in net losses.

Defendants treat certain investors—husbands and wives, LLCs and their members, and IRA accounts and their owners—as one investor for the purposes of calculating net losses. But no authority requires the Receiver to "aggregate" investors, and Mississippi law does not support it.

Defendants argue alleged net winners' total net winnings reduce total net losses. There is no legal or factual support for the argument.

Defendants may argue individual investors' sophistication or, relatedly, an absence of their "reliance" on specific misrepresentations, reduces total net losses. Reliance, however, is not an element of any of the claims against them.

Defendants may argue the Receivership Estate's settlements with other defendants reduce any damages they might be ordered to pay. But if that is true, it is not a question for the jury. It is, instead, properly raised post-trial.

## LAW

A party may request summary judgment on any "claim or defense" or any "part of [a] claim or defense." Fed. R. Civ. Pro. 56(a). "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id.*

## ARGUMENT

**1. The Receivership Estate's damages include $53 million in net losses.**

**a. A receivership estate's damages are its total debts to investors.**

A receivership estate's damages are its total debts to investors. That is the law in aiding and abetting cases such as this.

The Receiver, standing in the shoes of Madison Timber, alleges Defendants aided and abetted Lamar Adams's Ponzi scheme. Adams misused Madison Timber to perpetrate a Ponzi scheme (an established fact) and Defendants aided and abetted him (the Receiver's allegation). By participating in Adams's unlawful course of conduct, a Defendant contributed to (was a proximate cause of) Madison Timber's injuries, therefore he is liable to the Receivership Estate. *See, e.g., Rotstain v. Mendez*, 986 F.3d 931 (5th Cir. 2021); *Zacarias v. Stanford Int'l Bank, Ltd.*

*(Zacarias)*, 945 F.3d 883 (5th Cir. 2019); *Securities and Exchange Commission v. Stanford International Bank, Ltd. (Lloyds)*, 927 F.3d 830 (5th Cir. 2019).

The Receivership Estate's damages are its total debts to investors. The theory is not novel. The Fifth Circuit has held, in cases such as this, that a receivership estate's damages include the "unsustainable liabilities inflicted by the Ponzi scheme," *Zacarias*, 945 F.3d at 899-90, or, stated differently, the "additional liability incurred to its investors' due to [defendants'] participation in the Ponzi scheme," *Rotstain*, 986 F.3d at 941.

Under Mississippi law, aiders and abettors (and, relatedly, civil conspirators) are jointly and severally liable for damages. *See* Miss. Code Ann. § 85-5-7 ("(4) Joint and several liability shall be imposed on all who consciously and deliberately pursue a common plan or design to commit a tortious act, or actively take part in it. Any person held jointly and severally liable under this section shall have a right of contribution from his fellow defendants acting in concert."). It follows that, to the extent a Defendant participated in Adams's unlawful course of conduct, he is jointly and severally liable for the Receivership Estate's total debts to investors.

The Receiver's theory of damages is not only not novel, Defendants' own expert Steven Rhodes, a retired bankruptcy judge, testified to it. He readily agreed that an aider and abettor is liable for "all the losses" regardless of his particular participation.[1]

---

[1] Rhodes depo., Exhibit 1, at 46:4-10 ("MR. BARRIERE: As aider and abettor, you are liable for all the losses regardless of your particular participation in the scheme. Correct? MR. DAVANT: Object to the form. THE WITNESS: Yes."); *id.* at 76:11-18 ("[MR. BARRIERE:] And you have testified that as aiders and abettors, if they are held liable, they would be liable for all losses associated with the Ponzi scheme. Correct? MR. DAVANT: Object to form. THE WITNESS: Yes.").

### b. Defendants' expert confirms the Receiver's accounting.

In this case, the investors are noteholders. They either hold one or more Madison Timber promissory notes with an amount still due or hold an interest in a Madison Timber promissory note through the Alexander Seawright Timber Fund.

In 2021, in preparation for making a first distribution, the Receiver advised the Court that there are 485 such notes, and the total amount due under them is $100,198,437.98. [264, *S.E.C. v. Adams*, No. 3:18-cv-00252 (S.D. Miss.)] Of that total amount due, the total principal due is $80,271,125.79.

