# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
## NORTHERN DIVISION

ALYSSON MILLS, IN HER CAPACITY AS RECEIVER FOR ARTHUR LAMAR ADAMS AND MADISON TIMBER PROPERTIES, LLC,

   *Plaintiff*,

  v.

BUTLER SNOW LLP et al.,

   *Defendants*.

**Hon. Carlton W. Reeves, District Judge**
**Hon. Bradley W. Rath, Magistrate Judge**

Case No. 3:18-cv-00866-CWR-BWR

## BAKER DONELSON'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR JUDGMENT AS A MATTER OF LAW UNDER <u>FEDERAL RULE OF CIVIL PROCEDURE RULE 50(A)</u>

Craig D. Singer (*pro hac vice*)
Charles Davant (*pro hac vice*)
Benjamin W. Graham (*pro hac vice*)
William M. Schmidt (*pro hac vice*)
Paloma Cipolla Moguilevsky (*pro hac vice*)
C. Mark Aneke (*pro hac vice*)
WILLIAMS & CONNOLLY LLP
680 Maine Avenue, S.W.
Washington, DC 20024
Tel.: (202) 434-5000
Email: csinger@wc.com

James J. Crongeyer, Jr. (MSB #10536)
James M. Tyrone (MSB #102381)
WATKINS & EAGER PLLC
400 East Capitol Street, Suite 300 (39201)
Post Office Box 650
Jackson, MS 39205
Tel.: (601) 965-1900
Email: jcrongeyer@watkinseager.com

*Counsel for Defendant Baker, Donelson, Bearman, Caldwell & Berkowitz PC*

# TABLE OF CONTENTS

INTRODUCTION ..............................................................................................................1

LEGAL STANDARD........................................................................................................2

ARGUMENT......................................................................................................................3

I. THE EVIDENCE DOES NOT SUPPORT CIVIL CONSPIRACY....................................3

II. THE EVIDENCE DOES NOT SUPPORT AIDING AND ABETTING..........................9

III. THE EVIDENCE DOES NOT SUPPORT JOINT VENTURE LIABILITY ....................9

IV. THE RECEIVER CANNOT PREVAIL BECAUSE ADAMS AND MADISON
    TIMBER WERE NOT DEFRAUDED............................................................................11

V. THE EVIDENCE DOES NOT SUPPORT VICARIOUS LIABILITY ...........................11

    A. The Evidence Shows Timber Fund Was Outside the Scope of Employment........12

        1. Timber investment was not work "of the kind" Alexander and
       Seawright were employed to perform.........................................................12

        2. Alexander and Seawright were "not acting in the furtherance" of
       Baker Donelson's interests in their timber investment business ...............14

        3. Alexander's and Seawright's use of firm resources cannot support
       vicarious liability .....................................................................................16

    B. There Is No Evidence of Apparent Authority.........................................................17

    C. The Evidence Shows Baker Donelson Did Not Ratify the Actions of
       Alexander and Seawright .....................................................................................19

VI. THE EVIDENCE DOES NOT SUPPORT NEGLIGENT SUPERVISION.....................22

    A. Baker Donelson Cannot Be Liable for Negligent Supervision Absent an
       Underlying Tort, Which the Evidence Does Not Support .....................................22

    B. Baker Donelson's Alleged Negligence Did Not Proximately Cause the
       Receiver's Alleged Harm......................................................................................22

    C. Baker Donelson Had No Duty to Supervise Activities Outside the Scope of
       Employment...........................................................................................................24

    D. The Evidence Shows Baker Donelson Had No Knowledge of Any Tendency
       of Alexander and Seawright to Commit the Types of Wrong Alleged..................24

E. The Receiver Has Not Shown Baker Donelson Breached the Duty to Supervise ...................................................................................................26

    1. The Receiver's evidence did not articulate a coherent duty ......................26

    2. In all events, Baker Donelson did not fail to enforce its policies ..............28

VII. THE EVIDENCE DOES NOT SUPPORT $53 MILLION IN DAMAGES.....................31

A. The Receiver Cannot Recover the Debts of the Estate as Damages.....................31

B. The Receiver Did Not Adduce Competent Evidence of Damages........................32

C. Alexander and Seawright Did Not Proximately Cause $52 Million in Losses......33

VIII. THE EVIDENCE DOES NOT SUPPORT PUNITIVE DAMAGES ...............................33

IX. THE COURT SHOULD DECIDE OTHER ISSUES AS A MATTER OF LAW............34

A. AS LLC and ASTFI LLC Were Not Clients of the Firm .....................................34

B. The Receiver Has Abandoned Her Fraudulent Transfer Act Claim and Any Assigned Claims ..................................................................................................34

C. The Receiver's Claims Are Barred by *In Pari Delicto*..........................................35

CONCLUSION................................................................................................................35

**TABLE OF AUTHORITIES**

**CASES**

*Abreu v. Bank of Am. Corp.*, 812 F. Supp. 2d 316 (S.D.N.Y. 2011) ...........................................8, 9

*Adams v. Hughes*, 191 So. 3d 1236 (Miss. 2016) ...........................................................................10

*Andrew Jackson Life Ins. Co. v. Williams*, 566 So. 2d 1172 (Miss. 1990) ....................................17

*Armstrong Bus. Servs., Inc. v. AmSouth Bank*, 817 So. 2d 665 (Ala. 2001) ..................................24

*Baker Donelson Bearman Caldwell & Berkowitz, P.C. v. Seay*, 42 So. 3d 474 (Miss. 2010) ...........................................................................................................................12, 15, 16, 24

*Bolton v. John Lee, P.A.*, 405 So. 3d 1 (Miss. Ct. App. 2023) .......................................................11

*Bradley v. Kelley Bros. Contractors*, 117 So. 3d 331 (Miss. Ct. App. 2013) ...................................3

*Campbell v. Novartis Pharm. Co.*, 2020 WL 3452240 (S.D. Miss. Mar. 30, 2020) .....................24

*Com. Bank v. Hearn*, 923 So. 2d 202 (Miss. 2006) ................................................................ passim

*Dickens v. A-1 Auto Parts & Repair, Inc.*, 2018 WL 5726206 (S.D. Miss. Nov. 1, 2018) .............9

*Doe ex rel. Doe v. Salvation Army*, 835 So. 2d 76 (Miss. 2003) ....................................................34

*Eagle Motor Lines v. Mitchell*, 78 So. 2d 482 (Miss. 1955) ...............................................24, 25, 26

*Eaton v. Porter*, 645 So. 2d 1323 (Miss. 1994) ..............................................................................19

*Ebert v. DeJoria*, 922 F.3d 690 (5th Cir. 2019) .............................................................................31

*Faul v. Perlman*, 104 So. 3d 148 (Miss. Ct. App. 2012) ...............................................................23

*Forest Hill Nursing Ctr., Inc. v. McFarlan*, 995 So. 2d 775 (Miss. Ct. App. 2008) .....................18

*Franklin v. Turner*, 220 So. 3d 1003 (Miss. Ct. App. 2016) .........................................................21

*Freeman v. Lester Coggins Trucking, Inc.*, 771 F.2d 860 (5th Cir. 1985) .....................................22

*Gallagher Bassett Servs., Inc. v. Jeffcoat*, 887 So. 2d 777 (Miss. 2004) .........................................3

*Guile v. United States*, 422 F.3d 221 (5th Cir. 2005) .....................................................................32

*Gulledge v. Shaw*, 880 So. 2d 288 (Miss. 2004) ..............................................................12, 14, 16

*Henderson ex rel. Henderson v. Simpson Cnty. Pub. Sch. Dist.*, 847 So. 2d 856 (Miss. 2003) ......................................................................................................................................23

*Hults v. Tillman*, 480 So. 2d 1134 (Miss. 1985) ........................................................................9, 10

*In re Evans*, 467 B.R. 399 (Bankr. S.D. Miss. 2011) ......................................................................9

*In re On-Site Fuel Service, Inc.*, 2020 WL 3712868 (S.D. Miss. 2020)...........................................9

*In re SI Restructuring, Inc.*, 532 F.3d 355 (5th Cir. 2008) ...........................................................31

*James v. Antarctic Mech. Servs., Inc.*, 2020 WL 86209 (S.D. Miss. Jan. 7, 2020) ........................34

*Javier v. City of Milwaukee*, 670 F.3d 823 (7th Cir. 2012) ...........................................................21

*Jennings v. McCormick*, 154 F.3d 542 (5th Cir. 1998).....................................................................3

*JESCO Constr. Corp. v. Wells Fargo Bank, N.A.*, 579 F. Supp. 3d 827 (S.D. Miss. 2022)...........34

*Joan Cravens, Inc. v. Deas Constr. Inc.*, 2016 WL 6997508 (S.D. Miss. Nov. 30, 2016)............18

*Johnson v. Sawyer*, 47 F.3d 716 (5th Cir. 1995)..............................................................................22

*JP Morgan Chase Bank v. Winnick*, 406 F. Supp. 2d 247 (S.D.N.Y. 2005) ..................................33

*Kaiser Steel Corp. v. Mullins*, 455 U.S. 72 (1982) ........................................................................10

*Kirschner v. Grant Thornton LLP*, 2009 WL 1286326 (S.D.N.Y. Apr. 14, 2009) ................31, 32

*Life & Cas. Ins. Co. of Tennessee v. Bristow*, 529 So. 2d 620 (Miss. 1988)................................33

*Marlin v. Moody Nat'l Bank, N.A.*, 248 Fed. App'x 534 (5th Cir. 2007).........................................8

*McDorman ex rel. Connelly v. Texas-Cola Leasing Co. LP, LLP*, 288 F. Supp. 2d 796
(N.D. Tex. 2003).......................................................................................................................23

*Morgan v. MML Invs. Servs., Inc.*, 226 So. 3d 590 (Miss. Ct. App. 2017) ...................................17

*MultiPlan, Inc. v. Holland*, 937 F.3d 487 (5th Cir. 2019) ...............................................................3

*Northlake Dev. L.L.C. v. BankPlus*, 60 So. 3d 792 (Miss. 2011) ..................................................20

*Okoloise v. Yost*, 283 So. 3d 49 (Miss. 2019)................................................................................10

*Orr v. Morgan*, 230 So. 3d 368 (Miss. Ct. App. 2017)..................................................................33

*Patriot Com. Leasing Co. v Jerry Enis Motors, Inc.*, 928 So. 2d 856 (Miss. 2006).....................17