Today, after years of discovery, the Receiver's expert, Ken Lefoldt, and Defendants' expert, Donna Ingram, confirm that accounting. Ingram identified 489 notes, with a total amount due of $103,211,770.34[2]—but she did not account for a settlement by which four notes, with total amounts due of $3,041,583.36[3], were forgiven. [177-1, *S.E.C. v. Adams*, No. 3:18-cv-00252 (S.D. Miss.)]. If one excludes those four notes, as one must, by Ingram's math, there are 485 notes, and the total amount due is $100,170,186.98. Of that total amount due, the total principal due is $80,242,875.79.

This means the difference in the Receiver's and Ingram's accounting is only $28,500:

**Madison Timber notes with amounts due**

|  | notes with amounts due | principal still due | interest still due |
|---|---|---|---|
| Receiver's accounting | **485** | **$80,271,125.79** | **$19,927,311.19** |
| Donna Ingram's accounting | 495 | $82,532,209.15 | $20,679,569.19 |

---

[2] Ingram report, Exhibit 2, at Exhibit 2-1, page 6.
[3] Ingram report at Exhibit 2-2, page 34.

|  |  |  |  |
|---|---:|---:|---:|
| *minus four forgiven notes* | -4 | -$2,289,333.36 | -$752,250.00 |
|  | 485 | $80,242,875.79 | $19,927,311.19 |
|  |  | $28,500 |  |

The Receiver, consistent with this Court's orders, separately accounted for investors in Madison Timber through the Alexander Seawright Timber Fund. The Receiver determined the total principal due to those investors is $2,788,633.00. Ingram determined the total principal due to those investors is $2,832,498.71[4]—but she accounted for a principal payment of $50,000 to Alexander Seawright LLC.[5] If one excludes that payment, as one must, by Ingram's math, the total principal due is $2,782,498.71. This means the difference is only $6,164.29:

**Investors in Alexander Seawright Timber Fund**

|  | principal still due | interest still due |
|---|---:|---:|
| Receiver's accounting | **$2,788,633.00** | **$590,387.38** |
| Donna Ingram's accounting | $2,832,498.71 | $607,512.50 |
| *minus payment to Alexander Seawright* | -$50,000 | -$5,500 |
|  | **$2,782,498.71** | **$602,012.50** |
|  | $6,164.29 |  |

In the context of this case, these differences are not material. Combining the accountings, the differences are less than half of one percent of all amounts accounted for:

**Combined accountings**

|  | principal still due | interest still due | total amount due |
|---|---:|---:|---:|
| Receiver's accountings | $80,271,125.79 | $19,927,311.19 |  |
|  | $2,788,633.00 | $590,387.38 |  |

---

[4] Ingram report at Exhibit 4-1, page 2.
[5] Ingram report at Exhibit 4-2, page 1.

|  |  | $83,059,758.79 | $20,517,698.57 | $103,577.487.36 |
|---|---|---|---|---|
| Donna Ingram's accountings |  | $80,242,875.79 | $19,927,311.19 |  |
|  |  | $2,782,498.71 | $602,012.50 |  |
|  |  | $83,025,374.50 | $20,529,323.69 | $103,554,698.19 |
|  |  | $34,384.29 |  | $22,789.17 |
|  |  | 0.04% |  | 0.02% |

These differences are insignificant and should not detain the jury at trial. Given the forgoing, there can be no genuine dispute, that the combined total amount due under the notes is, at minimum, $103,554,698.19, of which principal due is $83,025,374.50.

### c. Combined total net losses are $53,452,467.13.

Defendants in this case and its related cases have long argued that investors are not entitled to the total amounts due under their notes but instead only to their net losses. In February 2024, this Court settled the debate: Investors are entitled to their net losses. [127]

There is no genuine dispute as to how to calculate an investor's net loss. The math is straightforward: You take the principal still due under the investor's notes and subtract any interest the investor ever received.

The Receiver did that straightforward math for distribution purposes. She began with persons holding one or more Madison Timber promissory notes with an amount still due. For each noteholder, she calculated the principal still due under their notes, then subtracted any interest the noteholder ever received. She determined that, of the 184 noteholders, approximately 40 did not have a net loss. For noteholders with a net loss, the total net losses were $52,015,104.91.