*Peoples Bank v. Bryan Bros. Cattle Co.*, 504 F.3d 549 (5th Cir. 2007).......................................10

*Pettis v. Simrall*, 354 So. 3d 295 (Miss. 2023) .............................................................................34

*RGH Enters., Inc. v. Ghafarianpoor*, 329 So. 3d 447 (Miss. 2021) .............................................12

*Smith v. City of McComb, Mississippi*, 2017 WL 3687334 (S.D. Miss. Aug. 25, 2017)..............27

*Smith v. Redd*, 593 So. 2d 989 (Miss. 1991).......................................................................10

*Sneed v. Ford Motor Co.*, 735 So. 2d 306 (Miss. 1999)........................................................35

*Tharp v. Bunge Corp.*, 641 So. 2d 20 (Miss. 1994)................................................................3

*Thompson v. Pass Christian Public School District*, 758 F. Supp. 3d 594 (S.D. Miss. 2024) .........................................................................................................27, 28, 29

*Tichenor v. Roman Catholic Church of Archdiocese of New Orleans*, 32 F.3d 953 (5th Cir. 1994) ...............................................................................................12

*United States v. Oti*, 872 F.3d 678 (5th Cir. 2017) ................................................................8

*United States v. Vasquez*, 677 F.3d 685 (5th Cir. 2012)........................................................8

*Wiand v. ATC Brokers Ltd.*, 96 F.4th 1303 (11th Cir. 2024)................................................11

*Williamson v. Daniels*, 748 So. 2d 754 (Miss. 1999) ...........................................................23

*Zacarias v. Stanford Int'l Bank, Ltd.*, 945 F.3d 883 (5th Cir. 2019) .....................................11

*Zervas v. Faulkner*, 861 F.2d 823 (5th Cir. 1988) .................................................................8

**STATUTES**

Miss. Code § 15-3-101 ...........................................................................................................34

Miss. Code § 11-1-65.............................................................................................................34

Miss. Code § 79-10-67...................................................................................................11, 12

Miss. Code § 79-10-5.............................................................................................................12

**OTHER AUTHORITIES**

Fed. R. Civ. P. 50...............................................................................................................2, 35

Fed. R. Evid. 702 ..................................................................................................................32

Restatement (2d) of Agency § 261 .......................................................................................17

Restatement (2d) of Torts § 876 ............................................................................................9

**INTRODUCTION**

The Court should grant Baker Donelson judgment as a matter of law. At the close of her case, the Receiver has not adduced evidence from which a jury could find in her favor.

The Receiver cannot prove her claims for civil conspiracy or aiding and abetting (Counts I and II). Both require evidence that Brent Alexander and Jon Seawright *knew* Lamar Adams was engaged in fraud—and chose to participate in his Ponzi scheme. The evidence cannot support that claim. *See* **Parts I & II**.

The Receiver cannot prove her claim for joint venture liability against Alexander and Seawright, assuming she is even attempting to assert that claim against Baker Donelson which obviously never entered into any joint venture. That claim sounds in contract. Because the evidence cannot show a meeting of the minds to join Adams' fraud, the claim fails. Alternatively, if the Receiver could prove a common fraudulent venture, the agreement is unenforceable as an illegal contract. And, in all events, the trial testimony shows that Alexander and Seawright neither controlled Madison Timber nor participated in its profits. *See* **Part III**.

The Receiver also cannot prove the elements of her torts because she stands in the shoes of Adams and Madison Timber—and they were not defrauded. *See* **Part IV**.

Assuming the Receiver could prove her direct claims against Alexander and Seawright, she still cannot establish liability against Baker Donelson. Alexander and Seawright were not acting within the scope of their employment or in furtherance of Baker Donelson's interests. Nor did the firm ratify their alleged participation in Adams' fraud. To the contrary, the evidence shows the firm consistently told the world their personal business was separate. The evidence also shows Alexander and Seawright maintained their innocence until after they left the firm. That the firm did not fire them based on denied allegations proves nothing. *See* **Part V**.

The Receiver also cannot prove negligent supervision. That claim requires a predicate

1

tort by the supervised employees, and she cannot prove the ones she has alleged. But Baker Donelson would not be liable in any event. First, there is no proximate causation because Alexander's and Seawright's alleged intentional participation in a Ponzi scheme is not a reasonably foreseeable consequence of the firm's alleged failure to enforce its policies concerning their use of firm resources and solicitation of clients. Second, the Receiver has not adduced evidence to establish any negligence. *See* **Part VI**.

Assuming liability, the Receiver has not adduced sufficient evidence of damages. Her expert admitted he did nothing to assess the necessary inputs to her $52 million of net losses to Madison Timber investors. For her part, the Receiver failed to move into evidence the bank records and promissory notes on which she purported to rely. And even if that damages figure were properly before the jury, the Receiver failed entirely to establish proximate causation. Not a single investor outside of Alexander Seawright Timber Fund I, LLC testified to any relationship with Alexander, Seawright, or Baker Donelson. *See* **Part VII**. On the facts adduced, punitive damages are unavailable as a matter of law. *See* **Part VIII**.

Finally, the Court should resolve other discrete issues. The Receiver has suggested that Alexander Seawright Timber Fund I, LLC and/or Alexander Seawright LLC are clients of Baker Donelson. The evidence supports no such claim, which will confuse the jury if allowed to linger. The Receiver has abandoned her fraudulent transfer claim (Count IV), and judgment should be entered on that count. And the evidence has only confirmed that the claims of the Receiver— who stands in the shoes of Lamar Adams—are barred by *in pari delicto*. *See* **Part IX.**

## LEGAL STANDARD

Judgment as a matter of law is appropriate "[i]f a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." Fed. R. Civ. P. 50(a)(1). The Court should

grant the motion if it "believes that reasonable [jurors] could not arrive at a contrary verdict," with inferences drawn and facts considered in light favorable to the nonmovant. *Jennings v. McCormick*, 154 F.3d 542, 546 (5th Cir. 1998).

## ARGUMENT

### I. THE EVIDENCE DOES NOT SUPPORT CIVIL CONSPIRACY

Civil conspiracy has four elements: "(1) an agreement between two or more persons, (2) to accomplish an unlawful purpose or a lawful purpose unlawfully, (3) an overt act in furtherance of the conspiracy, (4) and damages to the plaintiff as a proximate result." ECF No. 335 at 18 (quoting *Rex Distrib. Co., Inc. v. Anheuser-Busch, LLC*, 271 So. 3d 445, 455 (Miss. 2019)). "It is elementary" that "persons must agree . . . in order for a conspiracy to exist." *Gallagher Bassett Servs., Inc. v. Jeffcoat*, 887 So. 2d 777, 786 (Miss. 2004); *see also MultiPlan, Inc. v. Holland*, 937 F.3d 487, 495 (5th Cir. 2019) ("[T]here must be a '***meeting of the minds on the object or course of action***.'" (quoting *S. Health Corp. v. Crausby*, 174 So. 3d 916, 920 (Miss. Ct. App. 2015))). As the Court recognized, ECF No. 70 at 9 n.7, Mississippi courts have held that "[f]or a civil conspiracy to arise, the alleged confederates must be aware of the fraud or wrongful conduct at the beginning of the agreement," *Bradley v. Kelley Bros. Contractors*, 117 So. 3d 331, 339 (Miss. Ct. App. 2013).

The Receiver must prove these elements by clear and convincing evidence. *Tharp v. Bunge Corp.*, 641 So. 2d 20, 27 (Miss. 1994) ("[C]onspiracy to defraud carries with it the 'fraud' burden of proof—by clear and convincing evidence"); *see also* Vol. 4 (25:17-21) (Barriere: "we have a high hurdle here"). Under that or any other standard, the Receiver has not adduced "evidence from which a jury could find an agreement existed between [] Adams, Seawright, and Alexander." ECF No. 335 at 18.

*First*, there is no direct evidence of conspiracy. Each of the three alleged co-conspirators

3

(Alexander, Seawright, and Adams) denied such an agreement.  Alexander testified "we did not know this was a Ponzi scheme.  We did not know it was a fraud."  Vol. 5 (15:19-16:15); *see also id*., (112:13-20); Vol. 6 (21:9-12).  Seawright said the same.  *See, e.g.*, Vol. 9 (187:3-12).

Adams testified that "until April 2018, when [he] turned [him]self in to the FBI, [he] didn't tell anyone that the timber deals weren't real" and "didn't think anyone else knew or thought" those deals were fraudulent.  Vol. 3 (9:11-21).  He was unequivocal that "Seawright and [] Alexander . . . didn't know that this was a Ponzi scheme."  Vol. 3 (12:10-14).  He agreed that "people who invested in the Ponzi scheme, they wouldn't know it was a Ponzi scheme."  Vol. 3 (12:5-10).  That is because "they wouldn't invest in" a criminal enterprise and allow the Ponzi schemer to steal their money.  *Id.*  Alexander and Seawright invested their own money, along with the funds of friends and family.  Vol. 6 (24:6-25); Vol. 5 (123:19-124:10) (describing "friends" and "godfather to my children" among investors).  Adams thought Alexander and Seawright "believed everything [he] w[as] telling them"—otherwise, they "wouldn't have done the deal."  Vol. 3 (70:24-71:11).  What he told them, and what they believed, were all lies.  *See* Vol. 3 (169:9-21).  Adams "fooled everybody."  Vol. 3 (163:20-164:15).

Adams' testimony has been consistent, from the day of his FBI interview through his deposition to trial.  *See* D-1637; Vol. 3 (9:11-14).  The Receiver received a writ to bring Adams to court to testify live.  She had the opportunity to challenge his testimony and procure from him some evidence of an agreement or civil conspiracy.  There was none.  And Adams had every incentive to assist the Receiver in pursuit of her claims.  After all, she is seeking to pay off his debts to investors, and Adams was "hoping that Ms. Mills and the United States Attorney's Office could put in a good word for [him]" after his testimony to help him "earn home confinement credits" to reduce his remaining term in prison.  Vol. 3 (161:22-162:12).

*Second*, there is no documentary evidence of a conspiracy.  The documents instead refute

4

the notion that Alexander or Seawright knew of Adams' Ponzi scheme. Not one of the hundreds of emails in evidence suggests Alexander and Seawright knew the timber deals were fake. On the contrary, they asked many questions of Adams, such as about insurance, that would not make sense if they were in on the scheme. They asked to see documents, such as timber contracts, they would not have needed to see if they knew Adams had no such contracts. Even privately between themselves, they considered the transactions to have little risk because one of the only risks was that "Lamar is a fraud *but no evidence of that*." D-443; Vol. 5 (122:3-123:8).