She then did the same math for persons holding an interest in a Madison Timber promissory note through the Alexander Seawright Timber Fund. She determined that, of those 34 investors, eight did not have a net loss. For investors with a net loss, the total net losses were $1,437,362.22.

The combined total net losses, as calculated by the Receiver, are $53,452,467.13.

### 2. There is no basis for reducing the $53 million in net losses.

#### a. Ingram's "aggregation" does not reduce total net losses.

Ingram calculated combined total net losses to be $51,919,370.30 ($50,474,085.05 for persons holding one or more Madison Timber promissory notes with an amount still due and $1,445,285.25 for persons holding an interest in a Madison Timber promissory note through the Alexander Seawright Timber Fund). The difference between the Receiver's and Ingram's combined total net losses is $1,533,096.83.

The difference is not a matter of methodology. Ingram did the same math the Receiver and her expert did (principal due minus any interest ever received).

Instead, the difference is that Ingram, in her words, "aggregated" certain investors.[6] That is, after the fact, she presumed "economic relationships" between husbands and wives, LLCs and their members, and IRA accounts and their owners. For these "related" investors, she disregarded the investors' separateness. If two separate noteholders were married, for instance, she treated them as one investor. The effect of this "aggregation" was to apply one noteholder's net win to

---

[6] Ingram report at 15 (disagreeing with the Receiver's accounting because it "sometimes treat[s] a married couple who invested jointly, a person and his wholly owned investment vehicle, or a person who invested from more than one account as multiple investors"); *id.* at 16:

> I tried to use economic reality (i.e., whether multiple "investors" as listed in Mills' and Lefoldt's accountings actually were a single economic unit) to determine the identities of investors. For example, if a person invested money both from his Individual Retirement Account and his savings account, then I treated the investing activity as coming from a single investor. Or if a husband and wife jointly invested from a single account, then I treated them together. Or if a person invested both individually and through a single-member LLC, then I treated them as a single investor.

reduce the other's net loss. A husband who has a net win, for instance, erases or reduces his wife's net loss and entitlement to recovery. Ingram's "aggregation" reduced combined total net losses by $1,533,096.83.

The Receiver, for her accounting purposes, looked to the noteholder. The noteholder received any payments pursuant to the notes. If any payments are still due, they are due to that noteholder. If a wife held notes separately from her husband, the Receiver calculated her net losses, if any, separately. The Receiver did not treat husbands and wives, LLCs and their members, and IRA accounts and their owners as one investor. The Receiver did not systematically investigate every single investor for the purpose of making a personal judgment about their private relationships, economic or otherwise.[7]

Defendants thus far have pointed the Receiver to no authority which requires the Receiver herself to "aggregate" any investors. It warrants observation that, under Mississippi law, business entities such as LLCs are separate and distinct from their owners. *Edmonson v. State*, 301 So. 3d 108, 113–14 (Miss. Ct. App. 2020) ("We recognize that a basic principle under Mississippi law is 'that a corporation possesses a legal existence separate and apart from that of its officers and shareholders,' and that the same principle applies in the limited liability company (LLC) context.") (citations omitted). Mississippi law plainly does not support Ingram's "aggregation."

---

[7] Such a costly undertaking would not have been a good use of resources in any event. Defendants, however, did just that through their investor discovery. They subpoenaed investors for depositions primarily for the purpose of interrogating them about their personal and economic relationships. Ingram's "aggregation" reflects nothing more than Defendants' personal judgment that two "related" investors ought to be treated as one.

Even indulging Ingram's "aggregation," the effect is to reduce the combined net losses by $1,533,096.83 only. That difference is not insignificant, but it is still only a 2.86% difference. Given the time and resources Defendants expended on the effort, they surely expected a better result. All things considered, they cannot credibly contend the Receiver should have undertaken the same investigation. In the end, Ingram's own combined net losses are still approximately $52 million.

For what it is worth, Defendants Jon Seawright and Brent Alexander did not "aggregate" investors for their own accounting purposes.[8] Their calculation of net losses for persons who invested in the Alexander Seawright Timber Fund did not treat husbands and wives, LLCs and their members, and IRA accounts and their owners as one investor. They, like the Receiver, treated each investor who invested in his or her own name as a separate investor.