*Third*, none of the alleged co-conspirators *acted* like this was a conspiracy. To the contrary, the evidence is clear that Alexander and Seawright treated their business with Madison Timber like a legitimate, arms-length transaction with a third party. They even presented their business model to "independent audit and independent due diligence" with various financial professionals. Vol. 5 (105:8-21); Vol. 6 (46:22-47:3) (inviting scrutiny from "professional investment advisor"); *id*. (47:22-48:13) (from "a very, very shrewd and savvy individual with a lot of expertise in financial models, and at that time he was an investment banker with Morgan Stanley"); *id*. (82:10-18) (from "a really smart guy . . . number one in his class in mathematics, Harvard MBA . . . became the investment officer at Smith Shellnut); P-315, P-316, P-317, P-322, P-1262, D-671, D-1985. Adams was "concerned that investors would speak with people expert in the business and raise issue as to how [he] could possibly pay those returns," Vol. 2 (205:18-21), and that is precisely what they did. That is not the conduct of co-conspirators.

Adams, by contrast, was actively working to dupe and defraud Alexander and Seawright. Before the first loan, he discussed with Alexander and Seawright at length the structure and nature of the proposed deal. *See* Vol. 3 (60:18-71:4); D-426. The story he told was a lie. He "provided them with title opinions that were fake title opinions," Vol. 2 (189:14-16); he forged all of the timber deeds underlying their loans, *id*. (177:21-178:3); he created and then provided

fake "mill contracts" to Seawright, *id*. (192:7-11, 195:6-8); he "made up from scratch" the "cruise summary" for each transaction, Vol. 3 (96:6-20); he "explained . . . away" his lies about the mills shutting down in December with a false story about "maintenance," Vol. 2 (202:8-12); he required that Alexander and Seawright agree by contract to file the timber deeds only in the event of default, a requirement he "impose[d]" because "it was a fake timber deed," *id*. (179:7-20). Adams even invented stories about tracts of land that were "no longer available," Vol. 3 (83:11-20), a story that "ma[de] the business seem more legitimate" to Seawright, Vol. 9 (73:19-25). If Alexander and Seawright had agreed with Adams to steal money from investors, there was no reason for Adams to lie about unavailable tracts. All of the timber rights were fake.

*Fourth*, Alexander's and Seawright's guilty pleas are no evidence of conspiracy **with Adams**. At summary judgment, the Receiver argued there is "direct evidence" of conspiracy because "Seawright and Alexander both pleaded guilty to it." ECF No. 259 at 11. She read the bills of information—and the resulting pleas—to include Adams (the "timber broker") among the co-conspirators. *Id.*; *see also* ECF No. 302 at 2 (quoting the Receiver's counsel representing that "Jon pleaded guilty to conspiring with Lamar Adams"). The evidence does not support the Receiver's misreading of the guilty pleas. Alexander and Seawright conspired **with each other**. P-1227 (Alexander "did knowingly and intentionally conspire with" Seawright); P-1228 (same). The bills of information do not identify any unindicted co-conspirator. Nor do they state that Alexander and Seawright conspired to steal investors' money, as Adams did. Alexander and Seawright pled guilty because they lied to their investors when (1) they promised to perform certain due diligence and (2) when they failed to disclose the separate, upfront payment from Madison Timber to Alexander Seawright LLC. *See, e.g.*, Vol. 5 (113:7-114:21) (Alexander); Vol. 8 (197:23-198:6) (Seawright). No reasonable jury could conclude that Alexander and Seawright pled guilty to conspiring with Adams. Alexander and Seawright could have defrauded

6

their investors and used their funds to invest in entirely legitimate business. In that case, they would have committed a crime, even if Adams did not exist. Conversely, they could never have lied to their investors and still been victims of Adams' fraud. The fraud to which Alexander and Seawright pled is distinct from the fraudulent conspiracy the Receiver must prove.

At trial, the Receiver sought to conflate Alexander's and Seawright's dealings with their investors, on the one hand, with Alexander Seawright Timber Fund I, LLC's subsequent loans to Madison Timber, on the other. *See* Vol. 2 (181:11-183:14) (asking Adams to confirm he received equity term sheets from Alexander and Seawright). But Adams was clear on cross-examination that he had nothing to do with the representations Alexander and Seawright made to their investors. *See, e.g.*, Vol. 3 (213:5-214:2). Adams did not recall "ever see[ing]" an equity term sheet before trial and agreed it "has nothing to do with Madison Timber." *Id.* He agreed that, "to the extent you were made to feel like [the subscription agreement] was part of the closing between Madison Timber and Alexander Seawright Timber Fund I, that would have been a mistake." *Id.* (215:7-12). The Receiver failed in her efforts to conflate Alexander's and Seawright's admitted fraud with the broader conspiracy she alleges.

*Fifth*, accusations of ***negligence*** cannot create an agreement. Without evidence of intentional misconduct, the Receiver attacked Alexander and Seawright for failing to discover Adams' fraud. She confronted them with the language of their pleas: "if you had made such inquiries, you ***would have discovered*** that the timber deeds, lumber mill agreements, and related documents were false." Vol. 6 (162:6-8); *see also, e.g.*, Vol. 4 (73:7-8) ("But you didn't know he was a crook because you didn't look."); *id.* (17:11-15) ("Q. So you were a victim, but you were primarily a victim, sir, because you hadn't done the due diligence you promised . . . because you didn't look."). To be clear: The Receiver's position at trial has been that Alexander and Seawright ***failed to discover***—and that they ***did not know*** Adams was engaged in fraud.

The jury cannot reasonably infer actual knowledge from negligence, given all of the indicia in the record that Alexander and Seawright lacked such knowledge.  *See, e.g.*, *Marlin v. Moody Nat'l Bank, N.A.*, 248 Fed. App'x 534, 540 (5th Cir. 2007) ("Although the situation may present 'good reason to believe' that the 'existence and object of the conspiracy could have been discovered . . . by the exercise of the slightest degree of diligence,' such evidence alone does not support a reasonable inference of actual knowledge or an intent to participate in the wrong."). The inference would be based on nothing but conjecture and run counter to the record evidence. *Zervas v. Faulkner*, 861 F.2d 823, 836-37 (5th Cir. 1988) ("Although a conspiracy is usually proved by circumstantial evidence, . . . vital facts may not be proved by unreasonable inferences from other facts and circumstances or by piling inference upon inference.").  As Adams testified, "the investors all believed all of this" and "[n]o one ever questioned it."  Vol. 3 (17:18-22).

The Receiver hopes she can turn negligence into willful blindness—and from there meet her burden of actual knowledge.  *See, e.g.*, Vol. 6 (161:17-23) ("So you've claimed you didn't know, sir, but you certainly blinded yourself, didn't you? . . . You had the means and you blinded yourself?"); Vol. 8 (190:7-9) ("Well, is that not because you were willfully blind to what he was doing?  No.").  But that is not the law.  The Receiver has never identified a Mississippi case finding liability for civil conspiracy with the standard of willful blindness.  Nor do other states permit such arguments.  *See, e.g.*, *Abreu v. Bank of Am. Corp.*, 812 F. Supp. 2d 316, 322-23 (S.D.N.Y. 2011) (noting the "overwhelming weight of authority holds" aiding and abetting requires actual knowledge not "a lower standard such as recklessness or willful blindness").

In any event, a willful blindness instruction would be improper on the evidence adduced. The Receiver would need to show (1) that Alexander and Seawright were "subjectively aware of a high probability" of Adams' fraud and (2) that they "purposefully contrived to avoid learning" of his fraud.  *United States v. Oti*, 872 F.3d 678, 697 (5th Cir. 2017); *see also United States v.*

8

*Vasquez*, 677 F.3d 685, 696 (5th Cir. 2012) ("[T]he essence of deliberate ignorance is [saying,] 'Don't tell me, I don't want to know.'").  The evidence does not support that argument, even if it were an available theory under Mississippi law.

## II.     THE EVIDENCE DOES NOT SUPPORT AIDING AND ABETTING

This cause of action is unavailable under Mississippi law.  *In re Evans*, 467 B.R. 399, 409 (Bankr. S.D. Miss. 2011); *In re On-Site Fuel Service, Inc.*, 2020 WL 3712868, at *25-26 (S.D. Miss. 2020).  In any event, the Receiver cannot prove such a claim by clear and convincing evidence on the record adduced (or, indeed, by a preponderance of the evidence).

A party can be liable for aiding and abetting only where he "***knows*** that the other's conduct constitutes a breach of duty[.]"  Restatement (2d) of Torts § 876(b) (emphasis added). Evidence that a defendant "should have known about the dangers" of an alleged confederate's fraud falls short of showing the defendant "knew" about it, and thus fails to establish an aiding and abetting claim.  *Dickens v. A-1 Auto Parts & Repair, Inc.*, 2018 WL 5726206, at *3 (S.D. Miss. Nov. 1, 2018).  Mere "possession of information that would cause a person exercising reasonable care and due diligence to become aware of the fraud [] is insufficient" to establish a claim of aiding and abetting.  *Abreu v. Bank of Am. Corp.*, 812 F. Supp. 2d 316, 322-23 (S.D.N.Y. 2011) (noting the "overwhelming weight of authority holds" aiding and abetting requires actual knowledge not "a lower standard such as recklessness or willful blindness").

For the reasons above, the Receiver has failed to establish that Alexander or Seawright knew of Adams' fraud and intended to participate in furthering the fraud.

## III.    THE EVIDENCE DOES NOT SUPPORT JOINT VENTURE LIABILITY

A joint venture "exists when two or more persons combine in a joint business enterprise for their mutual benefit with an understanding that they are to share in profits or losses and each to have a voice in its management."  *Hults v. Tillman*, 480 So. 2d 1134, 1142 (Miss. 1985).

Because a "joint venture is a form of contract," both parties must have the same intent in forming their joint venture. *Id.* at 1143. The alleged joint venture is defrauding investors in a Ponzi scheme. (The Receiver cannot prove a joint venture to pursue legitimate deals and recover damages for Adams' undisclosed theft.) For the reasons above, the Receiver has failed to prove Alexander and Seawright shared a common intent with Adams. But even if she could prove a common intent to pursue a Ponzi scheme, Adams could not bring a claim arising out of such a joint venture because courts will not enforce an illegal contract. *Kaiser Steel Corp. v. Mullins*, 455 U.S. 72 (1982); *Okoloise v. Yost*, 283 So. 3d 49, 63 (Miss. 2019).