Because no authority requires the Receiver to "aggregate" investors, and Mississippi law does not support it, there is no basis for reducing the combined net losses as calculated by the Receiver. Those combined net losses are $53,452,467.13.

---

[8] See, e.g., ASTFI 001728, Exhibit 3, (separately accounting for net losses for investor who invested personally and through an IRA account). See also Seawright depo., Exhibit 4, at 171:20-173:9, explaining how he accounted for investors who invested in different capacities:

> Q. . . . [Y]ou write, "On the timber, you have two series of units. The first relates to Holmes County. The second, your IRA, relates to Scott County. Does this sentence indicate that he had invested both in his personal capacity and through his iRA?
> A. Does that sentence suggest it?
> Q. Yes.
> A. Yeah.
> Q. Yes?
> A. Yeah.
> Q. And that's consistent with your recollection?
> A. He was – I recall him investing in two different capacities.
> Q. Okay. And consistent with your testimony earlier, you would have issued him checks in those two different capacities – or would have issued checks in those two different capacities, I should say, one to the IRA and on to him personally?
> A. I believe – definitely one to the IRA. I think his personal investment was through a single member LLC. I can't remember the name of it, but I believe there was an entity that he owned.
> Q. Sir, for that clarification, I thank you for that. One check would have gone to the IRA; one check would have gone to the LLC?
> A. Correct.
> Q. Likewise, one K-1 would have gone to the IRA; one K-1 would have gone to the LLC; is that correct?
> A. Correct.
> Q. And there would have been separate subscription agreements for each of the LLC and the IRA?
> A. There should have been.

### b. Alleged total net winnings do not reduce total net losses.

Defendants instructed Ingram to identify every investor in the history of Madison Timber and to calculate for each their net winnings. Ingram identified 158 such investors, for an alleged total net winnings of $15,612,160.71.[9]

Defendants argue the Receivership Estate's damages should be reduced by $15,612,160.71. Defendants have pointed to no legal authority for the proposition that alleged total net winnings operate to reduce total net losses.

Defendants argue the Receiver had a duty to sue net winners, and if she had, she would have recovered $15,612,160.71. There are numerous problems with Defendants' argument.

1. The Receiver has no duty to sue anyone. The Receiver has a duty to recover money and assets for the benefit of victims. She necessarily undertakes to perform that duty as cost effectively as possible. Suing 158 investors would not have been cost effective. Indeed, other receivers have been criticized for wasteful litigation. *E.g., Sec. & Exch. Comm'n v. Stanford Int'l Bank, Ltd.*, 927 F.3d 830, 845 (5th Cir. 2019) (observing query as to "the benefits to be reaped, other than in the Receiver's legal fees, from these time-consuming suits against relatively poor former employees targeted by the Receiver").

2. There is no factual support for the proposition that if the Receiver had sued net winners she would have recovered $15,612,160.71. Defendants presume that all 158 lawsuits against 158 alleged net winners would have a 100% recovery, with no costs. That presumption is preposterous. The reality is that any recovery under any circumstances is highly speculative. But the

---

[9] Ingram depo., Exhibit 5, at 66:3-8; *id.* at 76:2-12.

circumstances here include the fact that many of the alleged net winners are deceased, missing, or elderly.[10] Ingram did not account for such obvious obstacles to recovery.[11]

3. The Receiver's decisions are not wrong because Defendants would have done things differently. Defendants contemplate a world in which their lawyers dictate the Receiver's strategy. But the Receiver "is an officer ... of the court," not Defendants' agent. *Zacarias*, 945 F.3d at 896 (quotations omitted). Whether the Receiver fulfills her duties is a matter of this Court's discretion. *See also Janvey v. GMAG, L.L.C*, 98 F.4th 127, 132–33 (5th Cir. 2024) ("A district court's actions in supervising an equity receivership are also reviewed for an abuse of discretion.") (quotation omitted).