Any claim would also fail on the merits. To prevail, "there must be a joint proprietary interest and right of mutual control." *Adams v. Hughes*, 191 So. 3d 1236, 1242 (Miss. 2016). "Participation in the control of the business is indicative" of whether a joint venture exists. *Smith v. Redd*, 593 So. 2d 989, 994 (Miss. 1991). Adams testified that Alexander and Seawright did not participate in controlling or running Madison Timber. Vol. 3 (168:9-169:4).

"Profit sharing is perhaps the most important indicator" of a joint venture. *Peoples Bank v. Bryan Bros. Cattle Co.*, 504 F.3d 549, 557 (5th Cir. 2007). The trial evidence shows that Alexander and Seawright once contemplated a "profit share approach" with Adams, but that structure wound up "dead in the water" and was never pursued. P-440; Vol. 8 (225:17-25). Instead, the proceeds "w[ere] in the nature of wages or compensation for services rendered, [and] no inference of a partnership should be made." *Hults*, 480 So. 2d at 1146.

Finally, there can be no claim of joint-venture liability against Baker Donelson. There is no evidence that Adams thought Alexander or Seawright were acting on behalf of the firm or that they could enter into a joint venture on the firm's behalf. Baker Donelson never authorized Alexander and Seawright to form a joint venture with Adams or Madison Timber—much less to form a joint venture to pursue a Ponzi scheme.

## IV. THE RECEIVER CANNOT PREVAIL BECAUSE ADAMS AND MADISON TIMBER WERE NOT DEFRAUDED

Each of the Receiver's tort claims also fails because the Receiver cannot prove their essential elements. A receiver "stands in the shoes of the [receivership entity]." *Zacarias v. Stanford Int'l Bank, Ltd.*, 945 F.3d 883, 896 n.34 (5th Cir. 2019). She must prove the same elements Adams and Madison Timber would need to prove. But she cannot prove her intentional tort claims because Adams and Madison Timber were not defrauded or targeted by fraud.

A court-appointed receiver for a "corporation used for Ponzi schemes" does not have "a cause of action to sue in common-law tort on behalf of a Ponzi corporation," including torts of aiding and abetting fraud, breach of fiduciary duty, and negligence. *Wiand v. ATC Brokers Ltd.*, 96 F.4th 1303, 1315-16 (11th Cir. 2024). *Wiand*'s reasoning was based on tort principles that exist equally in Mississippi, including the "fundamental principle" that "[t]he law does not afford a criminal conspirator" like Adams "the right to sue his coconspirator for civil damages arising out of a criminal conspiracy." *Bolton v. John Lee, P.A.*, 405 So. 3d 1, 8 (Miss. Ct. App. 2023). The record evidence shows that Adams was not defrauded. *See, e.g.*, Vol. 3 (163:20-164:25) (Adams) ("Q. This Ponzi scheme, you operated it alone, did you not? A. Yes.").

## V. THE EVIDENCE DOES NOT SUPPORT VICARIOUS LIABILITY

The Receiver's vicarious liability claim against Baker Donelson rests solely on the conduct of Alexander and Seawright. The record not only fails to support this claim, but also it affirmatively rebuts the Receiver's vicarious liability claim. Alexander and Seawright's timber business was separate from Baker Donelson.

Mississippi law limits the vicarious liability of a professional corporation like Baker Donelson to acts of employees performed "within the scope of their employment" or "of their apparent authority to act for the corporation." Miss. Code § 79-10-67(2). Regarding a duty to

supervise, Mississippi law imposes no duty on employers "to supervise their employees when the employees are off-duty or not working," or to uncover "employees' concealed, clandestine, personal activities." *Baker Donelson Bearman Caldwell & Berkowitz, P.C. v. Seay*, 42 So. 3d 474, 489 (Miss. 2010); *see also Tichenor v. Roman Catholic Church of Archdiocese of New Orleans*, 32 F.3d 953, 960 (5th Cir. 1994) (under Mississippi law, "[e]mployers also are not liable for failure to supervise when the employee engages in independent criminal conduct").

## A. The Evidence Shows Timber Fund Was Outside the Scope of Employment

To establish Alexander and Seawright were within the scope of their employment, the Receiver must prove their actions: (i) were professional services "of the kind" they were "employed to perform," (ii) "occur[ed] substantially within the authorized time and space limits," and (iii) were "actuated, at least in part, by a purpose to serve" Baker Donelson. *Com. Bank v. Hearn*, 923 So. 2d 202, 208 (Miss. 2006); Miss. Code §§ 79-10-67(2) & 79-10-5(g). The record forecloses a finding they acted within their scope of employment in connection with the Timber Fund. Advising or selling timber investments was not a professional service "of the kind" they were employed to perform and it was not "in furtherance" of the firm's "interests." *RGH Enters., Inc. v. Ghafarianpoor*, 329 So. 3d 447, 449 (Miss. 2021).

### 1. Timber investment was not work "of the kind" Alexander and Seawright were employed to perform

Where an employee's activity is not "of the kind he is employed to perform," the relationship between the employer and employee is "temporarily suspended" because the employee's conduct is not "within the scope of the authority conferred" by the employer. *RGH*, 329 So. 3d at 449-50; *Gulledge v. Shaw*, 880 So. 2d 288, 295-96 (Miss. 2004); *see also Hearn*, 923 So. 2d at 208-09.

Baker Donelson does not employ anyone to engage in investment activities. Baker

Donelson is a law firm; it provides "legal advice" to businesses, not "business advice" or "investment advice." Vol. 12 (65:5-25); Vol. 9 (239:1-14). It does not employ "business consultants" or "investment consultants." Vol. 12 (65:5-25); *see also* Vol. 9 (239:1-14).

The record confirms Seawright's employment at Baker Donelson had nothing to do with timber investments. He joined Baker Donelson in 2001 in the health law department and that practice was "almost exclusively" what he did throughout his employment. Vol. 9 (79:21-23); P-2117. His practice at Baker Donelson focused on healthcare, which has "its very own unique legal issues" that did not "necessarily translate into other just regular business transactions." Vol. 9 (79:9-20); *id.* (206:20-22). His "professional work" at the firm never included: (i) "making loans on behalf of the firm," (ii) "investing in timber," (iii) "real estate transactions," or (iv) "recording timber deeds." Vol. 9 (84:21-85:13).

The same is true for Alexander. He was a senior public policy advisor, which included, "federal and state lobbying," "message development and media strategy for clients who were trying to engage with others in the public arena," and "advocacy campaign management." Vol. 6 (58:4-25) (Alexander). His employment at Baker Donelson did not involve: (i) "timber rights," (ii) the "timber industry," (iii) "lobby[ing] on behalf of private financing corporations making loans," or (iv) "provid[ing] any form of investment advice." *Id.* (59:9-22).

The record shows Alexander and Seawright not only intended to keep their timber investment business separate but also took concrete steps to ensure that separation. Alexander testified he and Seawright "needed to keep Alexander Seawright *completely separate and apart from Baker Donelson*" and they "made every attempt [they] could to keep it completely separate." Vol. 6 (74:18-75:3); Vol. 9 (84:7-20). The Timber Fund was a "separate corporate entity" with its own "certificate of formation," and "an operating agreement to govern decision-making, management, rights of the owners." Vol. 9 (84:7-20) (Seawright). They also (i) created

13

an "alexanderseawright.com" email address and domain, (ii) purchased "separate computers, not connected to the Baker Donelson system," and (iii) created a separate logo for the LLC. Vol. 6 (96:6-97:5). They likewise had a "separate tax ID number" and a "separate bank account" for their timber business. Vol 9 (84:7-20); D-939 (ASTFI bank account). The Receiver points to Seawright's drafting of documents, but Alexander was clear in his testimony he understood Seawright was acting for the timber fund, not Baker Donelson. Vol. 6 (149:25-150:10). And Seawright testified he was acting in his capacity as an owner, not a lawyer. Vol. 9 (87:6-14).

They told investors the same thing. Alexander testified he never told "anyone, any members, any potential investors, that [their] Timber Fund was part of Baker Donelson," that "Baker Donelson had approved the fund," or that "Baker Donelson had reviewed the fund." Vol. 6 (75:25-76:22). The only investor in the Timber Fund who testified at trial, David Wender, fully understood it was Alexander's and Seawright's side business and not part of Baker Donelson. Alexander said the same thing, both at trial and in the contemporaneous documents. *See* Vol. 6 (75:25-84:18); P-315, P-316, P-317, P-322, P-1262, D-671, D-1985.

### 2. Alexander and Seawright were "not acting in the furtherance" of Baker Donelson's interests in their timber investment business

An employee's action must have been "actuated, at least in part, by a purpose to serve" the employer for the action to be within the course of employment. Put differently, "where an employee is not acting in the furtherance of her employer's interests," the employee "ceases to be an actor on the [employer's] behalf" and "instead [becomes] a private actor seeking to accomplish [their] own private purpose." *Gulledge v. Shaw*, 880 So. 2d 288, 295-96 (Miss. 2004). In furthering the employer's interests, the benefit must be direct and material—not a "perceived, possible, indirect benefit to the employer." *Hearn*, 923 So. 2d at 209.

The Receiver cannot prove Alexander and Seawright acted in furtherance of Baker

14

Donelson's interests. *First*, the record makes clear Baker Donelson received no money or profits from the Alexander Seawright Timber Fund. John Hicks reviewed Baker Donelson's accounting system where Baker Donelson records payment information as payments are made and received. Vol. 12 (95:5-96:13). He found and testified Baker Donelson never received any payment from Madison Timber or any Alexander Seawright entity. Vol. 12 (96:3-13); *see also* Vol. 3 (105:2-4) (Adams) ("Q: And you and Madison Timber never made out checks to the law firm Baker Donelson, correct? A. Correct."); Vol. 12 (23:11-14) (Hicks) ("Q. . . . Jon and Brent's Timber Fund work, it benefited Baker Donelson, too; right? A. No.").