---

[10] See, e.g., Ingram depo. at 87:6-19 ("Q. Are you aware that [net winner] is deceased? A. I may have a note to that effect, but I don't recall. There were several of them that have since passed away. I do not know if he was one of them. Q. All right. Did you do any investigation into whether [net winner] prior to his death had any financial capacity to make any payments to the receiver? A. I would not know that, sir."); *id.* at 87:21 – 88:3 ("Q. [Net Winner], net winnings of $371,834. Are you aware that defendants in this case sought to depose [Net Winner], but could not find him? A. I was not aware of that, sir. Q. And do you have any knowledge about his financial capacity to make any payments to the receiver? A. No knowledge."); *id.* at 89:17 – 90:2 ("Q. [Net Winner], that you are showing total net winner $364,601. Do you see where I'm referring to? A. I see that, sir. Q. All right. Are you aware those net winners are deceased? A. Again, I know that some are, but I couldn't tell you which ones that I knew that or not."); *id.* at 90:4-10 ("Q. [Net Winner], recipient, net winner of $231,120. Are you aware that gentleman is deceased? A. I don't recall"); *id.* at 90:12-21 ("Q. [Net Winner], number 154? A. What is the amount, sir, so I can - - Q. $159,531. A. I see that. Q. Are you aware that she is deceased? A. Again I may have something to that notation, but I don't recall today.").

[11] Ingram depo. at 88:4 – 89:13:

> Q. And, ma'am, is that true for all of the net winners? You have no knowledge of whether a single one of them could make a payment to the receiver. Is that correct?
>
> A. That would've been outside of what I had looked at, sir.
>
> Q. Okay. But just to answer my question. The answer is no, you don't know anything about their financial capacity?
>
> A. I may have seen things in depositions or whatever. But I couldn't tell you specifically of anyone that had or did not have the capacity to do anything.
>
> Q. · And as you sit here today, is there any single recipient of payments listed on the net winners who you could say, yes, that person has the financial capacity to pay the receiver?
>
> A. And these are net winners. Okay. For clawback. I would have to look at more documents and go back and determine that. But right offhand, I can't think of anyone, because I don't know.
>
> Q. Fair enough. And when, just so we are clear, when you say that the receiver could have brought clawback actions and gotten monies in, you are really just speculating in that regard, are you not?
>
> A. I just know it is a possibility.
>
> Q. Yeah. But whether or not she could actually receive a dime in a clawback action is not known to you, is it?
>
> A. It is not.

4. When Defendants argue the Receiver should have sued net winners, they usually point to the trustee in the Madoff case. But the Madoff case is different in important respects relevant here. Madoff was an investment advisor. People gave him money, and he pretended to invest it. He sent fake statements of account, and people thought they were watching their money grow. They did not get any money back unless they withdrew it.

One single Madoff investor withdrew $2 billion right before Madoff's scheme collapsed. That investor got $2 billion; other investors got nothing. Of course the Madoff trustee sued the $2 billion investor—the Madoff case was a $7 billion case, and $2 billion was big chunk of it. That lawsuit was a good use of resources.

There is no equivalent of a $2 billion investor here. This was also a different kind of Ponzi scheme. Lamar Adams actually paid people back every month. No investor withdrew money. Every investor, no matter how big or how small, received a monthly payment. In that sense, unlike in the Madoff case, all investors were similarly situated.[12] No one withdrew before anyone else.

5. Defendants ignore the Receiver's hard work and the glaring fact that the Receiver did sue or otherwise settle with many of the alleged net winners. Ingram lists Pinnacle Trust as a net winner with net winnings of $274,350[13]—but she does not account for the fact that the Receiver settled with Pinnacle Trust for *$500,000*.[14] Ingram lists Pay Sands Inc. as a net winner with net

---

[12] Defendants' own expert Steven Rhodes, a retired bankruptcy judge, volunteered that "every Ponzi scheme is different," *see* Rhodes depo. at 88-89, but admitted that he did not know anything at all about the Madison Timber Ponzi scheme. He did not know that, unlike in the Madoff case, no investor in Madison Timber withdrew money. He did not know that, unlike in the Madoff case, every investor received a monthly payment. *See id.* at 79 ("I was actually not aware of that.").

[13] Ingram report at Exhibit 8.