That is hardly surprising. Alexander and Seawright were clear their intention in forming and operating ASTFI was not to "benefit Baker Donelson." Vol. 9 (Seawright) (135:18-21); Vol. 6 (105:16-19) (Alexander) ("Q. . . . [W]as it ever your intention, when you were founding and operating the Timber Fund, for that company and that business to benefit Baker Donelson? A. No."). This was a side business, where they were making a profit for themselves.

The Receiver suggests Baker Donelson somehow benefitted—unbeknownst to it— because some ASTFI investors or entities they were affiliated with later became clients of Baker Donelson. That claim fails for at least two reasons. *Hearn*, 923 So. 2d at 209.

*First*, the Receiver must prove Alexander and Seawright were "motivated by a desire to benefit Baker Donelson." *Seay*, 42 So. 3d at 488. The record is clear their motivation in running their Timber Fund was to make money for themselves. Vol. 9 (135:22-136:4) (Seawright). Getting clients for the law firm had nothing to do with it. As the Mississippi Supreme Court has reaffirmed, "[a]n indirect benefit to the employer . . . is not the appropriate test for *respondeat superior*." *Hearn*, 923 So. 2d at 206.

*Second*, there is zero evidence of any "benefit"—even an indirect one—because the Receiver adduced no evidence that anyone became a client of the firm ***because of the Timber***

*Fund*. Clients come to Baker Donelson because it provides "excellent legal work." Vol. 12 (25:3-14) (Hicks). The Receiver cannot tie Baker Donelson's work on various, non-timber-related matters to unrelated investments in Alexander's and Seawright's outside business.

### 3. Alexander's and Seawright's use of firm resources cannot support vicarious liability

That leaves the Receiver with Alexander's and Seawright's incidental use of firm resources. But that evidence cannot sustain the Receiver's claims. *First*, as a legal matter, it "defies reason" to hold employers responsible for the acts of an employee that, though performed in the office during working hours, were not for the employer's benefit. *Seay*, 42 So. 3d at 489. Simply because an employee conducts personal activities within the "authorized time and space," *Hearn*, 923 So. 2d at 208, or "uses the appliances" of his employer does not transform the activity into one within the scope of employment, *Gulledge*, 880 So. 2d at 295. Instead, the employee must be "motivated by a desire to benefit" the employer or must have "furthered the business interests" of the employer, even if the activity was conducted during working hours, using the employer's resources, and in the employer's place of business. *Seay*, 42 So. 3d at 489; *see also Gulledge*, 880 So. 2d at 295-96. A contrary rule would "render most employers vicariously liable for virtually all of their employees' activities." *Hearn*, 923 So. 2d at 208.

*Second*, as a factual matter, Alexander's and Seawright's use of firm resources could not convert their outside business into a Baker Donelson-sponsored enterprise. The record plainly reflects that it is unremarkable for employees to make some use of their employers' resources for personal reasons, as both the Receiver's and Baker Donelson's witnesses testified. At Baker Donelson, it is hardly "unusual for somebody to use a conference room" or bakerdonelson.com email address for "non-firm business." Vol. 10 (32:15-33:2, 41:5-17); *see also* Vol. 12 (20:21-25) ("Q. Okay. And you agree that Baker Donelson's staff provided routine assistance to Jon

16

and Brent relating to their timber fund, correct?  A. Much like they do for most lawyers, myself included, yes.").  The Receiver's own expert, Ms. Schnabel, admitted she has sometimes used her employer's "receptionist or [] secretary" for "matters other than the firm's business."  Vol. 7 (16:5-11).  She also admitted to having kept "personal paperwork" in her office.  *Id.* (15:20-23).

Similarly, when the Receiver was at Fishman Haygood, she used the firm's resources for "personal" purposes, including using her "office phone . . . to make personal calls," "receiv[ing] personal packages," having people "drop things . . . at the receptionist," using the "photocopier for things that were not the business" of the firm, "ask[ing] a colleague to do something that was not the business of [the] law firm" (like "ask[ing] [some]one to print something out"), and "us[ing] a work email address for something personal."  Rought Tr. Vol. 14 (24:6-25:11).

### B.    There Is No Evidence of Apparent Authority

The Receiver has no evidence of apparent authority, whether viewed from the perspective of what was "apparent" to Adams and Madison Timber (as the law requires) or from the perspective of investors in the Timber Fund.

Apparent authority is "authority that the principal has by words or conduct held the alleged agent out as having."  *Patriot Com. Leasing Co. v Jerry Enis Motors, Inc.*, 928 So. 2d 856, 864 (Miss. 2006).  Apparent authority must be assessed "from the point of view of the third person" who is suing the principal.  Restatement (2d) of Agency § 261, cmt. a (A.L.I. 1958).  The plaintiff must demonstrate (1) "acts or conduct on the part of the principal indicating the agent's authority," (2) "reasonable reliance on those acts," and (3) "a detrimental change in position as a result of such reliance."  *Andrew Jackson Life Ins. Co. v. Williams*, 566 So. 2d 1172, 1181 (Miss. 1990).  All three elements are required and the Receiver cannot prove any of them.  *Morgan v. MML Invs. Servs., Inc.*, 226 So. 3d 590, 596 (Miss. Ct. App. 2017).

On the first prong, the Receiver must prove "acts or conduct" ***by Baker Donelson***

indicating Alexander's and Seawright's authority. And she must also prove those acts are "such that persons of reasonable prudence, ordinarily familiar with business practices, dealing with" Alexander and Seawright "might rightfully believe" they had the power to act on behalf of Baker Donelson in connection with the Alexander Seawright Timber Fund. ECF No. 335 (Order on Summary Judgment) at 10 (citing *Newsome v. Peoples Bancshares*, 269 So. 3d 19, 30 (Miss. 2018)). Apparent authority "hinges upon the acts and representations made **by the principal** to the third party" indicating the agent's authority. *Joan Cravens, Inc. v. Deas Constr. Inc.*, 2016 WL 6997508, at \*7 (S.D. Miss. Nov. 30, 2016) (emphasis added). It is insufficient that an **agent** "held herself out" as authorized because "the acts or conduct indicating the authority of the agent must be made by the principal." *Forest Hill Nursing Ctr., Inc. v. McFarlan*, 995 So. 2d 775, 781-82 (Miss. Ct. App. 2008). An agent's use of its principal's resources does not suffice. *Joan Cravens*, 2016 WL 6997508, at \*7-8 (use of defendant's "editing system" was insufficient to create apparent authority).

*First*, there is no evidence Baker Donelson indicated to Adams that Alexander or Seawright was acting for the firm. As Adams testified, there was "never any engagement letter or any other agreement between Madison Timber and Baker Donelson" and Baker Donelson was never Madison Timber's lawyer. Vol. 3 (104:15-23).

*Second*, there is no evidence Baker Donelson ever indicated to investors Alexander or Seawright were acting for the firm in their timber investment activities. To the contrary, the testimony of the three investors the Receiver presented at trial rebuts any suggestion that investors believed Alexander and Seawright were acting on behalf of the firm. Two Timber Fund investors testified in the Receiver's case: David Wender testified he knew Alexander and Seawright were acting on their own, and that the Timber Fund was not a Baker Donelson business. Bill Reed said nothing to the contrary. Dr. Wender "understood from the outset . . .

18

that the Alexander Seawright Timber Fund was something [they] were doing on their own" and that it was "independent of the law firm." Vol. 13 (157:2-10). Mr. Reed, who worked at Baker Donelson, testified this was a "private investment," and the Receiver elicited no testimony suggesting Mr. Reed thought it was a firm business. Vol. 12 (220:14-221:2). The only other investor who testified in the Receiver's case, Craig Endris, stated he "***had never heard about the Baker Donelson law firm***," "Jon Seawright[,] or Brent Alexander" at the time of his investments. Vol. 13 (83:5-10).

On the second prong, neither Adams nor the three investors who testified at trial relied on any belief the Timber Fund was sponsored by Baker Donelson. To the contrary, the record confirms none of them held such belief. *See, e.g.*, Vol. 13 (157:2-10). Adams had no reason to believe so: (i) he never had an engagement letter with Baker Donelson, (ii) he "never received any check on a Baker Donelson bank account," (iii) he "never made out any checks to the law firm Baker Donelson," (iv) he "never executed a promissory noted in favor of the law firm Baker Donelson, and (v) "all he knew about [Seawright's] position within the firm" was that he "worked at Baker Donelson as a business attorney." Vol. 3 (104:20-105:14).

In sum, the Receiver has failed to adduce any evidence identifying "acts" of Baker Donelson that "clothed" Alexander and Seawright "with indicia of authority" in running their timber business. *Eaton v. Porter*, 645 So. 2d 1323, 1326 (Miss. 1994).

**C.      The Evidence Shows Baker Donelson Did Not Ratify the Actions of Alexander and Seawright**

The Receiver next presses the theory Baker Donelson ratified or adopted Alexander's and Seawright's ASTFI activities after April 2018 because the firm failed to fire or otherwise discipline them. But ratification does not arise by operation of law; rather, "'[a] person ratifies an act by (a) ***manifesting assent*** that the act shall affect that person's legal relations, or

(b) conduct that justifies a ***reasonable assumption*** that the person so consents.'" *Northlake Dev. L.L.C. v. BankPlus*, 60 So. 3d 792, 797 (Miss. 2011) (quoting Restatement (3d) of Agency § 4.01(2)). Both the record and common sense refute this theory.

*First*, the Receiver has not identified any evidence Baker Donelson "manifested assent" to Alexander and Seawright's timber activities after it was revealed they had lent money to a Ponzi scheme. To the contrary, the testimony of several Baker Donelson witnesses refutes that implausible suggestion. Start with the testimony of Ben Adams, the former Chairman and CEO of Baker Donelson until April 2019, who testified Baker Donelson (i) does not approve—and has never approved—its employees' outside businesses, (ii) does not adopt—and has never adopted—investment businesses, and (iii) does not adopt—and has never adopted—timber companies. Vol. 10 (60:14-21). Mr. Hicks confirmed that Baker Donelson never "in words or substance . . . adopted Alexander and Seawright's activities with their Timber Fund as the firm's activities." Vol. 12 (112:17-113:5). Even the Receiver admitted in her testimony that she does not contend Baker Donelson "adopted the Alexander Seawright Timber Fund I, LLC, as its own." Rough Tr., Vol. 14 (20:5-21:24).