[14] Ingram depo. at 65:2-8 ("Q. And are you aware of what actions the receiver took to recover those commissions from Mr. Shell? A. I do know from her estate accountings that there was a collection from Pinnacle. I do not know if that is related to anything on these commissions or not. . . But that is the extent of my knowledge."); *but see* 336, Order Approving Settlement between the Receiver and Pinnacle Trust, *S.E.C. v. Adams*, No. 3:18-cv-00252 (S.D. Miss. Mar. 7, 2022) ("The proposed settlement with Pinnacle Trust is in the best interest of the Receiver and the Receiver Estate").

winnings of $239,416.64[15]—but she does not account for the fact that the Receiver released Pay Sands Inc. of liability in exchange for Pat Sands's transfer of his share of the real estate known as Oxford Springs to the Receivership Estate, which the Receiver sold for *$5,540,000*.[16]

The Receiver estimates that the Receivership Estate already received approximately *$9,410,628.90* in value from alleged net winners on Ingram's list.[17]  But by Defendants' rationale, those (much more) valuable settlements do not excuse the alleged failure to file 158 lawsuits against all alleged net winners, no matter the waste.

The bottom line is there is no legal basis for reducing the total net losses by alleged total net winnings, and the factual basis for it is fatally flawed.

    **c. Neither investors' sophistication nor, relatedly, an absence of their "reliance," reduces damages.**

Baker Donelson's answer asserts as a defense the doctrine of "assumption of the risk." [84 at 28].  When Baker Donelson moved for investor discovery, it argued "the Receiver must establish reliance" on "specific false representations" and that "this reasonably reliance caused investors' damages." [636 at 10, *In re Consolidated Cases*, No. 3:22-cv-00036 (S.D. Miss.)]  The Receiver thus anticipates that Defendants will argue investors' sophistication or, relatedly, an absence of their "reliance," reduces total net losses.  There are at least two problems with the argument:

---

[15] Ingram report at Exhibit 8.

[16] Ingram depo, at 80:3-24 ("Q. Do you know what amount the receivership received for the sale of [Oxford Springs]? A. I know it is in the receiver accounting records, but I don't know what that is today, sir."); but see Order Approving Settlement between the Receiver and Patrick Sands, S.E.C. v. Adams et al., No. 3:18-252, [185], (S.D. Miss. Oct. 9, 2019) ("Through the proposed settlements with FNBC, Sands, and Billings, the Receivership will own 100% of Oxford Springs and can sell its property free and clear of Oxford Springs's debt to FNBC. . . the Court finds that the terms of the Settlement Agreement with Sands are adequate, fair, reasonable, and equitable.").

[17] This number is based on publicly reported settlements.

1. Reliance is not an element of any of the claims against Defendants. The complaint alleges four causes of action (civil conspiracy, aiding and abetting, negligence, and negligent retention or supervision) and, separately, vicarious liability.

Civil conspiracy has four elements: "(1) an agreement between two or more persons, (2) to accomplish an unlawful purpose or a lawful purpose unlawfully, (3) an overt act in furtherance of the conspiracy, (4) and damages to the plaintiff as a proximate result." *Rex Distrib. Co., Inc. v. Anheuser-Busch, LLC*, 271 So. 3d 445, 455 (Miss. 2019) (quotation marks and citation omitted). Reliance is not an element of civil conspiracy.

Aiding and abetting has two elements: (1) knowledge that another's conduct constitutes a breach of duty and (2) substantial assistance or encouragement in that conduct. RESTATEMENT (SECOND) OF TORTS § 876(b) ("For harm resulting to a third person from the tortious conduct of another, one is subject to liability if he . . . knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself."). Reliance is not an element of aiding and abetting.

Mississippi law does not require the Receiver to prove the specific tort of fraud or securities fraud, much less that each Defendant committed the specific tort of fraud or securities fraud 485 times (that is, for each promissory note with an amount still due), to prove civil conspiracy or aiding abetting. It is enough that Defendants participated in Adams's unlawful course of conduct. *See Rex Distrib. Co.*, 271 So. 3d at 455 ("Mitchell is alleged to have agreed to and participated in Anheuser-Busch's [unlawful] course of conduct."). Reliance is not an element of that proof.