*Second*, Baker Donelson has consistently maintained in public statements Alexander's and Seawright's investment business had nothing to do with the law firm. For example, less than a month after the public reveal of the Ponzi scheme, Baker Donelson issued a press statement plainly stating it "[was] not a firm matter." D-2034 (May 11, 2018). The firm reiterated this position in press statements after the Receiver filed this lawsuit and after Alexander and Seawright were indicted. D-2035 (Dec. 21, 2018); D-2036 (May 21, 2021).

That leaves the Receiver with insisting Baker Donelson should have fired or otherwise taken adverse action against Alexander and Seawright immediately after April 2018. That theory is legally unsound. The "mere retention of the servant in the employment will not constitute

such ratification as will render the master liable for the unauthorized act." *Franklin v. Turner*, 220 So. 3d 1003, 1009 (Miss. Ct. App. 2016). "The mere fact that such employee is retained in the master's employ, and mere silence on the master's part relative to the [tort], is not sufficient evidence that the master adopted the act, nor does it lead to the inference that he assumes responsibility for the servant's [tort]." *Id.* (first alteration in original); *see also Javier v. City of Milwaukee*, 670 F.3d 823, 832 (7th Cir. 2012) ("[F]ailure to terminate or reprimand an employee by itself is not likely to ratify the employee's unauthorized action because the employer may have varied reasons for failing to take action adverse to an employee.").

Here, Baker Donelson was not "silent"—it specifically disavowed that Alexander and Seawright were acting on behalf of the firm. But even if one ignores that evidence, the Receiver has no evidence beyond the firm's alleged failure to fire or discipline them, which cannot possibly support a claim of ratification here. The Ponzi scheme news broke in April 2018, but Alexander's and Seawright's indictments (for a separate fraud) were not unsealed until May 2021. Vol. 9 (156:10-15). By then, Alexander had long since left Baker Donelson. Seawright immediately took an unpaid leave of absence and resigned from the firm shortly thereafter. Alexander and Seawright did not plead guilty until 2023 and 2022 respectively—long after they had departed the firm. Until they pleaded guilty, both steadfastly proclaimed their innocence of the charges against them. To this day they deny complicity in Adams' Ponzi scheme.

As Baker Donelson's CEO at the time testified, he believed in April 2018 they had done nothing improper and they along with the other investors were victims of the Madison Timber Ponzi scheme. Vol. 10 (83:13-23) ("Q. . . . [Y]ou took no adverse action against Jon or Brent at that time, correct? A. Based on what we believed to be the facts until that indictment was unsealed, they had not done anything improper or wrong other than be the victims of a Ponzi scheme. So we did not take any action against them."); Vol. 12 (112:8-113:5). That testimony is

21

consistent with the testimony of both Seawright and Alexander:  Before pleading guilty, they never told anyone they were "guilty of a crime" or that they "had lied to [their] investors"; to the contrary, they had "maintained [their] innocence" to "the whole world."  Vol. 12 (158:6-16); *see also* Vol. 6 (120:17-25) (same).

No reasonable jury could conclude Baker Donelson ratified activities implicated in a Ponzi scheme as its own merely because Alexander and Seawright remained employed for a period after April 2018.  The Receiver's contrary suggestion would require an employer to fire an accused employee automatically to avoid potential liability, even where the employee denies wrongdoing.  That is not the law.

## VI.  THE EVIDENCE DOES NOT SUPPORT NEGLIGENT SUPERVISION

### A.  Baker Donelson Cannot Be Liable for Negligent Supervision Absent an Underlying Tort, Which the Evidence Does Not Support

As discussed above, the evidence does not suffice to find that Alexander and Seawright committed the alleged torts of conspiracy or aiding and abetting.  Absent proof of an underlying tort, there is no claim for negligent supervision.  "No rational law would impose liability on an employer for the nontortious acts of its employee."  *Johnson v. Sawyer*, 47 F.3d 716, 731 (5th Cir. 1995); *see Freeman v. Lester Coggins Trucking, Inc.*, 771 F.2d 860, 861 (5th Cir. 1985) ("Under Mississippi law, . . . liability cannot be imposed on an employer on a theory of negligent entrustment unless the employee is first found to be negligent." (citing *Brown Oil Tools, Inc. v. Schmidt*, 148 So. 2d 685, 687 (Miss. 1963))).

Because the Receiver cannot prove her tort claims against Alexander and Seawright, her negligent supervision claims against the firm fail, too.

### B.  Baker Donelson's Alleged Negligence Did Not Proximately Cause the Receiver's Alleged Harm

Baker Donelson cannot be liable for negligent supervision with respect to the tort claims

the Receiver asserts. "[T]here is no liability predicated on lack or insufficiency of supervision where the event in connection with which the injury occurred is not reasonably foreseeable." *Henderson ex rel. Henderson v. Simpson Cnty. Pub. Sch. Dist.*, 847 So. 2d 856, 857 (Miss. 2003) (quoting *Levandoski v. Jackson County Sch. Dist.,* 328 So. 2d 339, 342 (Miss. 1976)); *see also Williamson v. Daniels*, 748 So. 2d 754, 759 (Miss. 1999) ("An actionable claim of negligent supervision, as is the case with all negligence claims, requires . . . that the injury sustained by the plaintiff was a reasonably foreseeable consequence of the defendant's negligence.").

"This is so because, in order for an act of negligence to proximately cause the damage, the fact finder must find that the negligence was both the cause in fact *and* legal cause of the damage." *Faul v. Perlman*, 104 So. 3d 148, 154 (Miss. Ct. App. 2012) (cleaned up). "And a defendant's negligence is the legal cause of the damage only when the damage is the type, or within the classification, of damage the negligent actor should reasonably expect (or foresee) to result from the negligent act." *Id.*

The Ponzi-scheme damages for which the Receiver seeks to hold Baker Donelson liable are wholly divorced from the type of damages reasonably foreseeable based on the alleged negligent supervision. For example, no reasonable jury could find a Ponzi scheme to be the foreseeable consequence of Baker Donelson's alleged negligence in not supervising Alexander's and Seawright's use of a conference room for outside business activities. *See, e.g.*, *McDorman ex rel. Connelly v. Texas-Cola Leasing Co. LP, LLP*, 288 F. Supp. 2d 796, 805 (N.D. Tex. 2003) ("Plaintiffs seem to allege that Coca Cola should never have hired Mr. Upshaw because its policy is to prevent putting fellow employees and customers in harm's way by hiring a violent employee. Even if true, such reasoning fails because the nexus between the harm that occurred, a traffic accident, and violating a hiring policy in place to protect fellow employees and customers from violent assaults by employees, is too tenuous.").

23

**C.     Baker Donelson Had No Duty to Supervise Activities Outside the Scope of Employment**

Alexander's and Seawright's timber activities were personal business that Baker Donelson had no duty under Mississippi law to supervise. An employer has "no legal duty to supervise" an employee if the employee's conduct "was outside the scope of his employment and purely for his own benefit." *Seay*, 42 So. 3d at 490; *see also id.* at 489 ("[E]mployers do not have a duty to supervise their employees when the employees are off-duty or not working[.]").

The Receiver has adduced no evidence from which a reasonable jury could conclude the Timber Fund fell within Alexander's or Seawright's scope of employment. *See* Part V *supra*.

**D.     The Evidence Shows Baker Donelson Had No Knowledge of Any Tendency of Alexander and Seawright to Commit the Types of Wrong Alleged**

Even assuming the firm had some duty to supervise the timber business (it did not), the Receiver cannot prove Baker Donelson breached such a duty. No reasonable jury could conclude, based on the Plaintiff's evidence, that Baker Donelson's management had knowledge of Alexander's and Seawright's timber activities, much less that they knew those activities involved wrongdoing. An employer must have "either ***actual or constructive knowledge*** of an employee's ***incompetence or unfitness***" to be liable for negligent supervision of an employee who injures a third party. *Campbell v. Novartis Pharm. Co.*, 2020 WL 3452240 at *7 (S.D. Miss. Mar. 30, 2020) (emphasis added) (quoting *Parmenter v. J&B Enters., Inc.*, 99 So. 3d 207, 217 (Miss. Ct. App. 2012)). It is not sufficient for a plaintiff to show "the employee acted incompetently." *Armstrong Bus. Servs., Inc. v. AmSouth Bank*, 817 So. 2d 665, 683 (Ala. 2001). Such evidence "do[es] not amount to proof that [defendant] was aware of and, negligently or wantonly, disregarded acts of incompetence by [employee] that damaged [plaintiff]." *Id.*

*First*, the Receiver has adduced ***no evidence*** that Alexander and Seawright were incompetent or unfit to perform the duties falling within their scope of employment. *See Eagle*

*Motor Lines v. Mitchell*, 78 So. 2d 482, 486 (Miss. 1955) ("A master may be liable for injuries inflicted on a third person by his servant where he was guilty of negligence in s[e]lecting a servant incompetent or otherwise unfit to perform the services *for which he was employed*[.]"). To the contrary, the evidence shows that Mr. Seawright and Mr. Alexander were ***exceptional and highly fit*** to execute their employment responsibilities. For instance, the evidence shows that Mr. Seawright "was a highly respected health care lawyer and business lawyer, very productive, you know, ***met any kind of expectations, in terms of quality, in terms of client service, in terms of productivity***." Vol. 10 (37:25-38:3) (B. Adams). Indeed, the Receiver's counsel observed, "We've all heard that Jon was a ***bright, smart lawyer***, and that his practice was in healthcare." Vol. 11 (149:1-3). The same is true of Alexander: as a "a senior public policy advisor, . . . he was ***highly effective at what he did*** and worked really hard at it." Vol. 10 (38:12-17) (B. Adams). And again, the Receiver's counsel suggested the same: "Now, you were ***successful in your role as a senior public policy advisor***, were you not?" Vol. 4 (83:1-2).

*Second*, no reasonable jury could find Baker Donelson had knowledge of any tendency by Seawright and Alexander to intentionally further a Ponzi scheme, the wrong alleged here. All the evidence supports the conclusion that ***no one other than Adams*** knew about the Ponzi scheme until it collapsed. As Adams' testimony showed: "This Ponzi scheme, [he] ***operated it alone***[.]" Vol. 4 (163:20). He "***fooled Jon Seawright***." *Id*. ( 164:8). "***And Brent Alexander***." *Id*. (164:10). His testimony should be dispositive. But even if not, it was indisputably Baker Donelon's understanding. Ben Adams, for instance, testified: "Based on what we believed to be the facts until that indictment was unsealed, they had not done anything improper or wrong ***other than be the victims of a Ponzi scheme***." Vol. 10 (83:17-19).