Negligence has four elements: (1) duty, (2) breach, (3) causation, and (4) damages. *Patterson v. Liberty Assocs., L.P.*, 910 So. 2d 1014, 1019 (Miss. 2004). *See also Maldonado v. Kelly*, 768 So. 2d 906, 910 (Miss. 2000) (Recklessness "is a failure or refusal to exercise any

care."); *Turner v. City of Ruleville*, 735 So. 2d 226, 229 (Miss. 1999) ("[G]ross negligence is that course of conduct which, under the particular circumstances, disclosed a reckless indifference to consequences without the exertion of any substantial effort to avoid them."). Reliance is not an element of negligence.

The theory of vicarious liability "has its basis in the fact that the employer has the right to supervise and direct the performance of the work by his employee in all its details, and this right carries with it the correlative obligation to see to it that no torts shall be committed by the employee in the course of the performance of the character of work which the employee was appointed to do." *Gulledge v. Shaw*, 880 So. 2d 288, 295 (Miss. 2004) (cleaned up; citation omitted). There are alternative bases for vicarious liability, including ratification. "Where an employer learns of the past intentional conduct and does nothing to reprimand the employee, this acts as a ratification." *Jones v. B.L. Dev. Corp.*, 940 So. 2d 961, 966 (Miss. Ct. App. 2006) (citing *Royal Oil Co. v. Wells*, 500 So.2d 439, 446 (Miss. 1986); *Allen v. Ritter*, 235 So.2d 253, 255–56 (Miss. 1970)). Whether the basis is the employee acted in the course and scope of employment, or the employer ratified the acts, reliance is not an element of vicarious liability.

2. The argument also misses the forest for the trees. This is not a case in which a single misrepresentation or omission injured a handful of investors. Adams used Madison Timber to perpetrate one singular fraudulent scheme. By participating in that unlawful course of conduct, Defendants Jon Seawright and Brent Alexander contributed to (were a proximate cause of) Madison Timber's injuries. The damages are Madison Timber's (today, the Receivership Estate's) total debts, *see Zacarias*, 945 F.3d at 899-90; *Rotstain*, 986 F.3d at 941; Seawright's and Alexander's liability is joint and several, *see* Miss. Code Ann. § 85-5-7 (4); and Baker Donelson's vicarious liability is coextensive with Seawright's and Alexander's.

An individual investor's sophistication or, relatedly, an absence of proof of their reliance on a specific misrepresentation or omission, does not break that chain. It does not alter, much less excuse, the fact that Madison Timber was a Ponzi scheme.

### d. Settlements with other defendants do not reduce damages.

Defendants may argue the Receivership Estate's settlements with other defendants (and subsequent distributions to victims) reduce any damages they might be ordered to pay. "It is well settled that 'a defendant tortfeasor is not entitled to have damages for which he is liable reduced by reason of the fact that the plaintiff has received compensation for his injury by and through a totally independent source, separate and apart from the defendant tortfeasor.'" *Wright v. Royal Carpet Servs.*, 29 So. 3d 109, 113 (Miss. Ct. App. 2010).

To the extent Defendants argue they are entitled to a contribution or setoff for any reason, they may make their arguments in a post-trial motion.

### CONCLUSION

In sum, the Receivership Estate's damages include $53 million in net losses, and there is no basis for reducing that number, certainly not before trial.

Respectfully submitted,

| | |
|---|---|
| */s/ Lilli Evans Bass* | */s/ Kaja S. Elmer* |
| BROWN BASS & JETER, PLLC | FISHMAN HAYGOOD, LLP |
| Lilli Evans Bass, Miss. Bar No. 102896 | *Admitted pro hac vice* |
| 1755 Lelia Drive, Suite 400 | Brent B. Barriere |
| Jackson, Mississippi 39216 | Kaja S. Elmer |
| Tel: 601-487-8448 | Maggie Daly |
| Fax: 601-510-9934 | 201 St. Charles Avenue, Suite 4600 |
| bass@bbjlawyers.com | New Orleans, Louisiana 70170 |
| | Tel: 504-586-5253 |
| | Fax: 504-586-5250 |
| | bbarriere@fishmanhaygood.com |
| | kelmer@fishmanhaygood.com |
| | mdaly@fishmanhaygood.com |

**CERTIFICATE OF SERVICE**

I certify that I electronically filed the foregoing with the Clerk of Court using the ECF system which sent notification of filing to all counsel of record.

*/s/ Kaja S. Elmer*