*Third*, not only did Baker Donelson have no knowledge of Alexander's and Seawright's allegedly furthering a Ponzi scheme, its management had ***no knowledge of their operating the***

*Alexander Seawright Timber Fund at all*.  Ben Adams, for instance, testified he *never* even "heard" of "Alexander Seawright Timber Fund I, LLC, or any timber business Alexander and Seawright might have been involved in" until "after everything broke in 2018."  Vol. 9 (242:8-12).  Mr. Hicks similar testified that no one "*ever report[ed]* anything about the Alexander Seawright Timber Funds to the board during [his] tenure[.]"  Vol. 12 (99:16-17).  Indeed, the Receiver's own expert confirmed she "*can't identify anyone* at Baker Donelson's headquarters who knew about the Alexander Seawright Timber Fund," Vol. 7 (44:3-4), nor is she "aware of any evidence that any employee of Baker Donelson reported, *told anyone in firm management about the existence of the Timber Fund*," *id.* (60:7-9).

### E.     The Receiver Has Not Shown Baker Donelson Breached the Duty to Supervise

#### 1.     The Receiver's evidence did not articulate a coherent duty

As a threshold matter, the Receiver has failed to articulate, let alone prove, the contents of the duty Baker Donelson allegedly violated.  The Receiver's own expert, Ms. Schnabel, identified three purported bases for the applicable standard in her report: (1) "Baker Donelson's internal rules/controls," (2) "the Rules of Professional Conduct," and (3) "the standard of care ordinarily possessed by and exercised by law firms similarly situated."  *See* Schnabel Rpt. at 12.  At trial, however, Ms. Schnabel could not articulate a coherent duty on Baker Donelson's part under any of those three bases.

Ms. Schnabel abandoned her second basis.  She testified unequivocally that "*it's not [her] opinion . . . that Baker Donelson*, the law firm, *violated any of the Rules of Professional Conduct*."  Vol. 6, 188:6-11.

Her third basis fails because Ms. Schnabel lacks any knowledge of how a "*law firm[] similarly situated*" to Baker Donelson is managed.  During the relevant period of 2011 to 2018,

Baker Donelson employed 600 to 700 lawyers and approximately the same number of non-lawyer employees. Vol. 10 (6:24-7:7) (B. Adams). By contrast, Ms. Schnabel manages a single-office law firm that "has never had more than six lawyers who are full-time." Vol. 7 (7:6-10). Other than her own firm, she is not aware of a single law firm (much less a large firm) that does things differently than Baker Donelson did. And she admitted that Baker Donelson's written policies satisfied industry standards. Vol. 7 (8:4-7). Ms. Schnabel was unable to opine on the standard of care governing a firm of Baker Donelson's size and complexity, and the Receiver has offered no competent evidence on this essential element of her claim.

As for Ms. Schnabel's first basis for alleged negligence, Mississippi law is well settled that internal corporate policies do not, standing alone, give rise to a legal duty owed to the general public. In *Smith v. City of McComb, Mississippi*, 2017 WL 3687334, at *7 (S.D. Miss. Aug. 25, 2017), the court declined to impose a legal duty based solely on a security company's internal arrest policy, noting that "[w]hile internal corporate policies are relevant when considering the reasonableness of an employee's action in a given context, the Court is unconvinced that the existence of an internal policy creates a legal duty to the general public where none previously existed." This principle was reaffirmed in *Thompson v. Pass Christian Public School District*, 758 F. Supp. 3d 594, 602 (S.D. Miss. 2024), where the court confirmed that "internal policies do not impose duties that exceed those imposed by Mississippi law" (citing *Galanis v. CMA Mgmt. Co.*, 175 So. 3d 1213, 1218 (Miss. 2015) (en banc)). Thus, even if Ms. Schnabel had been able to identify specific internal Baker Donelson policies that were purportedly breached (they were not), such policies cannot, as a matter of law, supply the legal duty necessary to sustain the Receiver's supervision claim.

The Receiver's inability to establish a cognizable standard of care through any of the three bases its own expert identified leaves this Court with no evidentiary foundation upon which

a reasonable jury could find that Baker Donelson owed or breached any actionable duty.

### 2. In all events, Baker Donelson did not fail to enforce its policies

The Receiver has failed to establish that Baker Donelson did not enforce its policies.

*First*, the Receiver has not identified a single document, nor elicited any testimony, indicating that any Baker Donelson employee ever reported a concern or violation regarding Mr. Alexander and Mr. Seawright's timber fund activities. The record is devoid of such evidence because no such report was ever made.

*Second*, Baker Donelson does not monitor or supervise the personal lives, personal businesses, or outside activities of its lawyers or other employees. Vol. 10 (7:8-13) (B. Adams). Baker Donelson conducts background checks before hiring employees, but once they are hired, it does not "run[] Google searches on [its] employees to find out what they are doing outside of work" because that is not "any of [the firm's] business." *Id.* (7:14-24). No reasonable jury could conclude that a firm's decision not to surveil its employees' private conduct constitutes a failure to enforce its policies.

*Third*, Alexander and Seawright did not violate firm policies, and certainly not in any manner that was or should have been known to the firm such that it would have warranted "enforcement" or discipline. Of course, if Baker Donelson had known a Ponzi scheme was afoot, it would have taken action, but as discussed above, nothing about the alleged policy violations would have revealed a Ponzi scheme to the firm. Absent some indication of wrongdoing, nothing Baker Donelson might have learned about Alexander's and Seawright's timber fund activities violated firm policy.

The only fact evidence of the meaning of the policies was from Ben Adams. The Receiver's expert Ms. Schnabel read the policies in the context of this case, but she had never seen them before, and she misconstrued them. Specifically:

Alexander and Seawright did not violate Baker Donelson's policy by creating a "conflict of interest." *See* P-1828. Ben Adams testified the "interests of Baker Donelson" are "[t]o serve our clients." Vol 10 (20:24-21:7). There is no evidence Alexander's and Seawright's Timber Fund activities interfered with Baker Donelson's client service. In fact, they continued to be productive members of the firm. Vol. 12 (80:4-13, 83:17-84:10) (Hicks).

Alexander and Seawright did not "use or attempt to use his or her position at Baker Donelson to obtain any improper personal benefit[.]" P-1828. Ben Adams testified this policy is designed to prevent employees who award "very valuable contracts to vendors" from receiving "some kind of kickback." Vol 10 (21:23-22:7). The policy does not mean "an employee can't have an outside business that makes money," or that there is "anything improper about running an outside business." *Id.* (21:16-18, 22:11-13).

Alexander and Seawright did not improperly "serve as an executive officer of a business client unless there is a written agreement." P-1828. This part of the policy does not apply to non-clients. Vol. 10 (23:24-24:7). ASTFI was not a Baker Donelson client. *Infra* Part IX. Nor did they improperly serve "on boards of directors of for-profit corporations." P-1828. Ben Adams testified the "big concern" that this policy addresses relates to "large public or private compan[ies,]" regardless of whether they are clients or non-clients. Vol. 10 (23:24-24:7). ASTFI was not "the type of corporation that this policy is addressing" because it was a "privately owned thing[] by the lawyer" that "ha[d] nothing do with this policy." *Id.* (26:1-9).

Alexander and Seawright did not violate Baker Donelson's policy on the use of conference rooms. *See* P-1828. Ben Adams explained that where the policy states conference rooms "should not be used by individuals for personal work," it is addressing the "problem" that an attorney may "commandeer a conference room . . . for a big case or a big deal or just [an attorney's] own work in a way that interferes with it being available for client use." Vol. 10,

(29:15-30:3). All attorneys at Baker Donelson "have an office, and . . . are supposed to do [their] work in [their] office. [They] are not supposed to do [their] own personal legal work in the conference room and then . . . hog the conference room by doing that." *Id.* "Personal work" is not the same thing as "personal outside business" and the "incidental personal use is not a problem." *Id.* (30:4-7, 32:2-14). Indeed, Ben Adams testified the conference room policy does not mean that employees can never use a firm conference for something having to do with their own personal business. *Id.* (30:16-19). It is not "unusual for somebody to use a conference room for an outside personal activity or business." *Id*. (32:15-18). There is no evidence in the record that either Alexander or Seawright hogged a conference room for a long period of time in a way that would violate the law firm's policy on conference rooms.

Alexander and Seawright did not improperly "solicit[] other employees for memberships in or subscription for any public or private enterprises, as well as sale of productions during the employee's work time." P-1828. Ben Adams testified this policy addresses the law firm's concern of "pressure being put on staff to buy products . . . a direct sales-type things." Vol. 10 (33:12-34:3). He explained this policy does not "preclude[] shareholders who are friends with each other from inviting each other to make investments" and has nothing to do with "preventing shareholders at the firm from going into business together." *Id*. (34:4-16).

Alexander and Seawright did not violate Baker Donelson's policy regarding outside employment. *See* P-1828. Employees "shall not work for other law firms on any basis." *Id.* ASTFI was not a law firm. As to part-time employment, Ben Adams explained the kind of job that it would cover includes weekend or night jobs, such as retail. Vol. 10 (36:22-37:11). ASTFI was not the part-time employment that the law firm's policy contemplates because it was "just [Alexander and Seawright's] business." *Id.* (36:18-19).

Alexander and Seawright did not use the law firm's email addresses improperly. *See* P-

1828.  Ben Adams testified that that policy does not mean that no one is allowed to use their Baker Donelson email address for anything that is not related to firm business.  Vol. 10 (40:13-16).  "[T]he whole policy deals with . . . public-facing social media, like Facetime, TikTok, Twitter . . . .  [T]he concern here is . . . if [lawyers] are going to be on those sites, we want them not to have any association with Baker Donelson."  *Id.* (40:2-12).  If Alexander and Seawright had sometimes used their Baker Donelson email in connection with their Timber Fund, they would have not violated the law firm's policy.  *Id.* (40:24-41:2).

Alexander and Seawright did not use company assets improperly.  *See* P-1828.  Ben Adams testified that this policy is about "things that are really noteworthy" such as "theft, fraud" and "people basically abusing [the law firm's] assets."  Vol. 10 (43:3-10).  He further explained that this policy does not mean that it is improper for somebody to ask their assistant or some other staff member to help them on a project that involves an outside non-firm business, as long as the project does not interfere with firm business or client work.  *Id*. (43:24-45:25).

## VII.    THE EVIDENCE DOES NOT SUPPORT $53 MILLION IN DAMAGES

### A.    The Receiver Cannot Recover the Debts of the Estate as Damages

The Receiver seeks to recover as "damages" the amounts the Receivership Estate owes to third-party investors.  Vol. 1 (94:8-12).  The Fifth Circuit calls this a claim of "deepening insolvency," which "has been defined as prolonging an insolvent corporation's life through bad debt, causing the dissipation of corporate assets[.]"  *In re SI Restructuring, Inc.*, 532 F.3d 355, 363 (5th Cir. 2008).  This "theory of damages has been criticized and rejected by many courts" and "deepening insolvency is not a valid theory of damages" in the Fifth Circuit.  *Id.*; *see also Ebert v. DeJoria*, 922 F.3d 690, 696-97 (5th Cir. 2019) (increased debts are not damage).  That is because taking in money and incurring debt is not an injury to the estate; the insolvent estate never had to repay the debt and is therefore a net beneficiary.  *See Kirschner v. Grant Thornton*

*LLP*, 2009 WL 1286326, at \*8 (S.D.N.Y. Apr. 14, 2009), *aff'd*, 626 F.3d 673 (2d Cir. 2010).[1]

**B.      The Receiver Did Not Adduce Competent Evidence of Damages**

The Receiver is seeking $52 million in damages.  At trial, her damages expert, Ken Lefoldt, testified that the Receiver's damages are $52,015,104.  Vol. 13 (33:2).  To calculate that figure, "you have to know the amount of interest an investor was paid over the years[.]"  *Id.* (42:9-11).  But Mr. Lefoldt "did nothing to verify the amounts of the interest payments" investors received, and he instead "just accepted the Receiver's numbers."  *Id.* (43:6-10).  Mr. Lefoldt did not check, analyze, or verify "a necessary input to get to the 52 million the Receiver presented" as her damages.  *Id.* (44:8-13).  Mr. Lefoldt's testimony is not based on sufficient facts or data nor the product of reliable principles and methods.  *See* Fed. R. Evid. 702.  The Receiver cannot rely on that testimony alone to meet her burden on damages.  *See Guile v. United States*, 422 F.3d 221, 227 (5th Cir. 2005) (stating "[a]n expert's opinion must be supported to provide substantial evidence" and where opinions "are unsupported by any data," they are not substantive evidence).

To back fill, the Receiver tried to offer her own testimony.  She testified that she "had to do like a proper accounting to figure out who" was a net loser.  Vol. 13 (196:20-22).  But Ms. Mills is not an accountant, and she has no expertise in accounting.  She admits that she made errors in her original accounting and then accepted investors' silence as confirmation for the rest. *Id.* (199:21-200:23).  On cross examination, Ms. Mills couldn't dispute the accounting she provided to Mr. Lefoldt still contains errors.  *See* Rough Tr., Vol. 14 (56:14-57:9) (discussing P-

---

[1] For this and other reasons, the Receiver lacks standing.  *See, e.g.*, ECF No. 60 at 13-18; ECF No. 129 at 6-8.  As the Court previously rejected these standing arguments as a matter of law, ECF No. 70 at 6-7; ECF No. 136 at 1, Baker Donelson does not reargue them here, but reserves the right to argue them on appeal.

1225).  Ms. Mills also testified that "the bank statements . . . that's really where you would go to confirm things."  Vol. 13 (199:21-200:23).  But none of those bank statements is in evidence.

The Receiver had the burden to prove her damages.  She did not.

**C.      Alexander and Seawright Did Not Proximately Cause $52 Million in Losses**

Damages are limited by proximate causation.  *Orr v. Morgan*, 230 So. 3d 368, 375 (Miss. Ct. App. 2017) (limiting civil conspiracy claims to "damages to the plaintiff as a proximate result"); *JP Morgan Chase Bank v. Winnick*, 406 F. Supp. 2d 247, 256 (S.D.N.Y. 2005) (damages where "the action of the aider and abettor proximately caused the harm on which the primary liability is predicated").

The Receiver cannot prove the conduct of Alexander and Seawright (much less anyone acting for the law firm) is the proximate cause of any losses sustained by the direct Madison Timber investors, who indisputably had no connection to ASTFI.  Alexander and Seawright were unaware that more than a handful of direct Madison Timber investors existed.  Vol. 8 (75:20-76:7).  At the close of the Receiver's case, there is no evidence any person who did not invest through ASTFI had any contact with Alexander and Seawright, or anyone else at Baker Donelson.  There is no evidence that any such investors even knew Alexander or Seawright existed.  The only direct investor in Madison Timber who testified—Craig Endris—said he knew nothing about Alexander, Seawright, or Baker Donelson.  Vol. 13 (96:16-97:2).  If the case were to proceed to the jury, the Court should rule that damages are limited (at most) to the losses of investors in the Timber Fund, which the Receiver puts at $1.4 million.  *Id.* (212:22-25).

## VIII.   THE EVIDENCE DOES NOT SUPPORT PUNITIVE DAMAGES

Punitive damages are an "extraordinary remedy," *Life & Cas. Ins. Co. of Tennessee v. Bristow*, 529 So. 2d 620 (Miss. 1988), and to claim it, the Receiver must prove by clear and convincing evidence Baker Donelson acted with "either malice or gross neglect or reckless

disregard" with respect to Alexander's and Seawright's conduct. *Doe ex rel. Doe v. Salvation Army*, 835 So. 2d 76, 81 (Miss. 2003); *see also* Miss. Code § 11-1-65(1)(a). "Punitive damages are allowed by Mississippi courts only 'where the facts are highly unusual and the cases extreme.'" *JESCO Constr. Corp. v. Wells Fargo Bank, N.A.*, 579 F. Supp. 3d 827, 841 (S.D. Miss. 2022) (quoting *Wise v. Valley Bank*, 861 So. 2d 1029, 1034 (Miss. 2003)). And, importantly, "punitive damages are not recoverable from the employer based on the employee's actions." *James v. Antarctic Mech. Servs., Inc.*, 2020 WL 86209, at *5 (S.D. Miss. Jan. 7, 2020). The record is a far cry from a fact pattern that could justify such an "extraordinary remedy." It is now time for the Court to dispose of this claim.

## IX.    THE COURT SHOULD DECIDE OTHER ISSUES AS A MATTER OF LAW

### A.    AS LLC and ASTFI LLC Were Not Clients of the Firm

The Receiver has suggested Alexander Seawright, LLC and/or Alexander Seawright Timber Fund I, LLC were Baker Donelson's clients. That is wrong. An attorney-client relationship cannot exist where the prospective client "clearly manifested an intent not to have representation." *Pettis v. Simrall*, 354 So. 3d 295, 300-01 (Miss. 2023). The testimony at trial has uniformly shown Alexander Seawright, LLC and Alexander Seawright Timber Fund I, LLC never agreed to be represented by Baker Donelson. Vol. 6 (75:10-20); Vol. 12 (92:11-94:9).

### B.    The Receiver Has Abandoned Her Fraudulent Transfer Act Claim and Any Assigned Claims

The Receiver provided the jury no evidence to evaluate a fraudulent transfer claim. *See* Miss. Code § 15-3-101, *et seq.* Her expert, Mr. Lefoldt, testified that the Alexander Seawright Timber Fund was a net loser, Vol. 13 (31:10-32:3), and thus not the proper subject of such an action. The only other target would be the fees received by Alexander and Seawright from Madison Timber. But the Receiver has presented no evidence to the jury to quantify those

amounts in the aggregate.

Indeed, the Receiver's counsel did not mention fraudulent transfers once in her opening. Vol. 2 (80:13-96:6). She has not provided a jury instruction addressing fraudulent transfers. *See* Receiver's Proposed Jury Instructions. And her verdict form omits the claim entirely. *See* Receiver' Proposed Verdict Form. No reasonable jury could thus return a fraudulent transfer verdict.

The Receiver also has not pursued any claims she received by assignment from investors.

## C.     The Receiver's Claims Are Barred by *In Pari Delicto*

Under Mississippi law, a plaintiff who is *in pari delicto* with the defendant may not recover. *Sneed v. Ford Motor Co.*, 735 So. 2d 306, 308 (Miss. 1999). The Receiver stands in the shoes of Adams and Madison Timber, and no party is more at fault for the debts to investors. The evidence at trial has established that beyond any shadow of doubt: Adams testified he acted alone in running this Ponzi scheme and that no one else knew it was a fraud. As explained in prior briefing, *see, e.g.*, ECF No. 230 at 33-36, Mississippi law does not recognize any innocent-successor exception to the doctrine and such an exception would not apply to the Receiver's claims. The Court should apply the doctrine and enter judgment in Baker Donelson's favor.

## CONCLUSION

Baker Donelson respectfully requests the Court enter judgment in its favor as a matter of law pursuant to Federal Rule of Civil Procedure 50(a).

Respectfully submitted,

**BAKER, DONELSON, BEARMAN, CALDWELL & BERKOWITZ PC**

*/s/ Craig D. Singer*
Craig D. Singer (*pro hac vice*)
Charles Davant (*pro hac vice*)
Benjamin W. Graham (*pro hac vice*)
William M. Schmidt (*pro hac vice*)
Paloma Cipolla Moguilevsky (*pro hac vice*)
C. Mark Aneke (*pro hac vice*)
WILLIAMS & CONNOLLY LLP
680 Maine Avenue, S.W.
Washington, DC  20024
Tel.:  (202) 434-5000
Fax:  (202) 434-5029
Email:  csinger@wc.com

*/s/ James J. Crongeyer, Jr.*
James J. Crongeyer, Jr. (MSB #10536)
James M. Tyrone (MSB #102381)
WATKINS & EAGER PLLC
400 East Capitol Street, Suite 300 (39201)
Post Office Box 650
Jackson, MS  39205
Tel.:  (601) 965-1900
Fax:  (601) 965-1901
Email:  jcrongeyer@watkinseager.com

*Counsel for Defendant Baker, Donelson, Bearman, Caldwell & Berkowitz PC*

**CERTIFICATE OF SERVICE**

I hereby certify that on May 12, 2026, I caused the foregoing to be electronically filed with the Clerk of the Court using CM/ECF, which will send notification of such filing to all registered participants.

_/s/ Craig D. Singer_
Craig D. Singer